**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____     District of    Delaware_____
                                            (State)

Case number *(If known)*: _____    Chapter    11_____

☐ Check if this is an
amended filing

<u>Official Form 201</u>

# Voluntary Petition for Non-Individuals Filing for Bankruptcy     04/16

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

| | | |
|---|---|---|
| 1. | **Debtor's name** | Garden Fresh Restaurant Intermediate Holding, LLC |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years** | Garden Fresh Restaurant Holdings, Inc. |
| | | Garden Fresh Restaurant Intermediate Holdings, Inc. |
| | Include any assumed names, trade names, and *doing business as* names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 46-1127513 |

**4.   Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 15822 Bernardo Center Drive, Suite A | |
| Number         Street | Number         Street |
| | |
| San Diego, CA 92127 | |
| City                    State        ZIP Code | City                    State        ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| San Diego | |
| County | Number         Street |
| | |
| | City                    State        ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | http://www.gardenfreshcorp.com/ |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ☒  Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐  Partnership (excluding LLP) |
| | | ☐  Other. Specify: _____ |

Debtor    Garden Fresh Restaurant Intermediate Holding, LLC _____    Case number *(if known)* _____
     Name

| | | |
|---|---|---|
| **7.** | **Describe debtor's business** | A. *Check one:* |

       ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A)

       ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

       ☐ Railroad (as defined in 11 U.S.C. § 101(44))

       ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

       ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

       ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

       ☒ None of the above

       Activities Related to Real Estate

      B. *Check all that apply:*

       ☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

       ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

       ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

      C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

      7225

| | | |
|---|---|---|
| **8.** | **Under which chapter of the Bankruptcy Code is the debtor filing?** | *Check one:* |

       ☐ Chapter 7

       ☐ Chapter 9

       ☒ Chapter 11.  *Check all that apply:*

          ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 on a consolidated basis (amount subject to adjustment on 4/01/19 and every 3 years after that).

          ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

          ☐ A plan is being filed with this petition.

          ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

          ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

          ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

       ☐ Chapter 12

| | | |
|---|---|---|
| **9.** | **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?** | ☒ No |
| | | ☐ Yes. |

      If more than 2 cases, attach a separate list.

      District _____    When _____    Case number _____
                                 MM / DD / YYY

      District _____    When _____    Case number _____
                                 MM / DD / YYY

Debtor    Garden Fresh Restaurant Intermediate Holding, LLC
       Name

Case number *(if known)*

---

| 10. | **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?** | | |
|---|---|---|---|

    List all cases. If more than 1, attach a separate list.

☐ No
☒ Yes.

Debtor    See attached

Relationship    See attached

District    See attached

When _____
MM / DD / YYY

Case number, if known _____

---

| 11. | **Why is the case filed in *this district*?** |
|---|---|

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

| 12. | **Does the debtor own or have possession of any real property or personal property that needs immediate attention?** |
|---|---|

☒ No
☐ Yes.  Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?**  *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
    What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

_____
Number     Street

_____

_____
City         State    ZIP Code

**Is the property insured?**

☐ No.
☐ Yes.  Insurance agency _____

Contact name _____

Phone _____

---

Debtor    Garden Fresh Restaurant Intermediate Holding, LLC _____    Case number *(if known)* _____
        Name

| | **Statistical and administrative information** |
|---|---|

**13.** **Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14.** **Estimated number of creditors**

| ☒ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
|---|---|---|
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15.** **Estimated assets**

| ☐ $0-$50,000 | ☒ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**16.** **Estimated liabilities**

| ☐ $0-$50,000 | ☒ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17.** **Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   10 / 02 / 2016
             MM / DD / YYYY

x _____        John D. Morberg
   Signature of authorized representative of debtor     Printed name

Title   Chief Executive Officer _____

Debtor   Garden Fresh Restaurant Intermediate Holding, LLC                                    Case number *(if known)*
         Name

---

**18.   Signature of attorney**      x   */s/ Michael R. Nestor*                        Date   10/3/2016
                                         Signature of attorney for debtor                       MM / DD / YYYY

                                         Michael R. Nestor
                                         Printed Name

                                         Young Conaway Stargatt & Taylor, LLP
                                         Firm name

                                         1000 North King Street
                                         Number        Street

                                         Wilmington                              DE              19801
                                         City                                    State           Zip Code

                                         (302) 571 - 6600                        mnestor@ycst.com
                                         Contact phone                           Email address

                                         3526                                    DE
                                         Bar number                              State

---

**ATTACHMENT 1 TO VOLUNTARY PETITION**

<u>Pending Bankruptcy Cases Filed by Affiliated Entities</u>

On the date hereof, each of the related entities listed below, including the debtor in this chapter 11 case (collectively, the "<u>Debtors</u>"), will file or have filed a petition in this Court for relief under title 11 of the United States Code, 11 U.S.C. §§ 101–1532. Contemporaneously with the filing of their voluntary petitions, the Debtors are filing a motion requesting that the Court consolidate their chapter 11 cases for administrative purposes only.

**The Debtors are the following entities (along with their federal tax identification numbers):**

1. Garden Fresh Restaurant Intermediate Holding, LLC (46-1127513)

2. Garden Fresh Holdings, Inc. (20-0818804)

3. GF Holdings, Inc. (20-0818783)

4. Garden Fresh Restaurant Corp. (33-0028786)

5. Garden Fresh Promotions, LLC (27-3961376)

01:19198345.2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**CONSOLIDATED CORPORATE OWNERSHIP STATEMENT
AND LIST OF EQUITY INTEREST HOLDERS PURSUANT
TO FED. R. BANKR. P. 1007(a)(1), 1007(a)(3), AND 7007.1**

Pursuant to Rules 1007(a)(1), 1007(a)(3), and 7007.1 of the Federal Rules of Bankruptcy Procedure, Garden Fresh Restaurant Intermediate Holding, LLC, a Delaware corporation, and its subsidiaries, who are each debtors and debtors in possession in the above-captioned cases (each a "**Debtor**"), hereby state as follows:

1.      The following entities directly or indirectly own 10% or more of any class of the equity interests of Garden Fresh Restaurant Intermediate Holding, LLC:

| Equity Holder | Nature of Interest Held | Percent Ownership |
|---|---|---|
| Sun Garden Fresh, LLC | Class A Units | 62.33% |
| Sun Garden Fresh Finance, LLC | Class A Units | 37.67% |
| Garden Fresh Restaurant Holding, LLC | Class B Units | 100% |

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376).  The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

2.      The subsidiary listed below is 100% owned by Garden Fresh Restaurant Intermediate Holding, LLC:

- Garden Fresh Holdings, Inc.

3.      The subsidiary listed below is 100% owned by Garden Fresh Holdings, Inc.:

- GF Holdings, Inc.

4.      The subsidiary listed below is 100% owned by GF Holdings, Inc.:

- Garden Fresh Restaurant Corp.

5.      The subsidiary listed below is 100% owned by Garden Fresh Restaurant Corp.:

- Garden Fresh Promotions, LLC

| Fill in this information to Identify the case: |
|---|

Debtor Name:   Garden Fresh Restaurant Intermediate Holding, LLC

United States Bankruptcy Court for the:      District of Delaware

Case Number (If known):

☐ Check if this is an amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | PRODUCE ALLIANCE, LLC 60 W MARKET ST # 140 SALINAS, CA  93901 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 831-455-7800 ROB@RUBYROBINSON.COM | TRADE | | $684,868.83 | | |
| 2 | TRAVELERS INSURANCE ONE TOWER SQUARE HARTFORD, CT  06183 | CONTACT: CHIEF FINANCIAL OFFICER FAX: 877-784-5329 | TRADE | | $491,234.00 | | |
| 3 | RADIOWAVE MARKETING AND PROMOTIONS LLC PROMOTIONS LLC 3740 MOORE STREET LOS ANGELES, CA  90066 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 310-621-5454 INFO@RADIOWAVEMARKETING.COM | TRADE | | $472,094.00 | | |
| 4 | TRINITY FRESH 8200 BERRY AVE SUITE 140 SACRAMENTO, CA  95828 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 916-714-7368 FAX: 916-714-7763 INFO@TRINITYFRESH.COM | TRADE | | $392,342.25 | | |
| 5 | ECOLAB INCORPORTED 370 WABASHA STREET NORTH ST PAUL, MN  55102 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 800-352-5326 FAX: 651-225-3098 INSTITUTIONALORDERS@ECOLAB.COM | TRADE | | $391,551.18 | | |
| 6 | RYDER TRUCK RENTAL INC. 11690 NW 105TH STREET MIAMI, FL  33178 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 305-500-3726 CUSTOMER_SERVICE-US@RYDER.COM | TRADE | | $370,161.12 | | |

**Debtor:** Garden Fresh Restaurant Intermediate Holding, LLC

**Case Number** (if known):

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7  GOLDEN WEST TRADING 4401 S DOWNEY RD VERNON, CA  90058 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 888-807-3663 FAX: 323.585.8483 INFO@GWFG.COM | TRADE | | $316,377.00 | | |
| 8  SUPERIOR PAPER & PLASTICS, INC 1930 E. 65TH STREET LOS ANGELES, CA  90001-2111 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 323-581 5555 FAX: 323-581 7777 | TRADE | | $259,976.37 | | |
| 9  ALTA DENA DAIRY 17851 E. RAILROAD CITY OF INDUSTRY, CA  91748 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 800-535-1369 MEDIA@DEANFOODS.COM | TRADE | | $237,229.63 | | |
| 10  KENT PRECISION FOODS GROUP INC 11457 OLDE CABIN RD #100 ST LOUIS, MO  63141 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 314-567-1400 FAX: 314-567-5402 | TRADE | | $200,237.48 | | |
| 11  ATALANTA CORPORATION. 1 ATALANTA PLAZA ELIZABETH, NJ  07206 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 908-351-8000 FAX: 908-555-8000 | TRADE | | $196,362.60 | | |
| 12  GROUP KIRKMAN, LLC P.O. BOX 231400 ENCINITAS, CA  92023-1400 | CONTACT: TERRY JOHNSON PHONE: 858-456-0107 FAX: 858-550-0449 EMAILINGTERRY@GMAIL.COM | LANDLORD | | $190,471.51 | | |
| 13  COCA COLA U.S.A. 1334 S CENTRAL AVE LOS ANGELES, CA  90021 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 213-744-8316 ROMACIAS@NA.COKECCE.COM | TRADE | | $185,070.49 | | |
| 14  RAMCO REFRIGERATION & AIR  INC 3921 E. MIRALOMA AVE. ANAHEIM, CA  92806-6201 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 714-792-1034 FAX: 714-792-1046 | TRADE | | $177,305.98 | | |
| 15  A ZEREGA'S SONS, INC. 200 NW VICTORIA DR LEE'S SUMMIT, MO  64086 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 201-797-1400 FAX: 201-797-0148 | TRADE | | $162,174.00 | | |

**Debtor:** Garden Fresh Restaurant Intermediate Holding, LLC        Case Number (if known):

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 16  CYPRESS CREEK ASSOCIATES LP CYPRESS CREEK ASSOCIATES LP P.O. BOX 5020 NEW HYDE PARK, NY  11042 | CONTACT: KIMCO REALTY PHONE: 516-869-2677 RSCHOLEM@KIMCOREALTY.COM | LANDLORD | | $156,289.76 | | |
| 17  ARTHUR SCHUMAN WEST 6180 ALCOA AVE VERNON, CA  90058 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 323-583-1251 | TRADE | | $154,995.80 | | |
| 18  ORACLE AMERICA, INC. 500 ORACLE PARKWAY REDWOOD, CA  94065 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 212.508.7935 FAX: 650-506-7114 DEBORAH.HELLINGER@ORACLE.COM | TRADE | | $145,927.15 | | |
| 19  ARAMARK UNIFORM SERVICES 22808 NETWORK PLACE CHICAGO, IL  60673-1228 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 951-231-6266 PAM.JACKSON@UNIFORM.ARAMARK.COM | TRADE | | $143,650.20 | | |
| 20  ARC PROPERTIES OPERATING PARTNERSHIP LP 2325 EAST CAMELBACK ROAD, SUITE 1100 PHOENIX, AZ 85016 | CONTACT: C/O AMERICAN REALTY CAPITAL PROPERTIES, INC PHONE: 602-778-6220 FAX: 480-449-7023 TJONES@ARCPREIT.COM | LANDLORD | | $140,982.46 | | |
| 21  WEINGARTEN REALTY INVESTORS P.O. BOX 301074 DALLAS, TX  75303-1074 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 713-868-6590 CCLOTHIER@WEINGARTEN.COM | LANDLORD | | $139,705.97 | | |
| 22  TWC SERVICES, INC. 2601 BELL AVENUE DES MONINES, IA  50321-1189 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 855-698-9224 FAX: 800-519-2587 | TRADE | | $135,019.87 | | |
| 23  ANDREW'S REFRIGERATION, INC 5617 E HILLERY DR SCOTTSDALE, AZ  85254-2449 | CONTACT: JON PHILLIPS PHONE: 602.992.9560 JON@ANDREWSAZ.COM | TRADE | | $132,670.27 | | |
| 24  SCA TISSUE NORTH AMERICA LLC BOX 200, SE-100 23 STOCKHOLM  SWEDEN | CONTACT: JAN CARLSON PHONE: 46-8-788-52-59 JAN.CARLSON@SCA.COM | TRADE | | $129,944.72 | | |

Debtor: Garden Fresh Restaurant Intermediate Holding, LLC

Case Number (if known):

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 25  GALLERIA CORPORATE CENTRE MAIENTENANCE DISTRICT HEDMARK 79 ROYAL SAINT GEORGE'S WAY RANCHO MIRAGE, CA  92270 | CONTACT: ATTN: DAVID MARS PHONE: 970-274-6902 DMARS@HEDMARK.US | LANDLORD | | $129,809.33 | | |
| 26  RC'S MECHANICAL SERVICES 4161 INGOT STREET FREMONT, CA  94538 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 510-438-8806 FAX: 877-727-8480 | TRADE | | $120,554.79 | | |
| 27  SILVERSTATE REFRIGERATION & HVAC, LLC HVAC, LLC 4535 COPPER SAGE ST LAS VEGAS, NV  89115 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 702.433.5008 FAX: 702-433.0811 BPETERSON@SSRFG.COM | TRADE | | $115,954.81 | | |
| 28  JAMES WALSH 15822 BERNARDO CENTER DRIVE SUITE A SAN DIEGO, CA  92127-2320 | CONTACT: JAMES WALSH | FORMER EMPLOYEE | | $115,085.47 | | |
| 29  BRE IMAGINATION OFFICE HOLDCO LLC BLDG ID#18670 P.O. BOX 209259 AUSTIN, TX  78720-9259 | CONTACT: BRE CA OFFICE OWNER LLC PHONE: 855-367-0345 | LANDLORD | | $111,623.20 | | |
| 30  NATIONAL FROZEN FOODS CORP. 1600 FAIRVIEW AVE. E., SUITE 200 SEATTLE, WA  98102 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 206-322-8900 FAX: 206-322-4458 | TRADE | | $111,608.89 | | |

Debtor    Garden Fresh Restaurant Intermediate Holding, LLC _____    Case number *(if known)* _____
       Name

| Debtor Name |
| --- |
| United States Bankruptcy Court for the: _____ District of <u>Delaware</u> |
| Case Number (if known) _____ |

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.** Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)*

☐ *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐ *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐ *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐ *Schedule H: Codebtors (Official Form 206H)*

☐ *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐ Amended *Schedule _____*

☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒ Other document that requires a declaration: <u>Consolidated Corporate Ownership Statement & List of Equity Security Holders</u>

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **10/02/2016**
          MM / DD / YYYY

x  */s/* _____    John D. Morberg
    Signature of authorized representative of debtor    Printed name

Title    Chief Executive Officer

**GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC**

<u>**OFFICER'S CERTIFICATE**</u>

**OCTOBER** <u> 3 </u>, **2016**

I, David A. Carr, hereby certify that I am the duly elected, qualified and acting Chief Financial Officer of Garden Fresh Restaurant Intermediate Holding, LLC, a Delaware limited liability company (the "<u>Company</u>"), and am authorized to execute this Officer's Certificate (the "<u>Certificate</u>") on behalf of the Company.  This Certificate is delivered in connection with that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated as of the date hereof (the "<u>Agreement</u>"), by and among Garden Fresh Holdings, Inc., a Delaware corporation (the "<u>Parent</u>"), Garden Fresh Restaurant Corp., a Delaware corporation, as borrower and debtor-in-possession in the Chapter 11 Cases (the "<u>Borrower</u>"), each other subsidiary of the Parent listed as a "<u>Guarantor</u>" on the signature pages thereto (together with the Parent, each a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>Loan Parties</u>"), the lenders from time to time party thereto (each a "<u>DIP Lender</u>" and collectively, the "<u>DIP Lenders</u>"), Cortland Capital Market Services LLC, a Delaware limited liability company, as collateral agent for the DIP Lenders (in such capacity, together with its successors and assigns in such capacity, the "<u>Collateral Agent</u>") and as administrative agent for the DIP Lenders (in such capacity, together with its successors and assigns in such capacity, the "<u>Administrative Agent</u>" and together with the Collateral Agent, each a "<u>DIP Agent</u>" and collectively, the "<u>DIP Agents</u>").  Unless the context requires otherwise, all capitalized terms used but not defined in this Certificate shall have the meanings set forth in the Agreement.

Solely in my official capacity as Chief Financial Officer of the Company and not individually, I certify as of the date hereof that:

(a)     Attached hereto as <u>Exhibit A</u> is a true and complete copy of the Certificate of Formation of the Company, and all amendments thereto, certified by the Secretary of State of the State of Delaware, as of a recent date not more than 45 days prior to the Closing Date, which sets forth the complete name of the Company and the organizational number of the Company, if an organizational number is issued in such jurisdiction.  No amendment of such Certificate of Formation has been made since the date of such certification.

(b)     Attached hereto as <u>Exhibit B</u> is a true and complete copy of the duly adopted Limited Liability Company Agreement of the Company, together with all amendments thereto as in full force and effect through the date hereof.

(c)     Attached hereto as <u>Exhibit C</u> is a true and complete copy of the resolutions duly adopted by the Board of Managers of the Company (the "<u>Resolutions</u>") approving and authorizing (i) the borrowings under the Agreement, the other DIP Loan Documents and the transactions contemplated thereby, and (ii) the execution, delivery and performance of the DIP Loan Documents to which it is a party on the date hereof or will be a party, and the execution and delivery of the other documents to be delivered by such Person in connection with the DIP Loan

Documents, and the transactions contemplated thereby. Such Resolutions have not been amended, rescinded or modified since their adoption and remain in full force and effect as of the date hereof and are the only resolutions that have been adopted by the Board of Managers of the Company with respect to the subject matter thereof.

(d)     The persons whose names, titles and signatures appear on <u>Exhibit D</u> attached hereto are, on and as of the date hereof, duly elected, qualified and acting officers of the Company occupying the offices set forth opposite their respective names on <u>Exhibit D</u>, and the signatures set forth opposite their respective names are their true signatures, and each of such officers is duly authorized to execute and deliver on behalf of the Company each of the other DIP Loan Documents to which it is a party and any other agreement, instrument or document to be delivered by the Company pursuant to the DIP Loan Documents to which it is a party and any Notices of Borrowing and all other notices under the Agreement and any other DIP Loan Document to which it is a party.

(e)     The representations and warranties set forth in Article VI of the Agreement and in each other DIP Loan Document, certificate or other writing delivered to any DIP Agent or DIP Lender pursuant hereto or thereto on or prior to the Closing Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Closing Date as though made on and as of such date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)).

(f)     No Default or Event of Default has occurred and is continuing on the Closing Date or would result from the Agreement or the other DIP Loan Documents becoming effective in accordance with its or their respective terms, or the making of the Initial DIP Loans (or other extensions of credit) under the Agreement.

(g)     Each Material Contract in existence on the Petition Date remains in full force and effect. Unless otherwise disclosed, none of the Material Contracts have been amended or otherwise modified. None of the Loan Parties have breached or defaulted in any material respects with respect to their obligations under such agreements.

*   *   *   *   *

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Company as of the date hereof.

GARDEN FRESH RESTAURANT
INTERMEDIATE HOLDING, LLC

By: _____

Name: David A. Carr
Title: Chief Financial Officer

The undersigned, being the duly elected and qualified Vice President of the Company, hereby certifies that David A. Carr is the duly elected and qualified Chief Financial Officer of the Company and that the foregoing signature appearing above his name is his genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Company as of the date hereof.

GARDEN FRESH RESTAURANT
INTERMEDIATE HOLDING, LLC

By: _____

Name: R. Gregory Keller
Title: Vice President

[Signature Page to Officer's Certificate]

## EXHIBIT A

Certificate of Formation

*Attached.*

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE FOURTH DAY OF OCTOBER, A.D. 2012, AT 1:02 O`CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "GARDEN FRESH RESTAURANT INTERMEDIATE HOLDINGS, INC." TO "GARDEN FRESH RESTAURANT HOLDINGS, INC.", FILED THE FOURTEENTH DAY OF JANUARY, A.D. 2013, AT 2:42 O`CLOCK P.M.

CERTIFICATE OF CONVERSION, FILED THE SECOND DAY OF OCTOBER, A.D. 2013, AT 5:55 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID  CERTIFICATE OF CONVERSION  IS THE SECOND DAY OF OCTOBER, A.D. 2013 AT 11:59 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

# Delaware

Page 2

### The First State

*CERTIFICATE OF FORMATION, FILED THE SECOND DAY OF OCTOBER,*
*A.D. 2013, AT 5:55 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF*
*THE AFORESAID CERTIFICATE OF FORMATION IS THE SECOND DAY OF*
*OCTOBER, A.D. 2013 AT 11:59 O'CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID*
*CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE*
*AFORESAID LIMITED LIABILITY COMPANY, "GARDEN FRESH RESTAURANT*
*INTERMEDIATE HOLDING, LLC".*



Jeffrey W. Bullock, Secretary of State

5222912  8100H
SR# 20166011722

Authentication: 203087317
Date: 09-30-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 01:19 PM 10/04/2012*
*FILED 01:02 PM 10/04/2012*
*SRV 121099407 – 5222912 FILE*

# CERTIFICATE OF INCORPORATION

## OF

## GARDEN FRESH RESTAURANT INTERMEDIATE HOLDINGS, INC.

### ARTICLE ONE

The name of the Corporation is Garden Fresh Restaurant Intermediate Holdings, Inc.

### ARTICLE TWO

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801. The name of its registered agent at such address is The Corporation Trust Company.

### ARTICLE THREE

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

### ARTICLE FOUR

The total number of shares of capital stock that the Corporation has authority to issue is 1,000 shares of Common Stock, par value $0.001 per share.

### ARTICLE FIVE

The name and mailing address of the sole incorporator are as follows:

| NAME | MAILING ADDRESS |
|------|-----------------|
| Tara McManus | 300 N. La Salle Street<br>Chicago, Illinois  60654 |

### ARTICLE SIX

The Corporation is to have perpetual existence.

### ARTICLE SEVEN

In furtherance and not in limitation of the powers conferred by statute, the board of directors of the Corporation is expressly authorized to make, alter or repeal the bylaws of the Corporation.

## ARTICLE EIGHT

Meetings of stockholders may be held within or outside of the State of Delaware, as the bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the board of directors or in the bylaws of the Corporation. Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

## ARTICLE NINE

To the fullest extent permitted by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended, a director of this Corporation shall not be liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director. Any repeal or modification of this ARTICLE NINE shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE TEN

The Corporation expressly elects not to be governed by §203 of the General Corporation Law of the State of Delaware.

## ARTICLE ELEVEN

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed herein and by the laws of the State of Delaware, and all rights conferred upon stockholders herein are granted subject to this reservation.

## ARTICLE TWELVE

To the maximum extent permitted from time to time under the law of the State of Delaware, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or stockholders, other than those officers, directors or stockholders who are employees of the Corporation. No amendment or repeal of this ARTICLE TWELVE shall apply to or have any effect on the liability or alleged liability of any officer, director or stockholder of the Corporation for or with respect to any opportunities of which such officer, director, or stockholder becomes aware prior to such amendment or repeal.

*    *    *    *    *

I, THE UNDERSIGNED, being the sole incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, do make this certificate, hereby declaring and certifying that this is my act and deed and the facts stated herein are true, and accordingly have hereunto set my hand on the 4th day of October, 2012.

/s/ *Tara McManus*
Tara McManus, Sole Incorporator

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:46 PM 01/14/2013*
*FILED 02:42 PM 01/14/2013*
*SRV 130045631 – 5222912 FILE*

# CERTIFICATE OF AMENDMENT
## TO
## CERTIFICATE OF INCORPORATION
### OF
## GARDEN FRESH RESTAURANT INTERMEDIATE HOLDINGS, INC.

\* \* \* \* \*

Adopted in accordance with the provisions
of §242 of the General Corporation Law
of the State of Delaware

\* \* \* \* \*

John D. Morberg being the Chief Financial Officer of Garden Fresh Restaurant Intermediate Holdings, Inc., a corporation duly organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify as follows:

**FIRST:**        That the Certificate of Incorporation of the Corporation be, and hereby is, amended by deleting Article One in its entirety and substituting in lieu thereof a new Article One to read as follows:

## ARTICLE ONE
## NAME

The name of the Corporation is Garden Fresh Restaurant Holdings, Inc.

**SECOND:**        That the board of directors of the Corporation approved the foregoing amendment by unanimous written consent pursuant to the provisions of Section 141(f) and 242 of the General Corporation Law of the State of Delaware and directed that such amendment be submitted to the stockholders of the Corporation entitled to vote thereon for their consideration, approval and adoption thereof.

**THIRD:**   That the stockholders entitled to vote thereon approved the foregoing amendment by written consent in accordance with Section 228 and 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the undersigned does hereby certify under penalties of perjury that this Certificate of Amendment to the Certificate of Incorporation of the Corporation is the act and deed of the undersigned and the facts stated herein are true and accordingly has hereunto set his hand this _9th_ day of January, 2013.

GARDEN FRESH RESTAURANT
INTERMEDIATE HOLDINGS, INC.
a Delaware corporation

By:_____
John D. Morberg
Chief Financial Officer

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:55 PM 10/02/2013*
*FILED 05:55 PM 10/02/2013*
*SRV 131156925 – 5222912 FILE*

## CERTIFICATE OF CONVERSION

## FROM A CORPORATION TO A

## LIMITED LIABILITY COMPANY

The undersigned, being duly authorized to execute and file this Certificate of Conversion for the purpose of converting a Delaware corporation to a Delaware limited liability company pursuant to the Section 18-214 of the Limited Liability Company Act of the State of Delaware, does hereby certify as follows:

1.      The jurisdiction where the corporation was first formed is Delaware.

2.      The jurisdiction of the corporation immediately prior to filing this Certificate of Conversion is Delaware.

3.      The date the corporation was first formed is October 4, 2012.

4.      The name of the corporation immediately prior to filing this Certificate is Garden Fresh Restaurant Holdings, Inc.

5.      The name of the limited liability company as set forth in the Certificate of Formation is Garden Fresh Restaurant Intermediate Holding, LLC.

6.      This Certificate of Conversion is to become effective on October 2, 2013, at 11:59 p.m. EDT.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Conversion on the 2nd day of October, 2013.

By: */s/ John D. Morberg*
        John D. Morberg, an Authorized Person

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:55 PM 10/02/2013*
*FILED 05:55 PM 10/02/2013*
*SRV 131156925 – 5222912 FILE*

CERTIFICATE OF FORMATION

OF

Garden Fresh Restaurant Intermediate Holding, LLC

This Certificate of Formation is being executed as of October 2, 2013 for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq.

The undersigned, being duly authorized to execute and file this Certificate of Formation, does hereby certify as follows:

1.  Name.  The name of the limited liability company is Garden Fresh Restaurant Intermediate Holding, LLC (the "Company").

2.  Registered Office and Registered Agent.  The Company's registered office in the State of Delaware is located at 1209 Orange Street, in the city of Wilmington, County of New Castle, 19801.  The registered agent of the Company for service of process at such address is The Corporation Trust Company.

3.  Effective Date.  This Certificate of Formation shall become effective on October 2, 2013, at 11:59 p.m. EDT.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Formation as of the day and year first above written.

By: */s/ John D. Morberg*
John D. Morberg, an Authorized Person

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:55 PM 10/02/2013*
*FILED 05:55 PM 10/02/2013*
*SRV 131156925 – 5222912 FILE*

CERTIFICATE OF CONVERSION

FROM A CORPORATION TO A

LIMITED LIABILITY COMPANY

The undersigned, being duly authorized to execute and file this Certificate of Conversion for the purpose of converting a Delaware corporation to a Delaware limited liability company pursuant to the Section 18-214 of the Limited Liability Company Act of the State of Delaware, does hereby certify as follows:

1.    The jurisdiction where the corporation was first formed is Delaware.

2.    The jurisdiction of the corporation immediately prior to filing this Certificate of Conversion is Delaware.

3.    The date the corporation was first formed is October 4, 2012.

4.    The name of the corporation immediately prior to filing this Certificate is Garden Fresh Restaurant Holdings, Inc.

5.    The name of the limited liability company as set forth in the Certificate of Formation is Garden Fresh Restaurant Intermediate Holding, LLC.

6.    This Certificate of Conversion is to become effective on October 2, 2013, at 11:59 p.m. EDT.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Conversion on the 2nd day of October, 2013.

By: /s/ *John D. Morberg*
John D. Morberg, an Authorized Person

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:55 PM 10/02/2013*
*FILED 05:55 PM 10/02/2013*
*SRV 131156925 – 5222912 FILE*

CERTIFICATE OF FORMATION

OF

Garden Fresh Restaurant Intermediate Holding, LLC

This Certificate of Formation is being executed as of October 2, 2013 for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq.

The undersigned, being duly authorized to execute and file this Certificate of Formation, does hereby certify as follows:

1. Name. The name of the limited liability company is Garden Fresh Restaurant Intermediate Holding, LLC (the "Company").

2. Registered Office and Registered Agent. The Company's registered office in the State of Delaware is located at 1209 Orange Street, in the city of Wilmington, County of New Castle, 19801. The registered agent of the Company for service of process at such address is The Corporation Trust Company.

3. Effective Date. This Certificate of Formation shall become effective on October 2, 2013, at 11:59 p.m. EDT.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Formation as of the day and year first above written.

By: */s/ John D. Morberg*
John D. Morberg, an Authorized Person

## EXHIBIT B

Limited Liability Company Agreement

*Attached.*

**GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC**

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of October 3, 2013

THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

CERTAIN OF THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, VESTING PROVISIONS, REPURCHASE OPTIONS, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH HEREIN AND/OR IN A SEPARATE AGREEMENT WITH THE INITIAL HOLDER OF SUCH UNITS. A COPY OF SUCH AGREEMENT(S) MAY BE OBTAINED BY THE HOLDER OF SUCH UNITS UPON WRITTEN REQUEST AND WITHOUT CHARGE.

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ..............................................................................................1

**ARTICLE II ORGANIZATIONAL MATTERS**.........................................................**10**
2.1    Formation of Intermediate LLC................................................10
2.2    Limited Liability Company Agreement.....................................10
2.3    Name  11
2.4    Purpose.......................................................................................11
2.5    Principal Office; Registered Office ...........................................11
2.6    Term   12
2.7    No State-Law Partnership ..........................................................12

**ARTICLE III CAPITAL CONTRIBUTIONS**............................................................**12**
3.1    Units.  12
3.2    Capital Accounts.........................................................................17
3.3    Negative Capital Accounts .........................................................18
3.4    No Withdrawal............................................................................18
3.5    Loans From Unitholders .............................................................18
3.6    Distributions In-Kind..................................................................18
3.7    Transfer of Capital Accounts .....................................................18

**ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS; REDEMPTION AND
CONVERSIONS** .................................................................................**18**
4.1    Distributions...............................................................................18
4.2    Cancellation of Class A Units.....................................................19
4.3    Allocations..................................................................................20
4.4    Special Allocations.....................................................................20
4.5    Offsetting Allocations.................................................................21
4.6    Tax Allocations...........................................................................22
4.7    Indemnification and Reimbursement for Payments on Behalf of a
Unitholder ...................................................................................23
4.8    Status of Management Investors............................**Error! Bookmark not defined.**

**ARTICLE V MANAGEMENT** ....................................................................................**23**
5.1    Authority of Board.......................................................................23
5.2    Composition of the Board............................................................24
5.3    Board Actions; Meetings .............................................................25
5.4    No Compensation.........................................................................25
5.5    Delegation of Authority ..............................................................25
5.6    Purchase of Units ........................................................................25
5.7    Limitation of Liability.................................................................25
5.8    Officers. ......................................................................................27

**ARTICLE VI RIGHTS AND OBLIGATIONS OF UNITHOLDERS AND MEMBERS**................................................................................**28**

    6.1     Limitation of Liability.................................................28
    6.2     Lack of Authority........................................................28
    6.3     No Right of Partition...................................................28
    6.4     Indemnification...........................................................28
    6.5     Members Right to Act..................................................30
    6.6     Investment Opportunities and Conflicts of Interest................30
    6.7     Confidentiality ...........................................................31

**ARTICLE VII BOOKS, RECORDS, ACCOUNTING AND REPORTS; INSPECTION**................................................................................**32**

    7.1     Records and Accounting .............................................32
    7.2     Reports.......................................................................32
    7.3     Transmission of Communications ...............................32

**ARTICLE VIII TAX MATTERS**................................................**32**

    8.1     Preparation of Tax Returns .........................................32
    8.2     Tax Elections .............................................................32
    8.3     Tax Controversies ......................................................33

**ARTICLE IX TRANSFER OF UNITS; REPURCHASE OF UNITS**................**33**

    9.1     Required Consent .......................................................33
    9.2     First Refusal Rights....................................................33
    9.3     Tag Along Rights........................................................34
    9.4     Approved Sale; Drag Along Obligations.....................36
    9.5     Redemption; Put; Sale Process. ..................................37
    9.6     Effect of Assignment. ................................................40
    9.7     Additional Restrictions on Transfer............................40
    9.8     Legend41
    9.9     Transfer Fees and Expenses ........................................42
    9.10    Void Transfers ...........................................................42
    9.11    Conversion to Corporate Form Upon a Public Offering.......42
    9.12    Holdback Agreement ..................................................43
    9.13    Power of Attorney; Certificated Units ........................43
    9.14    Forfeiture of Units......................................................44
    9.15    Voting; Proxy.............................................................44

**ARTICLE X ADMISSION OF MEMBERS** ................................**44**

    10.1    Substituted Members ..................................................44
    10.2    Additional Members ...................................................44

**ARTICLE XI WITHDRAWAL AND RESIGNATION OF UNITHOLDERS** ..........**44**

    11.1    Withdrawal and Resignation of Unitholders................44

**ARTICLE XII** ................................................................**45**

    12.1    Dissolution ................................................................45

12.2    Liquidation and Termination ........................................................45
12.3    Securityholders Agreement ..........................................................46
12.4    Cancellation of Certificate ...........................................................46
12.5    Reasonable Time for Winding Up ...............................................46
12.6    Return of Capital ..........................................................................47
12.7    Hart-Scott-Rodino ........................................................................47

**ARTICLE XIII** ........................................................................................**47**
13.1    Valuation of Company Securities ................................................47
13.2    Valuation of Other Assets and Securities ...................................47
13.3    Valuation Methodology ................................................................47

**ARTICLE XIV** ........................................................................................**48**
14.1    Power of Attorney .........................................................................48
14.2    Amendments ..................................................................................48
14.3    Title to Intermediate LLC Assets ...............................................48
14.4    Remedies ........................................................................................49
14.5    Successors and Assigns ................................................................49
14.6    Severability ....................................................................................49
14.7    Counterparts; Binding Agreement ...............................................49
14.8    Descriptive Headings; Interpretation ..........................................49
14.9    Applicable Law; Venue; Jury Trial Waiver ................................50
14.10   Addresses and Notices ..................................................................50
14.11   Creditors ........................................................................................50
14.12   Waiver50
14.13   Further Action ...............................................................................50
14.14   Offset  50
14.15   Entire Agreement ..........................................................................51
14.16   Delivery by Facsimile ...................................................................51
14.17   Survival ..........................................................................................51
14.18   Expenses ........................................................................................51
14.19   Acknowledgments..........................................................................52

**EXHIBITS**

Exhibit A          Illustrative Distribution Waterfall
Exhibit B          Form of Registration Agreement

**SCHEDULES**

Schedule of Unitholders
Schedule of Officeholders

**GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING LLC**
**LIMITED LIABILITY COMPANY AGREEMENT**

THIS LIMITED LIABILITY COMPANY AGREEMENT is entered into as of October 3, 2013 by and among the Members.

WHEREAS, Intermediate LLC was incorporated as a corporation pursuant to the General Corporation Law of the State of Delaware by filing a Certificate of Incorporation on October 4, 2012 with the Secretary of State of the State of Delaware;

WHEREAS, on October 2, 2013, Intermediate LLC filed with the Secretary of State of the State of Delaware (i) a Certificate of Conversion from a Delaware Corporation to a Delaware Limited Liability Company and (ii) a Certificate of Formation; and

WHEREAS, the Members desire to enter into this Agreement to set forth, among other things, their respective rights and obligations as Members.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the following meanings:

"Act" has the meaning set forth in Section 9.8.

"Acquiring Person" means a potential acquirer of Equity Securities in a Sale of Intermediate LLC.

"Additional Member" means a Person admitted to Intermediate LLC as a Member pursuant to Section 10.2.

"Adjusted Capital Account Deficit" means with respect to any Capital Account as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero. For this purpose, such Person's Capital Account balance shall be (i) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and (ii) increased for any amount such Person is obligated to contribute or is treated as being obligated to contribute to Intermediate LLC pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and 1.704-2(i) (relating to Minimum Gain).

"Affiliate" of any particular Person means (i) any other Person controlling, controlled by or under common control with such particular Person, where "control" means the

possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, and (ii) if such Person is a partnership, any partner thereof.

"Agreement" means this Limited Liability Company Agreement, as amended, modified and waived from time to time in accordance with the terms hereof.

"Approved Sale" has the meaning set forth in Section 9.4(a).

"Assignee" means a Person to whom Units have been Transferred in accordance with the terms of this Agreement and the other agreements contemplated hereby, but who has not become a Member pursuant to Article X.

"Authorization Date" has the meaning set forth in Section 9.2(a).

"Base Rate" means, on any date, a variable rate per annum equal to the rate of interest most recently published by *The Wall Street Journal* as the "prime rate" at large U.S. money center banks.

"Board" means the Board of Managers of Intermediate LLC established pursuant to Section 5.2.

"Book Value" means, with respect to any Intermediate LLC property, Intermediate LLC's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted, in the case of permitted adjustments, (to the extent Intermediate LLC makes such permitted adjustments) by Treasury Regulation Sections 1.704-1(b)(2)(iv)(d)-(g).

"Business" means engaging, directly or indirectly, in the business of operating a buffet-style or casual dining restaurant, or any restaurant specializing in soups or salads.

"Capital Account" means the capital account maintained for a Member pursuant to Section 3.2.

"Capital Contributions" means any cash, cash equivalents, promissory obligations or the Fair Market Value of other property which a Unitholder contributes with respect to any Unit pursuant to Section 3.1.

"Certificate" means Intermediate LLC's Certificate of Formation as filed with the Secretary of State of Delaware.

"Certificated Units" has the meaning set forth in Section 3.1(a).

"Change of Control" means (a) a Transfer in a single transaction or series of related transactions of Units (or any economic or voting interest represented thereby) by the holders thereof to a single purchaser or group of purchasers (other than to Sun or its Affiliates) (i) whereby Sun and its Affiliates own less than 35% of the aggregate number of Units held by all Members (including by operation of law, merger, consolidation, recapitalization,

- 2 -

reorganization or otherwise) and (ii) pursuant to which Sun and its Affiliates in the aggregate no longer directly or indirectly control Intermediate LLC where "control" means the possession, directly or indirectly, of the power to direct the management and policies of Intermediate LLC whether through the ownership of voting securities, by contract or otherwise or (b) a sale by Intermediate LLC or an issuance by the Company of shares of common stock of the Company, in a single transaction or a series of related transactions, which results in Intermediate LLC together with its Affiliates no longer owning, directly or indirectly, at least 50% of the outstanding shares of common stock of the Company and pursuant to which Intermediate LLC and its Affiliates in the aggregate no longer directly or indirectly control the Company where "control" means the possession, directly or indirectly, of the power to direct the management and policies of the Company whether through the ownership of voting securities, by contract or otherwise.

"Class A Redemption Price" means, with respect to any Class A Unit as of the date such Class A Unit is redeemed pursuant to Section 9.5(a) or 9.5(b), the sum of (A) the Class A Unpaid Yield on such Class A Unit plus (B) the Class A Unreturned Capital in respect of such Class A Unit.

"Class A Unit" means a Unit having the rights and obligations specified with respect to Class A Units in this Agreement.

"Class B Unit" means a Unit having the rights and obligations specified with respect to Class B Units in this Agreement.

"Class A Unpaid Yield" has the meaning set forth in Section 3.1(c).

"Class A Unreturned Capital" has the meaning set forth in Section 3.1(c).

"Class A Yield" has the meaning set forth in Section 3.1(c).

"Code" means the United States Internal Revenue Code of 1986, as amended. Such term, if elected by the Board in its sole discretion, shall be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary).

"Company" means Garden Fresh Holdings, Inc., a Delaware corporation, and any successor thereto (whether by merger, conversion, consolidation, recapitalization, reorganization or otherwise).

"Confidential Information" has the meaning set forth in Section 6.7.

"Conversion Units" means (i) with respect to a Public Offering of Intermediate LLC (or any successor thereto), Units or such other common equity securities of Intermediate LLC (or any successor thereto) that are sold pursuant to such Public Offering, and (ii) with respect to a Public Offering of the Company (or any successor thereto) or any of its Subsidiaries, common stock or such other common equity securities of the Company (or any successor thereto) or its Subsidiaries that are sold pursuant to such Public Offering.

"Corporate Conversion" has the meaning set forth in Section 9.11(b).

"Deal Counsel" has the meaning set forth in Section 9.5(c)(i).

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del.L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"Distribution" means each distribution made by Intermediate LLC to a Unitholder, whether in cash, property or securities of Intermediate LLC and whether by liquidating distribution, redemption, repurchase or otherwise; provided that none of the following shall be a Distribution: (i) any redemption or repurchase by Intermediate LLC of any securities of Intermediate LLC in connection with the termination of employment of an employee of Intermediate LLC or any of its Subsidiaries or any service provider of Intermediate LLC or any of its Subsidiaries, and (ii) any recapitalization, exchange or conversion of securities of Intermediate LLC, and any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise) of any outstanding Units.

"Employment Agreement" means any employment agreement, consulting agreement, confidentiality agreement, noncompetition agreement, nonsolicitation agreement or any similar agreement among a Management Investor and Intermediate LLC and/or any of its Subsidiaries, each as amended, modified and waived from time to time.

"Equity Agreement" has the meaning set forth in Section 3.1(f).

"Equity Securities" means (i) units (including, without limitation, the Class A Units and Class B Units) or other equity interests in Intermediate LLC or any of its Subsidiaries (including, without limitation, other classes, groups or series thereof having such relative rights, powers, and/or obligations as may from time to time be established by the Board or the board of directors (or similar governing body, as applicable) of such Subsidiary, as the case may be, including rights, powers, and/or duties different from, senior to or more favorable than existing classes, groups and series of units and other equity interests in Intermediate LLC or any of its Subsidiaries), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into units or other equity interests in Intermediate LLC or any of its Subsidiaries, and (iii) warrants, options or other rights to purchase or otherwise acquire units or other equity interests in Intermediate LLC or any of its Subsidiaries.

"Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in Intermediate LLC.

"Exchange Agreement" means that certain Exchange Agreement, dated as of the date hereof, by and between Intermediate LLC and Sun Garden Fresh Finance, LLC, as amended, modified or waived from time to time.

"Excluded Securityholder" has the meaning set forth in Section 3.1(g)(i).

"Executive Manager" has the meaning set forth in Section 5.2(a)(i).

"Exempt Transfers" has the meaning set forth in Section 9.1.

"Fair Market Value" means, with respect to any asset or equity interest, its fair market value determined according to Article XIII.

"Family Group" means, as to any particular Person, (i) such Person's spouse, and descendants (whether natural or adopted), (ii) any trust solely for the benefit of such Person and/or such Person's spouse and/or descendants and (iii) any partnerships or limited liability companies where the only partners or members are such Person and/or such Person's spouse and/or descendants.

"Financial Advisor" has the meaning set forth in Section 9.5(c)(i).

"Financial Investor" has the meaning set forth in Section 6.6.

"Fiscal Period" means any interim accounting period within a Taxable Year established by the Board and which is permitted or required by Code Section 706.

"Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Board.

"Fiscal Year" means the calendar year ending on September 30, or such other annual accounting period as may be established by the Board.

"Governmental Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"HSR Act" has the meaning set forth in Section 12.7.

"Indemnified Person" has the meaning set forth in Section 6.4(a).

"Intermediate LLC" means Garden Fresh Restaurant Intermediate Holding, LLC, a Delaware limited liability company.

"Intermediate Total Equity Value" means the aggregate proceeds which would be received by the Unitholders if: (i) the assets of Intermediate LLC as a going concern were sold at their Fair Market Value; (ii) Intermediate LLC satisfied and paid in full all of its obligations and liabilities (including all Taxes, costs and expenses incurred in connection with such transaction and any reserves established by the Board for contingent liabilities); and (iii) such net sale proceeds were then distributed in accordance with Section 4.1(a), all as determined by the Board. When determined in connection with a Sale of Intermediate LLC, Intermediate Total Equity Value shall be derived from the consideration paid in connection with such Sale of Intermediate LLC.

"Liquidation Assets" has the meaning set forth in Section 12.2(b).

"Liquidation FMV" has the meaning set forth in Section 12.2(b).

"Liquidation Statement" has the meaning set forth in Section 12.2(b).

"Liquidity Event" means both (i) a Sale of Intermediate LLC, but only if the consideration paid to the Company, to Intermediate LLC or to either of their equityholders consists (as determined by the Board in its sole discretion) of either (a) cash, (b) marketable securities of an issuer having a public market float (pre-closing) of not less than $500,000,000 or (c) any combination of consideration set forth in clauses (a) and (b) and (ii) a Change of Control.

"LLC Agreement" has the meaning set forth in Section 9.8.

"Losses" means items of Intermediate LLC loss and deduction determined according to Section 3.2.

"Majority Sun Capital Investors" means the Sun Capital Investors holding a majority of the Class A Units then held by all Sun Capital Investors or, if no Class A Units are then held by any Sun Capital Investors, the Sun Capital Investors holding a majority of the Class B Units then held by all Sun Capital Investors.

"Management Investors" means the Persons listed under the subheading titled "Management Investors" in the Schedule of Unitholders attached hereto, and any other Member who acquires Equity Securities after the date hereof and/or enters into an Equity Agreement after the date hereof pursuant to the terms of Section 3.1, in either case and also is designated as a "Management Investor" by the Board.

"Manager" means a current member of the Board, who, for purposes of the Delaware Act, will be deemed a "manager" (as defined in the Delaware Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"Member" means each of the Sun Capital Investors, the Management Investors, each Person listed on the Schedule of Unitholders attached hereto, and any Person admitted to Intermediate LLC as a Substituted Member or Additional Member; but only for so long as such Person is shown on Intermediate LLC's books and records as the owner of one or more Units.

"Minimum Gain" means the partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d).

"Notice of Sale Process" means a written notice to Intermediate LLC from the Majority Sun Capital Investors that the Majority Sun Capital Investors intend to initiate a Sale Process.

"Offer Notice" has the meaning set forth in Section 9.2(a).

"Offered Units" has the meaning set forth in Section 9.2(a).

"Other Business" has the meaning set forth in Section 6.6.

"Other Class A Member" has the meaning set forth in Section 9.5(b)(ii).

"Other Class A Member Put Notice" has the meaning set forth in Section 9.5(b)(ii).

"Other Members" has the meaning set forth in Section 9.3(a).

"Permitted Transferee" means (i) with respect to any Person who is an individual, a member of such Person's Family Group, and (ii) with respect to any Person which is an entity, any of such Person's Affiliates, but only for so long as such Person remains a Permitted Transferee of such Person.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Entity.

"Pro Rata Share" means with respect to each Unit, the proportional amount such Unit would receive if an amount equal to the Intermediate Total Equity Value were distributed to all Units in accordance with Section 4.1(a), and with respect to each Unitholder, such Unitholder's pro rata share of Intermediate Total Equity Value represented by all Units owned by such Unitholder, in each case as determined in good faith by the Board.

"Profits" means items of Intermediate LLC income and gain determined according to Section 3.2.

"Proportional Share" has the meaning set forth in Section 3.1(g)(i).

"Public Offering" means any underwritten sale of common equity securities of Intermediate LLC, or any Subsidiary of Intermediate LLC (or, in each case, any successor thereto) pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission.

"Put Notice" means a written notice delivered to Intermediate LLC by the Requesting Class A Members requesting that Intermediate LLC redeem all or any portion (as specified by the Requesting Class A Members) of the outstanding Class A Units held by the Requesting Class A Members.

"Put Percentage" means a fraction, the numerator of which is the sum of the aggregate Class A Unpaid Yield and the aggregate Class A Unreturned Capital of all outstanding Class A Units requested to be redeemed by the Requesting Class A Members pursuant to the applicable Put Notice and the denominator of which is the sum of the aggregate Class A Unpaid Yield and the aggregate Class A Unreturned Capital of all outstanding Class A Units held by the Requesting Class A Members.

"Qualified Public Offering" means a Public Offering of Intermediate LLC or any Subsidiary of Intermediate LLC (or, in each case, any successor thereto) on Forms S-1, S-2 or S-3 (or any successor forms adopted by the Securities and Exchange Commission); provided that the following shall not be considered a Public Offering: (i) any issuance of common equity securities as consideration for a merger or acquisition, and (ii) any issuance of common equity securities or rights to acquire common equity securities to employees or officers of Intermediate

LLC or any Subsidiary of Intermediate LLC or others as part of an incentive or compensation plan, agreement or arrangement.

"Regulatory Allocations" has the meaning set forth in Section 4.4(e).

"Requesting Class A Members" means the holders of Class A Units who deliver a Put Notice, which holders shall constitute a majority of the outstanding Class A Units.

"Required Consent" has the meaning set forth in Section 9.1.

"Sale of Intermediate LLC" means either (i) any consolidation, merger or other transaction in which Intermediate LLC is not the surviving entity or which results in the acquisition of all or substantially all of Intermediate LLC's outstanding membership interests by a single Person or by a group of Persons acting in concert, or (ii) any sale or transfer of all or substantially all of Intermediate LLC's or the Company's assets (whether by sale of assets, consolidation, merger or otherwise) determined on a consolidated basis; provided, however, that the term "Sale of Intermediate LLC" shall not include transactions either (x) with Affiliates of Intermediate LLC or Sun (as determined by the Board in its sole discretion) or (y) pursuant to which more than fifty percent (50%) of the shares of voting stock or membership interests of the surviving or acquiring entity is owned and/or controlled (by agreement or otherwise), directly or indirectly, by Sun or its Affiliates.

"Sale Notice" has the meaning set forth in Section 9.3(a).

"Sale Process" means a process intended by the Majority Sun Capital Investors to result in a Sale of Intermediate LLC.

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

"Securities Purchase Agreement" means that certain Securities Purchase Agreement, dated as of the date hereof, by and between Intermediate LLC and Sun Garden Fresh, LLC, as amended, modified or waived from time to time.

"Securityholders" means, collectively, the Unitholders and the owners of one or more units or shares of capital stock of any Subsidiary of Intermediate LLC as reflected on the books and records of such Subsidiary.

"State Acts" has the meaning set forth in Section 9.8.

- 8 -

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.  For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of Intermediate LLC.

"Substituted Member" means a Person that is admitted as a Member to Intermediate LLC pursuant to Section 10.1.

"Sun" means Sun Capital Partners, Inc., a Florida corporation.

"Sun Capital Equity" means (i) the Units issued to the Sun Capital Investors pursuant to this Agreement and any other Units issued to or acquired by the Sun Capital Investors, and (ii) any securities issued directly or indirectly with respect to the foregoing securities by way of a unit split, unit dividend, or other division of securities, or in connection with a combination of securities, recapitalization, merger, consolidation, or other reorganization. As to any particular securities constituting Sun Capital Equity, such securities shall cease to be Sun Capital Equity when they have been (A) effectively registered under the Securities Act and Securities Exchange Act and disposed of in accordance with the registration statement covering them, (B) distributed to the public pursuant to Rule 144 under the Securities Act (or any similar provision then in force) or (C) redeemed or repurchased by Intermediate LLC or any of its Subsidiaries or any designee thereof.

"Sun Capital Investors" means each of Sun Garden Fresh, LLC, a Delaware limited liability company, Sun Garden Fresh Finance, LLC, and any of their respective members or Affiliates and any of their respective Affiliates, and, if expressly set forth in any transfer document, any such Person's Transferees.

"Sun Capital Manager" has the meaning set forth in Section 5.2(a)(ii).

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, franchise, estimated, intangibles, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or

other tax, of any kind whatsoever, including any transferee liability and any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"Tax Matters Partner" has the meaning set forth in Section 6231 of the Code.

"Taxable Year" means Intermediate LLC's accounting period for federal income tax purposes determined pursuant to Section 8.2.

"Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof, but excluding conversions and redemptions of Units by Intermediate LLC made in accordance with this Agreement. The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Transferring Sun Capital Unitholder" has the meaning set forth in Section 9.3(a).

"Transferring Unitholder" has the meaning set forth in Section 9.2(a).

"Treasury Regulations" means the income tax regulations promulgated under the Code and effective as of the date hereof. Such term, if elected by the Board in its sole discretion, shall be deemed to include any future amendments to such regulations and any corresponding provisions of succeeding regulations (whether or not such amendments and corresponding provisions are mandatory or discretionary).

"Unit" means a Unit of a Member or an Assignee in Intermediate LLC representing a fractional part of the interests in Profits, Losses and Distributions of Intermediate LLC held by all Members and Assignees and shall include, without limitation, Class A Units and Class B; provided that any class, group or series of Units issued shall have the relative rights, powers and obligations set forth in this Agreement.

"Unitholder" means any owner of one or more Units as reflected on Intermediate LLC's books and records.

## ARTICLE II

## ORGANIZATIONAL MATTERS

2.1     Formation of Intermediate LLC.  Intermediate LLC was incorporated as a corporation pursuant to the General Corporation Law of the State of Delaware by filing a Certificate of Incorporation on October 4, 2012 with the Secretary of State of the State of Delaware.  On October 2, 2013, Intermediate LLC filed with the Secretary of State of the State of Delaware (i) a Certificate of Conversion from a Delaware Corporation to a Delaware Limited Liability Company and (ii) a Certificate of Formation.

2.2     Limited Liability Company Agreement.  The Members hereby execute this Agreement for the purpose of establishing the affairs of Intermediate LLC and the conduct of its

business in accordance with the provisions of the Delaware Act.  The Members hereby agree that during the term of Intermediate LLC set forth in Section 2.6 the rights, powers and obligations of the Unitholders with respect to Intermediate LLC will be determined in accordance with the terms and conditions of this Agreement and, except where the Delaware Act provides that such rights, powers and obligations specified in the Delaware Act shall apply "unless otherwise provided in a limited liability company agreement" or words of similar effect and such rights, powers and obligations are set forth in this Agreement, the Delaware Act; provided that, notwithstanding the foregoing, Section 18-210 of the Delaware Act (entitled "Contractual Appraisal Rights") and Section 18-305(a) of the Delaware Act (entitled "Access to and Confidentiality of Information; Records") shall not apply or be incorporated into this Agreement (but with it being understood that this proviso shall not affect the obligations of Intermediate LLC under Section 7.2).

2.3    Name.  The name of Intermediate LLC shall be "Garden Fresh Restaurant Intermediate Holding, LLC."  The Board may change the name of Intermediate LLC at any time and from time to time.  Notification of any such change shall be given to all Unitholders. Intermediate LLC's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

2.4    Purpose.  The purpose and business of Intermediate LLC shall be (i) to hold, directly or indirectly, the equity securities of the Company and to perform such other obligations and duties as are imposed upon Intermediate LLC under this Agreement, the Exchange Agreement, the Securities Purchase Agreement, the Equity Agreements and the other agreements, instruments or documents contemplated hereby and thereby, as the same may be amended or modified from time to time, (ii) to exercise all rights and powers granted to Intermediate LLC (whether as a holder of the Company's equity securities or otherwise) under the Company's constituent documents, the Exchange Agreement, the Securities Purchase Agreement, the Equity Agreements and the other agreements, instruments or documents contemplated hereby and thereby, as the same may be amended or modified from time to time, (iii) to manage and direct the business operations and affairs of the Company and its Subsidiaries (including, without limitation, the development, adoption and implementation of strategies, business plans, and policies concerning the conduct of the Company's and its Subsidiaries' business), and (iv) to engage in any other lawful acts or activities for which limited liability companies may be organized under the Delaware Act.

2.5    Principal Office; Registered Office.  The principal office of Intermediate LLC shall be located at 5200 Town Center Circle, Suite 600, Boca Raton, Florida 33486 or at such other place as the Board may from time to time designate, and all business and activities of Intermediate LLC shall be deemed to have occurred at its principal office.  Intermediate LLC may maintain offices at such other place or places as the Board deems advisable.  Notification of any such change shall be given to all Unitholders.  The address of the registered office of Intermediate LLC in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of Intermediate LLC) as the Board may designate from time to time in the manner provided by applicable law, and the registered agent for service of process on Intermediate LLC in the State of Delaware at such registered office shall be the registered agent named in the Certificate or

such Person or Persons as the Board may designate from time to time in the manner provided by applicable law.

2.6     Term.  The term of Intermediate LLC commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XII.

2.7     No State-Law Partnership.  The Unitholders intend that Intermediate LLC not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Unitholder be a partner or joint venturer of any other Unitholder by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this Section 2.7, and neither this Agreement nor any other document entered into by Intermediate LLC or any Unitholder relating to the subject matter hereof shall be construed to suggest otherwise.  The provisions of Sections 3.2, 3.3, 3.7, 4.3, 4.4, 4.5, 4.6 and 8.3 (as well as any other provisions and/or definitions in this Agreement regarding Capital Accounts, allocations of Profits and Losses, etc., or otherwise applicable only to an entity classified as a partnership for United States federal income tax purposes) shall be applicable only for any taxable period during which Intermediate LLC is treated as a partnership for United States federal income tax purposes.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1     Units.

(a)     Units Generally.  Each Unitholder's interest in Intermediate LLC, including such Unitholder's interest in Profits, Losses and Distributions of Intermediate LLC and the right to vote on certain matters as provided in this Agreement, shall be represented by the Units owned by such Unitholder.  Intermediate LLC may (but need not) issue certificates representing the Units (such Units then being "Certificated Units").  The ownership by a Member of Units shall entitle each such Member to allocations of Profits and Losses and other items and Distributions of cash and other property as set forth in this Article IV hereof.

(b)     Authorized Units.  Subject to Section 3.1(f), the total Units that Intermediate LLC has the authority to issue shall be determined by the Board from time to time and shall initially consist of an unlimited number of Class A Units and an unlimited number of Class B Units.  Intermediate LLC may issue fractional Units.

(c)     Class A Units.  Subject to Section 3.1(f), Intermediate LLC shall be authorized to issue from time to time, subject to Board approval, Class A Units.  With respect to the Class A Units:

"Class A Unpaid Yield" of any Class A Unit means, as of any date, an amount equal to (i) the aggregate Class A Yield accrued on such Class A Unit for all periods prior to such date (including partial periods), minus (ii) the aggregate amount of prior Distributions made by Intermediate LLC that constitute payment of Class A Yield on such Class A Unit pursuant to Section 4.1(a)(i);

- 12 -

"Class A Unreturned Capital" of any Class A Unit means, as of any date, the aggregate Capital Contributions made or deemed to be made in exchange for such Class A Unit reduced by all Distributions made by the Company that constitute a return of Class A Unreturned Capital pursuant to Section 4.1(a)(ii);

"Class A Yield" means, with respect to each Class A Unit, the amount accruing on such Class A Unit on a daily basis, at the rate of 25% per annum, compounded on the last day of each calendar quarter, on (i) the Class A Unreturned Capital of such Class A Unit, plus (ii) the Class A Unpaid Yield thereon for all prior quarterly periods.  In calculating the amount of any Distribution to be made during a period, the portion of the Class A Yield accrued with respect to such Class A Unit for the portion of the quarterly period elapsing before such Distribution is made shall be taken into account in determining the amount of such Distribution; and

(d)     Class B Units.  Subject to Section 3.1(f), the Company shall be authorized to issue from time to time, subject to Board approval, Class B Units

(e)     Capital Contributions; Schedule of Unitholders.  Each Unitholder named on the Schedule of Unitholders attached hereto has made Capital Contributions on the date specified thereon to Intermediate LLC as set forth on the Schedule of Unitholders in exchange for the Units specified thereon.  Any reference in this Agreement to the Schedule of Unitholders shall be deemed a reference to the Schedule of Unitholders as amended and in effect from time to time.

(f)     Issuance of Additional Units and Interests.  Subject to compliance with Sections 3.1(g), and except as otherwise expressly limited by this Agreement, the Board shall have the right to authorize and cause Intermediate LLC to create and/or issue Equity Securities of Intermediate LLC, in which event, (i) all Unitholders shall be diluted in an equal manner with respect to such issuance, subject to differences in rights and preferences of different classes, groups and series of Equity Securities, and (ii) the Board shall have the power to amend this Agreement and/or the Schedule of Unitholders to reflect such additional issuances and dilution and to make any such other amendments as it deems necessary or desirable to reflect such additional issuances (including, without limitation, amending this Agreement to increase the authorized number of Equity Securities of any class, group or series, to create and authorize a new class, group or series of Equity Securities and to add the terms of such new class, group or series including economic and governance rights which may be different from, senior to or more favorable than the other existing Equity Securities), in each case without the approval or consent of any other Person so long as such amendments would not otherwise adversely affect in any material respect any previously existing class, series or group of Units in a manner different than the Sun Capital Investors holding equity of the same class, series or group of Units; provided that if any such amendment would adversely affect in any material respect any previously existing class, series or group of Units in a manner different than the Sun Capital Investors holding equity of the same class, series or group of Units, such amendment shall also require the written consent of the holders of a majority of the class, series or group of Units so adversely affected.  Any Person who acquires Equity Securities may be admitted to Intermediate LLC as a Member pursuant to the terms of Section 10.2.  In connection with any issuance of Units, the Person who acquires such Units shall execute a counterpart to this Agreement, accepting and agreeing to be bound by all terms and conditions hereof, and shall enter into such other documents, instruments

- 13 -

and agreements to effect such purchase as are required by the Board (each, an "Equity Agreement").  Each Person who acquires Units shall in exchange for such Units make a Capital Contribution to Intermediate LLC in an amount to be determined by the Board in its sole discretion.

        (g)     Preemptive Rights.

           (i)     Except for issuances of:

           (A)     Units set forth in the Schedule of Unitholders as of the date hereof;

           (B)     Equity Securities in connection with debt financings, refinancings, restructurings or similar transactions which the Board determines are on arms-length terms;

           (C)     Equity Securities issued pursuant to a Corporate Conversion effected in accordance with Section 9.11 of this Agreement;

           (D)     Equity Securities issued in connection with strategic transactions involving Intermediate LLC or any of its Subsidiaries and other Persons (including, without limitation, Equity Securities issued in connection with joint ventures and similar arrangements or as consideration in connection with an acquisition transaction) the primary purpose of which is other than for capital raising purposes;

           (E)     Equity Securities issued to officers, directors, consultants, employees, independent contractors or other service providers to Intermediate LLC or any of its Subsidiaries pursuant to incentive or other compensation plans; or

           (F)     Units issued in connection with any Unit split or any subdivision of Units, Unit dividend or recapitalization of Intermediate LLC or any of its Subsidiaries;

if Intermediate LLC proposes to sell any Equity Securities to any Sun Capital Investor and/or any of their respective Affiliates, Intermediate LLC shall offer to each Securityholder (other than Excluded Securityholders) by written notice the right, for a period of ten (10) calendar days from the date on which such notice is postmarked, hand delivered or faxed, to purchase at an amount equal to the price or other consideration for which such Equity Securities are to be issued a portion of such Equity Securities equal to the quotient obtained by dividing (1) the aggregate number of Class A Units held by such Securityholder, by (2) the aggregate number of Class A Units held by all Securityholders (such Securityholder's "Proportional Share"); provided that no Securityholder who either (x) is entitled to purchase less than $10,000 of such Equity Securities after determination of such holder's Proportional Share, or (y) is not an "accredited investor" as such term is defined under the Securities Act and the rules and regulations promulgated thereunder (any such Securityholder, an "Excluded Securityholder") shall have any rights under this

- 14 -

Section 3.1(g). Each such Securityholder (other than Excluded Securityholders) shall be entitled to purchase such Equity Securities at the same price and on the same terms as such Equity Securities are to be offered to any Sun Capital Investor and/or any of their respective Affiliates; provided that if all Persons entitled to purchase or receive such Equity Securities are required to also purchase other securities of Intermediate LLC, the Securityholders exercising their rights pursuant to this Section 3.1(g) shall also be required to purchase the same strip of securities (on the same terms and conditions) that such other Persons are required to purchase. The purchase price for all securities offered to such Securityholders hereunder shall be payable in the same form as any Sun Capital Investor and/or any of their respective Affiliates.

(ii)    In order to exercise its purchase rights hereunder, a Securityholder must within ten (10) calendar days of the date of the written notice from Intermediate LLC describing in reasonable detail the securities being offered, the purchase price thereof, the payment terms and such Securityholder's Proportional Share, deliver a written notice to Intermediate LLC describing such Securityholder's election hereunder.

(iii)    Upon the expiration of the offering periods described above, Intermediate LLC shall be entitled to sell such securities which such Securityholders have not elected to purchase during the ninety (90) calendar days following such expiration at a price and on payment terms not less and on other terms and conditions no more favorable to the purchasers thereof than that offered to such Securityholders. Any securities offered or sold by Intermediate LLC after such ninety (90) calendar day period must be reoffered to such Securityholders pursuant to the terms of this Section 3.1(g).

(iv)    Notwithstanding anything to the contrary set forth herein, in lieu of offering any securities to the Securityholders at the time such Equity Securities are offered to any Sun Capital Investors and/or their Affiliates, Intermediate LLC may comply with the provisions of this Section 3.1(g) by making an offer to sell to the Securityholders (other than Excluded Securityholders) their Proportional Share of such securities promptly after a sale to any Sun Capital Investor and/or any of their Affiliates is effected. In such event, for all purposes of this Section 3.1(g), each Securityholder's Proportional Share shall be determined taking into consideration the actual number of securities sold to any other Person so as to achieve the same economic effect as if such offer would have been made prior to such sale.

(v)    The rights of the Securityholders under this Section 3.1(g) shall terminate upon the consummation of the first to occur of (A) a Qualified Public Offering, or (B) a Liquidity Event.

(h)    Certain Representations and Warranties. By executing this Agreement (or, after the date hereof, any counterpart or joinder to this Agreement) and in connection with the issuance of Equity Securities to such Unitholder, each Unitholder represents and warrants to Intermediate LLC as follows:

(i)    The Equity Securities being acquired by such Unitholder pursuant to this Agreement or otherwise will be acquired for such Unitholder's own account and

- 15 -

not with a view to, or intention of, distribution thereof in violation of the Securities Act or any applicable state securities laws, and the Equity Securities will not be disposed of in contravention of the Securities Act or any applicable state securities laws.

(ii)    Such Unitholder is sophisticated in financial matters and is able to evaluate the risks and benefits of decisions respecting the investment in the Equity Securities and is either (A) an executive officer of Intermediate LLC or a Subsidiary or Affiliate thereof or is a service provider knowledgeable about Intermediate LLC and its Subsidiaries or (B) an "accredited investor" as such term is defined under the Securities Act and the rules and regulations promulgated thereunder.

(iii)    Such Unitholder is able to bear the economic risk of his, her or its investment in the Equity Securities for an indefinite period of time because the Equity Securities have not been registered under the Securities Act or applicable state securities laws and are subject to substantial restrictions on transfer set forth herein and, therefore, cannot be sold unless subsequently registered under the Securities Act and applicable state securities laws or an exemption from such registration is available and in compliance with such restrictions on transfer.

(iv)    Such Unitholder has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Equity Securities and has had full access to such other information concerning Intermediate LLC and their respective Subsidiaries and Affiliates as he, she or it has requested.

(v)    Such Unitholder has received and carefully read a copy of this Agreement.  This Agreement and each of the other agreements contemplated hereby to be executed by such Unitholder (including any Employment Agreement or Equity Agreement) constitute the legal, valid and binding obligation of such Unitholder, enforceable in accordance with their terms, and the execution, delivery and performance of this Agreement and such other agreements do not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which such Unitholder is a party or any judgment, order or decree to which such Unitholder is subject or create any conflict of interest with Intermediate LLC or any Subsidiary of Intermediate LLC, or any of their respective Affiliates, or any of their present or former suppliers.

(vi)    Such Unitholder is a resident of the state, or has its principal place of business in the state, set forth under his, her or its name on the Schedule of Unitholders.

(vii)    Such Unitholder has been given the opportunity to consult with independent legal counsel regarding his, her or its rights and obligations under this Agreement and has consulted with such independent legal counsel regarding the foregoing (or, after carefully reviewing this Agreement, has freely decided not to consult with independent legal counsel), fully understands the terms and conditions contained herein and therein and intends for such terms to be binding upon and enforceable against him, her or it.

3.2     Capital Accounts.

(a)     Maintenance of Capital Accounts.  Intermediate LLC shall maintain a separate Capital Account for each Unitholder according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv).  For this purpose, Intermediate LLC may, upon the occurrence of the events specified in Treasury Regulation Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Intermediate LLC property.

(b)     Computation of Income, Gain, Loss and Deduction Items.  For purposes of computing the amount of any item of Intermediate LLC income, gain, loss or deduction to be allocated pursuant to Article IV and to be reflected in the Capital Accounts, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose); provided that:

(i)     The computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(1)(B) or Code Section 705(a)(2)(B) and Treasury Regulation Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income tax purposes.

(ii)     If the Book Value of any Intermediate LLC property is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

(iii)     Items of income, gain, loss or deduction attributable to the disposition of Intermediate LLC property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the Book Value of such property.

(iv)     Items of depreciation, amortization and other cost recovery deductions with respect to Intermediate LLC property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

(v)     To the extent an adjustment to the adjusted tax basis of any Intermediate LLC asset pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

3.3     Negative Capital Accounts.  No Unitholder shall be required to pay to any other Unitholder or Intermediate LLC any deficit or negative balance which may exist from time to time in such Unitholder's Capital Account (including upon and after dissolution of Intermediate LLC).

3.4     No Withdrawal.  No Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from Intermediate LLC, except as expressly provided herein.

3.5     Loans From Unitholders.  Loans by Unitholders to Intermediate LLC shall not be considered Capital Contributions.  If any Unitholder shall loan funds to Intermediate LLC in excess of the amounts required hereunder to be contributed by such Unitholder to the capital of Intermediate LLC, the making of such loans shall not result in any increase in the amount of the Capital Account of such Unitholder.  The amount of any such loans shall be a debt of Intermediate LLC to such Unitholder and shall be payable or collectible in accordance with the terms and conditions upon which such loans are made.

3.6     Distributions In-Kind.  To the extent that Intermediate LLC distributes property in-kind to the Members, Intermediate LLC shall be treated as making a distribution equal to the Fair Market Value of such property for purposes of Section 4.1 and such property shall be treated as if it were sold for an amount equal to its Fair Market Value and any resulting gain or loss shall be allocated to the Members' Capital Accounts in accordance with Sections 4.3 through 4.5.

3.7     Transfer of Capital Accounts.  The original Capital Account established for each substituted Member shall be in the same amount as the Capital Account of the Member (or portion thereof) to which such substituted Member succeeds, at the time such substituted Member is admitted to Intermediate LLC.  The Capital Account of any Member whose interest in Intermediate LLC shall be increased or decreased by means of the transfer to it of all or part of the Units of another Member shall be appropriately adjusted to reflect such transfer or repurchase.  Any reference in this Agreement to a Capital Contribution of or Distribution to a Member that has succeeded any other Member shall include any Capital Contributions or Distributions previously made by or to the former Member on account of the Units of such former Member transferred to such Member.

## ARTICLE IV

## DISTRIBUTIONS AND ALLOCATIONS;
## REDEMPTION AND CONVERSIONS

4.1     Distributions.

(a)     Distribution Priorities.  Except as otherwise set forth in this Article IV, and subject to the provisions of Section 18-607 of the Delaware Act, the Board may in its discretion make Distributions at any time or from time to time.  All Distributions shall be made only in the following order and priority:

(i)      first, to the Unitholders holding Class A Units, an amount equal to the aggregate Class A Unpaid Yield on such Unitholders' outstanding Class A Units held as of the time of such Distribution (distributed among such Unitholders based on the proportion that each Unitholder's share of Class A Unpaid Yield in respect of such Person's Class A Units bears to the aggregate Class A Unpaid Yield of all Class A Units), and no Distribution or any portion thereof may be made pursuant to any of Section 4.1(a)(ii) through (iii) until the entire amount of the Class A Unpaid Yield on the outstanding Class A Units as of the time of such Distribution has been paid in full;

(ii)     second, to the Unitholders holding Class A Units, an amount equal to the aggregate Class A Unreturned Capital in respect of such Unitholders' outstanding Class A Units held as of the time of such Distribution (distributed among such Unitholders based on the proportion that each such Unitholder's share of Class A Unreturned Capital in respect of such Person's Class A Units bears to the aggregate amount of Class A Unreturned Capital of all Class A Units), and no Distribution or any portion thereof may be made pursuant to any of Section 4.1(a)(iii) until the entire amount of Class A Unreturned Capital in respect of the outstanding Class A Units as of the time of such Distribution has been paid in full; and

(iii)    third, all remaining amounts, if any, shall be distributed to the Unitholders holding Class B Units, pro rata in proportion to their ownership of Class B Units.

For the avoidance of doubt, each Unitholder acknowledges and agrees that this Section 4.1 may be amended or modified by the Board without the consent or approval of any other Person, including in connection with the creation, authorization or issuance of a new class of Equity Security that is senior, *pari passu* or junior to any Equity Security existing prior to such amendment or modification, subject only to the restrictions set forth in Section 14.2.

(b)     Distributions upon a Sale of Intermediate LLC.  In the event of a Sale of Intermediate LLC, each Securityholder shall receive in exchange for the Units held by such Securityholder the same portion of the aggregate consideration from such transaction that such Securityholder would have received if such aggregate consideration had been distributed by Intermediate LLC in accordance with the provisions of Section 4.1(a) of this Agreement.  Each Member and Unitholder shall take all necessary or desirable actions in connection with the distribution of the aggregate consideration from any such transaction as requested by the Board.

4.2     Cancellation of Class A Units.    With respect to any Unitholder's outstanding Class A Units held as of the time of any Distribution pursuant to Section 4.1(a), such Class A Units shall be deemed to be cancelled immediately following such Distribution if, immediately following such Distribution, the aggregate Class A Unpaid Yield on such Unitholder's Class A Units is zero and the aggregate Class A Unreturned Capital on such Unitholders' Class A Units is zero.  With respect to any Unitholder's outstanding Class A Units held as of immediately prior to any redemption pursuant to Section 9.5(a) or 9.5(b), such Class A Units shall be deemed to be cancelled immediately following the payment in full of the Class A Redemption Price in accordance with Section 9.5(a) or 9.5(b), as applicable.  To the extent that the Board has in its discretion caused Intermediate LLC to issue certificates to any Unitholder

- 19 -

representing any such Class A Units so cancelled, such Unitholder shall promptly after such Distribution or redemption, as applicable, surrender to Intermediate LLC such certificate or certificates representing such Class A Units (or, if such Unitholder alleges that such certificate(s) has been lost, stolen or destroyed, deliver a lost certificate affidavit and agreement reasonably acceptable to Intermediate LLC to indemnify Intermediate LLC against any claim that may be made against Intermediate LLC on account of the alleged loss, theft, destruction of such certificate).

4.3     Allocations.  Except as otherwise provided in Section 4.4, Profit or Loss for any Fiscal Year shall be allocated among the Unitholders in such a manner as to reduce or eliminate, to the extent possible, any difference, as of the end of such Fiscal Year, between (a) the sum of (i) the Capital Account of each Unitholder, (ii) such Unitholder's share of Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)) and (iii) such Unitholder's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)) and (b) the respective net amounts, positive or negative, which would be distributed to them or for which they would be liable to Intermediate LLC under the Delaware Act, determined as if Intermediate LLC were to (i) liquidate the assets of Intermediate LLC for an amount equal to their Book Value and (ii) distribute the proceeds of liquidation pursuant to Section 12.2.

4.4     Special Allocations.

(a)     Minimum Gain Chargeback.  Losses attributable to partner nonrecourse debt (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulation Section 1.704-2(i).  If there is a net decrease during a Taxable Year in partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)), Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) shall be allocated to the Unitholders in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(i)(4).

(b)     Unitholder Nonrecourse Debt Minimum Chargeback.  Nonrecourse deductions (as determined according to Treasury Regulation Section 1.704-2(b)(1)) for any Taxable Year shall be allocated to each Unitholder ratably among such Unitholders based upon the manner in which Profits are allocated among the Unitholders for such Taxable Year.  Except as otherwise provided in Section 4.4(a), if there is a net decrease in the Minimum Gain during any Taxable Year, each Unitholder shall be allocated Profits for such Taxable Year (and, if necessary, for subsequent Taxable Years) in the amounts and of such character as determined according to Treasury Regulation Section 1.704-2(f).  This Section 4.4(b) is intended to be a Minimum Gain chargeback provision that complies with the requirements of Treasury Regulation Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c)     Qualified Income Offset.  If any Unitholder that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of Sections 4.4(a) and 4.4(b) but before the application of any other provision of this Article IV, then Profits for such Taxable Year shall be allocated to such Unitholder in proportion to, and to the extent of, such Adjusted Capital

- 20 -

Account Deficit.  This Section 4.4(c) is intended to be a qualified income offset provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d)    Allocation of Certain Profits and Losses.  Profits and Losses described in Section 3.2(b)(v) shall be allocated in a manner consistent with the manner that the adjustments to the Capital Accounts are required to be made pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

(e)    Regulatory Allocations.  The allocations set forth in Sections 4.4(a)-(d) (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations.  The Regulatory Allocations may not be consistent with the manner in which the Unitholders intend to allocate Profit and Loss of Intermediate LLC or make Distributions.  Accordingly, notwithstanding the other provisions of this Article IV, but subject to the Regulatory Allocations, income, gain, deduction, and loss shall be reallocated among the Unitholders so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Unitholders to be in the amounts (or as close thereto as possible) they would have been if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations.  In general, the Unitholders anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Unitholders so that the net amount of the Regulatory Allocations and such special allocations to each such Unitholder is zero.  In addition, if in any Fiscal Year or Fiscal Period there is a decrease in partnership Minimum Gain, or in partner nonrecourse debt Minimum Gain, and application of the Minimum Gain chargeback requirements set forth in Section 4.4(a) or Section 4.4(b) would cause a distortion in the economic arrangement among the Unitholders, the Unitholders may, if they do not expect that Intermediate LLC will have sufficient other income to correct such distortion, request the Internal Revenue Service to waive either or both of such Minimum Gain chargeback requirements.  If such request is granted, this Agreement shall be applied in such instance as if it did not contain such Minimum Gain chargeback requirement.

(f)    Intermediate LLC Losses shall not be allocated to a Member if such allocation of Losses would cause the Member to have an Adjusted Capital Account Deficit.  Intermediate LLC Losses that cannot be allocated to a Member shall be allocated to the other Members; provided, however, that, if no Member may be allocated Intermediate LLC Losses due to the limitations of this Section 4.4(f), Intermediate LLC Losses shall be allocated to all Members in accordance with their respective outstanding Units.

4.5    Offsetting Allocations.  If, and to the extent that, any Member is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Member and Intermediate LLC pursuant to Sections  83, 482, 483, 1272-1274 or 7872 of the Code or any similar provision now or hereafter in effect, the Board shall use its reasonable best efforts to allocate any corresponding Profit or Loss to the Member who recognizes such item in order to reflect the Members' economic interest in Intermediate LLC.

4.6     Tax Allocations.

(a)     Allocations Generally.  The income, gains, losses, deductions and credits of Intermediate LLC will be allocated for federal, state and local income tax purposes among the Unitholders in accordance with the allocation of such income, gains, losses, deductions and credits among the Unitholders for computing their Capital Accounts; except that if any such allocation is not permitted by the Code or other applicable law, Intermediate LLC's subsequent income, gains, losses, deductions and credits will be allocated among the Unitholders so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)     Code Section 704(c) Allocations.  Items of Intermediate LLC taxable income, gain, loss and deduction with respect to any property contributed to the capital of Intermediate LLC shall be allocated among the Unitholders in accordance with Code Section 704(c) so as to take account of any variation between the adjusted basis of such property to Intermediate LLC for federal income tax purposes and its Book Value.  In addition, if the Book Value of any Intermediate LLC asset is adjusted pursuant to the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), then subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).  The Board shall determine all allocations pursuant to this Section 4.6(b) using a method that is reasonable under Treasury Regulation Section 1.704-3.

(c)     Allocation of Tax Credits, Tax Credit Recapture, Etc.  Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Unitholders according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

(d)     In the event that (i) a Unitholder's Capital Account is debited (and the Capital Accounts of the other Unitholders are credited by, in aggregate, a corresponding amount) pursuant to Section 3.7 in connection with the repurchase of a Unitholder's unvested Class B Units pursuant to a written agreement between such Unitholder and Intermediate LLC setting forth the terms under which such Class B Units were issued or (ii) any other contribution, distribution or allocation made pursuant to this Agreement would (but for this Section 4.6(d)) cause the amounts allocated to a Unitholder for federal and applicable state and local income tax purposes to not ultimately be consistent with the cumulative distributions such Unitholder receives (or is entitled to receive), Intermediate LLC shall, to the extent possible and solely for federal and applicable state and local income tax purposes allocate amounts to such Unitholders in a manner which shall result in the cumulative federal and applicable state and local income tax allocations to each Unitholder being as nearly consistent with the cumulative distributions to each Unitholder as possible.

(e)     Effect of Allocations.  Allocations pursuant to this Section 4.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Unitholder's Capital Account or share of Profits, Losses, Distributions or other Intermediate LLC items pursuant to any provision of this Agreement.

- 22 -

4.7    <u>Indemnification and Reimbursement for Payments on Behalf of a Unitholder</u>.  Except as otherwise provided in <u>Sections 5.6</u> and <u>6.1</u>, if Intermediate LLC is required by law to make any payment to a Governmental Entity that is specifically attributable to a Unitholder or a Unitholder's status as such (including, without limitation, federal withholding taxes, state personal property taxes, and state unincorporated business taxes), then such Unitholder shall indemnify and contribute to Intermediate LLC in full for the entire amount paid (including interest, penalties and related expenses).  The Board may offset Distributions to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify Intermediate LLC under this <u>Section 4.7</u>.  A Unitholder's obligation to indemnify and make contributions to Intermediate LLC under this <u>Section 4.7</u> shall survive the termination, dissolution, liquidation and winding up of Intermediate LLC, and for purposes of this <u>Section 4.7</u>, Intermediate LLC shall be treated as continuing in existence.  Intermediate LLC may pursue and enforce all rights and remedies it may have against each Unitholder under this <u>Section 4.7</u>, including instituting a lawsuit to collect such indemnification and contribution, with interest calculated at a rate equal to the Base Rate plus three percentage points per annum (but not in excess of the highest rate per annum permitted by law), compounded on the last day of each Fiscal Quarter.

## ARTICLE V

## MANAGEMENT

5.1    <u>Authority of Board</u>.

(a)    <u>Sole Authority</u>.    Except for situations in which the approval of one or more of the Members is expressly and specifically required by the express terms of this Agreement, and subject to the provisions of this <u>Section 5.1</u>, (i) the Board shall conduct, direct and exercise full control over all activities of Intermediate LLC (including, subject to <u>Sections 3.1(g)</u>, all decisions relating to the issuance of additional Equity Securities and the voting and sale of, and the exercise of other rights with respect to, the equity securities of its Subsidiaries), (ii) all management powers over the business and affairs of Intermediate LLC shall be exclusively vested in the Board, and (iii) the Board shall have the sole power to bind or take any action on behalf of Intermediate LLC, or to exercise any rights and powers (including, without limitation, the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to Intermediate LLC under this Agreement or any other agreement, instrument, or other document to which Intermediate LLC is a party.  No Member shall have the authority to bind Intermediate LLC in any way, to do any act that would be (or that could be construed as) binding on Intermediate LLC, or to make any expenditures on behalf of Intermediate LLC, unless such specific authority has been expressly granted to and not revoked from such Member by the Board.

(b)    <u>Certain Actions</u>.  Without limiting the generality of the foregoing:

(i)    the Board shall exercise all rights and powers of Intermediate LLC (whether such rights and powers are expressly and specifically granted to Intermediate LLC under the terms of an agreement to which Intermediate LLC is a party, or arise as a

result of Intermediate LLC's ownership of securities or otherwise) to amend or consent to an amendment, modification, or waiver of the Equity Agreements and to take actions, give or withhold consents or approvals, waive or require the satisfaction of conditions, or make determinations, opinions, judgments, or other decisions which are granted to Intermediate LLC under the Equity Agreements;

(ii)    except as contemplated by Section 9.4, the Board shall have sole discretion and right to enter into any agreement regarding, and have sole authority to approve on behalf of Intermediate LLC and all of the Members, a Sale of Intermediate LLC or any merger, consolidation or other transaction involving Intermediate LLC or any of its Subsidiaries; and

(iii)   the Board shall have the right to determine the timing and amount of any equity investment in Intermediate LLC and to effect amendments to this Agreement in order to effectuate such equity investments.

5.2    Composition of the Board.

(a)    Number and Appointment.  The Board shall initially consist of five (5) Managers.  Thereafter, the number of Managers on the Board shall be established from time to time by the Majority Sun Capital Investors.  The Managers shall include:

(i)     up to two (2) executives of the Company and/or its Subsidiaries designated by the Majority Sun Capital Investors as "Executive Managers," who shall initially be David Goronkin and John D. Morberg; and

(ii)    such other persons designated by the Majority Sun Capital Investors as "Sun Capital Managers," who shall initially be Anthony Polazzi, Clarence E. Terry and Douglas Werking.

(b)    Term.  Each Manager appointed shall serve until a successor is appointed in accordance with the terms hereof or his or her earlier resignation, death or removal.  Any Manager will be removed from the Board, with or without cause, at the written request of the Majority Sun Capital Investors and under no other circumstances, except that each Executive Manager will be removed from the Board immediately (with no further action required) upon his employment with the Company and/or its Subsidiaries ceasing for any reason.  A Manager may resign at any time upon written notice to Intermediate LLC.  Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

(c)    Vacancies.  A vacancy in the Board because of resignation, death or removal of a Manager will be filled by the Majority Sun Capital Investors.  If the Majority Sun Capital Investors fail to appoint a Manager pursuant to the terms of this Section 5.2, such position in the Board shall remain vacant until the Majority Sun Capital Investors exercise their right to appoint a Manager as provided hereunder.  Newly created managerships resulting from any increase in the authorized number of Managers may be filled by the Board.

5.3     Board Actions; Meetings.  Unless another percentage is set forth herein or required by applicable law, any determination or action required to be taken by the Board shall be taken by a majority of the Managers then in office (through meetings of the Board or written consents pursuant to this Section 5.3).  A majority of the Managers shall constitute a quorum sufficient for conducting meetings and making decisions.  Regular meetings of the Board may be held on such date and at such time and at such place as shall from time to time be determined by the Board.  Special meetings of the Board may be called from time to time by any Sun Capital Manager.  Notice of each special meeting of the Board stating the date, place and time of such meeting shall be given to each Manager by hand, telephone, telecopy, overnight courier or the U.S. mail at least twenty-four (24) hours prior to any meeting of the Board.  Notice may be waived before or after a meeting or by attendance without protest at such meeting.  Any action to be taken by the Board may be taken at a meeting of the Board or by a written consent executed by the Managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting.  Managers may participate in a meeting of the Board by means of telephone conference or similar communications equipment by which all Persons participating in the meeting can communicate with each other, and such participation in a meeting shall constitute presence in person at the meeting.  Any Manager unable to attend a meeting of the Board may designate another Manager as his or her proxy.  The Board may adopt such other procedures governing meetings and the conduct of business at such meetings as it shall deem appropriate.

5.4     No Compensation.  Managers shall not be compensated for their services as members of the Board.

5.5     Delegation of Authority.  The Board may, from time to time, delegate to one or more Persons (including any Member and including through the creation and establishment of one or more other committees) such authority and duties as the Board may deem advisable.  Any delegation pursuant to this Section 5.5 may be revoked at any time by the Board.

5.6     Purchase of Units.  Subject to the other provisions of this Agreement, the Board may cause Intermediate LLC to purchase or otherwise acquire Units; provided that this provision shall not in and of itself obligate any Unitholder to sell any Units to Intermediate LLC. So long as any such Units are owned by Intermediate LLC such Units will not be considered outstanding for any purpose.

5.7     Limitation of Liability.

(a)     Waiver of Liability.  Except as otherwise provided herein or in any agreement entered into by such Person and Intermediate LLC and to the maximum extent permitted by the Delaware Act, no present or former member of the Board, nor any present or former officer of Intermediate LLC, nor any of their respective Affiliates, employees, agents or representatives shall be liable to Intermediate LLC or to any Member for any act or omission performed or omitted by such Person in his, her or its capacity as member of the Board or officer of Intermediate LLC; provided that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's gross negligence, willful misconduct or knowing violation of law as determined by a final judgment,

order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected).  Each member of the Board and each officer of Intermediate LLC shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by such Person in good faith reliance on such advice shall in no event subject such Person or any of such Person's Affiliates, employees, agents or representatives to liability to Intermediate LLC or any Member.

(b)    <u>Board Discretion</u>.  Whenever in this Agreement or any other agreement contemplated herein the Board is permitted or required to take any action or to make a decision or determination, the Board shall take such action or make such decision or determination in its sole discretion, unless another standard is expressly set forth herein or therein.  Whenever in this Agreement or any other agreement contemplated herein the Board is permitted or required to take any action or to make a decision or determination in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, each Manager shall be entitled to consider such interests and factors as such Manager desires (including, without limitation, the interests of such Manager's Affiliates as Unitholders).

(c)    <u>Good Faith and Other Standards</u>.  Whenever in this Agreement or any other agreement contemplated herein the Board is permitted or required to take any action or to make a decision or determination in its "good faith" or under another express standard, each Manager shall act under such express standard and, to the extent permitted by applicable law, shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein, and, notwithstanding anything contained herein to the contrary, so long as such Manager acts in good faith, the resolution, action or terms so made, taken or provided by the Board shall not constitute a breach of this Agreement or any other agreement contemplated herein or impose liability upon such Manager or any of such Manager's Affiliates, employees, agents or representatives.

(d)    <u>Limitation of Duties; Conflict of Interest</u>.  To the maximum extent permitted by applicable law, Intermediate LLC and each Member and Unitholder hereby waives any claim or cause of action against each Manager and each Member and their respective Affiliates, employees, agents and representatives for any breach of any fiduciary duty to Intermediate LLC or its Members or Unitholders or any of Intermediate LLC's Subsidiaries by any such Person, including, without limitation, as may result from a conflict of interest between Intermediate LLC or its Members or Unitholders or any of Intermediate LLC's Subsidiaries and such Person or otherwise; <u>provided</u> <u>that</u>, with respect to actions or omissions by a Manager, such waiver shall not apply to the extent the act or omission was attributable to such Manager's gross negligence, willful misconduct or knowing violation of law as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected).  Each Member and Unitholder acknowledges and agrees that in the event of any such conflict of interest, each such Person may, in the absence of bad faith, act in the best interests of such Person or its Affiliates, employees, agents and representatives.  No Manager or Member shall be obligated to recommend or take any action in its capacity as a Manager or Member that (i) prefers the interests of Intermediate LLC or its Members or Unitholders or any of its Subsidiaries over the interests of such Person or its Affiliates, employees, agents or

representatives or (ii) prefers the interests of the holders of Class A Units over the interests of the holders of the Class B Units, and each of Intermediate LLC and each Member and Unitholder hereby waives the fiduciary duty, if any, of such Person to Intermediate LLC and/or its Members and/or Unitholders, including, without limitation, in the event of any such conflict of interest or otherwise; provided that, with respect to actions or omissions by a Manager, such waiver shall not apply to the extent the act or omission was attributable to such Manager's gross negligence, willful misconduct or knowing violation of law as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected).

(e)    Effect on Other Agreements.  This Section 5.7 shall not in any way affect, limit or modify any Person's liabilities or obligations under any employment agreement, consulting agreement, management services agreement, confidentiality agreement, noncompete agreement, nonsolicit agreement or any similar agreement with Intermediate LLC or any of its Subsidiaries.

5.8    Officers.

(a)    The Board may, from time to time, employ and retain Persons as may be necessary or appropriate for the conduct of Intermediate LLC's business, including employees, agents and other Persons (any of whom may be a Member) who may be designated as officers of Intermediate LLC, with titles including but not limited to "chief executive officer," "chairman," "president," "vice president," "treasurer," "secretary," "assistant secretary," "director" and "chief financial officer," as and to the extent authorized by the Board.  The names of the initial officers of Intermediate LLC are set forth on the Schedule of Officeholders attached hereto.  Any number of offices may be held by the same person.  In its discretion, the Board may choose not to fill any office for any period as it may deem advisable.  Officers need not be residents of the State of Delaware or Members.  Any officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them; provided that in the absence of an express delegation of authority and duties, such persons shall have the authority and duties normally associated with such offices in respect of corporations formed pursuant to the Delaware Law.  Notwithstanding the foregoing, no officer shall have the authority to approve any actions of any Subsidiary of Intermediate LLC which requires the approval of Intermediate LLC in its capacity as a shareholder of such Subsidiary without the express authorization of the Board.  The Board may assign titles to particular officers.  Each officer shall hold office until his successor shall be duly designated qualified or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.  The salaries or other compensation, if any, of the officers of Intermediate LLC shall be fixed from time to time by the Board.

(b)    Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board or any Manager.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Board whenever in its judgment the best interests of Intermediate LLC shall be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the individual so removed.

Designation of an officer shall not of itself create contractual or employment rights. Any vacancy occurring in any office of Intermediate LLC may be filled by the Board.

## ARTICLE VI

## RIGHTS AND OBLIGATIONS OF UNITHOLDERS AND MEMBERS

6.1    Limitation of Liability.  Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of Intermediate LLC, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of Intermediate LLC, and no Unitholder or Member (including any Manager) shall be obligated personally for any such debt, obligation or liability of Intermediate LLC solely by reason of being a Unitholder or acting as a Member or Manager of Intermediate LLC, other than such Unitholder's obligation to make Capital Contributions to Intermediate LLC pursuant to the terms and conditions hereof, any Equity Agreement or any other agreement respecting the issuance and sale or grant of Equity Securities.  Except as otherwise provided in this Agreement, a Unitholder's liability (in its capacity as such) for debts, liabilities and losses of Intermediate LLC shall be such Unitholder's share of Intermediate LLC's assets; provided that a Unitholder shall be required to return to Intermediate LLC any Distribution made to it in clear and manifest accounting or similar error. The immediately preceding sentence shall constitute a compromise to which all Unitholders have consented within the meaning of the Delaware Act.  Notwithstanding anything contained herein to the contrary, the failure of Intermediate LLC to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Unitholders or Members (including any Manager) for liabilities of Intermediate LLC, except to the extent constituting fraud, gross negligence or willful misconduct by such Unitholders or Members.

6.2    Lack of Authority.  No Unitholder or Member in its capacity as such has the authority or power to act for or on behalf of Intermediate LLC in any manner or way, to bind Intermediate LLC, or do any act that would be (or could be construed as) binding on Intermediate LLC, in any manner or way, or to make any expenditures on behalf of Intermediate LLC, unless such specific authority has been expressly granted to and not revoked from such Member by the Board, and the Unitholders and Members hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

6.3    No Right of Partition.  No Unitholder or Member shall have the right to seek or obtain partition by court decree or operation of law of any Intermediate LLC property, or the right to own or use particular or individual assets of Intermediate LLC.

6.4    Indemnification.

(a)    Generally.  Subject to Section 4.7, Intermediate LLC hereby agrees to indemnify and hold harmless any Person (each an "Indemnified Person") to the fullest extent permitted under the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits Intermediate LLC to

- 28 -

provide broader indemnification rights than Intermediate LLC is providing immediately prior to such amendment), against all expenses, liabilities and losses (including attorney fees, judgments, fines, excise taxes or penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was a Unitholder or Member or is or was serving as a Manager, officer, director, principal, member, employee, agent or representative of Intermediate LLC or is or was serving at the request of Intermediate LLC as a managing member, manager, officer, director, principal, member, employee, agent or representative of another corporation, partnership, joint venture, limited liability company, trust or other enterprise; provided that no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' (the term "Affiliates" excluding, for purposes hereof, Intermediate LLC's and its Subsidiaries') gross negligence, willful misconduct or knowing violation of law as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected) or for any present or future breaches of any representations, warranties or covenants by such Indemnified Person or its Affiliates' (the term "Affiliates" excluding, for purposes hereof, Intermediate LLC's and its Subsidiaries'), employees, agents or representatives contained herein or in any other agreement with Intermediate LLC.    Expenses, including attorneys' fees and expenses, incurred by any such Indemnified Person in defending a proceeding shall be paid by Intermediate LLC in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by Intermediate LLC.

(b)    Nonexclusivity of Rights.    The right to indemnification and the advancement of expenses conferred in this Section 6.4 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, law, vote of the Board or otherwise.

(c)    Insurance.    Intermediate LLC may maintain insurance, at its expense, to protect any Indemnified Person against any expense, liability or loss described in Section 6.4(a) above whether or not Intermediate LLC would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this Section 6.4.

(d)    Limitation.    Notwithstanding anything contained herein to the contrary (including in this Section 6.4), any indemnity by Intermediate LLC relating to the matters covered in this Section 6.4 shall be provided out of and to the extent of Intermediate LLC assets only, and no Unitholder (unless such Unitholder otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of Intermediate LLC (except as expressly provided herein).

(e)    Savings Clause.    If this Section 6.4 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then Intermediate LLC shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 6.4

to the fullest extent permitted by any applicable portion of this <u>Section 6.4</u> that shall not have been invalidated and to the fullest extent permitted by applicable law.

6.5    <u>Members Right to Act</u>.   For situations for which the approval of the Members generally (rather than the approval of the Board or a particular group of Members) is required by this Agreement or by applicable law, the Members shall act through meetings and written consents as described in this <u>Section 6.5</u>.  For all purposes of the Act, the Class A Units shall be deemed to be the same class or group.  Notwithstanding the foregoing, (a) no Member, other than the Sun Capital Investors, shall have any voting rights under this Agreement or the Act with respect to the Class A Units held by such Member and (b) the Sun Capital Investors shall be entitled to one vote per Class A Unit held by such Member (unless expressly stated otherwise in an applicable Equity Agreement or other Transfer document).  At such time as the Sun Capital Investors hold Class A Units, the Members holding Class B Units (whether or not vested) shall have no voting rights under this Agreement or the Act with respect to such Units.  At such time as the Sun Capital Investors do not hold any Class A Units, (a) no Member, other than the Sun Capital Investors, shall have any voting rights under this Agreement or the Act with respect to the Class B Units held by such Member and (b) the Sun Capital Investors shall be entitled to one vote per Class B Unit held by such Member (unless expressly stated otherwise in an applicable Equity Agreement or other Transfer document).  The actions by the Members permitted hereunder may be taken at a meeting called by the Board or by Members holding at least a majority of the Units entitled to vote or consent on the matter on at least five days' prior written notice to the other Members entitled to vote or consent thereon, which notice shall state the purpose or purposes for which such meeting is being called.  The actions taken by the Members entitled to vote or consent at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, the Members entitled to vote or consent as to whom it was improperly held signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof.  The actions by the Members entitled to vote or consent may be taken by vote of the Members entitled to vote or consent at a meeting or by written consent (without a meeting and without a vote) so long as such consent is signed by the Members having not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted.  Prompt notice of the action so taken without a meeting shall be given to those Members entitled to vote or consent who have not consented in writing.  Any action taken pursuant to such written consent of the Members shall have the same force and effect as if taken by the Members at a meeting thereof.

6.6    <u>Investment Opportunities and Conflicts of Interest</u>.   Each Management Investor shall, and shall cause each of their Affiliates to, bring all investment or business opportunities to Intermediate LLC of which any of the foregoing become aware and which they believe are, or may be, within the scope and investment objectives related to the business of Intermediate LLC or any of its Subsidiaries, which would or may be beneficial to the business of Intermediate LLC or any of its Subsidiaries, or are otherwise competitive with the business of Intermediate LLC or any of its Subsidiaries.  The Unitholders expressly acknowledge and agree that, subject to the provisions of <u>Section 6.7</u> and to the terms of any other agreement to which they may be bound, (i) the Sun Capital Investors and their respective Affiliates (collectively, the "<u>Financial Investors</u>") are permitted to have, and may presently or in the future have, investments

or other business relationships with entities engaged in the Business other than through Intermediate LLC or any of its Subsidiaries (an "Other Business"), (ii) the Financial Investors have and may develop a strategic relationship with businesses that are and may be competitive or complementary with Intermediate LLC or any of its Subsidiaries, (iii) none of the Financial Investors will be prohibited by virtue of their investments in Intermediate LLC or its Subsidiaries or their service as Manager or service on Intermediate LLC's or any of its Subsidiaries' board of managers or directors from pursuing and engaging in any such activities, (iv) none of the Financial Investors will be obligated to inform or present Intermediate LLC, or its Subsidiaries or the Board of any such opportunity, relationship or investment, (v) the other Unitholders will not acquire or be entitled to any interest or participation in any Other Business as a result of the participation therein of any of the Financial Investors, and (vi) the involvement of the Financial Investors in any Other Business will not constitute a conflict of interest by such Persons with respect to Intermediate LLC or its Unitholders or any of Intermediate LLC's Subsidiaries.

6.7    Confidentiality. Each Unitholder recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of Intermediate LLC, and any of their Subsidiaries, including but not limited to confidential information of Intermediate LLC, and its Subsidiaries regarding identifiable, specific and discrete business opportunities being pursued by Intermediate LLC or its Subsidiaries (the "Confidential Information").  Each Unitholder (on behalf of itself and, to the extent that such Unitholder would be responsible for the acts of the following Persons under principles of agency law, its directors, officers, shareholders, partners, employees, agents and members) agrees that it will not, during or after the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever, except (i) to authorized directors, officers, representatives, agents and employees of Intermediate LLC, or its Subsidiaries and as otherwise may be proper in the course of performing such Unitholder's obligations, or enforcing such Unitholder's rights, under this Agreement and the agreements expressly contemplated hereby; (ii) as part of such Unitholder's normal reporting, rating or review procedure (including normal credit rating or pricing process), or in connection with such Unitholder's or such Unitholder's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such Unitholder's (or any of its Affiliates') Affiliates, auditors, attorneys or other agents; provided that in no event shall such Unitholder disclose any trade secrets or proprietary information to a competitor of Intermediate LLC or its Subsidiaries; (iii) to any bona fide prospective purchaser of the equity or assets of such Unitholder or its Affiliates or the Units held by such Unitholder, or prospective merger partner of such Unitholder or its Affiliates, provided that such purchaser or merger partner agrees to be bound by the provisions of this Section 6.7; or (iv) as is required to be disclosed by order of a Governmental Entity, or by subpoena, summons or legal process, or by law, rule or regulation, provided that, to the extent permitted by law, the Unitholder required to make such disclosure shall provide to the Board prompt notice of such disclosure.  For purposes of this Section 6.7, "Confidential Information" shall not include any information of which such Person can demonstrate was or has become generally available to the public other than as a result of disclosure by Intermediate LLC or its Subsidiaries to the public.  Nothing in this Section 6.7 shall in any way limit or otherwise modify any confidentiality covenants entered into by the Management Investors pursuant to the Management Agreements (if applicable) or any other agreement entered into with Intermediate LLC, or its Subsidiaries and any Unitholder.  With

respect to any Management Investor, in the event of any conflict between this <u>Section 6.7</u> and the confidentiality provisions set forth in any Employment Agreement entered into on or after the date hereof with such Management Investor, the confidentiality provisions set forth in such Employment Agreement shall govern as to such Management Investor and its Affiliates.

## ARTICLE VII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS; INSPECTION

7.1    <u>Records and Accounting</u>.  Intermediate LLC shall keep, or cause to be kept, appropriate books and records with respect to Intermediate LLC's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to <u>Section 7.2</u> or pursuant to applicable laws.  All matters concerning (i) the determination of the relative amount of allocations and distributions among the Unitholders pursuant to <u>Article III</u> and <u>Article IV</u> and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board, whose determination shall be final and conclusive as to all of the Unitholders absent manifest error.

7.2    <u>Reports</u>.

(a)    Intermediate LLC shall use commercially reasonable efforts to deliver or cause to be delivered to each Unitholder, within 120 days after the end of each Fiscal Year, an annual report containing a statement of changes in the Unitholder's equity and the Unitholder's Capital Account balance for such Fiscal Year (if any).

(b)    Intermediate LLC shall use commercially reasonable efforts to deliver or cause to be delivered, within 120 days after the end of each Fiscal Year, to each Person who was a Unitholder at any time during such Fiscal Year all information necessary for the preparation of such Person's United States federal and state income tax returns.

7.3    <u>Transmission of Communications</u>.  Each Person that owns or controls Units on behalf of, or for the benefit of, another Person or Persons shall be responsible for conveying any report, notice or other communication received from Intermediate LLC to such other Person or Persons.

## ARTICLE VIII

## TAX MATTERS

8.1    <u>Preparation of Tax Returns</u>.  Intermediate LLC shall arrange for the preparation and timely filing of all returns required to be filed by Intermediate LLC.

8.2    <u>Tax Elections</u>.  The Taxable Year shall be the Fiscal Year unless the Board shall determine otherwise.  The Board shall determine whether to make or revoke any available election pursuant to the Code.  Each Unitholder will upon request supply any information necessary to give proper effect to such election.

8.3     Tax Controversies.   Sun Garden Fresh, LLC shall be the Tax Matters Partner and, as such, shall be authorized and required to represent Intermediate LLC (at Intermediate LLC's expense) in connection with all examinations of Intermediate LLC's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend LLC funds for professional services and reasonably incurred in connection therewith.   Each Unitholder agrees to cooperate with Intermediate LLC and to do or refrain from doing any or all things reasonably requested by Intermediate LLC with respect to the conduct of such proceedings.  The Tax Matters Partner shall keep all Unitholders informed of the progress of any examinations, audits or other proceedings, and all Unitholders shall have the right to participate in any such examinations, audits or other proceedings.

## ARTICLE IX

## TRANSFER OF UNITS; REPURCHASE OF UNITS

9.1     Required Consent.   No Unitholder (other than holders of Sun Capital Equity) shall Transfer any interest in any Units without first obtaining the prior written consent of both the Board, which consent may be withheld in the Board's sole discretion, and the Majority Sun Capital Investors, which consent may be withheld in the Sun Capital Investors' sole discretion (the "Required Consent"), except that such Unitholders may Transfer Units pursuant to (i) Section 9.3 (but not as a Transferring Unitholder) or Section 9.4, (ii) the forfeiture and repurchase provisions set forth in this Agreement or any applicable Employment Agreement and/or Equity Agreement or (iii) a Transfer to a Permitted Transferee, (collectively, the "Exempt Transfers"); provided that if such Unitholder Transfers any interests in any Units to a Permitted Transferee, such Transferor shall retain voting and disposition control of such Units; provided further that if such Unitholder Transfers any interests in any Units to a Permitted Transferee and such Person ceases to be a Permitted Transferee of such Unitholder, then such Person shall, upon ceasing to be a Permitted Transferee, Transfer such interest to the Unitholder making such Transfer.

9.2     First Refusal Rights.

(a)     Offer.   Upon obtaining the Required Consent (which shall not be unreasonably withheld) and subject to compliance with all other provisions of this Agreement, at least 60 days prior to any Transfer of any Units (except pursuant to an Exempt Transfer), any Unitholder desiring to make such Transfer (other than any holder of Sun Capital Equity) (the "Transferring Unitholder") shall deliver a written notice (the "Offer Notice") to Intermediate LLC and each holder of Sun Capital Equity, specifying in reasonable detail the identity of the prospective Transferee(s), the number and class of Units to be Transferred (the "Offered Units") and the price and other terms and conditions of the proposed Transfer.   The Transferring Unitholder shall not consummate such proposed Transfer until at least 60 days after the delivery of the Offer Notice, unless the parties to the Transfer have been finally determined pursuant to this Section 9.2 and Section 9.3 prior to the expiration of such 60-day period (the date of the first to occur of (x) the expiration of such 60-day period after delivery of the Offer Notice or (y) such final determination is referred to herein as the "Authorization Date").

(b)    Intermediate LLC Election.  Intermediate LLC may elect to purchase all or any portion of the Offered Units at the price and on the other terms set forth in the Offer Notice, by delivering written notice of such election to the Transferring Unitholder within 30 days after delivery of the Offer Notice.

(c)    Investor Election.  If Intermediate LLC does not elect to purchase all of the Offered Units, then each holder of Sun Capital Equity may elect to purchase up to such holder's pro rata share (based on the number of Class A Units held by such holder) of the Offered Units at the price and on the other terms set forth in the Offer Notice, by delivering written notice of such election to the Transferring Unitholder within 20 days after delivery of the Offer Notice.  Any Offered Units not elected to be purchased by the end of such 20-day period shall during the immediately following 5-day period be reoffered by the Transferring Unitholder to the holders of Sun Capital Equity who have elected to purchase their pro rata share of the Offered Units and, if such holders collectively indicate interest within said 5-day period in acquiring additional Offered Units in an amount in excess of the aggregate amount of Offered Units remaining, such remaining Offered Units will be allocated among such holders pro rata in accordance with their respective holdings of Class A Units.

(d)    Closing.  If Intermediate LLC and/or the holders of Sun Capital Equity have elected to purchase all of the Offered Units from the Transferring Unitholder, such purchase shall be consummated as soon as practicable after the delivery of the election notice(s) to the Transferring Unitholder, but in any event within 30 days after the Authorization Date.  Notwithstanding any other provision hereof, in the event that the sale price, or any portion thereof, for the Offered Units is not payable in the form of cash at closing or cash payable on a deferred basis (such as pursuant to simple promissory notes issued by the prospective Transferee(s) described in the Offer Notice), each of Intermediate LLC and/or each holder of Sun Capital Equity electing to purchase Offered Units pursuant to this Section 9.2 shall be required to pay only such portion, if any, of the sale price described in the Offer Notice as consists of such cash consideration, and delivery of such consideration to the Transferring Unitholder shall be payment in full for such Offered Units.

(e)    No Election.  If Intermediate LLC and/or the holders of Sun Capital Equity do not elect, in the aggregate, to purchase all of the Offered Units from the Transferring Unitholder, then, subject to compliance with Section 9.3 below, the Transferring Unitholder shall have the right, within the 90 days following the Authorization Date, to Transfer such Offered Units which Intermediate LLC and the holders of Sun Capital Equity have not elected to purchase to the Transferee(s) specified in the Offer Notice in the amounts specified in the Offer Notice at a price not less than the price per unit specified in the Offer Notice and on other terms no more favorable to the Transferee(s) thereof than specified in the Offer Notice.  Any Offered Units not so Transferred within such 90-day period shall be reoffered to Intermediate LLC and each holder of Sun Capital Equity pursuant to this Section 9.2 prior to any subsequent Transfer.

9.3    Tag Along Rights.

(a)    Participation Right.  At least 10 days (but not more than 30 days) prior to any Transfer by any Sun Capital Investor (or any of their Affiliates) of any Units (other than one or more Transfers (v) pursuant to a Corporate Conversion, (w) to Permitted Transferees or which

are Exempt Transfers, (x) in an aggregate amount not to exceed 10% of each class of Sun Capital Equity held by the Sun Capital Investors as of immediately after the date hereof (as proportionately adjusted for unit splits, unit dividends and similar actions with the respect to the Units), (y) to any current or former officer, employee, manager, director, (direct or indirect) member, (direct or indirect) partner or co-investor of the Sun Capital Investors or any current or former officer, employee, manager, director, (direct or indirect) member, (direct or indirect) partner or co-investor of any Affiliate of any Sun Capital Investor, or any Affiliate or member of the Family Group of any of the foregoing) or (z) to Intermediate LLC pursuant to <u>Section 9.5</u>, each Person making such Transfer (the "<u>Transferring Sun Capital Unitholder</u>"), shall deliver a written notice (the "<u>Sale Notice</u>") to Intermediate LLC and to the other Members (the "<u>Other Members</u>"), specifying in reasonable detail the identity of the prospective Transferee(s), the number and class of Units to be Transferred and the terms and conditions of the Transfer. The Other Members which hold the same class of Units may elect to participate in the contemplated Transfer with Units of the same class by delivering written notice to the Transferring Sun Capital Unitholder within 10 days after delivery of the Sale Notice. Such participation shall be based upon the Pro Rata Share represented by the Units requested to be included by each Unitholder relative to the Pro Rata Share of all Units held by the Unitholders participating in such Transfer (including the Transferring Sun Capital Unitholder). If the Other Members have not elected to participate in the contemplated Transfer (through notice to such effect or expiration of the 10-day period after delivery of the Sale Notice), then the Transferring Sun Capital Unitholder may Transfer the Units specified in the Sale Notice at a price and on terms no more favorable to the Transferee(s) thereof than specified in the Sale Notice during the 90-day period immediately following the date of the delivery of the Sale Notice. Any Transferring Sun Capital Unitholder's Units not Transferred within such 90-day period shall be subject to the provisions of this <u>Section 9.3</u> upon subsequent Transfer.

(b)    <u>Participation Procedure; Conditions</u>. With respect to any Transfer subject to <u>Section 9.3(a)</u>, each Transferring Sun Capital Unitholder shall use its commercially reasonable efforts to obtain the agreement of the prospective Transferee(s) to the participation of the Other Members who have elected to participate in any contemplated Transfer, and no Transferring Sun Capital Unitholder shall Transfer any of its Units to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of the Other Members, unless in connection with such Transfer, one or more of the Transferring Sun Capital Unitholders or their Affiliates purchase (on the same terms and conditions on which such Units were sold to the Transferee(s)) the number and class of Units from each Other Member which such Other Member would have been entitled to sell pursuant to <u>Section 9.3(a)</u>. Each Unitholder Transferring Units pursuant to this <u>Section 9.3</u> shall pay its Pro Rata Share of the expenses incurred by the Transferring Sun Capital Unitholders in connection with such Transfer and shall be obligated to join based on its pro rata share (based on each such holder's share of the aggregate proceeds paid with respect to its Units) in any indemnification or other obligations that the Transferring Sun Capital Unitholder agrees to provide in connection with such Transfer (other than any such obligations that relate specifically to a particular Unitholder such as indemnification with respect to representations and warranties given by a Unitholder regarding such Unitholder's title to and ownership of Units); <u>provided</u> <u>that</u> unless a prospective Transferee permits a Unitholder to give a guarantee, letter of credit or other mechanism (which shall be dealt with on an individual basis), any escrow of proceeds of any such transaction shall be

- 35 -

withheld on a pro rata basis among all Unitholders (based on each such holder's share of the aggregate proceeds paid with respect to its Units).

9.4     Approved Sale; Drag Along Obligations.

(a)     Approved Sale.  If either the Board or the Majority Sun Capital Investors approve a Sale of Intermediate LLC (an "Approved Sale"), each Member and each Unitholder (and each Person that retains voting control of any Units Transferred to a Permitted Transferee) shall (and shall cause any Manager(s) designated by it to) vote for (whether at a meeting of Unitholders or by written consent), consent to and raise no objections against, and not otherwise impede or delay, such Approved Sale.  In furtherance of the foregoing, if the Approved Sale is structured as a (x) merger or consolidation, each Member and Unitholder shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (y) sale of Units, each Member and Unitholder shall agree to sell, and shall sell, all of his, her or its Units and rights to acquire Units on the terms and conditions approved by the Board or the Majority Sun Capital Investors, as the case may be.  Each Member and Unitholder shall take all necessary or desirable actions in connection with the consummation of the Approved Sale as requested by the Board or the Majority Sun Capital Investors (including, without limitation, executing and delivering any and all agreements, instruments and other documents executed by the Sun Capital Investors, including any applicable purchase agreement, stockholders agreement and/or indemnification and/or contribution agreement and, only in the case of Unitholders and their Affiliates who are also employees of Intermediate LLC, executing and delivering non-competition and non-solicitation agreements whether or not executed by the Sun Capital Investors.

(b)     Indemnification; Expenses.  Notwithstanding anything to the contrary, the Unitholders shall be severally obligated to join on a pro rata basis (as if such indemnification obligations reduced the aggregate proceeds available for distribution or payment to the Unitholders in such Approved Sale) in any indemnification obligation the Board or the Sun Capital Investors, as the case may be, have agreed to in connection with such Approved Sale (other than any such obligations that relate specifically to a particular Unitholder, such as indemnification with respect to representations and warranties given by a Unitholder regarding such Unitholder's title to and ownership of Units); provided that unless a prospective Transferee permits a Unitholder to give a guarantee, letter of credit or other mechanism (which shall be dealt with on an individual basis), any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all Unitholders (as if such escrow reduced the aggregate proceeds available for distribution or payment to the Unitholders in such Approved Sale).  Each Unitholder shall pay its pro rata share based on amounts distributable to such Unitholders as if the proceeds of such Approved Sale were distributed pursuant to Section 12.2(b) (as if such expenses reduced the aggregate proceeds available for distribution or payment to the Unitholders in such Approved Sale) of the expenses incurred by the Unitholders pursuant to an Approved Sale to the extent such expenses are incurred for the benefit of all Unitholders (as determined by the Board).  Expenses incurred by any Unitholder on its own behalf (including the fees and disbursements of counsel, advisors and other Persons retained by such holder in connection with the Approved Sale) will not be considered costs incurred for the benefit of all Unitholders and, to the extent not paid by Intermediate LLC, will be the responsibility of such Unitholder.  Each Unitholder shall enter into any other agreement which the Majority Sun Capital Investors

- 36 -

approve and (other than non-competition and non-solicitation agreements to be entered into by Unitholders who are also employees of Intermediate LLC or any of its Subsidiaries) enter into on the same terms and conditions (other than as differences in such terms and conditions might result from holdings of different classes of Units). Without limiting the immediately prior sentence, each Unitholder shall enter into any indemnification, contribution or unitholder representative agreement requested by the Board or the Majority Sun Capital Investors to ensure compliance with this Section 9.4(b) and the provisions of this Section 9.4(b) requiring several liability shall be deemed complied with if such requirement is addressed through such agreement, even if the purchase and sale agreement or merger agreement related to the Approved Sale provides for joint and several liability.

(c)     Purchaser Representative.  If any of Intermediate LLC, any of its Subsidiaries, or the Sun Capital Investors enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the other Unitholders shall, at the request of Intermediate LLC or the Majority Sun Capital Investors, as the case may be, appoint a "purchaser representative" (as such term is defined in Rule 501 promulgated under the Securities Act) designated by Intermediate LLC and reasonably acceptable to the Sun Capital Investors.  If any Unitholder so appoints a purchaser representative, Intermediate LLC shall pay the fees of such purchaser representative.  However, if any Unitholder declines to appoint the purchaser representative designated by Intermediate LLC, such Unitholder shall appoint another purchaser representative (reasonably acceptable to Intermediate LLC and the Majority Sun Capital Investors), and such Unitholder shall be responsible for the fees of the purchaser representative so appointed.

(d)     No Grant of Dissenters Rights or Appraisal Rights.  In no manner shall this Section 9.4 be construed to grant to any Member or Unitholder any dissenters rights or appraisal rights or give any Member or Unitholder any right to vote in any transaction structured as a merger or consolidation (it being understood that the Members hereby expressly waive rights under Section 18-210 of the Delaware Act (entitled "Contractual Appraisal Rights") and grant to the Board or the Sun Capital Investors, as the case may be, the sole right to approve or consent to a merger or consolidation of Intermediate LLC without approval or consent of the Members or the Unitholders).

9.5     Redemption; Put; Sale Process.

(a)     Redemption of Class A Units.  Intermediate LLC may, to the extent that funds are legally available therefor, redeem all or any portion of the outstanding Class A Units on a pro rata basis from the holders thereof (based upon the sum of the aggregate Class A Unpaid Yield and the aggregate Class A Unreturned Capital of all outstanding Class A Units held by each such holder) at the Class A Redemption Price.  Such redemption shall take place not more than thirty (30) days after delivery of written notice of such redemption to the holders thereof.

(b)      Put of Class A Units.

(i)      At any time after the second anniversary of the date hereof, the Requesting Class A Members may deliver a Put Notice to Intermediate LLC.  Following any such delivery of a Put Notice, Intermediate LLC shall either (A) effect a redemption of Class A Units in accordance with Section 9.5(b)(ii) or (B) or comply with the provisions of Section 9.5(c) as if the Majority Sun Capital Investors had delivered a Notice of Sale Process on the date on which the Put Notice was delivered.  If the funds of Intermediate LLC legally available for redemption of Class A Units under applicable law are insufficient to redeem the total number of Class A Units required to be redeemed as of any date pursuant to Section 9.5(b)(ii), then Intermediate LLC shall be deemed to have elected to comply with Section 9.5(b)(i)(B).

(ii)      Unless Intermediate LLC has elected to comply with Section 9.5(b)(i)(B), within five (5) days of receipt of the Put Notice, Intermediate LLC shall deliver written notice (an "Other Class A Member Put Notice") to each Member holding Class A Units other than the Requesting Class A Members (each, an "Other Class A Member"), describing the Put Notice and the Put Percentage.  The Other Class A Members may elect to participate in the contemplated redemption by delivering written notice to Intermediate LLC within ten (10) days after delivery of the Other Class A Member Put Notice.   Such Other Class A Member may elect to participate in such redemption in an amount for which (x) the sum of the aggregate Class A Unpaid Yield and the aggregate Class A Unreturned Capital of all outstanding Class A Units redeemed from such Other Class A Members, divided by (y) the sum of the aggregate Class A Unpaid Yield and the aggregate Class A Unreturned Capital of all outstanding Class A Units held by such Other Class A Member, is equal to or less than the Put Percentage. Intermediate LLC shall redeem the Class A Units specified in the Put Notice and in any written notices delivered by any participating Other Class A Members on a date fixed by the Requesting Class A Members in the Put Notice, which date shall not be less than twenty (20) days after the date such Put Notice is delivered to Intermediate LLC.

(c)      Sale Process.  Intermediate LLC shall, upon delivery of a Notice of Sale Process by the Majority Sun Capital Investors at any time after the second anniversary of the date hereof, either (i) redeem all of the outstanding Class A Units pursuant to Section 9.5(a) within fifteen (15) days of Intermediate LLC's receipt of such Notice of Sale Process or (ii) use its best efforts to facilitate a Sale of Intermediate LLC.  In the event Intermediate LLC does not redeem all of the outstanding Class A Units within such fifteen (15) day period, then, without limiting the generality of clause (ii) of the immediately preceding sentence, Intermediate LLC shall, and shall cause its agents, Affiliates, Subsidiaries, employees, officers and managers to:

(i)      engage an investment bank (the "Financial Advisor") and one or more law firms (the "Deal Counsel"), in each case satisfactory to the Majority Sun Capital Investors in their sole discretion, to assist with the Sale Process (or reimburse the costs, fees and expenses incurred by the Majority Sun Capital Investors in engaging the Financial Advisor and Deal Counsel to assist with the Sale Process);

- 38 -

(ii)     assist the Financial Advisor in creating a list of potential Acquiring Persons;

(iii)     prepare, or assist the Financial Advisor with the preparation of, any marketing, financial or other materials deemed by the Majority Sun Capital Investors or the Financial Advisor to be necessary or helpful in connection with the Sale Process;

(iv)     attend and participate in any meetings, conference calls or presentations regarding Intermediate LLC and its business with potential Acquiring Persons as the Majority Sun Capital Investors, the Financial Advisor or Deal Counsel may from time to time request;

(v)     communicate regularly and promptly with each of the Majority Sun Capital Investors, the Financial Advisor and Deal Counsel regarding the Sale Process;

(vi)     provide to the Majority Sun Capital Investors, the Financial Advisor and Deal Counsel such information relating to the financial condition, business, prospects or corporate affairs of Intermediate LLC as the Majority Sun Capital Investors, the Financial Advisor or Deal Counsel may from time to time request;

(vii)     provide to the Majority Sun Capital Investors, the Financial Advisor and Deal Counsel such information relating to material litigation, regulatory matters, material defaults under credit facilities and other material events and occurrences as the Majority Sun Capital Investors, the Financial Advisor or Deal Counsel may from time to time request;

(viii)     allow the Majority Sun Capital Investors, the Financial Advisor and Deal Counsel to visit and inspect Intermediate LLC's properties, examine its books of account and records, and discuss Intermediate LLC's affairs, finances and accounts with its officers, during normal business hours of Intermediate LLC as may be requested from time to time by the Majority Sun Capital Investors, the Financial Advisor and Deal Counsel;

(ix)     provide any assistance requested by the Majority Sun Capital Investors, the Financial Advisor and Deal Counsel in setting up and maintaining a virtual or actual data room (as elected by the Majority Sun Capital Investors) containing due diligence materials customarily provided in connection with transactions of the nature of a Sale of Intermediate LLC, along with any other due diligence materials requested by the Majority Sun Capital Investors, the Financial Advisor and Deal Counsel; and

(x)     to the extent necessary (as determined in good faith by the Majority Sun Capital Investors):

(A)     approve and execute a letter of intent or term sheet on terms reasonably acceptable to the Majority Sun Capital Investors with one or more potential Acquiring Persons; and

(B)    unless prohibited by law, approve, declare advisable, and execute such definitive agreements relating to a Sale of Intermediate LLC (including, for the avoidance of doubt, a Sale of Intermediate LLC structured as a merger) as are negotiated by the Majority Sun Capital Investors and the Acquiring Person, and perform Intermediate LLC's obligations contained therein.

Intermediate LLC's obligations shall automatically terminate pursuant to this <u>Section 9.5(c)</u> at such time as all Class A Units have been redeemed and no Class A Units are outstanding.

9.6    <u>Effect of Assignment</u>.

(a)    <u>Termination of Rights</u>.  Any Member who shall assign any Units or other interest in Intermediate LLC shall cease to be a Member with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest, except as provided in <u>Section 9.1</u>.

(b)    <u>Deemed Agreement</u>.  Any Person who acquires in any manner whatsoever any Units or other interest in Intermediate LLC, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in Intermediate LLC of such Person was subject to or by which such predecessor was bound.

9.7    <u>Additional Restrictions on Transfer</u>.

(a)    <u>Execution of Counterpart</u>.  Except in connection with an Approved Sale, each Transferee of Units or other interests in Intermediate LLC shall, as a condition prior to such Transfer, execute and deliver to Intermediate LLC a counterpart to this Agreement pursuant to which such Transferee shall agree to be bound by the provisions of this Agreement.

(b)    <u>Notice</u>.  In connection with the Transfer of any Units, the holder of such Units will deliver written notice to Intermediate LLC describing in reasonable detail the Transfer or proposed Transfer.

(c)    <u>Legal Opinion</u>.  No Transfer of Units or any other interest in Intermediate LLC may be made unless in the opinion of counsel, satisfactory in form and substance to the Board (which opinion may be waived by the Board), such Transfer would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to Intermediate LLC or the interest to be Transferred, or cause Intermediate LLC to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended.  Such opinion of counsel shall be delivered in writing to Intermediate LLC prior to the date of the Transfer.

(d)    <u>No Avoidance of Provisions</u>.  No Unitholder shall directly or indirectly (i) permit the Transfer of all or any portion of the direct or indirect equity or beneficial interest in such Unitholder or (ii) otherwise seek to avoid the provisions of this Agreement by issuing, or permitting the issuance of, any direct or indirect equity or beneficial interest in such Unitholder,

- 40 -

in any such case in a manner which would fail to comply with this <u>Article IX</u> if such Unitholder had Transferred Units directly, unless such Unitholder first complies with the terms of this Agreement.

(e)    <u>Code Section 7704 Safe Harbor</u>.  In order to permit Intermediate LLC to qualify for the benefit of a "safe harbor" under Code Section 7704, notwithstanding anything to the contrary in this Agreement, no Transfer of any Unit or economic interest shall be permitted or recognized by Intermediate LLC or the Board (within the meaning of Treasury Regulation Section 1.7704-1(d)) if and to the extent that such Transfer would cause Intermediate LLC to have more than 100 partners (within the meaning of Treasury Regulation Section 1.7704-1(h), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3)).

9.8    <u>Legend</u>.  In the event that Certificated Units are issued, such Certificated Units will bear the following legend:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR APPLICABLE STATE SECURITIES LAWS ("<u>STATE ACTS</u>") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.
>
> THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN A LIMITED LIABILITY COMPANY AGREEMENT, DATED AS OF OCTOBER 3, 2013 AS AMENDED AND MODIFIED FROM TIME TO TIME, GOVERNING THE ISSUER (THE "<u>COMPANY</u>"), AND BY AND AMONG CERTAIN INVESTORS (THE "<u>LLC AGREEMENT</u>"). THE UNITS REPRESENTED BY THIS CERTIFICATE MAY ALSO BE SUBJECT TO ADDITIONAL TRANSFER RESTRICTIONS, CERTAIN VESTING PROVISIONS, REPURCHASE OPTIONS, OFFSET RIGHTS AND FORFEITURE PROVISIONS SET FORTH IN THE LLC AGREEMENT AND/OR A SEPARATE AGREEMENT WITH THE INITIAL HOLDER.  A COPY OF SUCH CONDITIONS, REPURCHASE OPTIONS AND FORFEITURE PROVISIONS SHALL BE FURNISHED BY INTERMEDIATE LLC TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

If a Member holding Certificated Units delivers to Intermediate LLC an opinion of counsel, satisfactory in form and substance to the Board (which opinion may be waived by the Board), that no subsequent Transfer of such Units will require registration under the Securities Act, Intermediate LLC will promptly upon such contemplated Transfer deliver new Certificated Units which do not bear the portion of the restrictive legend relating to the Securities Act set forth in this <u>Section 9.8</u>

9.9     Transfer Fees and Expenses.  Except as provided in Sections 9.2, 9.3 and 9.4, the Transferor and Transferee of any Units or other interest in Intermediate LLC shall be jointly and severally obligated to reimburse Intermediate LLC for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

9.10     Void Transfers.  Any Transfer by any Member or Unitholder of any Units or other interest in Intermediate LLC in contravention of this Agreement (including, without limitation, the failure of the Transferee to execute a counterpart to this Agreement) shall be void and ineffectual and shall not bind or be recognized by Intermediate LLC or any other party.  No purported assignee shall have any right to any Profits, Losses or Distributions of Intermediate LLC.

9.11     Conversion to Corporate Form Upon a Public Offering.

(a)     Approval.  If the Board approves a Public Offering with respect to Intermediate LLC or any of its Subsidiaries, or otherwise approves the conversion of Intermediate LLC from a limited liability company to a corporation (whether or not in connection with a Public Offering) each Member and Unitholder (and each Person that retains voting control of any Units Transferred in accordance with Section 9.1) hereby consents to such Public Offering or conversion and shall vote for (to the extent it has any voting right) and raise no objections against such Public Offering or conversion, and each Member and Unitholder shall take all reasonable actions in connection with the consummation of such Public Offering or conversion as determined by the Board.

(b)     Required Actions.  Intermediate LLC shall, at the request of the underwriters in the case of a Public Offering or the Board in the case of any other conversion, effect a conversion to corporate form and, in connection therewith, the Members and the Unitholders shall, at the request and under the direction of the Board, take all actions necessary or desirable to effect such conversion (including, without limitation, whether by conversion to a subchapter C corporation, merger or consolidation into any entity controlled by the Sun Capital Investors, recapitalization or otherwise), giving effect to the same economic and corporate governance provisions contained herein after taking into consideration the structure of Intermediate LLC and its Subsidiaries and their respective securities (a "Corporate Conversion"). In connection with the Corporate Conversion, each holder of Units will be entitled to receive a percentage of the shares of voting common stock of the corporate successor outstanding immediately following the Corporate Conversion equal to the percentage that such Unitholder would have received of the total amount distributed to all Unitholders had Intermediate LLC liquidated and distributed such common stock in accordance with Article XII on the day of the Corporate Conversion (after giving effect to any payments as a result of the redemption (if any) of any Units).  Each Unitholder hereby consents to such Corporate Conversion and agrees that it will, in connection with such Corporate Conversion, consent to and raise no objections against the Corporate Conversion.  In connection with such Corporate Conversion, each Unitholder hereby agrees to enter into (i) a securityholders agreement with the corporate successor and each other Unitholder which contains restrictions on the Transfer of such capital stock and other provisions (including, without limitation, with respect to the governance and control of such corporate successor) in form and substance similar to the provisions and restrictions set forth

- 42 -

herein (including, without limitation, in <u>Article IX</u>) and (ii) an agreement with the corporate successor providing for the continued vesting of, and repurchase rights respecting, any capital stock issued in respect of Units that are subject to vesting or repurchase pursuant to any Equity Agreement in form and substance similar to the provisions and restrictions with respect to vesting and repurchase rights set forth therein.  Intermediate LLC or its successor shall pay any fees incurred by any Sun Capital Investor pursuant to the HSR Act in connection with any such Corporate Conversion.

(c)    <u>Registration Rights</u>.  If in connection with a Public Offering with respect to Intermediate LLC or any of its Subsidiaries, Intermediate LLC or its Subsidiary, as applicable, will enter into a registration rights agreement with the Sun Capital Investors and the other Members in the form attached hereto as <u>Exhibit B</u>.  If, in a Corporate Conversion in connection with a Public Offering of Intermediate LLC, the Unvested Class B Units are converted into stock options or restricted stock under an incentive stock option or restricted stock plan which, in the opinion of reputable legal counsel to Intermediate LLC (or its successor), can be registered on Form S-8, the corporate successor to Intermediate LLC  will cause the filing of a registration statement on Form S-8 (not to include a reoffer prospectus) covering such plan; <u>provided that</u> the corporate successor to Intermediate LLC shall not be required to cause the filing of such registration statement on Form S-8 if, in connection with such Public Offering, it shall have instructed the transfer agent  that the securities to be issued under such plan in respect of Unvested Class B Units may be sold in accordance with Rule 701(g)(3) under the Securities Act or that such securities need not bear a legend indicating that such securities have not been registered under the Securities Act and may not be sold absent such registration or an exemption therefrom.

9.12    <u>Holdback Agreement</u>.  No Unitholder shall effect any public sale or distribution of any Units or of any capital stock or equity securities of Intermediate LLC or any successor thereto, or any securities convertible into or exchangeable or exercisable for such Units, stock or securities, during the seven days prior to and the 180-day period beginning on the effective date of any underwritten Public Offering, except as part of such underwritten Public Offering or unless otherwise permitted by Intermediate LLC.

9.13    <u>Power of Attorney; Certificated Units</u>.  In order to secure the obligations of all holders of Units to Transfer any Units in accordance with the other provisions of this <u>Article IX</u> when required, each Unitholder hereby constitutes and appoints the Board (and any designee of the Board), with full power of substitution, as such holder's true and lawful agent and attorney-in-fact, with full power and authority in such holder's name, place and stead, to execute, swear to, acknowledge, deliver, file and record all instruments and other documents and do such other acts which the Board deems appropriate or necessary to effect or evidence any Transfer of Units required pursuant to this <u>Article IX</u>, and such power of attorney may be exercised at any time and from time to time.  The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive such holder's death, disability, incapacity, dissolution, bankruptcy, insolvency or termination and the Transfer of all or any portion of the Units and shall extend to such holder's heirs, successors, assigns and personal representatives.  In addition, in the event that any Units are issued as Certificated Units, all certificates evidencing such Certificated Units shall be held by Intermediate LLC for each such Unitholder's benefit and the benefit of the other Unitholders.  The purpose of Intermediate LLC's retention of the unit certificates is solely to

facilitate any Transfer of Units required pursuant to this <u>Article IX</u> and does not constitute a pledge of, or the granting of a security interest in, the underlying Units.

        9.14    <u>Forfeiture of Units</u>.  Units may be subject to forfeiture or repurchase as set forth in any applicable Employment Agreement and/or Equity Agreement.

        9.15    <u>Voting; Proxy</u>.  Each Member agrees to vote all Units owned or controlled by it, him or her in the manner specified by the Sun Capital Investor with respect to any matter on which the members of a Delaware limited liability company generally have a right to vote. Each Member hereby grants to the Sun Capital Investor an irrevocable proxy (which may be exercised at any Members' meeting, by any officer of the Sun Capital Investor executing a written consent on behalf of such Member, or otherwise) to vote all Units now or hereafter owned or controlled by each of them in accordance with the agreements set forth in this Agreement.

## ARTICLE X

## ADMISSION OF MEMBERS

        10.1    <u>Substituted Members</u>.  In connection with the Transfer of Units of a Unitholder permitted under the terms of this Agreement, the Equity Agreements (if applicable), and the other agreements contemplated hereby and thereby, the Transferee shall become a Substituted Member on the later of (a) the effective date of such Transfer, and (b) the date on which the Board approves such Transferee as a Substituted Member, and such admission shall be shown on the books and records of Intermediate LLC; <u>provided</u>, <u>however</u>, in connection with the Transfer of Units of a Unitholder to a Permitted Transferee permitted under the terms of this Agreement, the Equity Agreements (if applicable), and the other agreements contemplated hereby and thereby, the Transferee shall become a Substituted Member on the effective date of such Transfer.

        10.2    <u>Additional Members</u>.  A Person may be admitted to Intermediate LLC as an Additional Member only as contemplated under <u>Section 3.1</u> and only upon furnishing to Intermediate LLC (a) a letter of acceptance, in form satisfactory to the Board, of all the terms and conditions of this Agreement, including the power of attorney granted in <u>Section 14.1</u>, and (b) such other documents or instruments as may be deemed necessary or appropriate by the Board to effect such Person's admission as a Member.  Such admission shall become effective on the date on which the Board determines that such conditions have been satisfied and when any such admission is shown on the books and records of Intermediate LLC.

## ARTICLE XI

## WITHDRAWAL AND RESIGNATION OF UNITHOLDERS

        11.1    <u>Withdrawal and Resignation of Unitholders</u>.  No Unitholder shall have the power or right to withdraw or otherwise resign from Intermediate LLC prior to the dissolution and winding up of Intermediate LLC pursuant to <u>Article XII</u>, without the prior written consent of the Board (which consent may be withheld by the Board in its sole discretion), except as

otherwise expressly permitted by this Agreement or any of the other agreements contemplated hereby.  Upon a Transfer of all of a Unitholder's Units in a Transfer permitted by this Agreement, and (if applicable) the Equity Agreements, subject to the provisions of Section 9.6, such Unitholder shall cease to be a Unitholder.  Notwithstanding that payment on account of a withdrawal may be made after the effective time of such withdrawal, any completely withdrawing Unitholder will not be considered a Unitholder for any purpose after the effective time of such complete withdrawal, and, in the case of a partial withdrawal, such Unitholder's Capital Account (and corresponding voting and other rights) shall be reduced for all other purposes hereunder upon the effective time of such partial withdrawal.

## ARTICLE XII

## DISSOLUTION AND LIQUIDATION

12.1    Dissolution.  Intermediate LLC shall not be dissolved by the admission of Additional Members or Substituted Members.  Intermediate LLC shall dissolve, and its affairs shall be wound up upon the first of the following to occur:

(a)    Board approval of dissolution; or

(b)    the entry of a decree of judicial dissolution of Intermediate LLC under Section 35-5 of the Delaware Act or an administrative dissolution under Section 18-802 of the Delaware Act.

Except as otherwise set forth in this Article XII, Intermediate LLC is intended to have perpetual existence.  An Event of Withdrawal shall not cause a dissolution of Intermediate LLC and Intermediate LLC shall continue in existence subject to the terms and conditions of this Agreement.

12.2    Liquidation and Termination.  On the dissolution of Intermediate LLC, the Board shall act as liquidator or may appoint one or more representatives, Members or other Persons as liquidator(s).  The liquidators shall proceed diligently to wind up the affairs of Intermediate LLC and make final distributions as provided herein and in the Delaware Act.  The costs of liquidation shall be borne as a Intermediate LLC expense.  Until final distribution, the liquidators shall continue to operate Intermediate LLC properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidators are as follows:

(a)    The liquidators shall pay, satisfy or discharge from Intermediate LLC funds all of the debts, liabilities and obligations of Intermediate LLC (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine).

(b)    As promptly as practicable after dissolution, the liquidators shall (i) determine the Fair Market Value (the "Liquidation FMV") of Intermediate LLC's remaining assets (the "Liquidation Assets") in accordance with Article XIII hereof, (ii) determine the amounts to be distributed to each Unitholder in accordance with Section 4.1(a), and (iii) deliver

to each Unitholder a statement (the "Liquidation Statement") setting forth the Liquidation FMV and the amounts and recipients of such Distributions.

(c)      As soon as the Liquidation FMV and the proper amounts of Distributions have been determined in accordance with Section 12.2(b) above, the liquidators shall promptly distribute Intermediate LLC's Liquidation Assets to the holders of Units in accordance with Section 4.1(a) above.  Any non-cash Liquidation Assets will first be written up or down to their Fair Market Value, thus creating Profit or Loss (if any), which shall be allocated in accordance with Sections 4.3 and 4.4.  After taking into account such allocations, it is anticipated that each Unitholder's Capital Account will be equal to the amount to be distributed to such Unitholder pursuant to Section 12.2(b).  If any Unitholder's Capital Account is not equal to the amount to be distributed to such Unitholder pursuant to Section 12.2(b), Profits and Losses for the Fiscal Year in which Intermediate LLC is dissolved shall be allocated among the Unitholders in such a manner as to cause, to the extent possible, each Unitholder's Capital Account to be equal to the amount to be distributed to such Unitholder pursuant to Section 12.2(b).

The distribution of cash and/or property to a Unitholder in accordance with the provisions of this Section 12.2 constitutes a complete return to the Unitholder of its Capital Contributions and a complete distribution to the Unitholder of its interest in Intermediate LLC and all Intermediate LLC property and constitutes a compromise to which all Unitholders have consented within the meaning of the Delaware Act.  To the extent that a Unitholder returns funds to Intermediate LLC, it has no claim against any other Unitholder for those funds.

12.3      Securityholders Agreement.  To the extent that units or other equity securities of any Subsidiary of Intermediate LLC are distributed to any Unitholders and unless otherwise agreed to by the Board, such Unitholders hereby agree to enter into a securityholders agreement with such Subsidiary and each other Unitholder which contains restrictions on the Transfer of such equity securities and other provisions (including, without limitation, with respect to the governance and control of such Subsidiary) in form and substance similar to the provisions and restrictions set forth herein (including, without limitation, in Article V and Article IX).

12.4      Cancellation of Certificate.  On completion of the distribution of Intermediate LLC assets as provided herein, Intermediate LLC is terminated (and Intermediate LLC shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate Intermediate LLC.  Intermediate LLC shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 12.4.

12.5      Reasonable Time for Winding Up.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of Intermediate LLC and the liquidation of its assets pursuant to Section 12.2 in order to minimize any Losses otherwise attendant upon such winding up.

12.6    Return of Capital.  The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Unitholders (it being understood that any such return shall be made solely from Intermediate LLC assets).

12.7    Hart-Scott-Rodino.    In the event the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") is applicable to any Unitholder, the dissolution of Intermediate LLC shall not be consummated until such time as the applicable waiting period (and extensions thereof) under the HSR Act have expired or otherwise been terminated with respect to each such Unitholder.

# ARTICLE XIII

# VALUATION

13.1    Valuation of Company Securities.  The "Fair Market Value" of any equity securities of any Subsidiary of Intermediate LLC shall mean the average of the closing prices of the sales of the securities on all securities exchanges on which such securities may at the time be listed, or, if there have been no sales on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such securities are not so listed, the average of the representative bid and asked prices quoted in the NASDAQ System as of 4:00 P.M., New York time, or, if on any day such securities are not quoted in the NASDAQ System, the average of the highest bid and lowest asked prices on such day in the domestic over-the-counter market as reported by the National Quotation Bureau Incorporated, or any similar successor organization, in each such case averaged over a period of 21 days consisting of the day as of which the Fair Market Value is being determined and the 20 consecutive business days prior to such day.  If the dissolution and liquidation (or deemed dissolution and liquidation) of Intermediate LLC occurs in connection with the Public Offering of any Subsidiary of Intermediate LLC, the Fair Market Value of each equity security of such Subsidiary shall equal the price at which such securities are initially offered to the public in connection with such Public Offering.  If at any time the equity securities of a Subsidiary are not listed on any securities exchange or quoted in the Nasdaq System or the over-the-counter market, and the dissolution and liquidation (or deemed dissolution and liquidation) of Intermediate LLC does not occur in connection with a Public Offering of such Subsidiary, the Fair Market Value of each such security shall be equal to the fair value thereof as of the date of valuation as determined by the Board in good faith on the basis of an orderly sale to a willing, unaffiliated buyer in an arm's length transaction, taking into account all relevant factors determinative of value.

13.2    Valuation of Other Assets and Securities.  The "Fair Market Value" of all other non-cash assets or of any other securities issued by Intermediate LLC shall mean the fair value for such assets or securities as between a willing buyer and a willing seller in an arm's-length transaction occurring on the date of valuation as determined in good faith by the Board, taking into account all relevant factors determinative of value (and giving effect to any transfer taxes payable or discounts in connection with such sale).

13.3    Valuation Methodology.  In determining Fair Market Value of any other securities, the Board shall make such determination on the basis of an orderly sale to a willing,

unaffiliated buyer in an arm's length transaction, taking into account all relevant factors determinative of value.

## ARTICLE XIV

## GENERAL PROVISIONS

14.1    <u>Power of Attorney</u>.  Each Unitholder hereby constitutes and appoints the Board and the liquidators, with full power of substitution, as his true and lawful agent and attorney-in-fact, with full power and authority in his or its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (a) this Agreement, all certificates and other instruments and all amendments thereof in accordance with the terms hereof which the Board deems appropriate or necessary to form, qualify, or continue the qualification of, Intermediate LLC as a limited liability company in the State of Delaware and in all other jurisdictions in which Intermediate LLC may conduct business or own property; (b) all instruments which the Board deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms; (c) all conveyances and other instruments or documents which the Board and/or the liquidators deems appropriate or necessary to reflect the dissolution and liquidation of Intermediate LLC pursuant to the terms of this Agreement, including a certificate of cancellation; and (d) all instruments relating to the admission, withdrawal or substitution of any Unitholder pursuant to <u>Article X</u> or <u>Article XI</u>.  The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Unitholder and the Transfer of all or any portion of his or its Units and shall extend to such Unitholder's heirs, successors, assigns and personal representatives.

14.2    <u>Amendments</u>.  Subject to the right of the Board to amend this Agreement as expressly provided herein (including, without limitation, pursuant to <u>Section 3.1(f)</u>), this Agreement may be amended, modified, or waived with the written consent of the Majority Sun Capital Investors; <u>provided that</u> if any such amendment, modification, or waiver would adversely affect in any material respect any class, group or series of Units in a manner different than the Sun Capital Investors holding equity of the same class, series or group of Units, such amendment, modification, or waiver shall also require the written consent of the holders of a majority of the class of Units so adversely affected.

14.3    <u>Title to Intermediate LLC Assets</u>.  Intermediate LLC assets shall be deemed to be owned by Intermediate LLC as an entity, and no Unitholder, individually or collectively, shall have any ownership interest in such Intermediate LLC assets or any portion thereof.  Legal title to any or all Intermediate LLC assets may be held in the name of Intermediate LLC or one or more nominees, as the Board may determine.  The Board hereby declares and warrants that any Intermediate LLC assets for which legal title is held in the name of any nominee shall be held in trust by such nominee for the use and benefit of Intermediate LLC in accordance with the provisions of this Agreement.  All Intermediate LLC assets shall be recorded as the property of Intermediate LLC on its books and records, irrespective of the name in which legal title to such Intermediate LLC assets is held.

14.4    Remedies.  Each Unitholder and Intermediate LLC shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law.  Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

14.5    Successors and Assigns.    Except as otherwise provided herein, all covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

14.6    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

14.7    Counterparts; Binding Agreement.    This Agreement may be executed simultaneously in two or more separate counterparts (including by means of facsimile), any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.  This Agreement and all of the provisions hereof shall be binding upon and effective as to each Person who (a) executes this Agreement in the appropriate space provided in the signature pages hereto notwithstanding the fact that other Persons who have not executed this Agreement may be listed on the signature pages hereto and (b) may from time to time become a party to this Agreement by executing a counterpart of or joinder to this Agreement.

14.8    Descriptive Headings; Interpretation.    The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.    Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  The use of the word "including" in this Agreement shall be by way of example rather than by limitation.    Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof.  Whenever required by the context, references to a Fiscal Year shall refer to a portion thereof.  The use of the words "or," "either" and "any" shall not be exclusive.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict.

14.9    <u>Applicable Law; Venue; Jury Trial Waiver</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.    Subject to <u>Section 14.18</u>, any dispute relating hereto shall be heard in the state or federal courts of Delaware, and the parties agree to jurisdiction and venue therein.    EACH OF THE PARTIES HERETO (INCLUDING EACH MEMBER) IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR OTHER PROCEEDING INSTITUTED BY OR AGAINST SUCH PARTY IN RESPECT OF ITS, HIS OR HER OBLIGATIONS HEREUNDER.

14.10    <u>Addresses and Notices</u>.    All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when personally delivered, sent by telecopy (with hard copy to follow) or sent by reputable overnight express courier (charges prepaid), or (ii) three days following mailing by certified or registered mail, postage prepaid and return receipt requested.    Such notices, demands and other communications shall be sent to the address for such recipient set forth in Intermediate LLC's books and records, or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.    Any notice to the Board or Intermediate LLC shall be deemed given if received by the chairman of the Board at the principal office of Intermediate LLC designated pursuant to <u>Section 2.5</u>.    A copy of any notice given to Sun or Intermediate LLC, shall be delivered to Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois, 60654, Attention: Douglas C. Gessner, P.C. and Jeremy S. Liss, P.C.

14.11    <u>Creditors</u>.    None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of Intermediate LLC or any of its Affiliates, and no creditor who makes a loan to Intermediate LLC or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by Intermediate LLC in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Profits, Losses, Distributions, capital or property other than as a secured creditor.

14.12    <u>Waiver</u>.    No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

14.13    <u>Further Action</u>.    The parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

14.14    <u>Offset</u>.    Whenever Intermediate LLC is to pay any sum to any Unitholder or any Affiliate or related Person thereof, any amounts that such Unitholder or such Affiliate or related Person owes to Intermediate LLC or any of its Subsidiaries under any promissory note or other debt instrument issued to Intermediate LLC or any of its Subsidiaries or any other bona fide obligation owed to Intermediate LLC or any of its Subsidiaries may be deducted from that sum before payment.

14.15   Entire Agreement.  This Agreement, those documents expressly referred to herein and other documents dated as of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

14.16   Delivery by Facsimile.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall reexecute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

14.17   Survival.  Sections 4.7, 5.7, 6.4, and 6.7 shall survive and continue in full force in accordance with its terms notwithstanding any termination of this Agreement or the dissolution of Intermediate LLC.

14.18   Expenses.  Intermediate LLC shall or shall cause the Company one of its (direct or indirect) Subsidiaries to pay and hold the Sun Capital Investors and all holders of Sun Capital Equity harmless against liability for the payment of the reasonable out-of-pocket expenses of such Persons (including the reasonable fees and expenses of legal counsel or other advisors) arising in connection with (i) start-up and organizational costs in connection with the formation of Intermediate LLC and the commencement of its businesses and operations, (ii) the due diligence review of the Company and its Subsidiaries and the preparation, negotiation and execution of this Agreement, the Exchange Agreement, the Securities Purchase Agreement and the other agreements contemplated hereby or thereby, and the consummation of the transactions contemplated hereby or thereby, (iii) any amendments or waivers (whether or not the same become effective) under or in respect of this Agreement, the Exchange Agreement, the Securities Purchase Agreement or the other agreements contemplated hereby or thereby (including, without limitation, in connection with any proposed merger, sale or recapitalization of Intermediate LLC or any of its Subsidiaries), (iv) the interpretation, investigation and enforcement of the rights granted under this Agreement, the Exchange Agreement, the Securities Purchase Agreement or the other agreements contemplated hereby or thereby, (v) any filing with any Governmental Entity with respect to Intermediate LLC's investment in the Company or any such Person's investment in Intermediate LLC, or in any other filing with any Governmental Entity with respect to Intermediate LLC or any of its Subsidiaries that mentions such Person, (vi) the preparation, delivery and storage of books and records and financial and other statements required or permitted under this Agreement (including, without limitation, all matters concerning the determination of the relative amount of allocations and distributions among the Unitholders and accounting procedures and determinations), (vii) the delivery to each Unitholder of any report or other information required by this Agreement, (viii) the delivery to each Unitholder of

all information necessary for the preparation of such Person's United States federal and state income tax returns, (ix) the preparation and filing of all tax returns required to be filed by Intermediate LLC, (x) stamp and other Taxes which may be payable in respect of the execution and delivery of this Agreement or the issuance, delivery or acquisition of any securities (debt or equity) hereunder or under the Exchange Agreement or the Securities Purchase Agreement and the other agreements contemplated hereby or thereby and (xi) any transaction, claim or event which any such Person believes affects Intermediate LLC or any of its Subsidiaries and as to which such Person seeks advice of counsel.

14.19 <u>Acknowledgments</u>.  Upon execution and delivery of a counterpart to this Agreement or a joinder to this Agreement, each Member (including each Substituted Member and each Additional Member) shall be deemed to acknowledge to each Sun Capital Investor as follows: (a) the determination of such Member to acquire Units pursuant to this Agreement or any other agreement has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of Intermediate LLC and its Subsidiaries which may have been made or given by any other Member or by any agent or employee of any other Member, (b) no other Member has acted as an agent of such Member in connection with making its investment hereunder and that no other Member shall be acting as an agent of such Member in connection with monitoring its investment hereunder, (c) each of the Sun Capital Investors has retained Kirkland & Ellis LLP in connection with the transactions contemplated hereby and expect to retain Kirkland & Ellis LLP as legal counsel in connection with the management and operation of the investment in Intermediate LLC and its Subsidiaries, (d) Kirkland & Ellis LLP is not representing and will not represent any other Member in connection with the transaction contemplated hereby or any dispute which may arise between any of the Sun Capital Investors, on the one hand, and any other Member, on the other hand, (e) such Member will, if it wishes counsel on the transactions contemplated hereby, retain its own independent counsel, and (f) Kirkland & Ellis LLP may represent the Sun Capital Investors in connection with any and all matters contemplated hereby (including, without limitation, any dispute between any of the Sun Capital Investors, on the one hand, and any other Member, on the other hand) and such Member waives any conflict of interest in connection with such representation by Kirkland & Ellis LLP.

*     *     *     *     *

- 52 -

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Limited Liability Company Agreement as of the date first written above.

Garden Fresh Restaurant Holding, LLC

By: _____
Name:  Michael J. McConvery
Title:  Vice President & Assistant Secretary


Sun Garden Fresh, LLC

By: _____
Name:  Michael J. McConvery
Title:  Vice President & Assistant Secretary


Sun Garden Fresh Finance, LLC

By: _____
Name:  Michael J. McConvery
Title:  Vice President & Assistant Secretary

## <u>Schedule of Officeholders</u>
(As of October 3, 2013)


The business address for the following Officers is 15822 Bernardo Center Drive, Suite A, San Diego, California  92127:

|  |  |
|---|---|
| Chief Executive Officer: | David Goronkin |
| President: | R. Gregory Keller |
| Chief Financial Officer, General Counsel,<br>     Secretary & Treasurer: | John D. Morberg |
| Assistant Secretary: | Kathleen Salerno |

**SCHEDULE OF UNITHOLDERS**
(As of October 3, 2013)

| Unitholder | Class A Units | Total Amount of Capital Contributions in respect of Class A Units | Class B Units |
|---|---|---|---|
| **Sun Capital Investors** | | | |
| Garden Fresh Restaurant Holding, LLC *(California)* | - | - | 1,000 |
| Sun Garden Fresh, LLC *(Florida)* | 623,255 | $5,000,000.00 | - |
| Sun Garden Fresh Finance, LLC *(Florida)* | 376,745 | $3,022,392.99 | - |
| **Management Investors** | | | |
| | | | |
| **Other Investors** | | | |
| | | | |
| **TOTAL** | **1,000,000** | **$8,022,392.99** | **1,000** |

## EXHIBIT C

Resolutions

*Attached.*

**RESOLUTIONS**

**ADOPTED**

**BY THE**

**BOARD OF MANAGERS**

**OF**

**GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC**

**At the Meeting of the Board of Managers**

**on October 1, 2016**

**Bankruptcy Resolutions**

**WHEREAS**, it has been proposed that each of Garden Fresh Restaurant Intermediate Holding, LLC (the "Company") and certain of its affiliates, each of which is listed on Schedule 1 attached hereto (collectively, the "Affiliates"), seek relief under the provisions of title 11 of the United States Code (the "Bankruptcy Code") by filing a voluntary petition (the "Petition") for relief under Chapter 11 of the Bankruptcy Code;

**WHEREAS**, it has also been proposed that the Company and its Affiliates negotiate and, subsequent to the filing of the Petition, enter into that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement"), by and among the Loan Parties, the DIP Lenders and the DIP Agent (each as defined therein), whereby, among other things, the DIP Lenders agree to make certain loans and advances and to provide other financial and credit accommodations to the Company and its Affiliates, following the filing of the voluntary petitions under the Bankruptcy Code by each of the Company and its Affiliates and in all respects subject to applicable bankruptcy court orders;

**NOW, THEREFORE, BE IT RESOLVED**, that in the judgment of the Board of Managers of the Company (the "Board"), it is desirable and in the best interest of the Company, its creditors, its equity holders and other interested parties, that the Company be, and it hereby is, authorized, empowered, and directed to file or cause to be filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), at such time as it is deemed necessary by the appropriate officers of the Company, the Petition and all other documents, papers and pleadings necessary or appropriate to effectuate the Petition and any and all other documents, papers and pleadings necessary or appropriate in connection with the Chapter 11 cases of the Company and its Affiliates; and

**FURTHER RESOLVED**, that the Chief Executive Officer and the Chief Financial Officer of the Company (each, an "Authorized Officer", and collectively, the "Authorized Officers") be, and each of them, with full authority to act without the others, hereby is, authorized, empowered, and directed (i) to execute and verify the Petition and any other documents, papers and pleadings necessary or appropriate to effectuate the Petition and any and all  other documents, papers and pleadings necessary or appropriate in connection with the Chapter 11 cases of the Company and its Affiliates and to cause the Petition and any other documents, papers and pleadings necessary or appropriate to effectuate the Petition and any and all other documents, papers and pleadings necessary or appropriate in connection with the Chapter 11 cases of the Company and its Affiliates to be filed with the Bankruptcy Court and (ii) to perform any and all such acts as are reasonable, advisable, expedient, convenient, proper, or necessary, in the discretion of the Authorized Officers, to effect any of the foregoing; and

**FURTHER RESOLVED**, that the Authorized Officers, and such other officers as they shall from time to time designate, be, and each of them acting alone hereby is, authorized, empowered, and directed, on behalf of and in the name of the Company, to execute, verify and file or cause to be filed all petitions, schedules, lists, motions, objections, responses, applications, and other papers and documents necessary or desirable in connection with the Chapter 11 cases of the Company and its Affiliates; and

**FURTHER RESOLVED**, that the Company as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, is authorized to incur post-petition indebtedness under the DIP Credit Agreement and the form, terms and provisions of the DIP Credit Agreement and the other DIP Loan Documents (as defined in the DIP Credit Agreement) be, and they hereby are, approved, ratified and confirmed, and the Authorized Officers be, and each of them, with full authority to act without the others, hereby is, authorized, empowered, and directed to execute, deliver, and perform the DIP Credit Agreement and the other DIP Loan Documents, in the name and on behalf of the Company, with such changes therein and additions and amendments thereto and to any other documents related to or described in the DIP Credit Agreement and the other DIP Loan Documents as such Authorized Officer or Authorized Officers shall approve, such Authorized Officer's or Authorized Officers' delivery thereof to be conclusive evidence of such approval and approval of the Board; and

**FURTHER RESOLVED**, that the Company be, and it hereby is, authorized, empowered, and directed to perform its obligations under the DIP Credit Agreement and other DIP Loan Documents, including, without limitation, the granting of liens on all of its assets and obligations in respect of the joint and several liability of the Company and its Affiliates, as applicable, thereunder (and any and all prior grants are hereby reaffirmed in all respects) and paying such fees or amounts as are required under the DIP Credit Agreement and any fee letter(s); and

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them, with full authority to act without the others, hereby is, authorized, empowered and directed to prepare, execute and deliver, in the name and on behalf of the Company, such documents, letters, certificates, and other written instruments as may be necessary or appropriate in connection with the Company's execution, delivery, and performance of the DIP Credit Agreement and the other DIP Loan Documents and any other documents related thereto or described therein, as applicable; and

**FURTHER RESOLVED**, that the Authorized Officers, and such other officers as they shall from time to time designate, be, and each of them acting alone hereby is, authorized and directed to retain the law firms of Morgan, Lewis & Bockius LLP ("Morgan Lewis") and Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as bankruptcy counsel to render legal services to, and to represent, the Company in connection with the Chapter 11 cases and all other related matters in connection therewith, on such terms as the Authorized Officers, and such other officers as they shall from time to time designate shall approve; and

**FURTHER RESOLVED**, that the Authorized Officers, and such other officers as they shall from time to time designate, be, and each of them acting alone hereby is, authorized and directed to retain the firm of Epiq Bankruptcy Solutions, LLC ("Epiq") as notice and claims agent and administrative advisor to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations in connection with the Chapter 11 cases and all other related matters in connection therewith, on such terms as the Authorized Officers, and such other officers as they shall from time to time designate shall approve; and

**FURTHER RESOLVED**, that the Authorized Officers, and such other officers as they shall from time to time designate, be, and each of them acting alone hereby is, authorized and directed to retain Piper Jaffray Companies ("Piper Jaffray" and together with Morgan

Lewis, Young Conaway, and Epiq, the "<u>Professionals</u>") to render financial and restructuring advice and services to, and to represent, the Company in connection with the Chapter 11 cases and all other related matters in connection therewith, on such terms as the Authorized Officers, and such other officers as they shall from time to time designate shall approve; and

**FURTHER RESOLVED**, that the Authorized Officers, and such other officers as they shall from time to time designate, be, and each of them acting alone hereby is, authorized and directed to retain on behalf of the Company any additional counsel, accountants, and other advisors as the Authorized Officers, or any of them, may deem appropriate; and

**FURTHER RESOLVED**, that the Authorized Officers, and such other officers as they shall from time to time designate, be, and each of them acting alone hereby is, authorized and directed to take or cause to be taken any and all such further actions and to execute and deliver any and all such further instruments and documents and to pay all such expenses, costs, fees, or taxes, in each case, as in his or their judgment shall be necessary or desirable in order fully to carry out the intent and accomplish the purposes of the resolutions adopted herein; and

**FURTHER RESOLVED**, that all acts lawfully done or actions lawfully taken by any director or officer of the Company or any of the Professionals in connection with the DIP Credit Agreement, the other DIP Loan Documents, the reorganization or liquidation of the Company or any matter related thereto, or by virtue of these resolutions be, and they hereby are, in all respects ratified, confirmed and approved; and

**FURTHER RESOLVED**, the Authorized Officers, and such other officers as they shall from time to time designate, be, and each of them acting alone hereby is, authorized with full power of delegations, for and in the name and on behalf of the Company, to amend, supplement, or otherwise modify from time to time the terms of any documents, certificates, instruments, agreements, or other writings referred to in the foregoing resolutions; and

**FURTHER RESOLVED**, that any and all actions of any officer or director of the Company taken prior to the date hereof to carry out the purposes of the foregoing resolutions be, and they hereby are, ratified, approved, and confirmed in all respects.

## General Resolutions

**FURTHER RESOLVED**, that the officers of the Company be, and each of them hereby is, authorized and empowered, in the name and on behalf of the Company, to make all such arrangements, to do and perform all such acts and things, and to execute and deliver all such officers' certificates and such other instruments and documents as they may deem appropriate in order to effectuate fully the purpose and intent of each and all of the foregoing resolutions, and that any and all actions taken heretofore and hereafter to accomplish such purposes and intents, all or singular, be, and they hereby are, approved, ratified, and confirmed.

********

## SCHEDULE I
### **Affiliates**

- Garden Fresh Holdings, Inc.

- GF Holdings, Inc.

- Garden Fresh Restaurant Corp.

- Garden Fresh Promotions, LLC

## EXHIBIT D

### Officers

| Name | Office | Signature |
|------|--------|-----------|
| John D. Morberg | Chief Executive Officer and President | |
| David A. Carr | Chief Financial Officer, Secretary and Treasurer | |
| R. Gregory Keller | Vice President | |
| Michael Dorsey | Assistant Secretary | |