# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (___) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105(a), 363 AND 364 OF THE BANKRUPTCY CODE, (I) AUTHORIZING (A) PAYMENT OF PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY COURSE OF BUSINESS IN CONNECTION WITH INSURANCE PROGRAMS, INCLUDING PAYMENT OF POLICY PREMIUMS AND BROKER FEES, AND (B) CONTINUATION OF INSURANCE PREMIUM FINANCING PROGRAMS AND (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO

Garden Fresh Restaurant Intermediate Holding, LLC and its above-captioned affiliated debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") hereby submit this motion (the "<u>Motion</u>") for the entry of interim and final orders, substantially in the form attached hereto as <u>Exhibits C</u> and <u>D</u> (the "<u>Proposed Interim Order</u>" and the "<u>Proposed Final Order</u>," respectively), pursuant to sections 105(a), 363(b), and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew liability, property, and other insurance programs and pay policy premiums and broker fees arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business, and (b) continue the Debtors' insurance premium financing programs and renew or enter into new premium financing programs, as necessary, under substantially similar terms and (ii) authorizing

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376). The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of John D. Morberg in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").[2]  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), and 364 of the Bankruptcy Code.

## BACKGROUND

**I.      General**

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently with this Motion, the Debtors have also filed certain other motions and applications seeking certain "first day" relief.

3.      The Debtors have continued in possession of their properties and have continued to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

4.      No request has been made for the appointment of a trustee or examiner and no official committee has been established in these chapter 11 cases.

5.      Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

## II.      Overview of the Insurance Policies

6.      In the ordinary course of business, the Debtors maintain a carefully designed and vitally important insurance program, which includes the use of insurance premium finance agreements (the "Insurance Program"). This program includes approximately 41 policies that were in effect as of the Petition Date, including, but not limited to, policies covering general liability, flood, property, automobile liability, and D&O liability (collectively, the "Policies").[3] The Policies are provided by numerous different insurance carriers (the "Insurance Carriers"). Attached hereto as Exhibit A and incorporated herein by reference is a comprehensive list of the Policies, type of coverage, Policy numbers, identity of Insurance Carriers, and other salient information describing the Insurance Program.

7.      The Policies are essential to the preservation of the value of the Debtors' business, property, and assets. Not only are some of the Policies required by the various regulations, laws, and contracts that govern the Debtors' commercial activities, but section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). Moreover, the *Operating Guidelines for Chapter 11 Cases* of the

---

[3] The Debtors' insurance policies with respect to the Debtors' workers' compensation program are described in the *Debtors' Motion for Entry of Orders (a) Authorizing the Debtors to Pay and Honor Certain Prepetition Wages, Benefits and Other Compensation Obligations and (b) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* filed contemporaneously herewith.

Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") require debtors to maintain insurance coverage throughout the pendency of their chapter 11 cases.

8.      To assist in their efforts to obtain the insurance coverage necessary to operate their business in a reasonable, prudent and cost-effective manner, the Debtors utilize the expertise, experience, and services of insurance brokers (the "Brokers").  Among other things, the Brokers represent the Debtors in negotiations with their various insurance underwriters.  The Debtors remit the premium payments on account of certain of the Policies to the Brokers for payment by the Brokers to the Insurance Carriers.  The Debtors believe it is in the best interests of their creditors and estates to continue this business relationship with the Brokers. Accordingly, as a part of this Motion, the Debtors also seek authority to continue their prepetition practice of paying brokerage fees (the "Broker Fees"), and premiums to the Brokers (or any other agent or broker engaged by the Debtors) in connection with their respective representations of the Debtors in negotiations with the Insurance Carriers and other activities related to the maintenance of the Insurance Program.  In addition, the Debtors seek authority to renew, extend, renegotiate, and/or enter into a new insurance broker agreement, if necessary, in the ordinary course of business consistent with the Debtors' past practice.  As of the Petition Date, the Debtors estimate that approximately $110,000 is owed to the Brokers.  The Debtors believe that authorizing them to make the payments required to maintain the full effectiveness of the Policies and to continue the Insurance Program is essential to the preservation of their business, estates, and assets.

## III.    The Premium Finance Agreements

9.      The Debtors maintain the insurance premium finance agreements attached hereto as Exhibit B (the "PFAs") with (i) FIRST Insurance Funding Corp. and (ii) AFCO Credit

Corporation (collectively, the "PFA Lenders") for certain Policies (the "Financed Programs"). Pursuant to the PFAs, the PFA Lenders have agreed to pay the insurance premiums due under the Financed Programs in exchange for cash down payments in the aggregate amount of approximately $105,000 and nine monthly installment payments in the aggregate amount of approximately $100,000 per installment.  The Debtors have made the down payments and five (5) of the installment payments.  The next monthly installment payments were due October 1, 2016.  Pursuant to this Motion, the Debtors are seeking to make these payments, which were outstanding as of the Petition Date.  The Debtors' obligations under the PFAs are secured by all sums due under the PFAs and any unearned premiums or other sums that may become payable under the Financed Programs.  The Financed Programs are essential to the preservation of the Debtors' business.

10.     In the Debtors' business judgment, the terms of the PFAs represent the best possible terms for financing the premiums of the Financed Programs.  The Debtors' estates will benefit by maintaining this low-cost financing from the PFA Lenders.    Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms.  In some cases, the coverage is required by regulations, laws, or contracts that govern the Debtors' business obligations.  Thus, the Debtors request the authority to continue honoring their obligations pursuant to the PFAs and to continue the grant of security interests to the PFA Lenders.

## RELIEF REQUESTED

11.     By this Motion, the Debtors request entry of the Proposed Interim Order and the Proposed Final Order, (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew the Insurance Programs under substantially similar terms and pay policy

premiums and broker fees arising thereunder or in connection therewith, including such prepetition obligations arising in the ordinary course of business, and (b) continue the Financed Programs and enter into new premium financing programs, as necessary, under substantially similar terms and (ii) authorizing the Banks to honor and process check and electronic transfer requests related thereto.

## BASIS FOR RELIEF

I.      **The Court Should Authorize, But Not Direct, the Debtors, in Their Discretion, to Make Necessary Payments Related to the Insurance Programs to Maintain Existing Insurance Coverage.**

12.      Maintaining the Debtors' insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction.  Authority to pay any prepetition amounts that may be due and owing related to the Insurance Programs—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits, or proceeds provided under such Insurance Programs—is necessary, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtors' assets and, in most cases, such coverage is required by the various contracts and state and federal laws that govern the Debtors.  *See, e.g.,* 28 U.S.C. § 959(b) (chapter 11 debtor obligated under federal law to operate chapter 11 business according to the laws of the states where business and properties are located).  Further, under the chapter 11 operating guidelines issued by the U.S. Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain during these chapter 11 cases certain types of insurance coverage, which coverage is provided by certain of the Policies included in the Insurance Programs.

13.      In addition, the Debtors may need to renew or replace certain of their Insurance Programs during the pendency of these chapter 11 cases.  The nonpayment of any premiums,

deductibles, or related fees under any of the Insurance Programs could result in one or more of the Insurance Carriers increasing future insurance premiums, declining to renew their insurance policies, or refusing to enter into new insurance agreements with the Debtors.  If the Insurance Programs lapse without renewal, the Debtors may be exposed to substantial liability for first-party property claims and third-party liability claims to the detriment of all parties in interest.

14.    Similarly, the services provided by the Broker are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at competitive rates, and the Broker has a significant amount of institutional knowledge regarding the Debtors' insurance needs.  If the Debtors were forced to replace the Broker, the Debtors would necessarily be required to spend time, energy, and resources getting a new insurance broker familiar with the Debtors' insurance needs.

15.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  A bankruptcy court may use its equitable powers under section 105 of the Bankruptcy Code to permit a debtor in possession to pay prepetition claims when payment is necessary to effectuate a Debtors' bankruptcy goals and essential to the continued operation of the business.  *See In re Lehigh & New Eng. Ry. Co.,* 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (under necessity of payment doctrine prepetition claims may be paid if essential to the continued operation of the business during reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (recognizing that necessity of payment doctrine authorizes payment of prepetition claims when "such payment is essential to the continued operation of the business").

16.    In addition, the Court may authorize the Debtors to pay prepetition premiums to maintain insurance coverage under section 363(b) of the Bankruptcy Code.  In particular, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Thus, under this section, a court may authorize a debtor to pay certain prepetition claims.  *See Ionosphere Clubs*, 98 B.R. 174, 175-77 (S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code); *In re Natrol, Inc.,* Case No. 14-11446 (BLS) (June 23, 2014) (authorizing payment of prepetition claims associated with a Debtors' insurance program under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); *In re Bicent Holdings LLC*, Case No. 12-11304 (KG) (Apr. 24, 2012) (same).

**II.    The Court Should Authorize, But Not Direct, the Debtors, in Their Discretion, to Make Necessary Payments Under the PFAs and Renew the PFAs and/or Enter into New Premium Financing Agreements in the Ordinary Course of Business.**

17.    If the Debtors are unable to continue making payments under the PFAs, the PFA Lenders may be permitted to terminate the Financed Programs.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost.  If the Debtors are required to obtain replacement insurance and to pay a lump sum premium for such insurance in advance, this payment may be the same or greater than what the Debtors currently pay to the PFA Lenders under the PFAs.  Even if the PFA Lenders are not permitted to terminate the Financed Programs, any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies.  Thus, in view of the importance of maintaining the related insurance coverage and preserving their cash flow by financing their insurance premiums, the Debtors believe that it is in the best interest of their estates and creditors for the Court to authorize the Debtors to honor their obligations under the

PFAs.  Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.

18.     The PFAs grant the PFA Lenders a security interest in the Financed Programs, including all unearned premium, return premium, dividend payments, and loss payments thereof. Security interests created by premium finance arrangements generally are recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements.  *See TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.)*, 67 B.R. 990, 994-95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp. (In re Auto-Train Corp.)*, 9 B.R. 159, 164-66 (Bankr. D.D.C. 1981).  Therefore, if the Debtors fail to make the required payments under the PFAs, the PFA Lenders could seek relief from the automatic stay, either to cancel the Debtors' Financed Programs in accordance with the terms of the PFAs or to seek adequate protection of their investments.  *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr. W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting decline in value of the unearned premiums justified relief from the automatic stay). Accordingly, the practical solution from the Debtors' perspective is to continue making the premium financing payments required under the PFAs.  In addition, the Court should also authorize the Debtors to renew or enter into new premium finance agreements post-petition in the ordinary course of business under substantially similar terms.

19.     Section 363(c)(1) of the Bankruptcy Code provides that "the trustee [or a debtor in possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee [or debtor in possession], after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

20.     Neither the Bankruptcy Code nor its legislative history provides a framework for analyzing whether a transaction is in the ordinary course of business.   The Third Circuit, however, has developed a two-part inquiry, including a "horizontal dimension" test and a "vertical dimension" test, for determining whether a transaction is in the ordinary course of business under section 363(c)(1).   *See In re Roth Am., Inc.,* 975 F.2d 949, 952 (3d Cir. 1992); *see, e.g., In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 791 (Bankr. D. Del. May 24, 2007); *Braunstein v. McCabe*, 571 F. 3d 108, 124-25 (1st Cir. 2009).   The horizontal dimension test focuses on whether, from an industry wide perspective, the transaction is "of the sort commonly undertaken by companies in that industry." *In re Roth Am., Inc.*, 975 F.2d 202 at 953.   The vertical dimension test (or creditor's expectation test) focuses on the vantage point of a hypothetical creditor and inquires whether the transaction subjects the creditor to economic risk of a nature different from those the creditor accepted when it decided to extend credit to the debtor. *Id.*

21.     The Debtors believe that the renewal of the PFAs and/or the execution of new premium finance agreements satisfies the "horizontal dimension" test because maintaining insurance coverage and entering into related premium financing agreements is a common industry practice. *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1154 (Fed. Cir. 1986) (Such a premium financing agreement is a "common commercial arrangement."). The "vertical dimension" test is also satisfied because the Debtors' maintenance of insurance under premium finance agreements does not subject the Debtors' creditors to any economic risk, but rather serves to protect the Debtors' creditors from economic risk.   Accordingly, the renewal of the

PFAs and/or the execution of new premium finance agreements constitute "ordinary course" uses of estate property under section 363(c)(1) of the Bankruptcy Code. *See In re Roth Am.*, 975 F.2d at 952 n.4 (*citing U.S. v. Estate of Deutscher*, 115 B.R. 592, 598-99 (M.D. Tenn. 1990), for the proposition that "trustee's use of fund to . . . reinstate insurance was in ordinary course of business").

22.    Indeed, the Debtors submit that it may be outside the ordinary course of business for them to fail to renew the PFAs or enter into new premium finance agreements to obtain insurance coverage. *See In re Lavigne*, 114 F.3d 379, 383-84 (2d Cir. 1994) (cancellation of insurance policy was not in the ordinary course of business). Nevertheless, out of an abundance of caution, the Debtors have filed this Motion seeking entry of interim and final orders, to the extent necessary, approving, under section 363 of the Bankruptcy Code, the Debtors' post-petition renewal of the PFAs and/or the execution of new premium finance agreements.

23.    The Court may also authorize the Debtors to enter into new premium finance agreements pursuant to section 364(c)(2) of the Bankruptcy Code. Section 364(c)(2) authorizes, after notice and a hearing, a debtor in possession to obtain debt secured by a lien on property of the estate. *See* 11 U.S.C. § 364(c)(2). Under any new premium finance agreement, the counterparty would likely require that the Debtors grant a security interest in the unearned premiums under the financed policies. *See generally In re Schwinn Bicycle Co.*, 200 B.R. 980, 982 (Bankr. N.D. Ill. 1996) (describing insurance premium financing agreements).

24.    Section 364(c) authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates. *See, e.g., In re General Growth Props., Inc.*, 412 B.R. 122, 125-26 (Bankr. S.D.N.Y., May 14, 2009) (granting motion for post-petition financing upon

finding that a) "no comparable credit [was] available on more favorable terms"; b) that the debtors needed post-petition financing to "to preserve [their] assets and continue their operations; and c) that the terms and conditions of the DIP Documents had been negotiated in good faith); *In re Budget Grp., Inc.*, Case No. 02-12152, 2002 Bankr. LEXIS 1050, *6 (Bankr. D. Del. Aug, 1, 2002) (authorizing funding of acquisition of property on a secured basis where acquired property was necessary to maintain operations and debtor could not obtain such funding on an unsecured basis); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").   Because a borrowing to maintain essential insurance coverage is in the best interests of the Debtors' estates, the Court should authorize the Debtors to renew the PFAs and/or execute new premium finance agreements post-petition under substantially similar terms.[4]

### III.   The Court Should Authorize the Banks to Honor and Process the Debtors' Payments Related to the Insurance Programs and the PFAs

25.     The Debtors also request that the Court to authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.   The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

---

[4] Courts in this District have in other chapter 11 cases regularly authorized debtors to continue their pre-petition and enter into new post-petition insurance premium financing agreements.  *See, e.g., In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Oct. 2, 2015); *In re Trump Entertainment Resorts, Inc.,* Case No. 14-12103 (KG) (Sept. 10, 2014).

**IV.**     **Request for a Finding of Satisfaction of Bankruptcy Rule 6003(b)**

26.     Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), any motion seeking to use property of the estate pursuant to section 363 of

the Bankruptcy Code or to satisfy prepetition claims within twenty-one (21) days of the Petition

Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and

irreparable harm."   As set forth throughout this Motion, any disruption of the Insurance

Programs, including the Finance Programs and the related PFAs, would substantially diminish or

impair the Debtors' efforts in these chapter 11 cases to preserve and maximize the value of their

estates.

27.     For this reason and those set forth above, the Debtors respectfully submit that

Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid

immediate and irreparable harm to the Debtors and their estates.

**V.**     **Request for a Waiver of Bankruptcy Rule 6004(h)**

28.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 14 days after entry of

the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth throughout

this Motion, any disruption in the Debtors' insurance coverage would be detrimental to the

Debtors, their creditors and estates, and would impair the Debtors' ability to optimize their

business performance at this critical time as they begin the chapter 11 process.

29.     For this reason and those set forth above, the Debtors submit that ample cause

exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the

extent applicable to the Proposed Interim Order and the Proposed Final Order.

## VI.  **Reservation of Rights**

30.    Nothing in the Proposed Interim Order, the Proposed Final Order, or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action against an Insurance Carrier; or (iv) shall be construed as a promise to pay a claim.

## **NOTICE**

31.    Notice of this Motion has been provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; (v) the Prepetition Secured Parties; (vi) the lenders under the proposed debtor in possession financing facility; and (vii) the Banks.  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Interim Order and the Proposed Final Order, granting the relief requested herein and such further relief as may be just and proper under the circumstances.

Dated: October 3, 2016        **MORGAN, LEWIS & BOCKIUS LLP**
       Wilmington, Delaware     Neil E. Herman (*pro hac vice* pending)
                                James O. Moore (*pro hac vice* pending)
                                101 Park Avenue
                                New York, New York 10178
                                Telephone: (212) 309-6000

                                - and –

                                **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

                                */s/ Kenneth J. Enos*
                                Michael R. Nestor (No. 3526)
                                Kenneth J. Enos (No. 4544)
                                Ian J. Bambrick (No. 5455)
                                1000 N. King Street
                                Wilmington, Delaware 19801
                                Telephone:  (302) 571-6600

                                *Proposed Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**<u>List of Insurance Contracts</u>**

| Line of Coverage | Term | Policy # | Carrier |
|---|---|---|---|
| Auto Liability | 4/1/2016-4/1/2017 | TJ BAP-4246B344-16 | Travelers Property Casualty Co. of America |
| General Liability | 4/1/2016-4/1/2017 | TJ EXGL-4246B29A-16 | Travelers Property Casualty Co. of America |
| General Liability | 4/1/2016-4/1/2017 | TJ EXGL-4246B29A-16 | Travelers Property Casualty Co. of America |
| General Liability | 4/1/2016-4/1/2017 | TJ EXGL-4246B29A-16 | Travelers Property Casualty Co. of America |
| General Liability | 4/1/2016-4/1/2017 | TJ EXGL-4246B29A-16 | Travelers Property Casualty Co. of America |
| Work Comp | 4/1/2016-4/1/2017 | TRJ-UB-4246B092-16 | Travelers Property Casualty Co. of America |
| Work Comp | 4/1/2016-4/1/2017 | TRJ-UB-4246B092-16 | Travelers Property Casualty Co. of America |
| Umbrella | 4/1/2016-4/1/2017 | TUU568051311 | Great American Insurance Co. |
| Umbrella | 4/1/2016-4/1/2017 | TUU568051311 | Great American Insurance Co. |
| Umbrella | 4/1/2016-4/1/2017 | TUU568051311 | Great American Insurance Co. |
| Excess Liability | 4/1/2016-4/1/2017 | 6011313435 | Continental Casualty Co. |
| Excess Liability | 4/1/2016-4/1/2017 | 6011313435 | Continental Casualty Co. |
| Property | 4/1/2016-4/1/2017 | KTJ CMB 4E65525 5 16 | Travelers Property Casualty Co. of America |
| Property | 4/1/2016-4/1/2017 | KTJ CMB 4E65525 5 16 | Travelers Property Casualty Co. of America |
| Property | 4/1/2016-4/1/2017 | KTJ CMB 4E65525 5 16 | Travelers Property Casualty Co. of America |
| Property | 4/1/2016-4/1/2017 | KTJ CMB 4E65525 5 16 | Travelers Property Casualty Co. of America |
| Property - DIC | 4/1/2016-4/1/2017 | 8400003699 – 161 | Everest Indemnity Ins. Co |
| Cyber | 4/1/2016-4/1/2017 | 01 - 278 - 06 – 14 | National Union Fire Insurance Co. of Pittsburg, PA |
| Motor Truck Cargo | 5/11/2016-5/11/2017 | QT-660-4306B413-TIL-16 | Travelers Property Casualty Co. of America |
| Motor Truck Cargo | 5/11/2016-5/11/2017 | QT-660-4306B413-TIL-16 | Travelers Property Casualty Co. of America |
| Motor Truck Cargo | 5/11/2016-5/11/2017 | QT-660-4306B413-TIL-16 | Travelers Property Casualty Co. of America |
| Primary & Excess Directors & Officers/ EPL and Fiduciary Liability | 7/31/16 -7/31/18 | 01-615-79-13 | National Union Fire Insurance Co. of Pittsburgh, PA |
| Primary & Excess Directors & Officers/ EPL and Fiduciary Liability | 7/31/16 -7/31/18 | 8248-0975 | ACE/Chubb – Executive Risk Indemnity, Inc. |

01:19204247.7

| Crime | 7/31/16 -7/31/18 | 8248-0958 | Federal Insurance Company ACE/Chubb |
|---|---|---|---|
| Special Crime | 7/31/16-6/30/18 | 8248-0963 | Federal Insurance Company ACE/Chubb |
| Contaminated Product | 3/17/16 - 3/16/17 | B0509FINSR1500-035 | Lloyds of London |
| Flood | 2/21/16 - 2/21/17 | AB00122590 | American Bankers Insurance Company of Florida |
| Flood | 9/17/15 - 9/17/176 | AB00040377 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | 1011120038 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | 1011120041 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | 1011120040 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | 1011120039 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | AB00122589 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | AB00088261 | American Bankers Insurance Company of Florida |
| Flood | 3/30/15 - 3/30/16 | AB00122588 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | 1011120043 | American Bankers Insurance Company of Florida |
| Flood | 3/5/16 - 3/5/17 | AB00160028 | American Bankers Insurance Company of Florida |
| Flood | 6/25/16 - 6/25/17 | AB00120089 | American Bankers Insurance Company of Florida |
| Flood | 6/19/16 - 6/19/17 | AB00119457 | American Bankers Insurance Company of Florida |
| Flood | 7/6/16 - 7/6/17 | AB00121004 | American Bankers Insurance Company of Florida |
| Flood | 10/31/15 - 10/31/16 | AB00130904 | American Bankers Insurance Company of Florida |

01:19204247.7

**EXHIBIT B**

**PFAs**

This is not an invoice

*Rita*



## NOTICE OF ACCEPTANCE

**ACCOUNT NUMBER**
900 - 2825917
Refer to this number on all correspondence
**CUSTOMER ID**


**FIRST INSURANCE** · FUNDING
A WINTRUST COMPANY

FIRST Insurance Funding Corp.
450 Skokie Blvd, Ste 1000
Northbrook, IL 60062-7917
Phone: (800) 837-2511 Fax: (800) 837-3709
www.firstinsurancefunding.com


**NOTICE DATE**

04/12/2016

| Insured | Agent or Broker |
|---|---|
| **GARDEN FRESH RESTAURANT CORP.**<br>15822 BERNARDO CENTER DR., #A<br>SAN DIEGO, CA 92127 | **LOCKTON COMPANIES, INC.**<br>444 W 47TH STREET, SUITE 900<br>KANSAS CITY, MO 64112 |

*Check your account online: Your username is "900-2825917". Your password is "A64719w" unless you have changed it.*

Dear Insured:

We are pleased to receive and process the insurance premium finance agreement which was recently negotiated through your agent or broker referenced above. The Notice of Acceptance is our official acknowledgement and acceptance of your agreement.

If this is your first transaction with us, the following information may be helpful:

- ACCOUNT NUMBER. Your account number is indicated above. Please refer to it when calling or writing about your account.
- PAYMENTS. Unless you elected the coupon book option, you will receive a billing statement approximately 12-15 days before each payment is due. If your first payment is due soon, your first billing statement will arrive in the next few days. It is important that your payments be received in our office on or before the scheduled due date to ensure uninterrupted coverage. You may pay online or by phone. Our contact information is listed at the top of this notice.
- INQUIRIES. Our toll-free number is listed above. Our Customer Service department is ready to assist you with any questions about your account or other premium finance needs.

Federal law requires all financial institutions to obtain, verify and record information that identifies each person or entity that is granted a loan. FIRST requires such information as reasonably necessary for proper identification, such as the Insured's name, street address, FEIN, SSN, or date of birth. FIRST will use this information only to process the loan and will not share this information with outside parties except to the extent necessary to complete this transaction.

**THANK YOU for allowing us to be of service! We appreciate your business.**

This notice will acknowledge our acceptance of your premium finance agreement (the "Agreement") which was originated through the above referenced agent or broker. The insurance company(ies) providing your insurance coverage will be notified that you have entered into this Agreement. We will issue payment on your behalf as directed by your agent or broker.

Please review carefully the Loan Summary at right and the Schedule of Policies below. If any of the information does not agree with your records, please notify us immediately.

| LOAN SUMMARY | |
|---|---|
| Total Premiums, Taxes and Fees | $946,564.00 |
| Down Payment | $95,466.99 |
| Doc. Stamp Tax | |
| Amount Financed | $851,097.01 |
| Finance Charge | $8,105.90 |
| Total of Payments | $859,202.91 |
| Annual % Rate | 2.280 % |
| Number of Payments | 9 |
| Payment Amount | $95,466.99 |
| First Due Date | 05/01/2016 |

## SCHEDULE OF POLICIES

| POLICY NUMBER | POLICY EFFECTIVE DATE | INSURANCE COMPANY | COVERAGE TYPE | TERM (MOS.) | PREMIUMS TAXES & FEES |
|---|---|---|---|---|---|
| 6011313435 | 04/01/2016 | CONTINENTAL CASUALTY | EXLB | 12 | $ 15,960.00 |
| 8400003699161 | 04/01/2016 | EVEREST NATIONAL INSURANCE | DIC | 12 | $ 82,244.00 |

SEE NEXT PAGE FOR LISTING OF ADDITIONAL POLICY(IES)

(08673273)

**SCHEDULE OF POLICIES – CONTINUED**                    **ACCOUNT NUMBER: 900 - 2825917**

| POLICY NUMBER | POLICY EFFECTIVE DATE | INSURANCE COMPANY | COVERAGE TYPE | TERM (MOS) | PREMIUMS TAXES & FEES |
|---|---|---|---|---|---|
| KTJCMB4E65525516 | 04/01/2016 | TRAVELERS CASUALTY & SURETY | PROP | 12 | $ 651,266.00 |
| TUU56B051311 | 04/01/2016 | GREAT AMERICAN INSURANCE CO | UMB | 12 | $ 160,000.00 |
| TBD | 04/01/2016 | NATIONAL UNION FIRE INS CO PA | LIAB CYBER | 12 | $ 37,094.00 |

FILE NO. 1829

**AFCO**

**Premium Finance Agreement - Promise of Repayment**

8885 Rio San Diego Drive, Suite 347, San Diego, CA 92108
TEL. NOS. 619-209-5210  800-288-7920

(CHECK APPROPRIATE BOX)

| | PERSONAL |
|---|---|
| X | COMMERCIAL |

Page 1 of 3

| Agent (Name and Address)                    10054391 | Insured (Name and Address as shown on the policy) |
|---|---|
| Marsh USA Inc. | Garden Fresh Restaurant Corp |
| Attn : Nancy Zaleski | Attn : Karynn Capacete |
| 1560 Sawgrass Corporate Pkwy Ste 300 | 15822 Bernardo Center Drive, Ste A |
| Sunrise, FL 33323 | San Diego, CA 92127 |
| 954-838-3400 | 858-675-1600 |

| A) Total Premiums | B) Down Payment | C) Amount Financed | D) Finance Charge | E) Total Payments |
|---|---|---|---|---|
| $49,958.12 | $9,992.00 | $39,966.12 | $633.78 | $40,599.90 |

| F) Annual Percentage Rate | No. of Payments | Amount of Payments | First Installment Due | Installment Due Dates |
|---|---|---|---|---|
| 3.790 % | 9 (Monthly) | $4,511.10 | 04/17/2016 | 17th |

**SCHEDULE OF POLICIES**

| Policy Prefix and Numbers | Effective Date of Policy/Inst. | Name of Insurance Company and Name and Address of General or Policy Issuing Agent or Intermediary | Type of Coverage | Months Covered | Premium $ |
|---|---|---|---|---|---|
| B0509FINSR1600 039 | 03/17/2016 | Lloyds of London | Cont Prod | 12 | 47,500.00 |
| | | Marsh USA Inc 1560 Sawgrass Corporate Parkway #300 Sunrise, FL 33323 USA | | | |
| | | Fee | FEE | NRef | 83.12 |
| | | Tax | TAX | Ref | 2,375.00 |
| | | Policy Detail Continued... | | | |

**Security Agreement**

**(1) DEFINITIONS:** The above named insured (the "Insured") is the borrower. AFCO Acceptance Corporation ("AFCO") is the lender to whom the debt is owed. "Insurance company" or "company", "insurance policy" or "policy" and "premium" refer to those items listed under the "Schedule of Policies". Singular words shall mean plural and vice-versa as may be required in order to give this Agreement meaning.
**(2) PROMISE OF REPAYMENT:** The insured (i) requests AFCO to pay the premiums in the Schedule of Policies, less the Down Payment and any installments paid prior to acceptance of this Agreement and (ii) promises to pay to AFCO the amount stated in Block E above, according to the Payment Schedule shown above, subject to the remaining terms of this Agreement. No additional authority, acts, approvals or licenses are or will be necessary as a prerequisite to the enforceability of this Agreement. Payments to AFCO are deemed made only upon receipt in good funds. Checks are accepted, subject to collection.

**INSURED AGREES TO ALL TERMS SET FORTH ON ALL PAGES OF THIS AGREEMENT AND ANY ADDENDA THERETO.**

SIGNATURE OF INSURED(S) OR AUTHORIZED AGENT OF INSURED(S)    PRINT NAME              TITLE                DATE

**MARSH's Representations and Undertakings**

(1 ) The form of signature of the agent or broker notwithstanding, these representations and undertakings shall be deemed to be made by MARSH in its corporate capacity and not by the individual broker actually signing the Premium Finance Loan documentation. (2) The policies are in full force and effect and the information in the Schedule of Policies and the premiums are correct. (3) The insured has received a copy of the Premium Finance Loan documentation. (4) (i) MARSH shall hold in trust for AFCO only those funds which have been actually received by MARSH or credited to MARSH's account; (ii) MARSH shall have no liability or obligation with respect to any return premiums or other payments made by the carrier directly to the insured or other third part(ies); (iii) MARSH shall have no liability or obligation to AFCO for remitting return premiums or other payments to parties other than AFCO if such return premium is made pursuant to court order or other legal process and MARSH will use its best efforts to promptly advise AFCO of the service of any such court order or other legal process; (iv) MARSH shall have no obligation to return unearned commissions in the event of the appointment by the insured of a new broker and the mid-term cancellation and rewrite of the policies listed on the Premium Finance Loan documentation, provided however, that AFCO shall not be precluded from enforcing its rights against any insurer under any applicable law or regulation; and (v) MARSH shall have no obligation to refund commissions in the event of a premium reduction required by law unless such law requires the refund of such commissions. (5) AFCO represents that its decision to accept the Premium Finance Loan and to extend credit to the insured is based upon its own judgment as to the creditworthiness of the insured and the carrier and is not based upon any representation of or information supplied by MARSH other than is expressly stated in the Premium Finance Loan documentation. (6) None of the policies is non-cancelable, retrospectively rated, subject to minimum earned premiums or of a deposit premium type, unless AFCO is notified to the contrary by MARSH as part of the underwriting process. (7) The policies can be canceled by the insured and the unearned premiums will be computed on the standard short-rate or pro-rata table, unless AFCO is notified to the contrary by MARSH as part of the underwriting process. (8) MARSH represents on a best knowledge basis only, no independent check or verification having been made, that a proceeding in bankruptcy, receivership or insolvency has not been instituted by or against the named insured. (9) The disclosures required by Section 778.2 of the California Insurance Code have been provided to the Insured.

**IF THERE ARE ANY EXCEPTIONS TO THE ABOVE STATEMENTS, THEY ARE LISTED BELOW:**

SIGNATURE OF AGENT OR BROKER                TITLE                DATE

FOR INFORMATION CONTACT THE DEPARTMENT OF FINANCIAL INSTITUTIONS, STATE OF CALIFORNIA

CPFAM-2 (4/10) c. AFCO Acceptance Corp. 2010    QIV# 100001064246.001

**AFCO**

FILE NO. 1829

**Premium Finance Agreement - Promise of Repayment**
8885 Rio San Diego Drive, Suite 347, San Diego, CA 92108
TEL. NOS. 619-209-5210  800-288-7920

(CHECK APPROPRIATE BOX)

☐ PERSONAL
☒ COMMERCIAL
Page 2 of 3

## SCHEDULE OF POLICIES

| Policy Prefix and Numbers | Effective Date of Policy/Inst. | Name of Insurance Company and Name and Address of General or Policy Issuing Agent or Intermediary | Type of Coverage | Months Covered | Premium $ |
|---|---|---|---|---|---|
| | | The terms of this agreement are continued on addendum A, annexed hereto and made a part hereof.<br><br>Insured's Initials   X_____ | | | |

QIV# 100001064246.001

**(3) SECURITY INTEREST AND POWER OF ATTORNEY:** The Insured assigns and hereby gives a security interest to AFCO as collateral for the total amount payable in this Agreement in (a) any and all unearned premiums or dividends which may become payable for any reason under all insurance policies financed by AFCO, (b) loss payments which reduce the unearned premiums, subject to any mortgage or loss payee interests and (c) any interest in any state guarantee fund relating to any financed policy. If any circumstances exist in which all premiums related to any policy could become fully earned in the event of any loss, AFCO shall be named a loss-payee with respect to such policy. AFCO at its option may enforce payment of this debt without recourse to the security given to AFCO. The Insured irrevocably appoints AFCO as its attorney in fact with full authority to (i) cancel all insurance financed by AFCO for the reason set forth in paragraph 11, pursuant to this agreement, (ii) receive all sums hereby assigned to AFCO and (iii) execute and deliver on the Insured's behalf all documents, instruments of payment, forms and notices of any kind relating to the insurance in furtherance of this Agreement.

**(4) WARRANTY OF ACCURACY:** The Insured (i) warrants that all listed insurance policies are in full force and effect and that it has not and will not assign any interest in the policies except for the interest of mortgagees and loss payees and (ii) authorizes AFCO to insert or correct on this Agreement, if omitted or incorrect, the insurer's name, the policy numbers, and the due date of the first installment and to correct any obvious errors. In the event of any such change, correction or insertion, AFCO will give the Insured written notice thereof.

**(5) REPRESENTATION OF SOLVENCY:** The Insured represents that it is not insolvent or the subject of any insolvency proceeding.

**(6) ADDITIONAL PREMIUMS:** The money paid by AFCO is only for the premium as determined at the time the insurance policy is issued. AFCO's payment shall not be applied by the insurance company to pay for any additional premiums owed by the Insured resulting from any type of misclassification of the risk. The Insured shall pay to the insurer any additional premiums or any other sums that become due for any reason. If AFCO assigns the same account number to any additional extension or extensions of credit, (i) this Agreement and any other agreement(s) identified by such account number shall be deemed to comprise a single and indivisible loan transaction, (ii) any default with respect to any component of such transaction shall be deemed a default with respect to all components of such transaction and (iii) any unearned premiums relating to any component of such transaction may be collected and applied by AFCO to the totality of such transaction.

**(7) SPECIAL INSURANCE POLICIES:** If the insurance policy is auditable or is a reporting form policy or is subject to retrospective rating, then the Insured promises to pay to the insurance company the earned premium computed in accordance with the policy provisions which is in excess of the amount of premium advanced by AFCO which the insurance company retains.

**(8) NAMED INSURED:** If the insurance policy provides that the first named insured in the policy shall be responsible for payment of premiums and shall act on behalf of all other insureds regarding the policy, then the same shall apply to this Agreement and the Insured represents that it is authorized to sign on behalf of all insureds. If not, then all insureds' names must be shown on this Agreement unless a separate agreement appoints an insured to act for the others.

**(9) AGREEMENT BECOMES A CONTRACT:** This Agreement becomes a binding contract when AFCO mails the Insured its acceptance and is not a contract until such time. The Insured agrees that (i) this Agreement may be transmitted by facsimile, E-mail or other electronic means to AFCO, (ii) any such transmitted Agreement shall be deemed a fully enforceable duplicate original document and (iii) such Agreement, when accepted by AFCO, shall constitute a valid and enforceable contract.

**(10) DEFAULT AND DISHONORED CHECK CHARGES:** If the Insured is late in making a loan payment to AFCO by 10 or more days, the Insured will pay to AFCO a default charge not to exceed 5% of the delinquent installment, but will be at least $1. If a check is dishonored, the Insured will pay a dishonored check fee not to exceed $15.

**(11) CANCELLATION:** If the Insured does not pay any installment according to the terms of this agreement with AFCO, AFCO may cancel all insurance policies financed by AFCO after giving 10 days notice of its intent to do so and the full balance due to AFCO shall be immediately payable. Payment of unearned premiums shall not be deemed to be payment of installments to AFCO, in full or in part.

**(12) AGREED RATE OF CHARGE:** The rate of charge for a loan not exceeding $2,499.99 computed from the earliest effective date of the insurance coverage shall not exceed:
(a)  2% per month on the part of the unpaid principal balance not exceeding $1,000; 1% per month of any remainder of such unpaid balance in excess of $1,000; or
(b)  1.6% per month of the unpaid principal balance.
All other rates of charge shall be agreed upon by the parties to the contract. All contracts shall be subject to a minimum charge of $25.00.

**(13) MONEY RECEIVED AFTER NOTICE OF CANCELLATION:** Any payments made to AFCO after mailing of AFCO's Notice of Cancellation may be credited to the Insured's account without affecting the acceleration of this Agreement and without any liability or obligation to request reinstatement of a canceled policy. Any money AFCO receives from an insurance company shall be credited to the amount due AFCO with any surplus paid over to whomever is entitled to the money. No refund of less than $1.00 shall be made. In the event that AFCO requests, on the Insured's behalf, reinstatement of the policy, such request does not guarantee that coverage will be reinstated.

**(14) COLLECTION EXPENSE - ATTORNEY FEES:** The Insured agrees to pay AFCO's collection expenses. If AFCO obtains a court judgment against the Insured, the Insured agrees to pay to AFCO court costs and reasonable attorney's fees as allowed by the court in the judgment.

**(15) REFUND CREDITS:** The Insured will receive (i) a refund credit of part of the finance charge if it voluntarily prepays the outstanding debt in full before the last installment due date according to Section 18629 of the Financial Code and (ii) a refund credit of part of the finance charge if the maturity of the loan is accelerated for any reason according to Section 18642 of the Financial Code. The methods for computing these refund credits are stated below.
(a)  Voluntary Prepayment - (i) If prepayment in full is made during the first three months and 15 days after the earliest insurance policy effective date as shown on the front of this Agreement, AFCO will compute a finance charge by multiplying the agreed rate of charge as stated at the end of this Agreement by the unpaid principal balances for the number of days from the earliest policy effective date to the date of prepayment in full. AFCO will apply each payment made by the Insured, first to finance charge and then to principal. AFCO will then subtract this actual finance charge from the finance charge shown in Box D of the contract to obtain the refund credit. (ii) If prepayment in full is made more than three months and 15 days after the earliest insurance policy effective date, the refund credit shall be computed by the Rule of 78s method.
(b)  Acceleration of Maturity - If payment of the unpaid balance of the loan to AFCO is accelerated for any reason, AFCO shall make the same refund or credit as would be required if this loan contract was paid in full on the date of acceleration. Paragraph 15(a) states the method of computing the refund or credit. The unpaid balance remaining after subtracting the refund or credit shall be treated as the unpaid principal balance. The Insured agrees to pay AFCO interest on the unpaid principal balance, computed at the agreed rate of charge stated at the end of this Agreement, until AFCO is actually paid in full, notwithstanding any cancellation of coverage. If AFCO issues a Notice of Cancellation, AFCO may recalculate the total finance charge payable pursuant to this Agreement, and the Insured agrees to pay interest, on the Amount Financed set forth herein, from the first effective date of coverage, at the highest lawful rate of interest.

**(16) INSURANCE AGENT OR BROKER:** The insurance agent or broker named in this Agreement (the "Agent") is the Insured's agent, not AFCO's and AFCO is not legally bound by anything the agent or broker represents to the Insured orally or in writing. AFCO has not participated in the choice, placement, acquisition or underwriting of any financed insurance. Any disclosures made by the Agent are made in its capacity as the Insured's agent and AFCO makes no representations with respect to the accuracy of any such disclosures.

**(17) NOT A CONDITION OF OBTAINING INSURANCE:** This Agreement is not required as a condition for obtaining insurance coverage.

**(18) SUCCESSORS AND ASSIGNS:** All legal rights given to AFCO shall benefit AFCO's successors and assigns. The Insured will not assign this Agreement and/or the policies without AFCO's written consent except for the interest of mortgagees and loss payees.

**(19) LIMITATION OF LIABILITY - CLAIMS AGAINST AFCO:** AFCO's liability for breach of any of the terms of this agreement or the wrongful exercise of any of its powers shall be limited to the amount of the principal balance outstanding, except in the event of willful misconduct. Any claims against AFCO shall be litigated exclusively in the Supreme Court of the State of New York, County of New York.

**(20) DISCLOSURE:** The insurance company and any intermediaries and the insurance agent or broker named in this Agreement and their successors and assigns are authorized and directed to provide AFCO with full and complete information regarding all financed insurance policy or policies, including, without limitation, the status and calculation of unearned premiums.

**(21) ENTIRE DOCUMENT - GOVERNING LAW - ENFORCEMENT VENUE:** This document is the entire agreement between AFCO and the Insured and can only be changed in a writing signed by both parties except as stated in paragraph (4). The laws of the state of California will govern this Agreement unless otherwise stated. AFCO may, at its option, prosecute any action to enforce its rights hereunder in the Supreme Court of the State of New York, County of New York, and the Insured (i) waives any objection to such venue and (ii) will honor any order issued by or judgment entered in such Court.

CPFAM-2 (4/10) c. AFCO Acceptance Corp. 2010

**EXHIBIT C**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. _____ |

**INTERIM ORDER, PURSUANT TO SECTIONS 105(a), 363(b) AND 364 OF
THE BANKRUPTCY CODE, (I) AUTHORIZING (A) PAYMENT OF
PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY COURSE
OF BUSINESS IN CONNECTION WITH INSURANCE PROGRAMS, INCLUDING
PAYMENT OF POLICY PREMIUMS AND BROKER FEES, AND (B) CONTINUATION
OF INSURANCE PREMIUM FINANCING PROGRAMS AND (II) AUTHORIZING
BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC
TRANSFER REQUESTS RELATED THERETO**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an interim order, pursuant to sections 105(a), 363(b) and 364 of the Bankruptcy Code, (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew the Insurance Programs and pay policy premiums and broker fees arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business, and (b) continue the Financed Programs and renew or enter into new premium financing programs, as necessary, under substantially similar terms and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing; and upon consideration of the Motion and all pleadings

---

[1]  The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376).  The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

related thereto, including the First Day Declaration; and due and proper notice of the Motion

having been given; and it appearing that no other or further notice of the Motion is required; and

it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C.

§§ 157 and 1334, and the *Amended Standing Order of Reference* dated February 29, 2012, from

the United States District Court for the District of Delaware; and it appearing that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and

the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and

sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized to maintain the Insurance Programs without

interruption, and to renew, supplement, modify, or enter into new insurance policies, and to incur

and pay broker fees in connection therewith, in accordance with the same practices and

procedures as were in effect prior to the Petition Date, with the restrictions set forth herein.

3.      The Debtors are authorized, but not directed, in their discretion, to pay, honor, or

otherwise satisfy premiums, claims, deductibles, retrospective adjustments, administrative fees,

broker fees (including, without limitation, the Broker Fees), and any other obligations that were

due and payable or related to the period prior to the Petition Date on account of the Insurance

Programs (including the Financed Programs) and the PFAs, except that, during the interim

period, the Debtors shall make only those insurance premium payments that are due prior to the

final hearing on the Motion, which amount shall be capped at $130,000.

4.      The Debtors are authorized to (a) continue, in the ordinary course of business, the

Financed Programs and the PFAs and, subject to a final order, except with respect to any PFA

that will expire prior to the end of October, renew or enter into new premium financing

programs, as necessary, under substantially similar terms, and (b) pay their installment payments under the Financed Programs and the PFAs and any such new premium financing programs as the same become due in the ordinary course of business.

5. Notwithstanding anything to the contrary in any PFA, in the event the Debtors default under the terms of a PFA, the PFA Lender shall not cancel any insurance policy of the Debtors without first providing notice of such default in writing by overnight mail to the Debtors and their bankruptcy counsel, and at least 5 business days to cure. If the Debtors fail to cure the default within that time, then PFA Lender may, in accordance with the terms of the PFA, and without further order of this Court, exercise any and all of its rights under the PFA.

6. Notwithstanding anything to the contrary in any of the PFAs, the Debtors' filing of these bankruptcy cases shall not constitute a default under any of the PFAs.

7. The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Order.

8. A final hearing on the relief sought in the Motion shall be conducted on _____, 2016, at _____ ____.m. (ET). Any objections to the Motion and to entry of the Final Order must be filed by _____, 2016, at 4:00 p.m. (ET) (the

"Objection Deadline") and served so that it is received by the following parties on or before the Objection Deadline: (i) Garden Fresh Restaurant Intermediate Holding, LLC, 15822 Bernardo Center Drive, Suite A, San Diego, California 92127; (ii) proposed co-counsel to the Debtors, Morgan Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178 (Attn: Elaine V. Fenna, Esq.), and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Travis G. Buchanan, Esq.); (iii) counsel to the TLA Lenders and the TLA Agent, Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, CA 90067 (Attn: Michael L. Tuchin, Esq. and David M. Guess, Esq.), and Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq.); and (iv) counsel to the TLB Lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Jayme T. Goldstein, Esq. and Daniel P. Ginsberg, Esq.) and Pachulski, Stang, Ziehl & Jones LLP, 919 North Market Street, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq.). If no objections are timely filed, this Court may enter the Final Order without further notice or a hearing.

9.      Nothing in this Order (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action against an Insurance Carrier; or (d) shall be construed as a promise to pay a claim.

10. The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

11. The requirements of Bankruptcy Rule 6003(b) are satisfied.

12. Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

13. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2016
  Wilmington, Delaware    _____

               United States Bankruptcy Judge

**<u>EXHIBIT D</u>**

**<u>Proposed Final Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. _____** |

**FINAL ORDER, PURSUANT TO SECTIONS 105(a), 363(b) AND 364 OF
THE BANKRUPTCY CODE, (I) AUTHORIZING (A) PAYMENT OF
PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY COURSE
OF BUSINESS IN CONNECTION WITH INSURANCE PROGRAMS, INCLUDING
PAYMENT OF POLICY PREMIUMS AND BROKER FEES, AND (B) CONTINUATION
OF INSURANCE PREMIUM FINANCING PROGRAMS AND (II) AUTHORIZING
BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC
<u>TRANSFER REQUESTS RELATED THERETO</u>**

Upon consideration of the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and

debtors in possession (collectively, the "<u>Debtors</u>") for the entry of a final order, pursuant to

sections 105(a), 363(b) and 364 of the Bankruptcy Code, (i) authorizing, but not directing, the

Debtors to (a) continue and, to the extent necessary, renew the Insurance Programs and pay

policy premiums and broker fees arising thereunder or in connection therewith, including

prepetition obligations arising in the ordinary course of business, and (b) continue the Financed

Programs and renew or enter into new premium financing programs, as necessary, under

substantially similar terms and (ii) authorizing the Banks to honor and process check and electronic

transfer requests related to the foregoing; and upon consideration of the Motion and all pleadings

---

[1]  The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376).  The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

related thereto, including the First Day Declaration; and due and proper notice of the Motion

having been given; and it appearing that no other or further notice of the Motion is required; and

it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C.

§§ 157 and 1334, and the *Amended Standing Order of Reference* dated February 29, 2012, from

the United States District Court for the District of Delaware; and it appearing that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and

the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and

sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized to maintain the Insurance Programs without

interruption, and to renew, supplement, modify, or enter into new insurance policies, and to incur

and pay broker fees in connection therewith, in accordance with the same practices and

procedures as were in effect prior to the Petition Date, with the restrictions set forth herein.

3.      The Debtors are authorized, but not directed, in their discretion, to pay, honor, or

otherwise satisfy premiums, claims, deductibles, retrospective adjustments, administrative fees,

broker fees (including, without limitation, the Broker Fees), and any other obligations that were

due and payable or related to the period prior to the Petition Date on account of the Insurance

Programs (including the Financed Programs) and the PFAs.

4.      The Debtors are authorized to (a) continue, in the ordinary course of business, the

Financed Programs and the PFAs and renew or enter into new premium financing programs, as

necessary, under substantially similar terms, and (b) pay their installment payments under the

Financed Programs and the PFAs and any such new premium financing programs as the same

become due in the ordinary course of business.

5.      Notwithstanding anything to the contrary in any PFA, in the event the Debtors

default under the terms of a PFA, the PFA Lender shall not cancel any insurance policy of the

Debtors without first providing notice of such default in writing by overnight mail to the Debtors

and their bankruptcy counsel, and at least 5 business days to cure.  If the Debtors fail to cure the

default within that time, then PFA Lender may, in accordance with the terms of the PFA, and

without further order of this Court, exercise any and all of its rights under the PFA.

6.      Notwithstanding anything to the contrary in any of the PFAs, the Debtors' filing

of these bankruptcy cases shall not constitute a default under any of the PFAs.

7.      The Banks are authorized, when requested by the Debtors, in the Debtors'

discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank

accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or

other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds

are available in the applicable bank accounts to make such payments.  The Banks may rely on

the representations of the Debtors with respect to whether any check or other transfer drawn or

issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and

any such Bank shall not have any liability to any party for relying on such representations by the

Debtors, as provided for in this Order.

8.      Nothing in this Order (a) is intended or shall be deemed to constitute an

assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as

to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice,

waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity,

priority, or amount of any claim against the Debtors and their estates; (c) shall impair, prejudice,

waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all

claims or causes of action against an Insurance Carrier; or (d) shall be construed as a promise to pay a claim.

9.      The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

10.      The requirements of Bankruptcy Rule 6003(b) are satisfied.

11.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

12.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  _____, 2016
            Wilmington, Delaware            _____

United States Bankruptcy Judge