**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (A) AUTHORIZING THE DEBTORS TO PAY AND HONOR CERTAIN PREPETITION WAGES, BENEFITS AND OTHER COMPENSATION OBLIGATIONS AND (B) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

Garden Fresh Restaurant Intermediate Holding, LLC and its above-captioned affiliated debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") hereby submit this motion (the "Motion") for the entry of interim and final orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively (the "Interim Order" and the "Final Order"), pursuant to sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), (a) authorizing the Debtors to pay and honor certain prepetition wages, benefits, and other compensation obligations, (b) authorizing financial institutions to honor and process checks and transfers related to such obligations, and  (c) approving the Severance Pay and approving payments under the Complimentary Meal Program and Non-Insider Incentive Programs (as defined herein).  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of John D. Morberg In Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376).  The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

"First Day Declaration").[2]  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 363, 503, 507, 1107, and 1108 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### I.    General

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently with this Motion, the Debtors have also filed certain other motions and applications seeking certain "first day" relief.

3.      The Debtors have continued in possession of their properties and have continued to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request has been made for the appointment of a trustee or examiner and no official committee has been established in these chapter 11 cases.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

5.       Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

## II.    The Employees

6.       The Debtors have a current workforce of approximately 5,500 employees (the "Employees") in the fifteen (15) states in which they conduct their operations.  Approximately 450 of those Employees are employed on a salaried basis; while the remainder of the workforce is employed on an hourly basis.  The Debtors' workforce includes:  (i) approximately seventy (70) corporate support personnel who are primarily based in, or report to, the Debtors' headquarters located in San Diego, California (the "Support Center Employees"); (ii) 405 restaurant and central kitchen managers and other operations management personnel (the "Ops Management Employees") at the Debtors' various restaurants; (iii) 48 distribution center Employees (the "Distribution Employees") at either of the two distribution centers located in Riverside, CA or Kennesaw, GA; and approximately 5,000 crew members in the Debtors' various restaurants (the "Crew Members").

7.       The Employees possess the institutional knowledge, experience, and skills necessary to support the Debtors' business operations during the chapter 11 process and to support a successful sale of the Debtors' business operations.  These Employees rely on their compensation from the Debtors to pay their daily living expenses.  The Debtors also incur a number of obligations related to the Employees, such as paid vacation and other time off, federal and state withholding taxes and other withheld amounts, health and welfare benefits, life and accidental death and dismemberment insurance, long-term disability coverage, 401(k) contributions, expense reimbursements, and other benefits and programs that the Debtors have

historically provided in the ordinary course of business.  The Debtors' compensation and benefit programs are referred to herein as the "Employee Programs" and the obligations to the Employees thereunder are referred to herein as the "Employee Obligations" and are more fully described below.[3]

8.      The Debtors need the Employees' continued commitment and support; therefore, the Debtors are requesting the relief set forth in this Motion to minimize any hardship to the Employees resulting from the commencement of the Debtors' chapter 11 cases.  The Debtors must take all necessary steps to retain the Employees and bolster their morale to preserve and maximize the value of the Debtors' estates.

9.      Accordingly, by this Motion, the Debtors seek authority to pay and honor their prepetition Employee Obligations and to continue their Employee Programs, as further detailed below.

### III.    Temporary Employees and Independent Contractors

10.      The Debtors also employ approximately twelve (12) temporary employees ("Temporary Employees"), four (4) of which are employed and paid through temporary agencies—Proven Solutions and TEG Staffing (the "Employment Agencies")—and eight (8) of which are paid directly by the Debtors' payroll.  The Temporary Employees perform marketing, human resources, IT and other services.  As of the Petition Date, the Debtors owe the Employment Agencies approximately $7,700 on account of prepetition fees and wages for the applicable Temporary Employees and $13,800 to the Temporary Employees that the Debtors pay

---

[3]  The summary of the Employee Obligations provided herein is qualified entirely by the Debtors' official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (each, an "Official Policy").  In the event of any inconsistency or ambiguity between this summary and an Official Policy, the terms of such Official Policy shall govern, but, for the avoidance of doubt, in no event shall the Debtors make any payments or honor any prepetition obligations other than what is authorized by the Court after consideration of this Motion and subject to the requirements imposed on the Debtors under any order(s) of the Court approving the Debtors' debtor in possession financing facility and the use of cash collateral and any budget in connection therewith.

directly.  The Debtors believe that no more than $12,850 is owed to the Employment Agencies or any Temporary Employee for prepetition obligations with respect to any individual Temporary Employee.

11.    Additionally, the Debtors engage approximately five (5) independent contractors (the "Independent Contractors").  The Independent Contractors provide accounting, marketing and IT services.  As of the Petition Date, the Debtors do not believe that they owe any amounts to the Independent Contractors on account of prepetition obligations.

12.    The Debtors rely heavily on the Temporary Employees and Independent Contractors, who are an essential and integral part of the Debtors' business operations. Moreover, many of the Independent Contractors and Temporary Employees have worked with the Debtors over significant periods of time, and have gained institutional knowledge and training.  If the obligations to the Employment Agencies are not met, the Employment Agencies may decide to allocate their employees to other companies.  Further, if the Debtors do not meet their obligations to the Temporary Employees and Independent Contractors, in the event that any prepetition obligations exist, these parties may refuse to continue working for the Debtors.  It would be incredibly burdensome and costly for the Debtors to replace that portion of their workforce comprised of the Temporary Employees and/or Independent Contractors.

13.    The Debtors seek authority to continue to pay the Employment Agencies, Temporary Employees and Independent Contractors in the ordinary course of business, provided that the Debtors will not pay more than $12,850 on account of prepetition obligations with respect to any individual Temporary Employee or Independent Contractor.

## IV.    The Employee Obligations and Employee Programs

### A.    Unpaid Wages

14.    Generally, in the ordinary course of business, the Debtors issue payroll to all Employees on a bi-weekly basis, with payroll being disbursed every other Friday for the preceding payroll period, which runs from Monday through Sunday.  The Debtors pay, on average, approximately $8.2 million[4] in gross wages and salary per month.

15.    The Debtors' payroll is distributed either by direct deposit into the Employees' personal bank accounts or by checks issued from a payroll account maintained by the Debtors. The Debtors believe that the amount of uncashed checks issued to current Employees ("Uncashed Paychecks") that may be outstanding as of the Petition Date is approximately $2.3 million, and request authority to honor such amounts owed to the Employees.

16.    The Debtors estimate that up to approximately $1.9 million[5] in prepetition wages and salaries are owed to Employees (or former Employees) (collectively, the "Unpaid Wages") for the prepetition period.  Pursuant to this Motion, the Debtors seek authorization, but not direction, to pay and honor in the ordinary course of business the Unpaid Wages and Uncashed Paychecks and to continue to pay their Employees after the Petition Date in the ordinary course. If this Motion is granted, absent further order of the Court, the Debtors will not pay any individual Employee in excess of $12,850 on account of prepetition Unpaid Wages.

### B.    Non-Insider Incentive Programs

17.    In addition to their regular salary or hourly pay, certain Employees participate in various non-insider incentive bonus programs (the "Non-Insider Incentive Programs").  The

---

[4]  This amount is not inclusive of gratuities collected by the Debtors for tipped Employees, which are usually paid via payroll after being collected from catering customers, or gratuities paid by customers to Employees in cash. However, this amount does include the Debtors' employer payroll taxes on the related wages.

[5]  This amount includes estimated employer payroll taxes of $145,000 on the Employees' prepetition wages.

Non-Insider Incentive Programs are designed to incentivize and reward Employees based on their own performance and the overall performance of the Debtors' business operations and are an important part of eligible Employees' overall compensation packages.  In order to be eligible to receive payments under the Non-Insider Incentive Programs, eligible Employees must have been employed during the entire time by the Debtors while it was earned, but can be in terminated status at the time of payment.  Approximately 600 Employees are eligible for the Non-Insider Incentive Programs.  For the eleven months ending September 30, 2016, the total expense of the bonus program was approximately $2.3 million.

18.     *Crew Member Incentive Program*.   Eligible Crew Members are entitled to participate in a monthly Non-Insider Incentive Program (the "Crew Member Incentive Program"), wherein such Employees may share in a pool of bonus funds that are accumulated based on their restaurant and crew meeting certain metrics during the quarter.  The maximum amount of the monthly bonus pool per restaurant is approximately $600.  As of the Petition Date, the Debtors estimate that an aggregate of approximately $29,000 will be due and owing under the Crew Member Incentive Program.

19.     The Debtors do not believe that any Employee participating in the Crew Member Incentive Program will be owed in excess of $12,850 between her or his Unpaid Wages and potential bonus payments.  As a result, the Debtors seek authority to honor all amounts owed under the Crew Member Incentive Program as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

20.     *Restaurant Management Incentive Program*.   Eligible restaurant management Employees are entitled to participate in monthly Non-Insider Incentive Programs (the "Restaurant Management Incentive Programs"), wherein a pool of bonus funds, which is accumulated, based on individual restaurant performance and various other metrics, are shared among participating Employees at qualifying restaurants.  The maximum amount of the monthly Restaurant Management Incentive Programs bonus pool per restaurant is approximately $2,700, plus an overage based on the comparative performance of the restaurant against the prior year.[6] As of the Petition Date, the Debtors estimate that an aggregate of approximately $150,000 will be due and owing under the Restaurant Management Incentive Programs.

21.     The Debtors do not believe that any Employee participating in the Restaurant Management Incentive Programs will be owed in excess of $12,850 between her or his Unpaid Wages and potential bonus payments.  As a result, the Debtors seek authority to honor all amounts owed under the Restaurant Management Incentive Programs as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

22.     *Central Kitchen Management Incentive Program*.   Eligible central kitchen and management Employees are entitled to participate in monthly Non-Insider Incentive Programs (the "Central Kitchen Management Incentive Programs"), which is based on individual central kitchen performance and various other metrics and paid to eligible central kitchen managers. The maximum amounts of the monthly Central Kitchen Management Incentive Programs are approximately $200 per eligible employee.   The central kitchen directors of operations are

---

[6] As applied to the Debtors' Vancouver, WA location, the metrics of the Restaurant Management Incentive Program are slightly different, and the maximum bonus pool is approximately $1,400.

entitled to 25% of the bonus earned by the central kitchen managers they oversee, which is a maximum of approximately $500 per director of operations.  In addition, the central kitchen employees are eligible for a bonus of a maximum of approximately $1,100 per eligible Employee if they meet certain driver criteria over a six-month period, which is paid bi-annually. As of the Petition Date, the Debtors estimate that an aggregate of approximately $57,000 will be due and owing under the Central Kitchen Management Incentive Programs.

23.    The Debtors do not believe that any Employee participating in the Central Kitchen Management Incentive Programs will be owed in excess of $12,850 between her or his Unpaid Wages and potential bonus payments.  As a result, the Debtors seek authority to honor all amounts owed under the Central Kitchen Management Incentive Programs as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

24.    *Workers' Compensation Incentive Program*.  To incentivize safe working environments, eligible restaurant and central kitchen management Employees are entitled to participate in a quarterly Non-Insider Incentive Program (the "Workers' Compensation Incentive Program"), wherein participating Employees at qualifying restaurants may share in a pool of bonus funds if their locations meet certain safety and risk management criteria.  The maximum amount of the quarterly Workers' Compensation Incentive Program compensation per location is $3,000.  As of the Petition Date, the Debtors estimate that an aggregate of approximately $17,000 will be due and owing under the Workers' Compensation Incentive Program.

25.    The Debtors do not believe that any Employee participating in the Workers' Compensation Incentive Program will be owed in excess of $12,850 between her or his Unpaid

Wages and potential bonus payments.  As a result, the Debtors seek authority to honor all amounts owed under the Workers' Compensation Incentive Program as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

26.     *Directors of Operations Incentive Program*.  Eligible Directors of Operations— Employees responsible for overseeing the restaurant-level managers—are entitled to participate in a monthly Non-Insider Incentive Program (the "Ops Incentive Program").  The Ops Incentive Program allows eligible Employees to obtain a monthly bonus if a number of performance and similar metrics are met.  The maximum amount of the monthly bonus under the Ops Incentive Program is approximately $4,200 per eligible Employee, plus an overage based on the comparative performance of such Employee's restaurants against the prior year.  As of the Petition Date, the Debtors estimate that an aggregate of approximately $82,000 will be due and owing under the Ops Incentive Program.

27.     The Debtors do not believe that any Employee participating in the Ops Incentive Program will be owed in excess of $12,850 between her or his Unpaid Wages and potential bonus payments.  As a result, the Debtors seek authority to honor all amounts owed under the Ops Incentive Program as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

28.     *Vice President of Operations Incentive Program*.  Eligible Vice Presidents of Operations, which the Debtors submit are not insiders as such term is defined in the Bankruptcy Code, are entitled to participate in a monthly Non-Insider Incentive Program (the "VP Incentive

Program"). The VP Incentive Program allows eligible Employees to obtain a monthly bonus if a number of performance and similar metrics are met. The maximum amount of the monthly bonus under the VP Incentive Program is based on a percentage of the eligible Employee's salary, between 25–30%, which averages approximately $2,900 per eligible Employee. As of the Petition Date, the Debtors estimate that an aggregate of approximately $9,000 will be due and owing under the VP Incentive Program.

29.     The Debtors do not believe that any Employee participating in the VP Incentive Program will be owed in excess of $12,850 between her or his Unpaid Wages and potential bonus payments. As a result, the Debtors seek authority to honor all amounts owed under the Ops Incentive Program as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

30.     *Catering Sales Bonus Program*. Eligible catering sales manager and coordinator Employees are entitled to participate in a monthly Non-Insider Incentive Program (the "Catering Incentive Program"). The Catering Program allows eligible Employees to obtain a monthly bonus if a number of sales metrics are met. As of the Petition Date, the Debtors estimate that an aggregate of approximately $5,000 will be due and owing under the Catering Incentive Program.

31.     The Debtors do not believe that any Employee participating in the Catering Incentive Program will be owed in excess of $12,850 between her or his Unpaid Wages and potential bonus payments. As a result, the Debtors seek authority to honor all amounts owed under the Catering Incentive Program as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on

account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

32.     *Formal and Informal Awards*.  The Debtors also maintain a series of formal and informal awards and bonuses (the "Formal and Informal Awards") for non-insider Ops Management, Distribution, and Support Center Employees, which consists of awards for meeting specific criteria throughout the year.  As of the Petition Date, the Debtors estimate that an aggregate of approximately $111,000 will be due and owing on account of the Formal and Informal Awards.

33.     The Debtors do not believe that any Employee eligible for the Formal and Informal Awards will be owed in excess of $12,850 between her or his Unpaid Wages and potential bonus payments.  As a result, the Debtors seek authority to honor all amounts owed under the Formal and Informal Awards as they come due in the ordinary course of business, provided that the Debtors shall not be permitted to pay any individual in excess of $12,850 on account of amounts owed for prepetition Unpaid Wages and bonuses attributable to the prepetition period.

34.     *Admin Bonus Plan*.  Finally, eligible officer-, vice-president- and director-level Employees not participating in any other Incentive Program are entitled to participate in a yearly Incentive Program (the "Admin Bonus Plan"), which bonus plan is earned by the Debtors meeting certain yearly financial metrics.  The financial metrics necessary for payments under the Admin Bonus Plan will not be met for this year, and the Debtors will pay no amounts under the Admin Bonus Plan.

### C.     Accrued Vacation

35.     Ops Management Employees, Support Center Employees and Distribution Employees who work more than an average of thirty (30) hours per week can accrue paid

vacation ("Accrued Vacation").    Approximately 530 Employees are eligible for Accrued Vacation, which is based upon years of service and ranges from ten (10) to thirty (30) days per year.    Eligible Employees may accrue a maximum of up to two (2) times the annual yearly accrual (or a maximum of sixty (60) days).    The Debtors pay eligible Employees for Accrued Vacation in the event of termination.    As of September 11, 2016, eligible Employees had Accrued Vacation valued at approximately $1,655,000 (the "Accrued Vacation Obligations").

36.    In addition to Accrued Vacation, Ops Management Employees, Support Center Employees and Distribution Employees receive certain paid holidays and five (5) days per year to use for sick leave, which are paid in the payroll cycle in which the holiday or sick day occurs.

37.    The Debtors request that, to the extent applicable, they be authorized to honor the accrued prepetition Accrued Vacation Obligations and to continue their Accrued Vacation and paid holiday and sick programs postpetition in accordance with their prepetition policies; provided that the Debtors will not cash out unpaid vacation/leave time upon termination of an employee, unless applicable state law requires such payment..

**D.    Workers' Compensation**

38.    Under the laws of various states in which the Debtors operate, the Debtors are required to maintain workers' compensation liability insurance and to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.    The Debtors historically have self-insured their workers' compensation obligations and additionally maintained stop-loss workers' compensation insurance with Travelers Indemnity Company for the Employees at the statutorily-required level (the "Workers' Compensation Policy" and such program, the "Workers' Compensation Program") and will continue to do so as required postpetition.    The Workers' Compensation Policy is renewable annually, and the next renewal period is April 1, 2017.    The aggregate annual premium for the Workers' Compensation

Policy is approximately $5,155,000, which is paid in monthly installments. Under the Workers' Compensation Policy, the Debtors have a $250,000 per claim self-insured retention obligation. The approximate amount of due and owing outstanding premiums under the Workers' Compensation Policy as of the Petition Date is approximately $1,790,000.

39.    In addition to outstanding premium payments, the Debtors have outstanding Workers' Compensation Policy payment obligations in connection with future amounts that will be payable on past losses. As of the Petition Date, the Debtors owe approximately $135,000 on account of obligations for policy year 2014–2015; however, the Debtors are not currently seeking authority to make this payment. To secure these payment obligations, the Debtors have posted letters of credit in an amount equal to $4,585,000, which remain undrawn as of the Petition Date. The Debtors intend to leave this security in place post-petition. In addition, in the ordinary course of business, the Debtors make certain collateral installment payments in lieu of posting letter of credits.

40.    To ensure that claims incurred under the Workers' Compensation Program are resolved, the Debtors must pay outstanding prepetition liabilities associated with the Workers' Compensation Program, as well as outstanding policy premiums under the Workers' Compensation Policy, as such amounts become due and owing. For the claims administration process in this chapter 11 case to operate as efficient as is possible, and to ensure that the Debtors comply with state law requirements, the Debtors submit that the Workers' Compensation Program must continue in the ordinary course of business.

41.    Accordingly, the Debtors request authority, but not direction, in their discretion, to continue to maintain the Workers' Compensation Program in the ordinary course of business, and to pay prepetition amounts related thereto, including, without limitation, outstanding

premiums and potential retroactive premium adjustments under the Workers' Compensation Policy and payments for workers' compensation claims, deductibles and fees for administrative costs and other amounts required in connection with the program, as such amounts become due in the ordinary course of the Debtor's business; provided, however, that the Debtors are not currently seeking authority to increase the collateral package for any previous policy year.

### E.   Employee Benefits

42.    The Debtors have established various plans and policies to provide eligible Employees with various medical, dental, prescription drug, vision, life insurance, severance, and other benefits (collectively, the "Employee Benefits," and amounts owed under these plans, the "Employee Benefit Obligations"), which they intend to continue after the Petition Date in the ordinary course of business, subject to any adjustments or modifications that they determine are necessary, prudent, and in the best interests of their estates.[7]  The Debtors seek the authority, but not the direction, to satisfy all outstanding amounts related to Employee Benefit Obligations that arose prior to the Petition Date including, without limitation, any payments for claims, premiums and fees owed for administrative costs, and other amounts required in connection with the Employee Benefit Obligations, as such amounts become due in the ordinary course of the Debtors' business.  The Employee Benefits include, but are not limited to, the following:

### i.     Medical, Dental, and Vision Benefits

43.    The Debtors offer to eligible Ops Management Employees, Support Center Employees and Distribution Employees a self-insured High Deductible Health Plan (HDHP) with attached Health Savings Plan (HSA) (collectively, the "Health Plan").    There are

---

[7] Where required under applicable non-bankruptcy law, including COBRA, the Debtors provide eligible Employees with the opportunity to continue participating in the applicable Employee Benefits programs following their termination by the Debtors.  The Debtors intend for the relief requested herein to apply to such former Employees consistent with the Debtors' prepetition practices and the requirements of applicable law.

approximately 510 Employees enrolled in the Health Plan.  The Health Plan includes medical, dental, and vision coverage and is administered by Cigna, with whom the Debtors also maintain a stop-loss policy (the "Stop-Loss Policy").  The Stop-Loss Policy limits the Debtors' liability on account of any one claim to $190,000.  An HDHP is a health insurance policy that requires covered individuals to pay a high out-of-pocket deductible for medical care (at least $1,500) before any costs will be paid by the plan.  Per IRS requirements, participation in a HDHP is required for individuals to use an HSA.  An HSA is a part of an employee's health plan, into which deposits can be made by the employer or the employee.  These funds can then be used to pay for a variety of the individual's medical expenses.

44.     The eligible Employees pay a portion of the HDHP costs through post-tax payroll deductions, which amount also is dependent on the parties being covered, and also are entitled to make pre-tax payroll contributions to their HSA up to certain statutory caps.  The Debtors subsidize the remainder of the HDHP program and also make contributions to the eligible Employees' HSAs.  The amount of Employee deductions for their share of health care costs are approximately $85,000 per month.

45.     The Debtors pay on average approximately $418,000 per month in premiums and claim payments and approximately $3,500 per month in administrative fees related to the Health Plan.  As of the Petition Date, the Debtors owe approximately $510,000 on account of their prepetition obligations under the Health Plan, including administrative fees.

### ii.        Life Insurance, Disability Plans and EAP

46.     The Debtors offer to Ops Management Employees, Support Center Employees, and Distribution Employees: (i) employer-paid basic life and accidental death and dismemberment insurance ("Life Insurance") through Unum; (ii) short-term and long-term disability insurance (the "Disability Plan") through Unum; and (iii) an Employee Assistance

Program ("EAP") through Cigna.  Eligible Employees may also elect to purchase, at their own cost, additional voluntary Life Insurance for themselves and their families.

47.     The Disability Plan provides short-term benefits of income replacement in the amount of 55% of base pay for up to 12 weeks and long-term benefits of income replacement in the amount of 66.67% of base pay through Social Security retirement age.

48.     The EAP program is provided at no cost to eligible Employees and their family members, and includes assessment, counseling, and referrals for additional services.

49.     The Debtors' pay approximately $24,000 per month to Unum and Cigna on account of the Life Insurance, Disability Plan and EAP programs, and owe approximately $24,000 on account of prepetition obligations under these programs.

### iii.     Business Travel Accident Plan

50.     The Debtors provide employer-paid business travel accident insurance coverage to Ops Management Employees, Support Center Employees and Distribution Employees through The Hartford (the "Business Travel Accident Plan").  As of the Petition Date, the Debtors do not believe that there are any prepetition obligations outstanding with regards to the Business Travel Accident Plan.

### iv.     Severance

51.     Historically, the Debtors have paid one week of severance pay for each year worked by eligible Ops Management Employees, Support Center Employees, and Distribution Employees involuntarily terminated without cause (the "Severance Pay").  The Severance Pay for an eligible, terminated Employee is payable over the number of weeks equal to the number of weeks of Severance Pay to which that Employee is entitled.  The Debtors currently have no outstanding payment obligations for prepetition Severance Pay.

52.     Severance Pay is typically conditioned on a release of the Debtors and their affiliates, successors, assigns, and employees from any and all claims, liabilities, causes of action, and expenses, of any nature whatsoever pertaining or related to the Employee's employment with or separation from the Debtors.

53.     The Debtors may desire, going-forward, to continue to provide eligible non-insider Employees who are involuntarily terminated without cause with Severance Pay. Obtaining authorization to pay Severance Pay is critical to sustaining Employee morale and will help ensure that the Employees work towards the Debtors' chapter 11 goals.  For the avoidance of doubt, the Debtors are not asking for authority in this Motion to pay severance obligations to any current or former officer of the Debtors or other insiders.

54.     Given the critical need to continue their severance program, the Debtors are requesting interim approval to pay out Severance Pay to eligible Employees (with payment being made on the Debtors' regular payroll cycle) and to honor Severance Pay obligations, with final approval being considered at the "second day" hearing in these cases.  Until a final hearing on the Severance Pay relief is held, the Debtors will not pay any individual Severance Pay in excess of $12,850.

### v.     401(k) Plan and Retirement Savings

55.     The Debtors maintain a retirement savings plan (the "401(k) Plan"), administered by Wells Fargo, that meets the requirements of section 401(k) of the Internal Revenue Code of 1986.  For eligible Employees, the Debtors automatically will deduct 3% of each bi-weekly paycheck, on a pre-tax basis, and contribute that amount to the Employee's 401(k) Plan.  Each year, this amount automatically increases by 1% up to 6%, unless the Employee elects otherwise. Eligible Employees also can elect to make additional before-tax contributions to the 401(k) Plan through payroll deductions.   The Debtors collect contributions from eligible, participating

Employees each payroll cycle and transfer those contributions into the 401(k) Plan as directed by the Employees, typically on the same day payroll is paid.  Some of these amounts collected from Employees may not have been transferred into the 401(k) Plan prior to the Petition Date.  The Debtors do not make matching contributions, but pay quarterly amounts of $2,500 in the aggregate in administrative fees relating to the 401(k) Plan.

56.     By this Motion, the Debtors seek authority, but not direction, to honor their obligations under the 401(k) Plan and to continue the 401(k) Plan in the ordinary course of their business.

57.     In addition, the Debtors offer certain executive-level Employees a deferred compensation plan (the "Deferred Compensation Plan"), which permits these Employees to reduce income taxes through income tax deferral, as well as the opportunity to take advantage of tax-favored investing.  The Debtors are not requesting the authority to pay any amounts owed to participants under the Deferred Compensation Plan at this time.  The Debtors are only requesting the authority, but not the direction, to continue to administer the Deferred Compensation Plan in the ordinary course of business, and reserve all rights to seek later relief from the Court with respect to the Deferred Compensation Plan.

**F.     Employee Payroll Garnishments, Other Payroll Deductions, and Employer-Paid Taxes**

58.     The Debtors deduct from their Employees' paychecks certain taxes, such as payroll and social security taxes, required to be withheld by certain federal, state, and local taxing authorities, garnishments and other deductions (the "Payroll Deductions").  The Debtors forward certain of these withheld amounts, as well as the necessary employer contributions, to the appropriate governmental authorities.  The Debtors seek authority to continue to forward any Payroll Deductions not forwarded as of the Petition Date.

59.     Occasionally, the Debtors are presented with garnishment or child support orders requiring the withholding of an Employee's wages to satisfy such Employee's obligations. Additionally, some Employees are required to purchase slip resistant shoes.  Through an arrangement with the vendor, Shoes for Crews, Inc. ("Shoes for Crews"), the Debtors cover the initial costs for these shoes (which are bought from Shoes for Crews on credit), and are reimbursed by the Employees through payroll deductions over the course of several payroll cycles.  The Debtors estimate that approximately $52,000 is owed to Shoes for Crews for shoes purchased before the Petition Date, which should be recouped from Employee payroll deductions.  Finally, certain Employees have voluntary deductions for items such as additional life insurance.  In these instances, payments of these obligations are made from amounts otherwise payable to the Employees and ultimately are not an incremental cost obligation of the Debtors' estates.

60.     The Debtors seek authority to continue making such Payroll Deductions and to pay over such amounts to third parties as requested or required.  The Debtors also seek authority to pay all prepetition amounts owed to Shoes for Crews in the ordinary course of business, and to continue to obtain reimbursements for such amounts from the applicable Employees.

61.     Finally, the Debtors are subject to certain taxes, fees, and expenses, including federal wage and social security taxes and unemployment taxes and contributions (the "Employer Taxes and Fees").  The Employer Taxes and Fees are determined, for the most part, based on the gross wages and salaries that the Debtors pay to their Employees, and are required to be paid on a periodic basis.  As set forth in Footnote 5 above, the Employer Taxes and Fees that were incurred (or relate to compensation earned) prior to the Petition Date are approximately

$145,000.  The Debtors hereby seek authorization, but not direction, to remit these amounts to the applicable authorities consistent with the Debtors' prepetition practices.

### G.    Reimbursable Business Expenses and Auto Allowance

62.    As is customary with most large businesses, the Debtors reimburse their employees who incur and pay a variety of approved business-related expenses in the ordinary course of performing their duties, including payment for an Employee's use of his or her personal vehicle for company-related business, reimbursement to certain Employees for business cell phones, and reimbursement to certain Employees for health, wellness and business development expenses.  Some Employees initially incur and pay such expenses by using personal credit cards or cash, but are subsequently reimbursed by the Debtors after submission and approval of expense or mileage reimbursement requests.  The Debtors estimate that their average monthly payment to reimburse Employees for out-of-pocket business expenses is approximately $43,000.  The Debtors estimate that, as of September 30, 2016, approximately $43,000 is owed on account of reimbursable out-of-pocket expenses, including reimbursable mileage and cell phone payments.

63.    The Debtors also provide certain Employees with access to company-paid credit cards (the "Company Charge Cards") and other credit accounts through American Express to pay for reimbursable business expenses (the "American Express Program"), including business travel, hotels, and the payment to various vendors for goods and services provided to the Debtors.  As of the Petition Date, the Debtors estimate that approximately $50,000 is due and owing under the American Express Program.

64.    The American Express Program allows the Debtors to ensure that the Employees are able to fulfill financial obligations that arise in the ordinary course conduct of the Debtors' business without putting a direct, financial strain on the Employee's own finances.  In the

ordinary course, obligations arising from the use of the American Express Program are paid directly by the Debtors.  However, the Employees who use the Company Charge Cards may be personally liable for unpaid prepetition obligations under the American Express Program.  As such, authority to pay the prepetition obligations for use of the Company Charge Cards is necessary to avoid financial hardship for the relevant Employees and to maintain Employee dedication and morale.  Furthermore, the administrative benefit of continuing to utilize the American Express Program and avoiding having to request that Employees finance the costs of the Debtors' operations merits the continuation and maintenance of the American Express Program, with such reasonable modifications as the Debtors may agree to postpetition in the exercise of their discretion and sound business judgment.

65.    Finally, certain Employees are paid in advance for mileage such Employees are expected to drive in their personal vehicles in connection with the Debtors' business.  These amounts are paid monthly and the relevant Employees are taxed quarterly for any unpaid portion of this advance.  The average monthly payment on account of these advance mileage payments is approximately  $32,000.  As of September 30, 2016, the Debtors estimate they owe approximately $31,225 on account of these mileage advances.

**H.    Complimentary Meals and Miscellaneous Benefits**

66.    The Debtors also provide certain Employees with a number of complimentary meals each month.  In addition to these complimentary meals, the Debtors reimburse such Employees at the end of the year for taxes that the Employees would owe due to their complimentary meal benefit.  This program is referred to herein as the "Complimentary Meals Program."  The approximate amount per year that the Debtors pay for these taxes is equal to $44,000.  The prepetition obligation stemming from the Complimentary Meals Program is approximately $33,000.

67.    The Debtors are currently aware of and may discover other *de minimis* prepetition obligations that are owed with respect to the Employees (the "Miscellaneous Benefits").  The Debtors request authority to continue to honor these Miscellaneous Benefits in the ordinary course.  The Debtors believe that honoring their commitments under these Miscellaneous Benefits programs is warranted, at a minimum, by public relations and Employee morale considerations.  Accordingly, the Debtors request authority to continue making payments in the ordinary course of their business on account of Miscellaneous Benefits.

## RELIEF REQUESTED

68.    To minimize the personal hardship the Employees will suffer in connection with the filing of these cases, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to pay, in their discretion, the Employee Obligations as described in this Motion, (ii) authorizing, but not directing, the Debtors to maintain and continue to honor the Employee Programs as they were in effect as of the Petition Date, as may be modified, amended or supplemented from time to time in the ordinary course of business, and (iii) authorizing the applicable banks and other financial institutions (the "Banks") to receive, honor, process, and pay any and all checks presented for payment and all electronic payment requests made by the Debtors related to the Employee Obligations, whether such checks were presented or electronic payment requests were submitted before or after the Petition Date; provided that the final relief with respect to the Severance Pay and Non-Insider Incentive Programs will only be authorized at the "second day" hearing.

## BASIS FOR RELIEF

I. **Authority to Honor the Employee Obligations and Continue the Employee Programs Is Warranted Under the Facts of These Chapter 11 Cases**

    A. **Authority to Honor the Employee Obligations Is Authorized Under Section 363(b) of the Bankruptcy Code**

69.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code) (internal citations omitted); see also *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring a "good business reason" for a sale under section 363 of the Bankruptcy Code); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003) (requiring a "good business reason" for disposition of assets outside of the ordinary course in bankruptcy); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (same).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

70.    As described above, the Employees are essential to the continued operation of the Debtors' business.  The Debtors believe their enterprise value will be materially impaired by workforce instability or attrition at this critical juncture.  The relief requested in this motion is,

therefore, a necessary and critical element of the Debtors' efforts to preserve value for their stakeholders.  Absent approval of the relief requested in this motion, the Employees may face significant financial hardship and other risks and could be obliged to seek alternative employment opportunities or will become demoralized and less productive.  Additionally, the maximization of value of the Debtors' estates is intrinsically tied to their workforce.  The Debtors cannot readily replace their human capital without significant efforts—which may not be successful given the overhang of these chapter 11 cases and the widespread and disparate workforce that the Debtors have across the United States.  Paying the Employee Obligations is necessary for the Debtors to avoid unnecessary recruitment and related costs, to avoid certain operating risks, to ensure safe food preparation and high quality customer service in the Debtors' restaurants, and to minimize the disruption to their operations during these chapter 11 cases.  The costs of the Employee Obligations are far outweighed by the benefit of preserving the Debtors' operations as a going concern and far outweigh the potential destruction in value that would occur if the Debtors were unable to operate their business.

71.     Accordingly, as authorized by sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority to pay the Employee Obligations that become due and owing during the pendency of these cases and to continue at this time their practices, programs, and policies with respect to the Employees, as such practices, programs, and policies were in effect as of the Petition Date.  The Debtors submit that the relief requested herein is essential and critical to their ability to maximize value for their creditors.

### B. Continuation of the Employee Programs and Payment of the Employee Obligations Are Warranted Under the Doctrine of Necessity

72.     Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The Court may use its power under section 105(a) to authorize payment of the Employee Obligations under the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

73.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying stay pending appeal on grounds that there is no serious basis to challenge doctrine of necessity in the Third Circuit); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–26 (Bankr. D. Del. 1999) (noting that the Third Circuit permits debtors to pay prepetition claims that are essential to the continued operation of business).

74.     Continuation of the Employee Programs is warranted under the doctrine of necessity.  The Employees provide the Debtors essential services necessary to conduct their business.  As discussed above, the Debtors and their stakeholders cannot afford to lose their vital human capital during this critical period.  Certainly, payment of the Employee Obligations will give the Debtors the greatest likelihood to retain their Employees as the Debtors seek to preserve

and maximize the value of their assets and business while in chapter 11.  The failure to continue the Employee Programs and pay obligations related thereto (including the Employee Obligations) would place the Debtors' efforts in this regard in material jeopardy.

## II.     This Motion Should Only Affect the Timing of Payment for Certain Employee Obligations

75.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the Unpaid Wages and a number of other prepetition Employee-related obligations to priority treatment. Likewise, section 507(a)(8) of the Bankruptcy Code affords statutory priority to many of the Employer Taxes and Fees.  To confirm a chapter 11 plan, the Debtors must pay priority claims in full.  *See* 11 U.S.C. § 1129(a)(9)(B) and (C) (requiring payment in full under a plan of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation or sick leave pay, earned by an individual, (b) contributions to an employee benefit plan, and (c) priority tax obligations).  Thus, granting the relief sought herein would only affect the timing of payments of Employee Obligations that are entitled to priority treatment under sections 507(a) of the Bankruptcy Code.

## III.    Payment of Certain Employee Obligations Is Required by Law and the U.S. Trustee's Operating Guidelines.

76.     Additionally, the failure to pay tax-related Payroll Deductions and the Employer Taxes and Fees could result in tax liabilities and penalties for both the Employees and the Debtors, and potentially for the Debtors' directors and officers.  Likewise, the failure to transmit garnishments and other similar deductions can cause hardship to certain Employees and an administrative burden for the Debtors.  Indeed, if the Debtors were to be prohibited from transmitting such deductions, the Debtors would expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments that are not the Debtors' property, but, rather, have been withheld from Employees' paychecks on such

parties' behalves.  Further, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit such payments.

77.     Moreover, maintaining the Workers' Compensation Policy is justified because applicable state law and the Chapter 11 Operating Guidelines (the "Guidelines") promulgated by the Office of the United States Trustee ("U.S. Trustee") require that the Debtors maintain appropriate insurance, including workers' compensation insurance.  If the Debtors fail to maintain the Workers' Compensation Policy, state laws may prohibit the Debtors from operating in those states and the U.S. Trustee may also take action against the Debtors as a result of their failure to adhere to the Guidelines.  Payment of all amounts that may be owed under the Workers' Compensation Policy, therefore, is important to the Debtors' continued operations and the success of the Debtors' efforts in these chapter 11 cases.

**IV.     The Severance Pay and Non-Insider Incentive Programs Are Reasonable and a Sound Exercise of Business Judgment.**

78.     The Debtors further request that they be allowed to continue to honor the Non-Insider Incentive Programs and continue the Severance Pay program in the ordinary course of business and to pay to all non-insider Employees such amounts that become due during the course of these chapter 11 cases.  The Debtors submit that these programs should be reviewed under section 363(c)(1) of the Bankruptcy Code because these programs are simply a preexisting program that the Debtors have maintained in the ordinary course, and seek to make outstanding payments to the Employees on a postpetition basis.  *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012).  The Debtors are not seeking to make bonus or severance payments to insiders under this Motion; therefore, any limitations imposed by section 503(c) of the Bankruptcy Code are not applicable.

79.     The Debtors submit that continuing to maintain the Non-Insider Incentive Programs and Severance Pay, and honor related obligations as set forth herein, is a sound exercise of their business judgment and in the best interests of the estates.   The Non-Insider Incentive Programs are long-standing components of the Debtors' overall employee compensation package.   The Severance Pay is also a long-standing business practice of the Debtors that helps to facilitate the orderly wind-down of closing stores and allows the Debtors to retain valuable Employees to assist in the transition that typically accompanies a reduction in force.   The Debtors therefore believe that it is necessary to continue these programs on a postpetition basis, and honor their obligations thereunder, in order to ensure that the Employees are not exposed to significant financial constraints due to these chapter 11 cases and to continue to provide the Employees with the appropriate motivation and compensation to help the Debtors succeed.

80.     Accordingly, the Debtors seek authority to continue the Non-Insider Incentive Programs and to continue the Severance Pay program in the ordinary course of business, including payment of prepetition obligations related thereto, if any, as set forth herein.

**V.      The Banks Should Be Authorized to Honor and Pay Checks and Electronic Payment Requests in Connection with the Employee Obligations.**

81.     In addition, by this Motion, the Debtors request that the Banks be authorized, when requested by the Debtors, to receive, process, honor, and pay any and all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to the prepetition obligations described herein, whether such checks were presented or fund transfer requests were submitted before or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.   The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating

directly to the authorized payment of obligations described herein.  Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.

82.     For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of their estates and creditors.

## VI.     Request for a Finding of Satisfaction of Bankruptcy Rule 6003(b)

83.     Under Bankruptcy Rule 6003, the Court may authorize the Debtors to satisfy the prepetition Employee Obligations because such relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)).

84.     As described above and in the First Day Declaration, the continuity and viability of the Debtors' business operations depends upon a stable work force.  Thus, any significant number of Employee departures or deterioration in morale at this time will substantially and adversely impact the Debtors' business and result in immediate and irreparable harm to the estates and their creditors.  There is a real, immediate risk that, if the Debtors are not authorized to continue to satisfy Employee Obligations in the ordinary course, Employees would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and instantly destroying the prospects of a successful reorganization.  Consequently, it is critical that the Debtors continue in their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date, except as otherwise set forth herein, for all of their Employees.

85.     Accordingly, the Debtors respectfully submit that the relief requested herein is necessary to avoid immediate and irreparable harm and that, therefore, Bankruptcy Rule 6003 is satisfied.

## VII.    Request for a Waiver of Bankruptcy Rule 6004(h)

86.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), as any delay in satisfying the Employee Obligations would jeopardize the Debtors' business operations and their efforts in connection with these chapter 11 cases, to the detriment of their estates and creditors.

87.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## VIII.    Reservation of Rights

88.     Authorization to pay any amounts under this Motion shall not be deemed to constitute postpetition assumption or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy Code.   The Debtors reserve all of their rights under the Bankruptcy Code with respect thereto.   Moreover, authorization to pay all amounts under this Motion shall not affect the Debtors' right to contest the amount or validity of any Employee Obligations, including without limitation the Payroll Deductions or Employer Taxes and Fees that may be due to any taxing authority.

## **Notice**

89.     Notice of this Motion has been provided to:  (i) the U.S. Trustee ; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; (v) the Prepetition Secured Parties; (vi) the lenders under the proposed debtor in possession financing facility and (vii) the Banks. Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the orders substantially in the forms annexed hereto as Exhibit A and Exhibit B granting the relief requested herein and such further relief as may be just and proper under the circumstances.

Dated:  October 3, 2016       **MORGAN, LEWIS & BOCKIUS LLP**
       Wilmington, Delaware     Neil E. Herman (*pro hac vice* pending)
                                 James O. Moore (*pro hac vice* pending)
                                 101 Park Avenue
                                 New York, New York 10178
                                 Telephone: (212) 309-6000

- and –

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Michael R. Nestor (No. 3526)
Kenneth J. Enos (No. 4544)
Ian J. Bambrick (No. 5455)
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600

*Proposed Counsel to the Debtors and Debtors in Possession*

# **EXHIBIT A**

## **Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. _____ |

### INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO PAY AND HONOR CERTAIN PREPETITION WAGES, BENEFITS AND OTHER COMPENSATION OBLIGATIONS AND (B) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order (a) authorizing the Debtors to pay and honor certain prepetition wages, benefits, and other compensation obligations, and (b) authorizing financial institutions to honor and process checks and transfers related to such obligations, as described more fully in the Motion; and upon consideration of the Motion and all pleadings related thereto, including the First Day Declaration; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* dated February 29, 2012, from the United States District Court for the District of Delaware; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376). The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on an interim basis to the extent set forth herein.

2.      Pursuant to sections 105(a), 363, and 507(a) of the Bankruptcy Code, except as otherwise set forth in this Order, the Debtors are authorized, but not directed, in their discretion, to pay, honor, or otherwise satisfy, in accordance with the Debtors' policies and in the ordinary course of business, all amounts and obligations on account of the prepetition Employee Obligations and Employee Programs specified in the chart below, and all costs, expenses, fees, and other amounts related thereto, including, without limitation, any amounts that have accrued but remained unpaid as of the Petition Date, capped at the amounts set forth below as to prepetition obligations, and the Debtors are authorized, on an interim basis, to provide payment for obligations that become due prior to the final hearing on the Motion for (i) the Complimentary Meal Program, and (ii) Severance Pay to non-insiders and payments due to non-insiders under the Non-Insider Incentive Programs, in each case in accordance with the Debtors' regular bi-weekly payroll cycle; provided, however, that no individual Employee receives payments and/or benefits on account of prepetition Employee Obligations that exceed, in the aggregate, the amounts set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. For the purpose of this Interim Order, the term "non-insider" excludes any person holding the title of Vice President or any other officer title.

| | |
|---|---|
| Employee Wages | |
| Uncashed Paychecks | $2,300,000 |
| Unpaid Wages | $1,900,000 |
| Temporary Employees | $21,500 |
| Crew Member Incentive Program | $15,000 |

| | |
|---|---|
| Restaurant Management Incentive Program | $150,000 |
| Central Kitchen Management Incentive Program | $57,000 |
| Workers' Compensation Incentive Program | $17,000 |
| Ops Incentive Program | $82,000 |
| Catering Incentive Program | $5,000 |
| Formal and Informal Awards | $25,000 |
| Workers' Compensation Program | $1,790,000 |
| Health plan | $510,000 |
| Life Insurance, Disability Plans and EAP | $24,000 |
| 401(k) Plan | $2,500 |
| Payroll Deductions (including Shoes for Crews) | $ TBD |
| Employer Taxes and Fees | $145,000 |
| Reimbursable Business Expenses and Auto Allowance | $43,000 |
| Mileages Advances | $32,000 |
| Complimentary Meals Program | $33,000 |
| Miscellaneous Benefits | $25,000 |
| Total | $_____ |

3.      The Debtors are authorized, but not directed, in their discretion, to continue operating the American Express Program and to honor their prepetition and postpetition obligations related thereto; provided that such prepetition amounts shall not exceed $50,000.

4.      A hearing on final authorization to permit the Debtors to pay non-insider Severance Pay and continue the Non-Insider Incentive Programs and Complimentary Meal

Program in accordance with their prepetition practices shall be held on _____ at

_____.  Parties shall have until _____ at 4:00 P.M. (ET) to file and serve objections

("Objection") to the Motion with respect to final approval of the non-insider Severance Pay and

the Non-Insider Incentive Programs and Complimentary Meal Program.  If no Objections are

timely filed in accordance with this paragraph, the Court may grant such relief without a hearing.

Objections must be served on the following parties:  (i) Garden Fresh Restaurant Intermediate

Holding, LLC, 15822 Bernardo Center Drive, Suite A, San Diego, California 92127;

(ii) proposed co-counsel to the Debtors, Morgan Lewis & Bockius LLP, 101 Park Avenue, New

York, New York 10178 (Attn: Neil E. Herman, Esq. and James O. Moore, , Esq.), and Young

Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn.:

Kenneth J. Enos, Esq.); (iii) counsel to the TLA Lenders and the TLA Agent, Klee, Tuchin,

Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, CA 90067 (Attn:

Michael L. Tuchin, Esq. and David M. Guess, Esq.), and Richards, Layton & Finger, P.A., 920

North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq.); (v) counsel to the TLB

Lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038

(Attn: Jayme T. Goldstein, Esq. and Daniel P. Ginsberg, Esq.) and Pachulski, Stang, Ziehl &

Jones LLP, 919 North Market Street, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq.)

(vi)  any statutory committee appointed in these chapter 11 cases; and (vii) the U.S. Trustee, 855

King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Juliet Sarkessian, Esq.).

     5.     The Debtors and any other third parties administering withholding obligations on

behalf of the Debtors, are authorized, but not directed, to make payments to applicable third

parties with respect to the Payroll Deductions and Employer Taxes and Fees, as set forth in the

Motion, and the costs associated therewith, in accordance with the Debtors' ordinary course of business and stated policies, as set forth in the Motion.

6.      Except as otherwise set forth herein, the Debtors are authorized, but not directed, on a postpetition basis to maintain and continue to honor the Employees Programs described in the Motion as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course of business.

7.      The Banks shall be, and hereby are, authorized, when requested by the Debtors in their discretion, to receive, process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtors' bank accounts on account of the prepetition Employee Obligations and the Employee Benefits, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

8.      The Debtors are authorized to issue postpetition checks or to affect postpetition fund transfer requests in replacement of any checks or fund transfer requests related to the Employee Obligations dishonored or rejected as a consequence of the commencement of these chapter 11 cases.

9.      Authorization to pay all amounts on account of Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Employee Obligations, including without limitation, the Payroll Deductions that may be due to any taxing authority.

10.     Nothing contained in this Order or the Motion shall constitute a rejection or assumption by the Debtors of any executory contract or unexpired lease by virtue of reference to any such contract or lease in the Motion.

11.     The Debtors are authorized and empowered to take such actions as may be necessary and appropriate to implement the terms of this Order.

12.     Absent further order of the Court, the Debtors shall not (a) pay any amounts that are subject to section 503(c) of the Bankruptcy Code, or (b) cash out Accrued Vacation Obligations or leave time upon termination of an employee, unless applicable state law requires such payment.

13.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

14.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

15.     The requirement of Bankruptcy Rule 6004(a) is waived.

16.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: Wilmington, Delaware
       _____, 2016


       _____
       UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket Nos. _____ |

**FINAL ORDER (A) AUTHORIZING THE DEBTORS TO PAY AND HONOR
CERTAIN PREPETITION WAGES, BENEFITS AND OTHER COMPENSATION
OBLIGATIONS AND (B) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR
AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order (a) authorizing the Debtors to pay and honor certain prepetition wages, benefits, and other compensation obligations, and (b) authorizing financial institutions to honor and process checks and transfers related to such obligations, as described more fully in the Motion; and upon consideration of the Motion and all pleadings related thereto, including the First Day Declaration; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* dated February 29, 2012, from the United States District Court for the District of Delaware; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376). The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtors, their estates, and creditors; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on a final basis to the extent set forth herein.

2.      Pursuant to sections 105(a), 363, and 507(a) of the Bankruptcy Code, except as otherwise set forth in this Final Order, the Debtors are authorized, but not directed, in their discretion, to pay, honor, or otherwise satisfy, in accordance with the Debtors' policies and in the ordinary course of business, all amounts and obligations on account of the prepetition Employee Obligations and Employee Programs specified in the chart below, and all costs, expenses, fees, and other amounts related thereto, including, without limitation, any amounts that have accrued but remained unpaid as of the Petition Date, capped at the amounts set forth below as to prepetition obligations, and the Debtors are authorized, on a final basis, to continue their Severance Pay, Complimentary Meal Program, and Non-Insider Incentive Programs and to make Severance Pay, Complimentary Meal Program and Non-Insider Incentive Program payments to non-insiders, in each case in accordance with the Debtors' regular bi-weekly payroll cycle; provided, however, that no individual Employee receives payments and/or benefits on account of prepetition Employee Obligations that exceed, in the aggregate, the amounts set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

| | |
|---|---|
| Employee Wages | |
| Uncashed Paychecks | $2,300,000 |
| Unpaid Wages | $1,900,000 |
| Temporary Employees | $21,500 |
| Crew Member Incentive Program | $29,000 |
| Restaurant Management Incentive Program | $150,000 |

| | |
|---|---|
| Central Kitchen Management Incentive Program | $57,000 |
| Workers' Compensation Incentive Program | $17,000 |
| Ops Incentive Program | $82,000 |
| VP Incentive Program | $9,000 |
| Catering Incentive Program | $5,000 |
| Formal and Informal Awards | $111,000 |
| Workers' Compensation Program | $1,790,000 |
| Health Plan | $510,000 |
| Life Insurance, Disability Plans and EAP | $24,000 |
| 401(k) Plan | $ 2,500 |
| Payroll Deductions (including Shoes for Crews) | $ TBD |
| Employer Taxes and Fees | $145,000 |
| Reimbursable Business Expenses and Auto Allowance | $43,000 |
| Mileages Advances | $32,000 |
| Complimentary Meals Program | $33,000 |
| Miscellaneous Benefits | $25,000 |
| Total | $_____ |

3.      The Debtors are authorized, but not directed, in their discretion, to continue operating the American Express Program and to honor their prepetition and postpetition obligations related thereto; provided that such prepetition amounts shall not exceed $50,000.

4.      The Debtors and any other third parties administering withholding obligations on behalf of the Debtors, are authorized, but not directed, to make payments to applicable third

parties with respect to the Payroll Deductions and Employer Taxes and Fees, as set forth in the Motion, and the costs associated therewith, in accordance with the Debtors' ordinary course of business and stated policies, as set forth in the Motion.

5.      Except as otherwise set forth herein, the Debtors are authorized, but not directed, on a postpetition basis to maintain and continue to honor the Employees Programs described in the Motion as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course of business.

6.      The Banks shall be, and hereby are, authorized, when requested by the Debtors in their discretion, to receive, process, honor, and pay any and all checks or electronic fund transfers drawn on the Debtors' bank accounts on account of the prepetition Employee Obligations and the Employee Benefits, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

7.      The Debtors are authorized to issue postpetition checks or to affect postpetition fund transfer requests in replacement of any checks or fund transfer requests related to the Employee Obligations dishonored or rejected as a consequence of the commencement of these chapter 11 cases.

8.      Authorization to pay all amounts on account of Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Employee Obligations, including without limitation, the Payroll Deductions that may be due to any taxing authority.

9.      Nothing contained in this Order or the Motion shall constitute a rejection or assumption by the Debtors of any executory contract or unexpired lease by virtue of reference to any such contract or lease in the Motion.

10.     The Debtors are authorized and empowered to take such actions as may be necessary and appropriate to implement the terms of this Order.

11.     Absent further order of the Court, the Debtors shall not (a) pay any amounts that are subject to section 503(c) of the Bankruptcy Code, or (b) cash out Accrued Vacation Obligations or leave time upon termination of an employee, unless applicable state law requires such payment.

12.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

13.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: Wilmington, Delaware
        _____ 2016


        _____
        UNITED STATES BANKRUPTCY JUDGE