## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (CSS) |
| Debtors. | (Joint Administration Requested) |
| | Hearing Date:  TBD<br>Objection Deadline:  TBD |

### DEBTORS' EMERGENCY MOTION FOR ORDER (I) AUTHORIZING THE ASSUMPTION OF THE LIQUIDATION AGREEMENT; (II) AUTHORIZING SALE IN ACCORDANCE WITH THE LIQUIDATION AGREEMENT, WITH SUCH SALE TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF

Garden Fresh Restaurant Intermediate Holding, LLC and its above-captioned affiliated

debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") hereby

submit this motion (the "Motion"), pursuant to sections 105, 363, 364, and 365 of title 11 of the

United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003,

6004, 6006, and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures for the United States

Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order in the

form attached hereto as Exhibit A (the "Proposed Order"), (i) authorizing the Debtors'

assumption of the liquidation agreement (the "Liquidation Agreement") by and between the

Debtors and Tiger Commercial & Industrial (the "Agent"), a copy of which is attached as Exhibit

1 to the Proposed Order, (ii) authorizing the Debtors to sell at a publicly marketed sale (the

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376).  The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

"Sale") certain restaurant equipment packages and other furniture, fixtures, and equipment (the "Assets") pursuant to the Liquidation Agreement with such Sale to be free and clear of all liens, claims, encumbrances, and interests; and (iii) granting certain related relief.  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of John D. Morberg in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").[2]  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 363, 364, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 6006, and 6007, and Local Rule 6004-1.

## BACKGROUND

**I.    General**

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently with this Motion, the Debtors have also filed certain other motions and applications seeking certain "first day" relief.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

01:19334749.6

3.      The Debtors have continued in possession of their properties and have continued to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request has been made for the appointment of a trustee or examiner and no official committee has been established in these chapter 11 cases.

5.      Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

## II.    The Proposed Sale

6.      As set forth in further detail in the First Day Declaration, the Debtors currently operate 123 restaurants under the Souplantation® and Sweet Tomatoes® brands across 15 states.

7.      In light of the Debtors' financial difficulties, prior to the Petition Date, the Debtors' management, in consultation with their advisors, including Piper Jaffray & Co. ("Piper Jaffray"), performed a comprehensive analysis of the Debtors' financial performance, which included an in-depth review of the performance of each restaurant and the markets in which the Debtors operate.

8.      As a result of such financial analysis, the Debtors identified two categories of restaurants: (a) "non-core" restaurants, which are losing money and are located in non-strategic locations and, thus, provide limited benefit to the Debtors, and (b) "core" restaurants, which are successful, or have the potential to be successful, and are located in strategic locations. The Debtors concluded that it was in the best interests of the Debtors and their stakeholders to move forward with a going concern sale of their core restaurants, and to maximize the value of their

01:19334749.6

non-core restaurants (each, a "Closing Restaurant" and, collectively, the "Closing Restaurants") through the Sale.

9.      Accordingly, in September 2016, the Debtors and their advisors began contacting certain nationally recognized potential liquidators to solicit interest in bidding on the right to conduct the Sale.  The Debtors discussed the Sale with such nationally recognized liquidator firms to allow the Debtors to identify the highest and best bid.  The Debtors engaged extensively with the potential bidders and, among other things, provided significant data on the restaurants included in the Sale.

10.     After extensive negotiations, with the assistance of personnel from Piper Jaffray, the Debtors selected the Agent to conduct the Sale, and liquidate the Assets of the Closing Restaurants in accordance with the terms of the Liquidation Agreement (the material terms of which are set forth below).  In order to avoid the accrual of additional administrative rent expenses, the Sale must be conducted on an expedited basis – both commencing and concluding during October 2016.  To the extent that the Assets remain in the Closing Restaurants at the end of October, the Debtors anticipate that such Assets will be abandoned or, if possible, relocated.

**III.    The Liquidation Agreement**

11.     Under the terms of the Liquidation Agreement, subject to the Court's approval of the Proposed Order, the Agent will serve as the exclusive agent to the Debtors for the purpose of conducting the Sale.  The Debtors seek to assume the Liquidation Agreement so that they may leverage the experience and resources of the Agent in performing large-scale liquidations, which the Debtors believe will provide the maximum benefit to the estates.

01:19334749.6

12.    The material terms of the Liquidation Agreement are described in the summary chart below.[3]

| Provision | Description |
|---|---|
| Purpose of Agreement | Agent shall act as the Debtors' exclusive agent to sell the Debtors' restaurant equipment packages and other furniture, fixtures & equipment, including but not limited to those items listed on Exhibit A to the Liquidation Agreement at a publicly marketed sale. |
| Date and Time of Sale | Agent shall schedule the date of the sale to occur on or about October 24, 2016 (the "Sale Date"). |
| Manner of Sale | The Debtors authorize Agent to sell the Assets, in whole or in part, at online auction(s), and/or private sale(s) to the highest bidder thereof.  Agent shall conduct the Sale in a manner intended to maximize recovery given the expedited time frame necessary to vacate the Premises by October 31, 2016.  Agent shall have complete authority to conduct the Sale in the manner, and utilizing the methods, that Agent deems, in its professional judgment, to be appropriate and in the best interest of Seller.  The Debtors shall provide one employee of the Debtors for each of the 20 Premises to work with Tiger Field Supervisors, a subsidiary of the Agent, to provide access and assist with Sale set-up, inspection and monitoring of Asset removal by prevailing Sale bidders.  The Debtors' employee will also provide riggers with access to the five locations requiring a vacate date by October 10, 2016.  If necessary, the Debtors shall also provide a local Sale site for Assets from the Texas and Illinois Premises to be relocated to and prepared for Sale.  The Debtors agree that they will not effectuate any sale of the Assets on their own without utilizing the services of Agent in connection therewith. |
| Agent Fees | The following shall define Agent's fees ("Compensation"):<br><br>a.    Agent will receive a commission of 10% on Sale proceeds<br><br>b.    Agent shall charge a Buyers' Premium on all sales at a rate of 18%.  The Buyer's Premium will be added to each buyer's invoice and paid directly to Agent by buyers.  The Buyer's Premium shall not be considered part of the sale proceeds or property of the Seller, but rather as Agent's Compensation.<br><br>c.    Seller shall pay Agent $150,000.00 (the "Prepayment") upon execution of the Liquidation Agreement as a prepayment for Costs. |

[3] Capitalized terms used but not otherwise in this summary chart shall have the meanings ascribed to them in the Liquidation Agreement.  To the extent that this summary differs in any way from the terms set forth in the Liquidation Agreement, the terms of the Liquidation Agreement shall control.

| Sale Costs | Agent shall be entitled to reimbursement for all Sale-related expenses (hereinafter referred to as "Costs") incurred by Agent in preparing for and conducting the Sale, including labor, marketing, supplies and other related costs.  Agent shall not be entitled to reimbursement for Costs in excess of $105,000.00, which amount is inclusive of the Prepayment, without prior authorization from the Debtors.  All expenses shall be documented in Agent's final settlement package provided to the Debtors. |
|---|---|
| Term of Agreement | The rights and obligations of the Parties under the Liquidation Agreement shall terminate upon the completion of the Sale of all the Assets by Agent, the removal of the sold Assets following the Sale and/or the abandonment of such sold Assets by Buyers, and satisfaction of the Parties' respective payment obligations to one another as set forth in the Liquidation Agreement ("Termination Date"). |

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek the entry of the Proposed Order:  (i) authorizing the Debtors' assumption of the Liquidation Agreement, (ii) authorizing the Sale pursuant to the Liquidation Agreement with such Sale to be free and clear of all liens, claims, encumbrances, and interests; and (iii) granting certain related relief

## BASIS FOR RELIEF REQUESTED

### I.    Assumption of the Liquidation Agreement Is Authorized Under Section 365(a).

14.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The United States Court of Appeals for the Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to renounce title to and abandon burdensome property."  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (internal quotation marks omitted).

15. The standard applied to determining whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. *See In re AbitibiBowater Inc.*, 418 BR 815 (unpaginated) (Bankr. D. Del. Oct. 27, 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

16. The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See In re Integrated Res.*, 147 B.R. at 656; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attached to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in

possession] demonstrate that [assumption] or rejection of the contract will benefit the estate");
*see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 420–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

17.    Here, the Debtors have exercised sound business judgment in determining that assumption of the Liquidation Agreement is in the best interests of the Debtors and their estates, and accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code.  *See, e.g.*, *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").  If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease.  *See, e.g.*, *In re Phil. Newspapers, LLC*, 424 BR 178, 182–83 (Bankr. E.D. Pa. 2010).

18.    As a key component of the Debtors' continuing efforts to preserve and maximize estate value, the Debtors have concluded, in their business judgment, that the assumption of the Liquidation Agreement is beneficial to the Debtors' estates.  Furthermore, after engaging in extensive, arms'-length negotiations with certain nationally recognized liquidators regarding the Sale and conducting reasonable diligence, the Debtors determined that entering into the Liquidation Agreement would provide the greatest return to the Debtors' estates for the Assets.  Additionally, the Debtors believe that the terms set forth in the Liquidation Agreement are fair and equitable and present the best path forward with respect to the Closing Restaurants.

01:19334749.6

19.     In particular, the Agent's extensive expertise in conducting liquidation sales allows it to oversee and implement the Sale, with the assistance of the Debtors' management, in an efficient and cost-effective manner.   Assumption of the Liquidation Agreement and conducting the Sale during the initial month of these chapter 11 cases will present tremendous value – both in terms of cost savings and an influx of cash - that will inure to the benefit of the Debtors' estates and all stakeholders.  The Assets to be sold are not being used in the Debtors' ongoing business, and yet the storage of such equipment creates administrative rent obligations of approximately $405,000 per month.   By selling the Assets and vacating the Closing Restaurants, the Debtors will be able to reject the real property leases for the Closing Restaurants and thereby reduce the administrative burden on the estates while at the same time monetizing otherwise unnecessary property.   Further, the Debtors have already dedicated substantial resources toward the Sale by, among other things, identifying their underperforming restaurants, investigating potential liquidators, and engaging in extensive negotiations regarding the Liquidation Agreement.

20.     If the Sale is not permitted to go forward, and the Liquidation Agreement is not ultimately assumed, the Debtors' estates would also lose the benefit of the efforts that have already been expended by the Agent in preparing for the Sale.   Indeed, it is the Debtors' understanding that the Agent has already begun creating a marketing plan and arranged for its personnel to begin marshaling the Assets at the Closing Restaurants.   Accordingly, any delay in conducting the Sale would result in increased administrative expenses, including, but not limited to, additional rent payments and storage costs resulting from the delay, along with lost revenue.

21.     Therefore, the Debtors request that the Court authorize the assumption of the Liquidation Agreement.

II.    **Sufficient Business Justification Exists for the Sale Under Section 363(b).**

22.    Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.*); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same).

23.    As set forth above, the demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656.

24.    Accordingly, similar store-closing or liquidation sales are routinely approved by courts in this district in chapter 11 cases involving retail debtors.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (stating that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); *see also In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016); *In re Hancock Fabrics, Inc.*, Case No. 16-10296 (BLS) (Bankr. D. Del. Feb. 25, 2016); *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bankr. D. Del. Nov. 24, 2015); *In re*

*American Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr. D. Del. Nov. 20, 2015); *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015); *In re Coldwater Creek, Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014).

25.     The Debtor' decision to conduct the Sale represents the best path forward to maximizing recoveries to the Debtors' estates with respect to the Assets, is based upon the Debtors' sound business judgment, and should thus be approved under section 363(b) of the Bankruptcy Code.  The Agent, as a nationally recognized liquidation firm, has the experience necessary to assist the Debtors in monetizing the Assets through an efficient and orderly process, and any delay in the Sale would harm the Debtors' ability to successfully monetize the Assets. Absent such relief, the Closing Restaurants will impose a significant drain on the Debtors' liquidity given that, as noted above, the Debtors would also be forced to incur approximately $405,000 per month in administrative rent obligations to store equipment that is not being in the Debtors' ongoing business.  By contrast, upon the sale of the Assets and the wind-up of the Closing Restaurants, the Debtors expect to realize an immediate benefit in terms of financial liquidity.  Since, in addition to avoiding significant rent obligations, the Debtors will realize up to $300,000 in net proceeds from the Sale, with the remainder of the proceeds being used to pay down the TLA Obligations.

26.     For the foregoing reasons, the Debtors request that the Court approve the Debtors' commencement of the Sale in accordance with the terms of the Liquidation Agreement.

**III.    The Sale of the Assets Free and Clear of All Liens, Encumbrances, and Other Interests Is Authorized Under Bankruptcy Code Section 363(f).**

27.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such

> interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

28.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets and commencement of the Sale "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).  Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

29.    To facilitate the sale of the Assets, the Debtors propose that any liens, claims and other interests asserted against the Assets be transferred, and attach, to the Sale proceeds received by the Debtors.  All liens on the Assets will be satisfied or will attach to the proceeds of the Sale with the same force, effect and priority as such liens have on the Assets, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto.  Accordingly, the Debtors submit that the sale of Assets free and clear of liens, claims and other interests satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

01:19334749.6

**IV.**     **The Court Should Waive Compliance with Any Restriction in the Leases.**

30.     Certain of the Debtors' leases governing the Closing Restaurants contain or may contain provisions purporting to restrict or prohibit the Debtors from conducting store-closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets"); *In re R.H. Macy and Co.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

31.     In addition, courts in this district have held that restrictive lease provisions affecting store-liquidation sales in chapter 11 cases are unenforceable. *See, e.g.*, *In re Hancock Fabrics, Inc.*, Case No. 16-10296 (BLS) (Bankr. D. Del. Feb. 25, 2016) (ordering that sale of merchandise be conducted notwithstanding any restrictive lease provisions); *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bankr. D. Del. Nov. 24, 2015) (same); *In re American Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr. D. Del. Nov. 20, 2015) (same); *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) (same); *In re Coldwater Creek,*

*Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales

be conducted without the further need for compliance with, among other things, lease provisions).

Thus, as a result of the above, and to the extent that such provisions or restrictions exist in any of

the leases of the Closing Restaurants, the Debtors request that the Court authorize the Debtors

and the Agent to conduct the Sale without interference by any landlords or other persons affected,

directly or indirectly.

## V.      Appointment of a Consumer Privacy Ombudsman Is Unnecessary.

32.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or

release personally identifiable information about individuals unless such sale or lease is

consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to

section 332 of the Bankruptcy Code.  The Debtors will not be selling or releasing personally

identifiable information in the course of the Sale.  Therefore, appointment of a consumer privacy

ombudsman is unnecessary.

## VI.     Request for a Finding of Satisfaction of Bankruptcy Rule 6003(b).

33.     Pursuant to Bankruptcy Rule 6003, any motion seeking to use property of the

estate pursuant to section 363 of the Bankruptcy Code within 21 days of the Petition Date

requires the debtor to demonstrate that such relief "is necessary to avoid immediate and

irreparable harm."

34.     As described above, the Assets to be sold are not being used in the Debtors'

ongoing business, yet the storage of such equipment creates administrative rent obligations of

approximately $405,000 per month, severely constricting the Debtors' much-needed liquidity, to

the detriment the Debtors' estate and creditors.  There is thus no question that the Debtors'

failure to commence the Sale within the timeline set forth in the Liquidation Agreement will

result in immediate and irreparable harm to the Debtors' estates by detracting from, and potentially derailing, the Debtors' chapter 11 efforts.

35.     Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## VII.    Provisions That Potentially Implicate Local Rule 6004-1

36.     Local Rule 6004-1(a) provides, in part, that "this rule applies to motions to sell property of the estate under Bankruptcy Code section 363(b) ("Sale Motions") and motions seeking approval of sale, bid or auction procedures in anticipation of or in conjunction with a Sale Motion . . . ."

37.     As required by Local Rules 6004-1(b)(i) and (ii), a copy of the Liquidation Agreement is attached to the Proposed Order as Exhibit 1, and the Proposed Order is attached hereto as Exhibit A.

38.     Further, as required by Local Rule 6004-1(b)(iv)(H), the Debtors hereby disclose that any net proceeds of the Sale in excess of $300,000 shall be used for the immediate paydown of the TLA Obligations.  Moreover, the Debtors will seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such a stay is applicable.

## VIII.    Request for a Waiver of Bankruptcy Rule 6004(h).

39.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, any delay in the Debtors' ability to conduct the Sale would be detrimental to the

01:19334749.6

Debtors, their creditors, and estates and would impair the Debtors' ability to optimize their business performance at this critical time as they begin the chapter 11 process.

40.      For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Order.

## NOTICE

41.      Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; (v) the Prepetition Secured Parties; (vi) the lenders under the proposed debtor in possession financing facility; (vii) the landlords for the Closing Restaurants; (viii) the state Attorneys General for each state where a Closing Restaurant is located; and (ix) all entities know to have asserted any lien, claim, interest or encumbrance upon any of the Assets.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

01:19334749.6

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested herein and such further relief as may be just and proper under the circumstances.

Dated: October 3, 2016                 **MORGAN, LEWIS & BOCKIUS LLP**
      Wilmington, Delaware           Neil E. Herman (*pro hac vice* pending)
                                            James O. Moore (*pro hac vice* pending)
                                            101 Park Avenue
                                            New York, New York 10178
                                            Telephone: (212) 309-6000

                                            - and –

                                            **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

                                            */s/ Kenneth J. Enos*
                                            Michael R. Nestor (No. 3526)
                                            Kenneth J. Enos (No. 4544)
                                            Ian J. Bambrick (No. 5455)
                                            1000 N. King Street
                                            Wilmington, Delaware 19801
                                            Telephone:  (302) 571-6600

                                            *Proposed Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. _____** |

**ORDER (I) AUTHORIZING THE ASSUMPTION OF THE
LIQUIDATION AGREEMENT; (II) AUTHORIZING SALE IN
ACCORDANCE WITH THE LIQUIDATION AGREEMENT, WITH SUCH SALE TO
BE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES;
AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of Garden Fresh Restaurant

Intermediate Holding, LLC and its above-captioned affiliated debtors and debtors in possession

(collectively, the "Debtors") for the entry of an order, pursuant to sections 105, 363, 364, and

365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 6006, and 6007, and

Local Rule 6004-1, (i) authorizing the Debtors' assumption of the liquidation agreement (the

"Liquidation Agreement") by and between the Debtors and Tiger Commercial & Industrial (the

"Agent"), a copy of which is attached as Exhibit 1 hereto, (ii) authorizing the Debtors to sell at a

publicly marketed sale (the "Sale") certain restaurant equipment packages and other furniture,

fixtures, and equipment (the "Assets") pursuant to the Liquidation Agreement with such Sale to

be free and clear of all liens, claims, encumbrances, and interests; and (iii) granting certain

related relief; and upon consideration of the Motion and all pleadings related thereto, including

the First Day Declaration; and due and proper notice of the Motion having been given; and it

---

[1]  The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376).  The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

01:19334749.6

1

appearing that no other or further notice of the Motion is required; and it appearing that the Court

has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334, and the

*Amended Standing Order of Reference* dated February 29, 2012, from the United States District

Court for the District of Delaware; and it appearing that this is a core proceeding pursuant to 28

U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and sufficient cause

appearing therefor, **IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.      The Debtors have advanced sound business reasons for entering into the

Liquidation Agreement, as set forth in the Motion and at the hearing, and entering into the

Liquidation Agreement is a reasonable exercise of the Debtors' business judgment and in the

best interests of the Debtors and their estates.

B.      The Sale will provide an efficient means for the Debtors to maximize recoveries

of their estates with respect to the Assets.

C.      The Liquidation Agreement was negotiated, proposed, and entered into by the

Agent and the Debtors without collusion, in good faith and from arm's-length bargaining

positions.

D.      The relief set forth herein is necessary to avoid immediate and irreparable harm to

the Debtors and their estates, and the Debtors have demonstrated good, sufficient, and sound

business purposes and justifications for the relief approved herein, thereby satisfying Bankruptcy

Rules 4001(a) and 6003.

E.      The Sale is in the best interests of the Debtors' estates.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* Fed. R. Bankr. P. 7052.

01:19334749.6

F.      The Debtors have represented that they are neither selling nor leasing personally identifiable information pursuant to the Motion.

G.      The entry of this Order is in the best interest of the Debtors and their estates, creditors, interest holders, and all other parties in interest herein; and now therefor, **IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The assumption of the Liquidation Agreement, a copy of which is attached hereto as Exhibit 1, is approved.  The Debtors are authorized to act and perform in accordance with the terms of the Liquidation Agreement.

3.      The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Order.  The failure to include specifically any particular provision of the Liquidation Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Liquidation Agreement and all of its provisions, payments, and transactions be authorized and approved as and to the extent provided for in this Order.

4.      To the extent of any conflict between this Order and the Liquidation Agreement, the terms of this Order shall control.

5.      Bankruptcy Rules 4001(a) and 6003 has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors. The requirements of Bankruptcy Rule 6007(a) are waived.

6.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall take effect immediately upon its entry.

01:19334749.6

7.      Subject to the restrictions set forth in this Order, the Debtors and the Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Liquidation Agreement and the Sale, and each of the transactions contemplated by the Liquidation Agreement, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Liquidation Agreement or the Sale prior to the date of this Order, hereby are approved and ratified.

8.      The Debtors are authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sale in accordance with this Order and the Liquidation Agreement.

9.      The Debtors shall use any net proceeds of the Sale in excess of $300,000 for the immediate paydown of the TLA Obligations.

10.      The Sale shall not be exempt from, and the Agent shall be required to comply with, all laws of general applicability, including without limitation, public health and safety laws, and applicable criminal, traffic, tax, labor, employment, environmental and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Subject to the foregoing, the Debtors and the Agent be, and they hereby are, authorized to take such actions necessary and appropriate to implement the Liquidation Agreement and to conduct the Sale without the necessity of a further order of this Court as provided by the Liquidation Agreement.

11.      Neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any governmental unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Sale and to take the related actions authorized herein.

01:19334749.6

12.     All newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sale and the sale of Assets pursuant to the Liquidation Agreement, including, without limitation, to conduct and advertise the Sale in the manner contemplated by and in accordance with this Order and the Liquidation Agreement.

13.     Except as expressly provided in the Liquidation Agreement, the Sale shall be conducted by the Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets, or "going dark" provisions.  The Agent and landlords of the Closing Restaurants are authorized to enter into agreements ("Side Letters") between themselves without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords.

14.     No person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sale or the sale of Assets, or the advertising and promotion of such Sale, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sale or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the Closing Restaurants that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or sale of the Assets or other liquidation

sales at the Closing Restaurants, or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

15.     In accordance with and subject to the terms and conditions of the Liquidation Agreement, the Agent shall have the right to use the Closing Restaurants and all related Closing Restaurant services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with this Order.

16.     All sales of Assets shall be "as is" and final.

17.     Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell, and all sales of Assets pursuant to the Sale, shall be free and clear of claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded

or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances"); *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of Assets with the same validity, in the amount, with the same priority, and to the same extent that any such liens, claims, and encumbrances have with respect to the Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Liquidation Agreement).

18.     To the extent that the Debtors propose to sell Assets that may contain personally identifiable or confidential information about the Debtors' employees or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such Assets before such sale.

19.     The Debtors and the Agent (as the case may be) are authorized and empowered to close the Closing Restaurants and transfer Assets from the Closing Restaurants.  The Agent is authorized to sell the Assets as provided for and in accordance with the terms of the Liquidation Agreement.

20.     The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Liquidation Agreement.

01:19334749.6

21.    This Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Order or the Liquidation Agreement.

Dated: _____, 2016
        Wilmington, Delaware

_____
Christopher S. Sontchi
United States Bankruptcy Judge

**<u>Exhibit 1</u>**

**<u>Liquidation Agreement</u>**



TIGER

ASSET INTELLIGENT

This Agreement is entered into effective this 3rd day of October 2016, between Garden Fresh Restaurant Corp. ("Seller", "Company") and Tiger Commercial & Industrial ("Agent"), each a "Party" and collectively the "Parties".

Section 1.        Purpose of Agreement.  Seller hereby retains Agent to act as its exclusive agent to sell the restaurant equipment packages and other furniture, fixtures & equipment of Company, including but not limited to those items listed on the attached Exhibit 'A' (hereinafter referred to as the "Assets") at a publicly marketed sale (hereinafter referred to as the "Sale(s)"). Agent hereby agrees to use its professional skill, knowledge and experience to the best advantage of both Parties, but makes no representations or warranties regarding the outcome of the Sale, except to the extent as may be provided for in this Agreement.

Section 2.        Title to the Assets.  Seller shall be responsible to file such notices and/or comply with such legal processes, as may be required to ensure that Agent, as agent of the Seller, shall have the right to convey all Assets to purchasers free and clear of any liens, judgments or encumbrances whatsoever.  Seller shall be responsible to disclose any UCC-1 filings, which exist that encumber the Assets subject to this Agreement, as well as any leases, which exist on any of Company's Assets.  If applicable, Seller shall provide written documentation to Agent that authorizes the terms of this Agreement for any Assets secured by a UCC-1 financing statement.

Section 3.        Location Of Assets.  The Assets are located at the sites listed on EXHIBIT B, collectively referred to as the "Premises".

Section 4.        Date and Time of Sale.  Agent shall schedule the Sale date to occur on or about October 24, 2016 (the "Sale Date").

Section 5.        Manner of Sale.  Seller hereby authorizes Agent to sell the Assets, in whole or in part, at online auction(s), and/or private sale(s) to the highest bidder thereof.  Agent shall conduct the Sale in a manner intended to maximize recovery given the expedited time frame necessary to vacate the Premises by October 31, 2016.  Agent shall have complete authority to conduct the Sale in the manner, and utilizing the methods, that Agent deems, in its professional judgment, to be appropriate and in the best interest of Seller.  Seller shall provide one Sweet Tomatoes staff member for each of the 20 Premises to work with Tiger Field Supervisors to provide access and assist with Sale set-up, inspection and monitoring of Asset removal by prevailing Sale bidders.  Staff member will also provide riggers with access to the five locations requiring a vacate date by October 10, 2016.  If necessary, Seller shall also provide a local Sale site for Assets from the  TX and IL Premises to be relocated to and prepared for

Sale.  Seller hereby agrees that it will not effectuate any sale of the Assets on its own without utilizing the services of Agent in connection therewith.

Section 6.    Sale Process.  Agent is hereby authorized by Seller to be its sole and exclusive agent to sell the Assets. Upon execution of this Agreement, Seller will turn over all sales or negotiations for sales of the Assets to Agent, as well as all contact information for parties that have expressed interest in the Assets to Seller.  Except as set forth in this Agreement, Seller agrees not to remove any Assets from the Sale for any reason after execution of this Agreement.  The sale shall be without reserve.  Agent shall be authorized to accept, as Seller's agent, cash, cashiers' checks, guaranteed checks, Visa, MasterCard and American Express as payment for the Assets sold.  Agent shall be responsible to collect, report, and remit sales tax collected during the Sale(s).  Seller shall be the principal party in interest for the sale of all Assets.  Upon full payment for the Assets by purchaser Seller hereby authorizes Agent to execute on its behalf, all bills of sale, receipts and other documents necessary to transfer title to the Assets as well as to provide Seller's federal employer identification number to purchasers, their agents, customs officials or similar parties for the limited purpose of completing a Shipper's Export Declaration form or any documentation reasonably necessary to facilitate the respective purchaser's export of the Assets.  Agent shall not be responsible for any purchaser that fails to live up to its obligation to complete a purchase of any of the Assets

Section 7.    Compensation.  The following shall define Agent's fees ("Compensation"):

a.        Agent and Seller agree to the following commission:  10% on Sale Proceeds

b.        Agent shall charge a Buyers' Premium on all Sales at a rate of 18%.  The Buyer's Premium will be added to each buyer's invoice and paid directly to Agent by buyers.  The Buyer's Premium shall not be considered part of the sale proceeds or property of the Seller, but rather as Agent's Compensation.

c.        Seller shall pay Agent $150,000.00 (the "Prepayment") upon execution of this Agreement as a prepayment for Costs (as defined in Section 8 of this Agreement).

Section 8.    Sale Costs.  Agent shall also be entitled to reimbursement for all sale related expenses (hereinafter referred to as "Costs") incurred by Agent in preparing for and conducting the sale, including labor, marketing, supplies and other related costs.  Agent shall not be entitled to reimbursement for Costs in excess of $105,000.00, which amount is inclusive of the Prepayment, without prior authorization from Seller.  All expenses shall be documented in Agent's final settlement package provided to Seller.  The following expenses have not been included in the Costs and are not deemed a responsibility of Agent: occupancy costs, personal property insurance, data backup, removal and/or destruction (if applicable), electrical & gas safe-offs and any refrigerant removal.

Section 9.    Allocation of Sales Proceeds.  Agent is authorized to deduct Compensation, remaining Costs due Agent, Sales Tax & Buyers' Premium Collected and all other funds authorized by this Agreement from the

proceeds of the Sale and deposit the remaining proceeds of the Sales (hereinafter referred to as "Net Income") into Agent's segregated trust account.  To comply with bulk sale laws, thirty (30) days following the completion of Agent's Sale related activities, Agent shall provide Seller with an accounting of the Sale income and expenses along with its remittance of the Net Income.  All funds due to Agent under the terms of this Agreement shall be paid to Agent before any payment in satisfaction of any security interest, lien, or encumbrance against the Assets or the proceeds thereof.

Section 10.        Taxes.  Seller warrants that now, and at the time of sale, there shall be no taxes due to any government entity, which may cloud Agent's ability to convey free and clear title to the Assets, including personal property taxes, payroll taxes, income taxes, etc.  Seller further indemnifies and holds Agent harmless from any claims made against Agent for the payment of taxes related to the Assets, with the exception of sales taxes collected by Agent during the sale, for which Agent shall be solely responsible for the collection, reporting, and payment of.

Section 11.        Insurance.  Until such time as title to and possession of any Asset is delivered to each sale purchaser, Seller shall obtain and thereafter maintain full fire, vandalism, burglary, theft and liability insurance on the Assets in an amount not less than the full insurable value of the Assets and shall name Agent as an additional insured.  In the event of a loss, Agent shall be paid from any claim for funds due under the terms of this Agreement. To the extent that Seller elects not to insure the Assets, Seller assumes full responsibility for all associated risks of loss, including Agent's costs and compensation.

Section 12.        Use of the Premises.  Seller shall be solely responsible to make arrangements with the landlord to provide the Premises for purposes of (i) storing the Assets, (ii) preparing for and conducting the Sale thereupon, and (iii) otherwise exhibiting the Assets.  Seller shall not charge Agent any rent, storage fees, utilities or any other fees associated with Agent's use of the Premises.  Seller shall provide adequate utilities to the Premises (including power, telephone, internet, security, and trash services) at Seller's sole expense, so as to allow Agent (i) to demonstrate and exhibit the Assets to any prospective purchaser and (ii) to conduct the Sale.  Notwithstanding any other term of this Agreement to the contrary, Seller's obligations to Agent under this Section shall commence upon the execution of this Agreement and shall terminate, unless otherwise extended by the Parties, on the below defined termination date.  Seller understands that Agent's duties defined herein are time sensitive.  Seller shall ensure Agent's representatives are provided with reasonable access to the Premises to facilitate: (i) sale preparation, (ii) buyer inspections and (iii) Asset removal.

Section 13.        Advertising; Disclaimers of Warranties; Etc.  Agent shall have sole authority to advertise the Sale.  Seller shall not place or arrange for any advertising without Agent's approval as to content.  To the extent allowable by law, Seller hereby authorizes Agent: (a) to use Seller's and Company's name and logo, without additional consideration from Agent, in promotional materials pertaining to the Sale; and (b) to state both in its advertising of the Sale and at the Sale that all Assets are being sold, "AS IS, WHERE IS, AND WITH ALL FAULTS," and otherwise to include any disclaimers of warranty, including but not limited to disclaimers of the warranties of

merchantability and fitness for a particular purpose or use.  Seller hereby acknowledges and agrees that Agent: (a) has no knowledge with respect to, and has no obligation to investigate, the merchantability or fitness for any particular purpose or use of any of the Assets; and (b) has no duty to comply with the relevant provisions of the secured transaction laws (if applicable), including but not limited to the delivery of any requisite notice to third parties, as it is Seller's responsibility to ensure that every aspect of the Sale shall be commercially reasonable (if applicable).

Section 14.        Seller's Obligations.  Seller shall seek to facilitate the following, where applicable, in such timeframes as necessary to support the time sensitive nature of the Sale: (i) executed Agreement, (ii) access to the Premises, (iii) sale authorization from secured parties; (iv) vehicle keys and executed vehicle title documentation, (v) purging any Assets of any refrigerant, fluids, gasses, hazardous materials, and (vi) removal of all sensitive data.

Section 15.        Removal of Sensitive Information.  Seller acknowledges that certain materials located at the sites may be of sensitive or personal nature (e.g., books and records, computer data, etc.).  Agent shall not be responsible for the proper retrieval, storage and/or destruction of any personal or sensitive materials.  Seller (and not Agent) shall be responsible to remove from the Premises and offices all paperwork, personal effects, and sensitive materials.  This includes removing sensitive data from the computers and hard drives to be sold; however, in no case should any data pertaining to the Seller's intellectual properties be destroyed or removed from the premises (including, but not limited to, customer and vendor lists, trademarks, sales history, and related items), if intellectual property is included in the Assets to be sold.

Section 16.        Hazardous Materials.  Agent has no obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any HAZARDOUS SUBSTANCES that may be located at the Premises or otherwise associated with the Assets.  Agent shall have no liability to any party for any environmental action brought (i) because the Assets were involved in, or are somehow related to, the storage, handling, treatment, disposition, generation, or transportation of HAZARDOUS SUBSTANCES or (ii) in connection with any remedial actions associated with the Assets or the Premises.  Seller (and not Agent) shall be responsible to safe-off all gas lines and remove from the Premises all HAZARDOUS SUBSTANCES, including refrigerants, from Assets to be sold prior to Agent's preview of the Assets to prospective Buyers.

The term "HAZARDOUS SUBSTANCES" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980,as amended, 42 U.S.C.A,9601(14), as a "hazardous substance,'' (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste," or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public  health  or welfare  or  to the environment or as otherwise requiring special handling, collection,  storage, treatment, disposal, or transportation.

-

Section 17.        <u>Term of Agreement; Removal of Sold Assets</u>.  The rights and obligations of the Parties under this Agreement shall terminate upon the completion of the Sale of all the Assets by Agent, the removal of the sold Assets following the Sale and/or the abandonment of such sold Assets by Buyers, and satisfaction of the Parties respective payment obligations to one another as set forth herein ("Termination Date").

Section 18.        <u>Condition of Premises</u>.  Agent's services involve the orchestration of a sales and marketing effort of the Assets, on behalf of Seller.  Agent is not a cleaning, demolition, data destruction or hazardous waste company.  Following Agent's completion of the Sale, it shall endeavor to leave the premises in a clean and orderly condition, as allowable within the budget allocated for the Sale and based upon the availability of sufficient trash containers provided by Seller.  However, under no circumstances shall Agent be responsible for i) removal of unsold items, ii) removal of items abandoned by Buyers, iii) trash and debris of the Company or resulting from the removal process, iv) Company paperwork, v) hazardous materials.  As a term of sale between Agent and its Buyers, Agent compels Buyers to remove all of their purchased items and leave the Premises clean of all trash and debris resulting from their efforts.  Further, Agent takes steps to enforce these terms of sale.  These terms also include Buyer's acknowledgment of Seller's and Landlord's rights to pursue Buyer for its failure to fulfill its purchase obligations.

Section 19.        <u>Cancellation</u>.

a.        Sale Cancellation.  In the event the Sale is cancelled for any reason, other than Agent's failure to perform, or in the event revenues from the Sale are seized or frozen by legal action, Seller shall guarantee performance of its obligations under the terms of this Agreement, including reimbursement of Costs incurred up through the date of cancellation and a Sale cancellation fee of $25,000.00 ("Cancellation Fee"), not as a penalty, but as the Parties' good faith attempt to fix compensation to Agent in the event the Sale is cancelled.  However, in no event shall a Sale cancellation nullify Seller's obligations to Agent in the event Seller successfully transacts a sale of the Assets within 3 months of the date of this Agreement, in which case Seller shall be responsible to reimburse Agent for Costs incurred and to pay the higher of an amount equal to its Compensation or the Cancellation Fee.

b.        Asset Cancellation.  In the event Agent is unable to fulfill delivery of a sold Asset to a Buyer by no fault of Agent, Agent shall have been deemed to have fulfilled its responsibilities of this Agreement and shall, therefore, be entitled to an amount equal to its compensation on the sold Asset.

c.   Damages.  Because the nature of this engagement involves Agent's public promotion of a Sale, any cancellation of a Sale after it has been promoted may result in reputational damages to Agent.  Therefore, the cancellation provisions of this Agreement are intended to address events that might occur outside the control of the Seller, not to permit the Seller to cancel the Sale at its discretion.  Furthermore, Seller hereby acknowledges that once an item has been offered for sale by auction (i.e. bidding has opened for an item), there are no circumstances under which the item may be removed from the Sale without Agent's consent.

Section 20.  Representations of Agent.  Agent represents and warrants to Seller that:

a. The person executing this Agreement on behalf of Agent is authorized to do so.

b. The terms of this Agreement are binding upon and enforceable against Agent.

Section 21.  Indemnifications By Agent.  Agent hereby indemnifies, defends and agrees to hold harmless the Seller and the Seller's officers. agents  and employees from and against any and all claims, demands, liabilities, judgments, damages, settlements, costs and expenses (including but not limited to court costs and attorneys fees) that may be sustained or incurred by the Seller as a result of Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement.

Section 22.  Representations of Seller.  Seller represents and warrants to Agent that:

a. The person executing this Agreement on behalf of the Seller is authorized to do so.

b.   The terms of this Agreement are binding upon and enforceable against Seller.

c.   To the best of Seller's knowledge, Seller now holds, and at the time of sale shall hold, good and marketable title to the Assets.

d.   To the best of Seller's knowledge, none of the Assets infringe upon or violate (or contain any parts or components which infringe upon or violate) any third party's copyright, patent, trademark, trade secret or other proprietary rights.

e.   To the best of Seller's knowledge, none of the Assets or any components thereof, or related software or technology requires a U.S. Government license for export from the United States to countries other than those which are subject to comprehensive embargoes or support for terrorism, except those notated with their respective Export Control Classification Numbers on the Exhibit "A".

f.        The terms of this Agreement are binding upon and enforceable against Company, upon U.S. Bankruptcy Court approval.

Section 23.        <u>Indemnifications By The Seller</u>.  Seller hereby indemnifies, defends and agrees to hold harmless Agent and Agent's officers, agents and employees from and against any and all claims, demands, liabilities, judgments, damages, settlements, costs and expenses (including but not limited to court costs and attorneys fees) that may be sustained or incurred by Agent as a result of (i) Seller's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement (ii) any failure of Seller to pay to its employees any wages, salaries or benefits due to such employees during or after the Sale, (iii) any consumer warranty or products liability claims relating to the Assets, or (iv) any liability or other claims asserted by customers, creditors, any of Seller's employees, or any other person or entity against Agent.

Section 24.        <u>Limitation of Liability</u>.  Notwithstanding any of the terms of this Agreement to the contrary, Agent's maximum liability for (i) any breach of Agent's covenants, agreements and/or indemnifications set forth herein, and (ii) any and all damages of any type *or* nature whatsoever, whether in contract, tort or otherwise, that *may* be sustained by the Seller or any other person or entity that arises from or is otherwise related to this Agreement or the Sale and which is in excess of any applicable insurance coverage shall be limited to the aggregate amounts actually received by Agent as compensation under this Agreement.

Section 25.        <u>Binding Obligation; Assignment</u>.  This Agreement shall be binding upon the Parties hereto and their respective successors and assigns.  Neither Party may assign its interest in this Agreement without the prior written consent of the other Party.

Section 26.        <u>Final Agreement</u>.  This Agreement, and any and all (i) exhibits that are attached hereto and made a part hereof, and (ii) side agreements, letter agreements and amendments, if any, that are executed by the Seller and Agent, contains the final and entire agreement and understanding and any terms, and conditions not set forth in this Agreement (or in such exhibits, side agreements, side letter agreements and amendments) are not part of this Agreement and the understanding of the Parties.  The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event of any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise by the virtue of the authorship of any provision of this Agreement.  This Agreement may be amended or altered only in writing, signed by the Party to be bound by the change or alteration.

Section 27.        <u>Time</u>.  Time is strictly of the essence of this Agreement.

Section 28.        <u>Number, Gender and Captions</u>.  As used herein, the singular shall include the plural and the plural may refer to the singular. The use of any gender shall be applicable to all genders.  The captions contained herein are for purposes of convenience only and are not a part of this Agreement.

Section 29.    Partial Invalidity.  If any term, covenant or condition of this Agreement or its application to any person or circumstances shall be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected, and each term shall be valid and enforceable to the fullest extent permitted by law.

Section 30.    Force Majeure.  Notwithstanding any of the terms of this Agreement to the contrary, Agent shall not be deemed in default with respect to the performance of any of the terms, covenants and conditions of this Agreement and the Termination Date shall be extended accordingly, if Agent (i) is unable to conduct the Sale, (ii) determines that the Sale should be postponed, or (iii) otherwise is unable to fulfill its obligations hereunder due to or because of any: (a) strike or lockout; (b) civil commotion, war-like operation, invasion, rebellion, terrorist act, hostilities, military or usurped power, sabotage, or governmental regulation or control; or (c)hurricane, tornado, flood, mudslide, fire, act of God, or any other cause that is beyond the control of Agent.

Section 31.    Technology Disclaimer. Agent does not warrant that the functions, features or content contained in Agent's website (including any third party software, products or other materials used in connection with its website) or any third party website used by Agent, will be timely, secure, uninterrupted or error-free, or that defects will be corrected.

Section 32.    Notices.  Any notice required or permitted by or in connection with this Agreement, without implying the obligation to provide any such notice, shall be in writing and shall be made by facsimile (confirmed on the date the facsimile is sent or by one of the other methods of giving notice provided for in this Section) or by hand delivery, by Federal Express, or other similar overnight delivery service, or by certified mail, unrestricted delivery, return receipt requested, postage prepaid, addressed to the respective Party at the appropriate address set forth below or to such other address as may be hereafter specified by written notice by the respective Parties.  If notice is tendered pursuant to the provisions of this Section and is refused by the intended recipient thereof, the notice shall be considered to have been given.

If to the Seller:

_____
_____
_____
Attention: _____
Telephone: _____
Email: _____

If to Agent:

Tiger Commercial & Industrial
340 N. Westlake Boulevard, Suite 260
Westlake, California 91362

Page 9
-

       Attention:  John Coelho
       Telephone: (805) 497-4999
       Email: jcoelho@tigergroup.com

       Section 33.     <u>No Partnership; Etc.</u> Agent is not in any way or for any purpose a partner of, joint venturer with, or an investor or member of any enterprise with, the Seller in the conduct of the Seller's business, or otherwise.  This Agreement establishes a relationship solely between a Seller and an Agent as to certain services that are to be rendered.

       Section 34.     <u>Jurisdiction</u>. This Agreement shall be interpreted under and in accordance with the laws of the United States Bankruptcy Court, _____ of _____..

In witness thereof, the Parties hereto have executed this Agreement on this 29th day of October, 2016.

Seller:                                     Agent:

_____           Tiger Commercial & Industrial

By:_____    By:_
_____

                                       John Coelho, Senior Vice President

Page 9
-

Attention: John Coelho
Telephone: (805) 497-4999
Email: jcoelho@tigergroup.com

Section 33.      No Partnership; Etc. Agent is not in any way or for any purpose a partner of, joint venturer with, or an investor or member of any enterprise with, the Seller in the conduct of the Seller's business, or otherwise.  This Agreement establishes a relationship solely between a Seller and an Agent as to certain services that are to be rendered.

Section 34.      Jurisdiction. This Agreement shall be interpreted under and in accordance with the laws of the United States Bankruptcy Court, _____ of _____..

In witness thereof, the Parties hereto have executed this Agreement on this 29th day of October, 2016.

Seller:                                                   Agent:

GARDEN FRESH RESTAURANT CORP      Tiger Commercial & Industrial

By: _____      By:_____
       John D. Morberg                            John Coelho, Senior Vice President
       Chief Executive Officer

EXHIBIT 'A'


Asset Schedule


[To Be Provided]