## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-16-12174 (CSS) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF JOHN D. MORBERG IN SUPPORT OF
## DEBTORS' PETITIONS AND FIRST-DAY MOTIONS

I, John D. Morberg, hereby declare under penalty of perjury:

1.      I am the President and Chief Executive Officer of Garden Fresh Restaurant Intermediate Holding, LLC ("Intermediate Holding"), a company organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these cases (the "Chapter 11 Cases") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.      On the date hereof (the "Petition Date"), Intermediate Holding and four of its direct and indirect subsidiaries each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376).  The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive Suite A, San Diego, California 92127.

3.      I submit this declaration (this "First Day Declaration") pursuant to Bankruptcy Rule 1007 to provide an overview of the Debtors and the Chapter 11 Cases and support the Debtors' Chapter 11 petitions and "first day" motions (each, a "First Day Motion," and collectively, the "First Day Motions").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.      PRELIMINARY STATEMENT[3]

1.      Following an extensive prepetition marketing process that yielded no bid whatsoever, the Debtors engaged in good-faith negotiations with their secured lenders, resulting in an agreement on a restructuring transaction to be implemented swiftly through a Bankruptcy Code section 363 sale of substantially all of the Debtors' assets (the "Sale Transaction").  Before the Petition Date, the Debtors, 100% of their secured TLA and TLB Lenders, the agents for the Debtors' TLA and TLB facilities, certain of their TLC Lenders and the Debtors' Manager entered into the Restructuring Support Agreement ("RSA"), pursuant to which the parties agreed to support the Sale Transaction and certain restructuring terms on a specified timeframe and pursuant to other specified conditions.

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion, as applicable.

[3]  All capitalized terms used in this Preliminary Statement but not yet defined, have the meaning given to them below.

2.      The Sale Transaction contemplates, among other things, the sale of the operational assets of the Debtors through an auction process pursuant to section 363 of the Bankruptcy Code.  The TLB Lenders will provide much-needed liquidity to the Debtors through the funding of debtor-in-possession financing (the "DIP").  Additionally, the TLB Purchaser agreed to serve as the stalking horse bidder in such auction, whereby the TLB Purchaser will set the baseline bid through a combination of (i) the assumption of certain liabilities, including the TLA Obligations and the DIP Obligations, (ii) a credit bid, (iii) the provision of up to $150,000 in cash (the "GUC Pool") to be escrowed by the buyer for the satisfaction of allowed unsecured creditor claims and (iv) the payment of certain cure costs at the closing of the Sale Transaction to the TLB Purchaser, upon the satisfaction of certain conditions.  The RSA also outlines certain requirements for third party bidders.

3.      Because of the liquidity constraints (as described in more detail below), the RSA contemplates that the Debtors consummate the Sale Transaction by December 5, 2016.

## II.      GENERAL BACKGROUND

### A.      Overview of the Debtors' Businesses

4.      The Debtors currently operate 123 restaurants under the Souplantation® and Sweet Tomatoes® brands across 15 states.  Founded in 1978 in San Diego, Souplantation and Sweet Tomatoes is the leading salad, soup, and bakery self-serve restaurant chain, offering fresh, wholesome food scratch-made daily using fresh ingredients sourced from farmer partners at a fixed price. The restaurants feature a self-serve salad bar, scratch-made soups, house-made focaccia pizzas, breads and muffins, hot pastas, desserts, and other freshly-prepared dishes. They also provide outside catering, and select "guest favorite" recipes are available in retail stores.  The Debtors operate a fully integrated supply chain and distribution network including 17 central kitchens and two distribution centers.

01:19332429.12

5.      All of the Debtors are incorporated in Delaware, except for Garden Fresh Promotions, LLC, which is incorporated in California.  The Debtors' principal place of business is 15822 Bernardo Center Drive Suite A, San Diego, California 92127.  The Debtors' stock is privately held, and all of their debt was privately placed.

6.      The Debtors have a current workforce of approximately 5,500 employees. Approximately 450 of those employees are employed on a salaried basis, and approximately 5,000 are employed on an hourly basis.  The Debtors' workforce includes:  (i) approximately 70 corporate support personnel who are primarily based in, or report to, the Debtors' headquarters; (ii) 400 restaurant and central kitchen managers and other operations management at the Debtors' various restaurants; (iii) 50 distribution center employees at either of the two distribution centers located in Riverside, CA or Kennesaw, GA; and 5,000 crew members in Debtors' various restaurants.

7.      The locations of the Debtors' operations are reflected in the following map:



**B.**    **Debtors' Prepetition Organizational Structure**

8.    Debtors' organizational chart is below:



**C.**    **The Debtors' Prepetition Capital Structure**

9.    As of the Petition Date, the substantial majority of the Debtors' liabilities consisted of funded debt (i.e., not trade debt).  The Debtors' prepetition capital structure is as follows:

 *i.*    the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations under that certain Financing Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time, the "<u>TLA Agreement</u>" and the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations thereunder, the

"TLA Obligations"), by and among Garden Fresh Holdings, Inc. (the "Parent"), Garden Fresh Restaurant Corporation (the "Company"), each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor" thereunder, the lenders party thereto from time to time (collectively, the "TLA Lenders"), Cerberus Business Finance, LLC as administrative agent and collateral agent for such lenders (in such capacities, the "TLA Agent"), and certain other parties thereto;

ii.     the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations under that certain Financing Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time, the "TLB Agreement" and the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations thereunder, the "TLB Obligations"), by and among Parent, the Company, each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor" thereunder, the lenders party thereto from time to time (collectively, the "TLB Lenders"), and Cortland Capital Market Services LLC as administrative agent and collateral agent for such lenders (in such capacities, the "TLB Agent");

iii.    the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations under that certain Term Loan Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time, the "TLC Agreement" and the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations thereunder, the "TLC Obligations"), by and among Parent, the Company, each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor"

thereunder, the lenders party thereto from time to time (including Sun Garden Fresh Finance, LLC ("Sun Garden")) (collectively, the "TLC Lenders"), and Apollo Investment Corporation as administrative agent and collateral agent for such lenders (in such capacities, the "TLC Agent");[4]

iv.      the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations under that certain Term Loan Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time, the "TLD Agreement" and the indebtedness, interest, fees and expenses (including professional fees and expenses) and other obligations thereunder, the "TLD Obligations"), by and among Parent, the Company, each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor" thereunder, the lenders party thereto from time to time (collectively, the "TLD Lenders," and together with the TLA Lenders, TLB Lenders and TLC Lenders, the "Prepetition Lenders"), and Apollo Investment Corporation as administrative agent and collateral agent for such lenders (in such capacities, the "TLD Agent," and together with the TLA Agent, TLB Agent, TLC Agent and Prepetition Lenders, the "Prepetition Secured Parties"); and

v.      the shares of capital stock (preferred and common) or other equity, ownership or profits interests (or any warrants, options or securities convertible into, or exercisable or exchangeable for, any such capital stock or other equity, ownership or profits interests) of Parent (collectively, the "Equity Interests" and the holders of the Equity Interests, the "Equity Holders").

---

[4]  For the Court's information, affiliates of Sun Garden (one of the TLC Lenders) also own all of the equity of the Debtors' ultimate non-debtor parent entity.

10.      As of the Petition Date, the aggregate outstanding amount of the TLA Obligations was no less than $87,366,250, consisting of no less than $86,525,398.50 of principal and no less than $840,851.50 of interest, fees and other obligations under the TLA Agreement and certain outstanding undrawn letters of credit.  The aggregate outstanding amount of the TLB Obligations was $35,662,159.70, consisting of $30,000,000 of principal and $5,662,159.70 of interest, fees and other obligations under the TLB Agreement.  The aggregate outstanding amount of the TLC Obligations was $19,804,836.85, consisting of $15,737,595 of principal and $4,067,241.85 of interest, fees and other obligations under the TLC Agreement.  The aggregate outstanding amount of the TLD Obligations was $51,944,897.38, consisting of $33,305,369 of principal and $18,639,528.38 of interest, fees and other obligations under the TLD Agreement.  Pursuant to three separate intercreditor agreements (described below), and several prepetition forbearance agreements entered into by the Debtors and the secured lenders, (a) the liens of the TLA Lenders have a first priority; the liens of the TLB Lenders have a second priority; the liens of the TLC Lenders have a third priority; and the liens of the TLD Lenders have a fourth priority; and (b) the Debtors stipulated to the validity, enforceability, perfection of the liens and waived defense, setoffs and counterclaims.

## III.    EVENTS LEADING TO THE CHAPTER 11 CASES

11.      Before the Petition Date, the Debtors experienced a number of factors that have increased cash flow pressure.  First, the Debtors have experienced declining sales consistent with the declines experienced in the entire restaurant industry.  Second, cost increases related to the Debtors' workers' compensation plans, coupled with increased collateral requirements to secure these plans, have greatly pressured cash flows.  In addition, minimum wage increases across many of the Debtors' markets and higher employee benefit costs associated with health plans have further pressured cash flows.  Finally, annual restaurant rent increases on properties sold by

and leased back to the Debtors under unfavorable and above market rates have burdened the Debtors' cash flows. Restaurants have been facing substantial pressures due to sales declines, as well as cost increases, as evidenced by the large number of recent Chapter 11 cases filed by restaurants, including Fresh & Easy, Fox & Hound, Cosi, and Logan's Roadhouse. In light of these financial and industry pressures, the Debtors in January 2016 hired Piper Jaffray & Co. ("PJC") as their exclusive investment banker and commenced the process of evaluating options by which they could deleverage their balance sheet. Under the terms of its engagement, PJC explored a refinancing, recapitalization and/or a sale transaction for the Debtors.

12.     Beginning in February 2016, as directed by the Debtors' Board of Directors, PJC contacted parties to determine their interest in an acquisition of the Debtors' assets. Specifically, PJC contacted 215 potential bidders, representing both financial and strategic potential buyers. Of these contacted bidders, 173 either reviewed a teaser document or participated in high-level discussions about the transaction, and 76 of these entities ultimately negotiated confidentiality agreements and were provided a Confidential Information Memorandum about the Debtors' business. Interested parties were asked to participate in an initial discussion with PJC to learn more about the purchase opportunity and the Debtors' business. Parties who demonstrated sufficient interest in the transaction were then given access to further due diligence information via a package of detailed financial information.

13.     In April 2016, four parties provided oral or written indications of interest and were invited to more detailed diligence discussions and presentations with the Debtors' management. Two parties elected at this stage to move forward and participate in follow up discussions, attend a management presentation and review a virtual data room. These parties were then asked to provide written letters of intent for the Board of Directors to consider by early

June.  By early June 2016, however, PJC had received no letters of intent and all the parties who remained in the process ultimately declined to submit any bid.[5]

14.      Beginning in March 2016, PJC, working together with the Debtors' counsel and advisors to certain of the Prepetition Secured Parties, began searching for alternative capital for an out-of-court restructuring that would provide liquidity while enabling the TLC and TLD Lenders to remain in the capital structure.  Unfortunately, no offers were received for this alternative.  However, a potential equity investor was identified and a letter of intent was executed by the Debtors, at the direction of their Board of Directors, in July 2016.  The potential equity investor conducted detailed due diligence and held meetings with management, but in August 2016, decided not to pursue any transaction.

15.      After the potential equity investor declined to move forward with an offer, and with no pending offers (and a looming liquidity crisis), the Debtors began negotiations with certain of their TLB Lenders (the "TLB Purchaser"), who expressed interest in submitting a bid for the sale of the Debtors' assets.  After extensive negotiations, the Debtors and the TLB Purchaser entered into the RSA, which sets forth the terms of the contemplated Sale Transaction, under which the TLB Purchaser will serve as a stalking horse for the Debtors' assets and, if it is ultimately the successful purchaser under the terms of the proposed bidding and sale procedures, will acquire substantially all of the Debtors' assets and certain of their liabilities subject to certain conditions precedent.  The RSA also provides for the TLB Lenders to provide a DIP loan to fund operations through the closing of the Sale Transaction.  The result of the transactions contemplated by the RSA is that the Debtors will shed millions of dollars of secured debt, significantly increase liquidity and promptly emerge from Chapter 11 as a profitable business.

---

[5]  Similarly, despite marketing efforts, no bids or proposals for a refinancing of the Debtors' existing secured debt were received.

16.     To ensure the Debtors are able to comply with their obligations as debtors-in-possession, the RSA contains a broad "fiduciary out" permitting the Debtors to terminate the RSA if they determine, in good faith and on advice of counsel, that continuing to perform under the RSA is inconsistent with their fiduciary duties.   The RSA allows the Debtors and their representatives to continue providing due diligence information to, and have discussions, with prospective purchasers.   PJC will continue to provide updated and additional information to potential interested parties who may be considering submitting an overbid in the auction process.

## IV.    EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

17.     Concurrently with the filing of their Chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.   The Debtors request that the Court grant the relief requested in each of the First Day Motions as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, the Chapter 11 Cases.   I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

### A.     Joint Administration Motion

18.     The Debtors seek entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only (the "Joint Administration Motion").   Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of Intermediate Holding.

19.     The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code and the Debtors' operations are largely interrelated.   Many of the motions, hearings, and orders in the Chapter 11 Cases will affect all Debtor entities.

01:19332429.12

20.     Joint administration of the Chapter 11 Cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, I believe that joint administration of the Debtors' cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

### B.     Motion for Appointment of Claims and Noticing Agent

21.     The Debtors request entry of an order, pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code, and Local Rule 2002-1(f), authorizing the retention and appointment of Epiq Bankruptcy Solutions LLC ("Epiq") as claims and noticing agent in connection with the Chapter 11 Cases, effective *nunc pro tunc* to the petition date (the "Epiq Retention Application").  The Epiq Retention Application pertains only to the work to be performed by Epiq under the Clerk of the Court's delegation of duties permitted by section 156(c) of the Judicial Code, Local Rule 2002-1(f) and the Claims Agent Protocol.  Among other things, Epiq will (i) prepare and serve required notices in the Chapter 11 Cases, (ii) maintain a list of all potential creditors, equity holders and other parties in interest, and a core mailing list; and (iii) maintain an official claims register for each Debtor, if necessary, and process all proofs of claim received, if any.

22.     I believe that the relief requested in the Epiq Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will ease the administrative burden on the Clerk in connection with the Chapter 11 Cases.  In addition, I have been advised by counsel that the retention of a claims and noticing agent is required by the Local Rules in light of the anticipated number of creditors in the Chapter 11 Cases.  Having solicited proposals from three claims noticing agents, Epiq provided what the Debtors deemed to be the

most cost-efficient terms for the services to be provided.  Accordingly, on behalf of the Debtors, I respectfully submit that the Debtors' application to retain Epiq should be approved.

### C.    DIP Motion

23.    The Debtors seek entry of interim and final orders under sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 2002-1(b), 4001-1, 4001-2 and 9013-1(m), authorizing them to obtain secured postpetition financing on a superpriority basis under section 364 of the Bankruptcy Code, use Cash Collateral, and provide adequate protection to the Prepetition Lenders (the "DIP Motion"), specifically:

a) authorizing the Debtors to obtain postpetition secured debtor in possession financing in an aggregate principal amount of up to $4,500,000 under the DIP Facility pursuant to the DIP Documents, including an initial draw of $1,000,000 on an interim basis, and incur the "Secured Obligations" under the DIP Credit Agreement (as provided for and defined in the DIP Credit Agreement, the "DIP Obligations");

b) authorizing the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Documents as such amounts become due and payable;

c) authorizing the Debtors to use the proceeds of the DIP Facility as expressly provided in the DIP Documents:

i. finance the ongoing working capital needs of the Debtors and to otherwise fund the operations and administration of the Debtors during the Chapter 11 Cases, in accordance with the Approved Budget;

ii. make required adequate protection payments, solely as provided for in Paragraph 11 of the Interim Order; and

iii. pay costs and expenses in connection with the DIP Documents and the Chapter 11 Cases, including, but not limited to, professional expenses, in accordance with the Approved Budget.

d) authorizing the Debtors to grant, pursuant to 364(c)(1) of the Bankruptcy Code, allowed senior administrative expense claims against each Debtor, on a joint and several basis, (the "DIP Superpriority Claims"), in respect of all DIP Obligations; provided, however, that the DIP Superpriority Claims shall be subject to the payment in full in cash of any amounts due (i) in respect of the TLA Superpriority Claims and (ii) under the Carve-Out; provided, further that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, including, subject to the entry of the Final Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code, subject to the order of priorities set forth in the Interim Order;

e) authorizing the Debtors to grant to the DIP Agent for the benefit of the DIP Parties, as security for the DIP Obligations, as contemplated by the DIP Documents and as set forth in the Interim Order, valid, perfected, and unavoidable security interests in and liens upon (such security interests and liens, collectively, the "DIP Liens") the DIP Collateral (as defined in the Interim Order), having priority as follows:

    i. pursuant to section 364(c)(2), valid, binding, continuing, enforceable, fully perfected liens upon and security interests in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected unavoidable security interest or lien on the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code); provided, that, the DIP Liens (other than in the Debtors' unexpired real property leases and the proceeds thereof (the "Lease Collateral")) shall be junior to the TLA Liens and the TLA Replacement Liens;

    ii. subject to clause (iii) below, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected lien upon and security interest in all of the Debtors' right, title and interest in, to and under all DIP Collateral which as of the Petition Date was encumbered by the Prepetition Liens, subject to the Carve-Out and junior only to the TLA Liens, the TLA Replacement Liens (other than in the Lease Collateral) and the Permitted Liens, and senior to any other lien upon, or security interest in, the DIP Collateral;

    iii. pursuant to section 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, senior, priming, fully perfected lien upon and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral, (A) junior only to (i) the Carve-Out, (ii) the TLA Liens, (iii) the TLA Replacement Liens (other than in the Lease Collateral), (iv) the Permitted Liens and (v) a valid perfected unavoidable security interest or lien in existence as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b)

of the Bankruptcy Code and that is a Permitted Lien and expressly permitted in the DIP Credit Agreement to be senior to the DIP Liens granted to the DIP Agent and the DIP Lenders to secure the DIP Obligations, and (B) senior to any other lien upon, or security interest in, the DIP Collateral; and

iv. the DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, provided, however, that if the TLA Liens or TLA Replacement Liens are avoided (or are determined not to be valid, enforceable, or perfected), the DIP Agent nonetheless shall be required to pay over to the TLA Agent amounts that the DIP Agent receives that the DIP Agent would otherwise have had to pay over to the TLA Agent had the TLA Liens and TLA Replacement Liens not been avoided (or determined to be invalid, unenforceable, or unperfected) (ii) except as expressly set forth in the Interim Order or in the DIP Documents, any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases (for the avoidance of doubt, excluding any lien or security interest heretofore or hereinafter granted to the TLA Agent or the TLA Lenders), including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors to the extent permitted by applicable non-bankruptcy law or (iii) any intercompany or affiliate liens of the Debtors.

f)  authorizing the DIP Parties, the TLA Agent and the TLA Lenders, on terms specified in the Interim Order and in the DIP Credit Agreement, to terminate the Debtors' rights under the Interim Order or the DIP Credit Agreement to use Cash Collateral, except to the extent such cash may be used for the Carve-Out, upon the occurrence and continuance of an Event of Default;

g)  authorizing, subject to entry of the Final Order, the Debtors to grant liens to the DIP Agent for the benefit of the DIP Parties on the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (collectively, the "Avoidance Actions");

h)  authorizing the Debtors' use, among other things, solely in accordance with the Approved Budget, of Cash Collateral in which the Prepetition Secured Parties may have an interest and the granting of adequate protection to the Prepetition Secured Parties, including with respect to any postpetition Diminution in Value of their interests in the Prepetition Collateral arising from, inter alia, the Debtors' use of the Cash Collateral

and the priming of the liens of the Prepetition Secured Parties (other than the TLA Liens and TLA Replacement Liens) by the DIP Liens;

i)   authorizing an option by the TLA Agent and the TLA Lenders, at any time and in their sole and absolute discretion, to purchase from the DIP Lenders all (but not less than all) of the DIP Loan by giving written notice to the DIP Agent, which, once delivered, shall be irrevocable, and shall provide for the purchase of the DIP Loan (at par plus all accrued and unpaid interest and fees under the DIP Loan) by the TLA Agent and the TLA Lenders who elect to participate in such purchase pursuant to the terms set forth in the Interim Order;

j)   authorizing the DIP Agent (at the direction of the Required DIP Lenders) and each Prepetition Agent (subject to obtaining any required consents under the applicable Prepetition Credit Document) to "credit bid" up to the full allowed amount of its respective claims in connection with any sale of all or any portion of the DIP Collateral or Prepetition Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code;

k)   subject to and only effective upon the entry of a Final Order granting such relief, waiving any right of the Debtors to surcharge against the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

l)   the Court's modification of the automatic stay imposed by section 362 of the Bankruptcy Code, to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

m)  the Court's waiver of any applicable stay as provided in the provisions of the Bankruptcy Rules (including under Bankruptcy Rule 6004), and providing for the immediate effectiveness of the Interim Order;

n)   scheduling a preliminary hearing on this Motion and the Court's authorization that, during the period commencing on the date of this Court's entry of the Interim Order and ending on the earlier of (a) the date this Court enters the Final Order, and (b) the occurrence of the Final Maturity Date, the Debtors may borrow from the DIP Lenders under the DIP Facility an aggregate principal amount equal to $1,000,000, subject to compliance with the terms, conditions, and covenants contained in the DIP Documents and in accordance with the Approved Budget, and that the Debtors may utilize Cash Collateral on the terms set forth in the Interim Order; and

o) scheduling the final hearing (the "Final Hearing") as soon as practicable, and within 28 days after the Petition Date, to consider entry of the Final Order granting the relief requested in this Motion on a final basis and authorizing the $3,500,000 balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and DIP Documents, and approving the Debtors' notice with respect to the Motion.

24.    The relief sought in the DIP Motion is a *sine qua non* to the Debtors' restructuring efforts. In order to operate during the Chapter 11 Cases and effectuate the terms of the RSA, the Debtors will need to utilize prepetition collateral (including the Cash Collateral), as well as obtain additional, postpetition financing. Without the immediate use of the Cash Collateral and the DIP Facility, the Debtors would be unable to pay operating expenses, including, without limitation, amounts coming due to vendors, as well as employee payroll and other benefits, rent, utilities and the various other items reflected in the Approved Budget. Based on the Debtors' projections, without immediate use of the Cash Collateral and the DIP Facility, the Debtors' cash funds would be exhausted almost immediately.

25.    The Debtors have attempted unsuccessfully to refinance their existing indebtedness prepetition and, based on the Debtors' experiences in connection with these efforts, I do not believe the Debtors will be able to obtain either unsecured financing or secured financing on better terms than that offered under the DIP Facility. Furthermore, as to the priming of the TLC Lenders and the TLD Lenders, pursuant to the Junior Intercreditor Agreement, the TLC Lenders and the TLD Lenders agreed that (i) debtor in possession financing to be provided by any of the TLA or TLB Lenders, or use of cash collateral with the consent of the TLA and TLB Lenders, may be secured by superpriority liens on all or part of the assets of the Debtors and (ii) the TLC and TLD Lenders will not contest or oppose such debtor in possession financing or cash collateral use, and will be deemed to have waived any objections to such debtor in possession financing or cash collateral use, as long as certain conditions set forth

in the Junior Intercreditor Agreement are met.  As such conditions have been met, the granting of priming liens and superpriority claim status to the DIP Facility is authorized pursuant to the Junior Intercreditor Agreement.

26.    The DIP Credit Agreement and terms of the proposed Interim Order were negotiated in good faith extensively over several weeks, by parties who were each represented by their independent counsel, and none of the TLA and TLB Lenders or Agents is an insider of any of the Debtors.  Over the course of many drafts, the terms and conditions improved for the benefit of the Debtors and are the best terms available under the circumstances.  Interest under the DIP Facility is comparable to interest under the Term Loan B, and the DIP Credit Agreement largely tracks the TLB Agreement.  The terms of the DIP Facility and other factors such as the DIP Lenders' existing familiarity with the Debtors' debt structure, operations and assets, as well as the speed with which the funds can be accessed, made the DIP Facility the best proposal available to the Debtors.

27.    Accordingly, the Debtors and I believe that the entry into the DIP Credit Agreement to obtain access to the DIP Facility and the Debtors' use of Cash Collateral are necessary to maintain the value of the Debtors' businesses as a going concern, and prevent harm to the Debtors' employees and business operations (and, in turn, to the marketable value of the Debtors' business assets) that would result without access to liquidity to pay the operating expenses, among other items, reflected in the Approved Budget.

### D.    Cash Management Motion

28.    The Debtors seek entry of an order, pursuant to sections 105, 345, 363 and 503 of the Bankruptcy Code, Rules 6003 and 6004 of the Bankruptcy Rules, and Rule 2015-2 of the Local Rules, (i) authorizing and approving the Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to continue to use their prepetition bank

accounts and existing check stock, (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis with respect to the Debtors' deposit practices, (iv) authorizing the continuation of intercompany transactions and granting administrative expense status to certain postpetition intercompany claims between and among the Debtors and (v) maintaining the ability to use debit, wire and ACH payments (the "<u>Cash Management Motion</u>").

29.     The Cash Management System operates similarly to the centralized cash management systems used by other large retail and restaurant companies to manage the cash of numerous operating units in a cost-effective, efficient manner.  The Cash Management System operates primarily through bank accounts maintained at Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>").  The Cash Management System generally consists of a series of "zero-balance" accounts that sweep, each business day, into a main concentration account (the "<u>Concentration Account</u>") maintained by the Company at Wells Fargo.  The Concentration Account funds two controlled disbursement accounts to cover operating and administrative expenses.

30.     The Cash Management System includes all activities necessary and pertinent to collecting, disbursing and investing the Debtors' cash assets and is carefully managed through oversight procedures implemented by the Debtors' financial and accounting personnel located at the Debtors' corporate offices in San Diego, California.  Through its control over the Cash Management System and the daily reporting received in connection therewith, the Debtors' management can provide cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control of the administration of the Bank Accounts.  The Cash Management System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer cash as needed to respond to these requirements.  Further, it is essential to the

efficient execution and achievement of the Debtors' strategic business objectives, and, ultimately, to maximizing the value of the Debtors' estates.  An interruption in the use of the Cash Management System could have devastating effects on the Debtors' ability to make ordinary-course payments and could cause a loss of confidence in the Debtors by trade vendors, employees and other parties critical to the preservation of the value of the Debtors' operations. Accordingly, the Debtors and I believe the relief sought in the Cash Management Motion is critical to the success of the Chapter 11 Cases.

        **E.**       **Utilities Motion**

       31.     The Debtors have filed a motion pursuant to sections 105(a) and 366(b) of the Bankruptcy Code seeking entry of interim and final orders:  (i) prohibiting the Debtors' utility service providers from altering, refusing, or discontinuing utility services on account of unpaid pre-petition invoices; (ii) deeming the Debtors' utility service providers adequately assured of future payment; (iii) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide additional adequate assurance of future payment to the Debtors' utility service providers; and (iv) setting a final hearing related thereto (the "Utilities Motion").

       32.     The Debtors incur utility expenses in the ordinary course of business for, among other things, natural gas, electricity, irrigation, water, sewer, waste disposal, telecommunications, and other similar services.  The Debtors propose to establish a segregated account into which the Debtors will make a Utility Deposit equal to approximately 50% of the Debtors' average monthly utility consumption over the course of twelve (12) months, including payments to Utility Companies for accounts holding security deposits, or approximately $600,000, and, additionally, have proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

33.     If the Utility Companies are permitted to terminate services under section 366, the Debtors may be forced to suspend the affected operations, resulting in a severe disruption, loss of revenue and profits, and potentially the destruction of their businesses.  Such disruption and loss would, at a minimum, cause substantial harm to the Debtors' efforts to expeditiously consummate the Sale Transaction and be detrimental to the estates and the Debtors' creditors. Accordingly, it is essential that the Utility Companies continue to provide their services without interruption.

34.     For the foregoing reasons, the Debtors submit, and I believe, the relief requested in the Utilities Motion is in the best interests of the Debtors, their estates and their creditors, and therefore should be approved on an interim and final basis.

### F.     Employee Wage Motion

35.     The Debtors have filed a motion seeking entry of interim and final orders, pursuant to sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (i) authorizing the Debtors to pay and honor certain prepetition wages, benefits, and other compensation obligations, (ii) authorizing financial institutions to honor and process checks and transfers related to such obligations, and (iii) approving the Severance Pay and approving payments under the Complimentary Meal Program and Non-Insider Incentive Programs (the "Employee Wage Motion").  I believe that no individual Employee will be owed wages, salary, bonuses, incentives, and other compensation earned prior to the Petition Date in an amount exceeding $12,850.

36.     The Debtors have a current workforce of approximately 5,500 Employees in the fifteen (15) states in which they conduct their operations.  Approximately 450 of those Employees are employed on a salaried basis; while the remainder of the workforce is employed on an hourly basis.  The vast majority of these Employees rely exclusively on their full

01:19332429.12

compensation, benefits, and reimbursement of their expenses to continue to pay their daily living expenses, and these Employees may be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid employee obligations.  I believe that if the Debtors are unable to honor all such obligations immediately, employee morale and loyalty will be jeopardized at a time when such support is critical.

37.     The uninterrupted continuation of the Debtors' businesses—and the concomitant preservation of the Debtors' going-concern sale value—is critically dependent upon a stable work force.  Failure to honor the Employee Obligations and continue these services would have a detrimental impact on the Employees and could result in attrition and disruptions in the Debtors' workforce at a time when the Debtors can ill afford it.  Further, such attrition and disruption would result in additional administrative burdens and costs as the Debtors attempt to stabilize their work-force in the same period that they are trying to promptly consummate the Sale Transaction.  Failure to maintain Employee relations would imperil the Debtors' continued operation and thwart the purpose of the Debtors' efforts in the Chapter 11 Cases—effectuating the Sale Transaction.  Payment of the Obligations will significantly aid the Debtors in achieving this goal.  Moreover, with respect to workers' compensation obligations, various statutory schemes require the Debtors to continue these programs to do business in the states in which they operate.

38.     As a result of the foregoing, I believe it is in the best interests of the Debtors' and their estates to continue to honor Employee Obligations as set forth in the Employee Wage Motion on an interim and final basis.

### G.    Customer Programs Motion

39.     The Debtors have filed a motion for an order pursuant to sections 105(a), 363(c), 503(b)(1), 1107(a), and 1108 of title the Bankruptcy Code (i) authorizing, but not directing, the

Debtors, in their business judgment, to continue, maintain, implement new, and/or terminate, and to pay, honor, and otherwise satisfy pre-petition obligations related to, their pre-petition customer practices and programs, in the ordinary course of business and in a manner consistent with past practice, and (ii) the Banks to honor and process check and electronic transfer requests related to the foregoing.

40.     As is customary in the food and beverage industry, in order to develop and sustain a positive reputation and relationship with their patrons and customers, in the ordinary course of business, the Debtors implemented the Customer Programs to ensure customer satisfaction, develop and sustain customer relationships and loyalty, improve profitability, and generate goodwill for the Debtors and their products and services.  As of the Petition Date, the Customer Programs consist of: (i) Gift Cards; (ii) the Charitable Giving Programs; and (iii) various coupon and discount programs.

41.     The Debtors believe that they must promptly assure customers of their continued ability to satisfy prepetition and postpetition obligations under the Customer Programs to maintain their valuable customer base, goodwill, and a myriad of other important benefits derived therefrom, following the commencement of the Chapter 11 Cases.  Any inability of the Debtors to promptly honor these obligations would impair goodwill and may lead to the loss of customer patronage.  Continued use of the Customer Programs, on the other hand, will enable the Debtors to protect their customer base and revenue growth opportunities.  The Debtors believe that the relief requested will pay dividends with respect to the success of the Chapter 11 Cases, especially at this critical time following the filing of the cases, by assuring customers that the quality dining experiences offered by the Debtors' restaurants will not be affected by these cases.

42.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**H.    Tax Motion**

43.    The Debtors have filed a motion pursuant to sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code requesting entry of an order (i) authorizing, but not directing, the Debtors, in their sole discretion, to remit and pay prepetition sales, use, and similar taxes (collectively, the "Taxes") to various federal, state, county, and city taxing authorities (each, an "Authority" and, collectively, the "Authorities"), and (ii) authorizing the Banks to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing (the "Tax Motion").

44.    In the ordinary course of business, the Debtors incur and/or collect certain Taxes and remit such Taxes to various Authorities.  The Debtors believe that there are approximately $1.75 million of sales and use taxes that have accrued as of the Petition Date.  The Taxes consist entirely of current tax obligations and are not in respect of catch-up payments.

45.    The Debtors must continue to pay the Taxes to continue operating in certain jurisdictions and to avoid costly distractions during the Chapter 11 Cases.  The Debtors' failure to pay the Taxes could adversely affect the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay.  In addition, certain of the Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which undoubtedly would distract those individuals from their duties related to the Debtors' prosecution of the Chapter 11 Cases.

01:19332429.12

46.     I believe that the relief requested in the Tax Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

Debtors to continue to operate their businesses in Chapter 11 without disruption.  Accordingly,

on behalf of the Debtors, I respectfully submit that the Tax Motion should be approved.

I.      **PACA/PASA/503(b)(9) Motion**

47.     The Debtors have filed a motion for interim and final orders pursuant to sections

105(a), 363, 503(b)(9), 507(a)(2), 541, 1107(a), and 1108 of the Bankruptcy Code

(i) authorizing, but not directing, the Debtors, in their sole discretion, to pay, in the ordinary

course of business as such claims come due, (a) prepetition claims arising under the Perishable

Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a–499t ("PACA"), (b)

prepetition claims arising under the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§

181–231 ("PASA"), and (c) upon the entry of a final order, certain prepetition claims arising

under section 503(b)(9) of the Bankruptcy Code and (ii) authorizing the Banks to receive,

process, honor, and pay all checks and electronic payment requests relating to the foregoing (the

"PACA/PASA/503(b)(9) Motion").

48.     The Debtors rely on a number of vendors that supply the Debtors with fruits and

vegetables protected by PACA and with meat and poultry protected by PASA, which statutes

may provide in certain instances for the imposition of liens on protected Debtor inventory and

give rise to PACA/PASA Claims that may be entitled to priority ahead of other creditors in the

Chapter 11 Cases.  The existence of these liens on the Debtors' inventory (and the proceeds

thereof) could provide an impediment to the Debtors' use of cash in the ordinary course, as

contemplated in the other First Day Motions, and could interfere with the consummation of the

Sale Transaction.  As of the Petition Date, the Debtors estimate they owe holders of PACA

Claims approximately $1,430,000 in the aggregate for PACA goods delivered prior to the

01:19332429.12

25

Petition Date and estimate that there are no amounts outstanding for PASA goods delivered prior to the Petition Date; although, out of an abundance of caution, the Debtors are nevertheless seeking authority to pay up to $50,000 for any PASA Claims that may be outstanding as of the Petition Date.  As these PACA/PASA Claims will in any event be entitled to priority, the relief sought in the PACA/PASA/503(b)(9) Motion is a question of when, not if, those claims will be paid.  Accordingly, there is no harm to the Debtors' estates or creditors that would arise from the payment of the PACA/PASA Claims, and there are significant benefits to the Debtors' estates.

49.     Certain of the vendors may be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods in the ordinary course of business within the 20-day period immediately prior to the Petition Date.  The Debtors estimate approximately $2,874,000 in such claims as of the Petition Date (the "Section 503(b)(9) Claims"); the Debtors expect to be invoiced for substantially all of this amount within 21 days following the Petition Date.  Pursuant to the relief sought in the PACA/PASA/503(b)(9) Motion, the Debtors intend to pay up to $1,174,000 in Section 503(b)(9) Claims upon the entry of a final order approving the relief requested therein.  As set forth in greater detail below, the Debtors are seeking to pay the remaining Section 503(b)(9) Claims pursuant to the relief requested in the Critical Vendor Motion in the period immediately following the Petition Date. Because the Debtors must pay Section 503(b)(9) Claims in full to confirm a plan of reorganization, the payment of these Section 503(b)(9) Claims merely affects the timing of such payments, and not the amount.  Furthermore, the Debtors propose to condition the payment of the Claims on the agreement of individual Vendors to continue to provide goods to the Debtors during the pendency of the Chapter 11 Cases on the most favorable terms that existed prior to the Petition Date, unless this requirement is waived by the Debtors, in their sole discretion.

01:19332429.12

26

50. For these reasons, the Debtors and I believe the relief sought in the PACA/PASA/503(b)(9) Motion is appropriate. Accordingly, on behalf of the Debtors, I respectfully submit that the PACA/PASA/503(b)(9) Motion should be approved on an interim and final basis.

### J.    Critical Vendor Motion

51. The Debtors have filed a motion for an order pursuant to sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the Bankruptcy Code (i) authorizing, but not directing, the Debtors to pay prepetition claims held by (a) 503(b)(9) Critical Vendors in an aggregate amount not to exceed the $1,700,000 503(b)(9) Critical Vendor Cap, and (b) Non-503(b)(9) Critical Vendors in an aggregate amount not to exceed the $100,000 Non-503(b)(9) Critical Vendor Cap and (ii) authorizing the Banks to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the foregoing (the "Critical Vendor Motion").

52. To operate their one hundred and twenty-three (123) restaurants, the Debtors require a wide variety fresh produce, meat, dairy, beverages, condiments, dry and canned goods, and restaurant accessories. Raw groceries are typically delivered to the Debtors' central kitchens and restaurants one (1) to six (6) times per week, with some groceries and produce not requiring preparation at the central kitchens shipped directly to stores from regional produce vendors. If the delivery of products to the Debtors is stopped or delayed for even one day, the Debtors could not operate their restaurants. Without a full supply of food and beverages, the Debtors would be extremely disadvantaged in a highly competitive market segment and would suffer swift attrition in customer patronage, which would be difficult, if not impossible, to restore. The Debtors' business depends on, among other things, the Debtors' ability to retain their vendors and maintain their reputation and customer loyalty. The Debtors need to be able to assure their

customers, vendors, and employees that, notwithstanding the filing of the Chapter 11 Cases, they will continue to operate at the highest level.

53.     To identify the Critical Vendors, the Debtors have reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria:  (i) whether certain quality specifications or other requirements of the Debtors' customers prevent the Debtors from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; (ii) whether, if a vendor is not a single-source supplier, the Debtors have sufficient product in inventory to continue their operations while a replacement vendor is put in place; and (iii) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship products to the Debtors postpetition if its prepetition balances are not paid.

54.     Without the relief granted in the Critical Vendor Motion, the Critical Vendors may refuse to supply to the Debtors essential food, products, services, and supplies.  Failure to receive these goods and services could cause serious disruptions to the continuous and timely flow of food, product, and supplies that are essential to the Debtors' business.  Paying the prepetition obligations owed to these vendors in the ordinary course of business will thus benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.   Additionally, the Debtors intend only to make payments to Critical Vendors where the Debtors have determined that the payment is necessary and in the best interests of the Debtors and their estates.  Further, the Debtors will seek to require the Critical Vendors to enter into Trade Agreements with the Debtors as a condition to receiving payment of their Critical Vendor Claims, thereby ensuring that the Debtors have a committed supply of the critical goods and services provide by Critical Vendors.

55.     I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will provide the Debtors' business operations a smooth transition into Chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendor Motion should be approved.

### K.     Insurance Motion

56.     The Debtors have filed a motion for interim and final orders pursuant to sections 105(a), 363(b), and 364 of the Bankruptcy Code (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, renew liability, property, and other insurance programs and pay policy premiums and broker fees arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business, and (b) continue the Debtors' insurance premium financing programs and renew or enter into new premium financing programs, as necessary, under substantially similar terms and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing (the "Insurance Motion").

57.     In connection with the operation of their businesses, as of the Petition Date, the Debtors maintain approximately 41 policies, including, but not limited to, policies covering general liability, flood, property, automobile liability, and D&O liability.  The Policies are essential to the preservation of the value of the Debtors' business, property, and assets.  If the Insurance Programs are permitted to lapse or are otherwise terminated, the Debtors could face significant postpetition liability for personal or property damage, which, in turn, could harm all parties in interest.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirements of the U.S. Trustee.

01:19332429.12

58.     For certain of the Policies (the "<u>Financed Programs</u>"), the Debtors maintain insurance premium finance agreements (the "<u>PFAs</u>").  Pursuant to the PFAs, the PFA Lenders have agreed to pay the insurance premiums due under the Financed Programs in exchange for cash down payments in the aggregate amount of approximately $105,000 and nine monthly installment payments in the aggregate amount of approximately $100,000 per installment.  The Debtors have made the down payments and five (5) of the installment payments.  The next monthly installment payments were due October 1, 2016.  Pursuant to the Insurance Motion, the Debtors are seeking to make these payments, which were outstanding as of the Petition Date, because the Financed Programs are essential to the preservation of the Debtors' business. Accordingly, the Debtors must make payments with respect to the Insurance Programs and the related PFAs to preserve the value of the Debtors' estates for the benefit of all creditors.

59.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved on an interim and final basis.

## IV.     EVIDENTIARY SUPPORT FOR EXPEDITED POST-FIRST DAY RELIEF

### A.     Emergency Asset Sale Motion and Related Motion to Shorten

60.     By the sale motion (the "<u>Emergency Asset Sale Motion</u>"), the Debtors are seeking authorization for (i) the assumption of the liquidation agreement (the "<u>Liquidation Agreement</u>") by and between the Debtors and Tiger Commercial & Industrial (the "<u>Agent</u>"), a copy of which is attached as <u>Exhibit 1</u> to the proposed order submitted with the Emergency Asset Sale Motion, and (ii) a publicly marketed sale (the "<u>Sale</u>") of restaurant equipment packages and other furniture, fixtures, and equipment (the "<u>Assets</u>") at certain non-core restaurants (the "<u>Closing</u>

Restaurants"), pursuant to the terms of the Liquidation Agreement, with such Sale to be free and clear of all liens, claims, encumbrances, and interests.  The Sale is scheduled to occur on or about October 24, 2016 to allow the Debtors to vacate the Closing Restaurants by October 31, 2016.  By the related motion to shorten (the "Motion to Shorten"), the Debtors request entry of an order setting an expedited hearing and shortening the notice period on the Emergency Asset Sale Motion so that the hearing may occur prior to the Sale.

61.     In light of the Debtors' financial difficulties, prior to the Petition Date, the Debtors' management, in consultation with their advisors, including PJC, performed a comprehensive analysis of the Debtors' financial performance, which included an in-depth review of the performance of each restaurant and the markets in which the Debtors operate.  As a result of such financial analysis, the Debtors identified two categories of restaurants: (a) "non-core" restaurants, which are losing money and are located in non-strategic locations and, thus, provide limited benefit to the Debtors, and (b) "core" restaurants, which are relatively successful and located in strategic locations.  The Debtors concluded that it was in the best interests of the Debtors and their stakeholders to move forward with a going concern sale of their core restaurants, and to maximize the value of their Closing Restaurants through the Assets Sale.

62.     Accordingly, in September 2016, the Debtors and their advisors began contacting certain nationally recognized potential liquidators to solicit interest in bidding on the right to conduct the Asset Sales.  The Debtors discussed the Assets Sale with such nationally recognized liquidator firms to allow the Debtors to identify the highest and best bid.  The Debtors engaged extensively with the potential bidders and, among other things, provided significant data on the restaurants included in the Assets Sale.

63.     After extensive negotiations, with the assistance of personnel from PJC, the Debtors selected the Agent to conduct the Asset Sales; liquidating at the Debtors' direction, the Assets of the Closing Restaurants in accordance with the terms of the Liquidation Agreement.  In order to avoid the accrual of additional administrative rental expenses, the Assets Sale must be conducted on an expedited basis—both commencing and concluding during October of 2016.

64.     The Debtors respectfully submit that allowing the Emergency Asset Sale Motion to be considered on an expedited basis is reasonable and appropriate under the circumstances. As set forth in more detail in the Emergency Asset Sale Motion, the Assets to be sold pursuant to the Liquidation Agreement are not being used in the Debtors' ongoing business, and the storage of such equipment beyond the timeline contemplated in the Liquidation Agreement will cause the Debtors to incur significant administrative rent obligations of approximately $405,000 per month.  By selling the Assets and vacating the Closing Restaurants, the Debtors will be able to reject the real property leases for the Closing Restaurants and thereby reduce the administrative burden on the estates.  Accordingly, the Debtors have already dedicated substantial resources toward the Sale by, among other things, identifying their underperforming restaurants, investigating potential liquidators, and engaging in extensive negotiations regarding the Liquidation Agreement.  In addition to avoiding significant rent obligations, the Debtors will also realize up to $300,000 in net proceeds from the Sale of the Assets, with the remainder of the proceeds being used to pay down the Debtors' TLA Obligations.  For these reasons, assuming the Liquidation Agreement and conducting the Sale during the initial month of the Chapter 11 Cases will present tremendous cost savings and value that will certainly inure to the benefit of the Debtors' estates and all stakeholders.

65.     I believe that the relief requested in the Emergency Asset Sale Motion and the Motion to Shorten is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, as it will enable the Debtors to minimize the potential losses attributable to the "non-core" restaurants on the necessary expedited basis.  Accordingly, I respectfully submit that the Emergency Asset Sale Motion and the Motion to Shorten should be approved.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 2, 2016
         San Diego, California

John D. Morberg
Chief Executive Officer
Garden Fresh Restaurant Intermediate Holding, LLC
15822 Bernardo Center Drive Suite A
San Diego, California  92127

01:19332429.2
     DB1/ 89233285.9