## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (CSS) |
| Debtors. | (Joint Administration Requested) |
| | Ref. Docket Nos. 13 and 67 |

**INTERIM ORDER: (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND (D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

This matter is before the Bankruptcy Court on the motion dated October 3, 2016 (the "Motion")[2] of Garden Fresh Restaurant Corp., as a debtor and debtor in possession (the "Company"), Garden Fresh Holdings, Inc. ("Parent") and their affiliated debtors and debtors in possession (together with the Company and Parent, collectively, the "Debtors" or the "GF Entities") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of an interim order (this "Interim Order") and a final order (the "Final Order"), under sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1(b), 4001-1, 4001-2 and 9013-1(m) of the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376). The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive, Suite A, San Diego, California 92127.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the applicable DIP Documents (as defined herein).

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

(1) authorization for the Debtors to (A) obtain postpetition secured debtor in possession financing on an interim basis up of $1,000,000 and on a final basis in an aggregate principal amount of up to $4,500,000 (the "DIP Facility") pursuant to the terms and conditions of this Interim Order and that certain Senior Secured Debtor-in-Possession Credit Agreement (substantially in the form attached hereto as Exhibit A, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement"), dated as of October 5, 2016 (the "Closing Date"), by and among the Company, as borrower, each of the other Debtors, as guarantors, Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, collectively, the "DIP Agent") and the lenders named therein (the "DIP Lenders" and, together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "DIP Parties"), and (B) incur the "Secured Obligations" under the DIP Credit Agreement (such Secured Obligations, as provided for and defined in the DIP Credit Agreement, shall be referred to herein as the "DIP Obligations") (the DIP Credit Agreement together with this Interim Order, any Final Order and any related agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents");

(2) authorization for the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Documents as such amounts become due and payable;

(3) authorization for the Debtors to grant security interests, liens and superpriority claims, including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (and, solely as set forth in Paragraph 10(c) of this Interim Order, priming liens pursuant to section 364(d)(1) of the Bankruptcy Code), to the DIP Agent, for the benefit of the DIP Parties, in the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in this Interim Order; provided that, except as expressly provided in this Interim Order with respect to the Lease Collateral (as defined herein), all liens, security interests, superpriority claims and administrative claims granted in favor of the DIP Agent and DIP Parties will be junior in priority to the liens, security interests, superpriority claims and administrative claims (as applicable) granted in favor of the TLA Agent and the TLA Lenders (as defined herein) and/or securing the TLA Obligations (as defined herein);

(4) authorization for the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined herein) as provided herein, and the provision of adequate protection to the Prepetition Secured Parties, including for any Diminution in Value (as

01:19353964.1

defined herein) of their interests in the Prepetition Collateral (as defined herein), including Cash Collateral, solely as set forth in Paragraph 11 below;

(5) authorization for the Debtors to borrow under the DIP Facility up to an aggregate principal or face amount of $4,500,000, to be incurred in accordance with the terms and conditions of the DIP Documents to (A) finance, in accordance with the Approved Budget (as defined herein), the ongoing working capital needs of the Debtors and to otherwise fund the operations and administration of the Debtors during these Chapter 11 Cases, (B) make required adequate protection payments and (C) pay costs and expenses in connection with the DIP Documents and these Chapter 11 Cases to the extent set forth in the Approved Budget, including, but not limited to, professional expenses;

(6) an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order;

(7) the scheduling of a final hearing (the "Final Hearing") on the Motion for a date that is before the 28th day after the Petition Date (as defined herein) to consider entry of a Final Order, *inter alia*, authorizing the borrowings under the DIP Facility on a final basis and approval of notice procedures with respect thereto; and

(8) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order.

This Court having found that notice of the Motion and Interim Hearing was provided by the Debtors as set forth in Paragraph K below, and having held the Interim Hearing on October 4, 2016 after considering all the pleadings, motions and other papers filed with this Court and as further stated on the record at the Interim Hearing; and this Court having overruled

all unresolved objections to the interim relief requested in the Motion; and upon the record made by the Debtors at the Interim Hearing, the First Day Declaration, and after due deliberation and consideration and good and sufficient cause appearing therefor:

## THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A.    *Petition Date*.  On October 3, 2016 (the "Petition Date"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    *Jurisdiction and Venue*.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors confirmed their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection with the Motion consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rules 2002-1(b), 4001-1, 4001-2 and 9013-1(m).

C.    *Debtors' Stipulations*.  Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in Paragraph 15 below), the Debtors hereby admit, acknowledge, agree and stipulate that:

(i)    Pursuant to (a) that certain Financing Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time in

accordance with the terms thereof, the "TLA Agreement"), by and among Parent, the Company, each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor" thereunder, the lenders party thereto from time to time (collectively, the "TLA Lenders"), Cerberus Business Finance, LLC, as administrative agent and collateral agent for such lenders (in such capacities, the "TLA Agent"), and certain other parties thereto, and (b) the other "Loan Documents" (as defined in the TLA Agreement and, together with the TLA Agreement, the "TLA Loan Documents"), the TLA Lenders provided a loan to and for the benefit of the Company. As of the Petition Date, the Debtors were truly and justifiably indebted to the TLA Lenders and TLA Agent, without defense, counterclaim or offset of any kind, in respect of loans made and letters of credit issued in the aggregate outstanding principal amount under the TLA Loan Documents of not less than $87,366,250.00, plus accrued and unpaid interest and fees with respect thereto (which, as of October 1, 2016, was not less than $840,851.50, which amount, for the avoidance of doubt, does not include the TLA Agent's and the TLA Lenders' accrued and unpaid attorneys' fees, costs, and expenses, or any "Applicable Prepayment Premium" (as defined in the TLA Loan Documents) or any other premium, make-whole or penalty payments otherwise required by the terms of the TLA Loan Documents upon a prepayment or acceleration of the TLA Obligations) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the TLA Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's obligations pursuant to the TLA Loan Documents, collectively the "TLA Obligations");

(ii) To secure the TLA Obligations, the Borrower granted to the TLA Agent and the TLA Lenders a security interest in and lien upon (the "TLA Liens") all "Collateral" under and as defined in the TLA Loan Documents (collectively, the "TLA Collateral");

(iii) Pursuant to (a) that certain Financing Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "TLB Agreement"), by and among Parent, the Company, each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor" thereunder, the lenders party thereto from time to time (collectively, the "TLB Lenders"), Cortland Capital Market Services LLC, as administrative agent and collateral agent for such lenders (in such capacities, the "TLB Agent"), and certain other parties thereto, and (b) the other "Loan Documents" (as defined in the TLB Agreement and, together with the TLB Agreement, the "TLB Loan Documents"), the TLB Lenders provided a loan to and for the benefit the Company. As of the Petition Date, the Debtors were truly and justifiably indebted to the TLB Lenders and TLB Agent, without defense, counterclaim or offset of any kind, in respect of loans made in the aggregate outstanding principal amount under the TLB Loan Documents of not less than $35,662,159.70, plus accrued and unpaid interest and fees with respect thereto (which amount, for the avoidance of doubt, does not include the TLB Agent's and the TLB Lenders' accrued and

unpaid attorneys' fees, costs, and expenses, or any "Applicable Prepayment Premium" (as defined in the TLB Loan Documents) or any other premium, make-whole or penalty payments otherwise required by the terms of the TLB Loan Documents upon a prepayment or acceleration of the TLB Obligations) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the TLB Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's obligations pursuant to the TLB Loan Documents, collectively the " TLB Obligations");

   (iv) To secure the TLB Obligations, the Borrower granted to the TLB Agent and the TLB Lenders a security interest in and lien upon (the " TLB Liens") all "Collateral" under and as defined in the TLB Loan Documents (collectively, the "TLB Collateral");

   (v) Pursuant to (a) that certain Financing Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "TLC Agreement"), by and among Parent, the Company, each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor" thereunder, the lenders party thereto from time to time (including Sun Garden Fresh Finance, LLC ("Sun Garden")) (collectively, the "TLC Lenders"), Apollo Investment Corporation, as administrative agent and collateral agent for such lenders (in such capacities, the "TLC Agent"), and certain other parties thereto, and (b) the other "Loan Documents" (as defined in the TLC Agreement and, together with the TLC Agreement, the "TLC Loan Documents"), the TLC Lenders provided a loan to and for the benefit the Company. As of the Petition Date, the Debtors were truly and justifiably indebted to the TLC Lenders and TLC Agent, without defense, counterclaim or offset of any kind, in respect of loans made in the aggregate outstanding principal amount under the TLC Loan Documents of not less than $15,737,595.00, plus accrued and unpaid interest and fees with respect thereto (which, as of the Petition Date, was not less than $4,067,241.85) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the TLC Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's obligations pursuant to the TLC Loan Documents, collectively the " TLC Obligations");

   (vi) To secure the TLC Obligations, the Borrower granted to the TLC Agent and the TLC Lenders a security interest in and lien upon (the " TLC Liens") all "Collateral" under and as defined in the TLC Loan Documents (collectively, the "TLC Collateral");

(vii)    Pursuant to (a) that certain Financing Agreement, dated as of October 3, 2013 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "TLD Agreement" and, together with the TLA Agreement, the TLB Agreement and the TLC Agreement, the "Prepetition Credit Agreements"), by and among Parent, the Company, each direct and indirect subsidiary of Parent that is a "Borrower" or "Guarantor" thereunder, the lenders party thereto from time to time (collectively, the "TLD Lenders" and, together with the TLA Lenders, the TLB Lenders and the TLC Lenders, the "Prepetition Lenders"), Apollo Investment Corporation, as administrative agent and collateral agent for such lenders (in such capacities, the "TLD Agent" and, together with the TLA Agent, the TLB Agent and the TLC Agent, the "Prepetition Agents" and, together with the Prepetition Lenders, the "Prepetition Secured Parties"), and certain other parties thereto, and (b) the other "Loan Documents" (as defined in the TLD Agreement and, together with the TLD Agreement, the "TLD Loan Documents" and, together with the TLA Loan Documents, the TLB Loan Documents and the TLC Loan Documents, the "Prepetition Credit Documents"), the TLD Lenders provided a loan to and for the benefit the Company.  As of the Petition Date, the Debtors were truly and justifiably indebted to the TLD Lenders and TLD Agent, without defense, counterclaim or offset of any kind, in respect of loans made in the aggregate outstanding principal amount under the TLD Loan Documents of not less than $33,305,369.00, plus accrued and unpaid interest and fees with respect thereto (which, as of the Petition Date, was not less than $18,639,528.38) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the TLD Loan Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's obligations pursuant to the TLD Loan Documents, collectively the " TLD Obligations" and, together with the TLA Obligations, the TLB Obligations and the TLC Obligations, the "Prepetition Secured Obligations");

(viii)    To secure the TLD Obligations, the Borrower granted to the TLD Agent and the TLD Lenders a security interest in and lien upon (the " TLD Liens" and, together with the TLA Liens, the TLB Liens and the TLC Liens, the "Prepetition Liens") all "Collateral" under and as defined in the TLD Loan Documents (collectively, the "TLD Collateral" and, together with the TLA Collateral, the TLB Collateral and the TLC Collateral, the "Prepetition Collateral");

(ix)    (a) the Prepetition Secured Obligations constitute legal, valid, enforceable and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition Secured Obligations exist; (c) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction or (other than as contemplated by the Intercreditor Agreements, this Interim Order, and Bankruptcy Code section 510(a)) subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Credit Documents are valid and enforceable by the Prepetition Secured Parties against each of the Debtors; (e) the

Prepetition Liens were perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the Intercreditor Agreements, this Interim Order, and Bankruptcy Code section 510(a)) subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral (with the Prepetition Liens having priority in the following order: (i) TLA Liens; (ii) TLB Liens; (iii) TLC Liens; and (iv) TLD Liens), subject only to certain liens otherwise expressly permitted by the Prepetition Credit Documents (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code, the "Permitted Liens"); (f) the Prepetition Secured Obligations constitute allowed secured claims against the Debtors' estates; and (g) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, (other than as contemplated by the Intercreditor Agreements, this Interim Order, and Bankruptcy Code section 510(a)) subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Credit Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery;

(x)     Certain of the Debtors are parties to (a) that certain Intercreditor Agreement, dated October 3, 2013, by and among certain of the Debtors, the TLA Agent, the TLA Lenders, the TLB Agent, and the TLB Lenders (the "Senior Intercreditor Agreement"), (b) that certain Intercreditor and Subordination Agreement, dated October 3, 2013, by and among certain of the Debtors, the Prepetition Agents, and the Prepetition Lenders (the "Junior Intercreditor Agreement"), and (c) that certain Intercreditor and Subordination Agreement, dated October 3, 2013, by and among certain of the Debtors, the TLC Agent, and the TLD Agent (together with the Senior Intercreditor Agreement and the Junior Intercreditor Agreement, the "Intercreditor Agreements"), and upon the incurrence of the DIP Obligations by the Debtors, the aggregate amount of all outstanding TLA Obligations, TLB Obligations and DIP Obligations will not exceed the Maximum Senior Principal Amount (as defined in the Junior Intercreditor Agreement);

(xi)     All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Agents and the other Prepetition Secured Parties, as applicable;

(xii)    As a result of, among other things, the commencement of the Chapter 11 Cases, the Debtors are in default of their debts and obligations under the Prepetition Credit Agreements; and

(xiii)    Subject to the entry of the Final Order, the Debtors hereby forever, unconditionally and irrevocably release, discharge and acquit the DIP Agent, the DIP Lenders, the TLA Agent, the TLA Lenders, the TLB Agent, the TLB Lenders, Sun Garden Fresh Finance, LLC (solely in its capacity as a TLC Lender) and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to the DIP Facility or the DIP Documents, the TLA Obligations or the TLA Loan Documents, the TLB Obligations or the TLB Loan Documents, or the TLC Obligations or the TLC Loan Documents, as applicable, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the DIP Liens, the DIP Obligations, the TLA Liens, the TLA Obligations, the TLB Liens, the TLB Obligations, the TLC Liens and the TLC Obligations, as applicable. Subject to the entry of the Final Order, the Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the TLA Obligations, the TLB Obligations, the TLC Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Interim Order.

D.    *Need for Post-Petition Financing*.    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and the use of Cash Collateral.    The Debtors' ability to maintain business relationships with their vendors, suppliers, and employees, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability.    In addition, based on the record presented at the Interim Hearing: (i) the Debtors' critical need for financing is immediate and the

entry of this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors'

estates; (ii) in the absence of the DIP Facility and the use of Cash Collateral, the continued

operation of the Debtors' businesses would not be possible and serious and irreparable harm to

the Debtors and their estates would occur; and (iii) the preservation, maintenance and

enhancement of the going concern value of the Debtors are of the utmost significance and

importance to the Debtors' contemplated sale of their assets that will enable the Debtors to

reorganize successfully and continue as a going concern.

> E.    _No Credit on More Favorable Terms_.  As set forth in the Motion, the

Debtors, through their advisors, contacted four alternative parties (including both incumbent

lenders and third parties in the market), all of whom declined to provide postpetition financing.

Given their current financial condition, financing arrangements and capital structure, the Debtors

are unable to obtain sufficient interim and long-term financing from sources other than the DIP

Lenders on terms more favorable than under the DIP Facility and the DIP Documents (including,

but not limited to, financing that is junior in priority in relation to the TLA Obligations), and are

not able to obtain unsecured credit allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code.  New credit is unavailable to the Debtors without providing

the DIP Agent for the benefit of the DIP Lenders the (i) DIP Superpriority Claims (as defined

herein) and (ii) DIP Liens (as defined herein) in the DIP Collateral, as provided herein and in the

DIP Documents.

> F.    _Findings Regarding the DIP Facility_.  Based upon the pleadings and

proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility

are fair and reasonable, are supported by reasonably equivalent value and fair consideration, (ii)

the DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the

DIP Parties and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Parties have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facility, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

G.      *Need for Use of Cash Collateral*.  An immediate and critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facility) to continue to operate their businesses in the ordinary course, pay wages, maintain business relationships with vendors and suppliers, make payroll, make capital expenditures, make adequate protection payments, generally conduct their business affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets, and afford the Debtors adequate time to finalize and execute documents under the DIP Facility (subject to and within the limits imposed by the terms of this Interim Order).

H.      *Use of Proceeds of the DIP Facility; Use of Cash Collateral; Consent of Prepetition Secured Parties*.  The Debtors have received the necessary consents from the Prepetition Secured Parties to the (i) financing arrangements contemplated by this Interim Order and the DIP Documents and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order.  Such consents are expressly limited to the postpetition financing being provided by the DIP Lenders and the use of Cash Collateral (in each case as contemplated by this Interim Order and the DIP Documents) and the provision of adequate protection herein, and shall not extend to any other postpetition financing or to any modified

version of the DIP Facility or to any modified version of the use of Cash Collateral.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and Cash Collateral shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents and this Interim Order and in accordance with the Approved Budget, solely for the purposes set forth in the DIP Credit Agreement and this Interim Order, including (v) working capital and other general corporate purposes, (w) adequate protection payments, solely as provided for hereunder, (x) the permitted payment of costs of administration of the Chapter 11 Cases, (y) payment of fees and expenses related to the DIP Facility as set forth herein and in the DIP Documents, and (z) payment of such prepetition expenses as consented to by the DIP Agent (at the direction of the Required DIP Lenders), the TLA Agent and the TLB Agent and approved by the Bankruptcy Court, including prepetition expenses approved by the Bankruptcy Court in connection with the Debtors' "first day" motions.

I.      *Adequate Protection*.   The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, solely as set forth in Paragraph 11 below, including for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, arising from, or attributable to, (i) the Debtors' use, sale or lease of such collateral, (ii) the granting of liens under § 364 of the Bankruptcy Code, (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (iv) the subordination to the Carve-Out (as defined herein) (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

J.      *Intercreditor Agreements*. The DIP Lenders, the Pre-Petition Lenders and the Debtors agree that each of the Intercreditor Agreements constitutes a legal, valid, enforceable and binding "subordination agreement" within the meaning of Bankruptcy Code section 510(a). Other than as expressly provided herein, the DIP Obligations, DIP Liens, and DIP Superpriority Claims (each as defined herein) are subject to the same terms, obligations and restrictions under the Senior Intercreditor Agreement as if they were TLB Liens and TLB Obligations, as applicable. The DIP Lenders, the Pre-Petition Lenders and the Debtors agree that, pursuant to the Junior Intercreditor Agreement, the TLC Agent and the TLD Agent have limited rights to contest and/or object to the DIP Facility and the Debtors' use of Cash Collateral as provided herein.

K.      *Notice*. The Debtors have represented that telephonic, facsimile notice or overnight mail notice of this Interim Hearing and the proposed entry of this Interim Order has been provided to: (i) the thirty (30) largest unsecured creditors; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) counsel to the proposed DIP Agent; (iv) counsel to the Prepetition Agents; (v) all known parties, to the best of the Debtors' knowledge, information, or belief, asserting a lien against the DIP Collateral; (vi) the Debtors' landlords; (vii) the Internal Revenue Services and applicable state taxing authorities; (viii) the United States Securities and Exchange Commission; and (ix) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the Bankruptcy Rules and the Local Rules. Requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

L.      *Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization or a sale of their assets as a going concern or otherwise.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      Approval of Interim Order.  The Motion is approved, on an interim basis, on the terms and conditions set forth in this Interim Order.  Any objections to the interim relief requested in the Motion that have not previously been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.      Approval of DIP Documents; Authority Thereunder.  The Debtors are hereby authorized to enter into, and execute and deliver, the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be required or requested by the DIP Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.

3.      Validity of DIP Documents.  Upon execution and delivery of the DIP Documents, each of the DIP Documents shall constitute, and is hereby deemed to be, the legal, valid and binding obligation of the Debtors party thereto, enforceable against each such Debtor

in accordance with its terms. Loans advanced under the DIP Credit Agreement (the "DIP Loans") until the Final Hearing will be made to fund the Debtors' working capital and general corporate needs in the ordinary course of business and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other orders of this Court, in each case to the extent permitted under the DIP Credit Agreement and the Approved Budget. No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

4.      Authorization to Borrow; Use of Cash Collateral.  Upon entry of this Interim Order and during the period prior to entry of any final order on the Motion (such period, the "Interim Period"), the Debtors are immediately authorized to borrow from the DIP Lenders under the DIP Facility in an aggregate principal amount equal to $1,000,000 (the "Initial Draw"), subject to the terms and conditions set forth in the DIP Documents and this Interim Order and in accordance with the Approved Budget. The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the DIP Documents have been satisfied in full or waived by the DIP Agent acting at the direction of the Required DIP Lenders. Subject to the terms and conditions of this Interim Order, the DIP Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the earlier of (a) the Final Maturity Date and (b) the date upon which the Debtors' right to use Cash Collateral is terminated hereunder.

5.    <u>Use of Proceeds and Cash Collateral</u>.  From and after the entry of this Interim Order, the Debtors shall use advances of credit under the DIP Facility and Cash Collateral only for the purposes permitted by this Interim Order and the DIP Documents and in compliance with the Approved Budget.  The Debtors are authorized to use the proceeds of the DIP Loans and Cash Collateral, in part, to make certain adequate protection payments to the Prepetition Secured Parties, solely as provided for in Paragraph 11 of this Interim Order and subject to and in accordance with the Approved Budget.

6.    <u>Approved Budget.</u>

(a)    <u>General</u>.  Except as otherwise provided herein or approved by the DIP Agent (at the direction of the Required DIP Lenders), the TLA Agent and the TLB Agent, the proceeds of the DIP Facility and Cash Collateral shall be used only in compliance with the Approved Budget (including in connection with the adequate protection payments provided for in Paragraph 11 of this Interim Order), and to pay Statutory Fees, as defined in paragraph 13(a)(i) below, which are not subject to any budget.  Attached as <u>Exhibit 1</u> hereto and incorporated by reference herein is a summary 13-week cash flow forecast setting forth "Total Operating Disbursements" and "Disbursements – Non Operations" on a weekly basis for the period beginning as of the week of the Closing Date through and including the 13th week after the Closing Date, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Facility and the Cash Collateral for such period, which shall include, among other things, available cash, cash flow, payment of trade payables and ordinary course expenses, total cash disbursements and capital expenditures, fees and expenses relating to the DIP Facility, and working capital and other general corporate needs of the Debtors (a more detailed version of such cash-flow forecast delivered to the DIP Agent, the DIP Lenders and the Prepetition Agents,

on or prior to the date hereof, hereinafter, the "Initial Budget"). Upon entry of this Interim Order and approval by the DIP Agent (at the direction of the Required DIP Lenders), the TLA Agent and the TLB Agent, the Initial Budget shall be deemed an "Approved Budget".

(b)    [Reserved].

(c)    Not later than 1:00 p.m. (New York time) on Sunday of every second (2nd) calendar week, the Debtors shall deliver to the DIP Agent (for further delivery to the DIP Lenders) and the Prepetition Agents (for further delivery to the Prepetition Secured Parties), a report (a "Variance Report") setting forth the actual cash flows for the immediately preceding Test Period with respect to each line item in the Approved Budget; provided that each Variance Report delivered during the week after a Test Date shall also set forth such cash flows for the Test Period most recently ended, together with the percentage, if any, by which such actual cash flows for each line item exceeded or were less than the cash flows set forth in the Approved Budget for such Test Period.

7.    Payment of DIP Expenses. Subject to the limitations set forth below, the Debtors are hereby authorized and directed to pay upon demand all costs, expenses and other amounts payable under the terms of the DIP Documents and all other reasonable out-of-pocket costs and expenses of the DIP Parties in accordance with the terms of the DIP Documents (including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of one lead counsel (which shall initially be Stroock & Stroock & Lavan LLP), one Delaware counsel (which shall initially be Pachulski, Stang, Ziehl & Jones LLP) and any other necessary local or regulatory counsel in connection with advising the DIP Parties), subject to receiving a written invoice therefor. None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee

guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee, counsel to the TLA Agent and counsel to any official unsecured creditors' committee appointed in these Chapter 11 Cases (the "Committee") (if any); provided further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information (the "Redactions"), except that the copies of invoices provided to the U. S. Trustee shall not be redacted, and the provision of such invoices (including the unredacted copies provided to the U.S. Trustee) shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  Unredacted copies of such invoices provided to the U.S. Trustee shall be subject to and protected under section 107(c)(3)(B) of the Bankruptcy Code. If any of the Debtors, U.S. Trustee, the TLA Agent or the Committee (if any) objects to the reasonableness of the fees and expenses of any DIP Parties, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Debtors, the U.S. Trustee, the TLA Agent or the Committee (if any), as the case may be, shall file with the Court and serve on such DIP Parties an objection limited to the reasonableness of such fees and expenses (each, a "Reasonableness Fee Objection").  Without limiting the foregoing, if the TLA Agent or the Committee (if any) objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Parties subject to such Redaction objection shall file with the Court and serve on counsel to the Debtors, the U.S. Trustee, counsel to the TLA Agent and counsel to the Committee (if any) a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "Redaction Fee Objection," and

each Reasonableness Fee Objection and Redaction Fee Objection may be referred to herein generally as a "<u>Fee Objection</u>"). Any hearing on an objection or request, as applicable, regarding payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the propriety of the Redactions and the reasonableness of the particular items or categories of the fees, costs, and expenses, in each case which are the subject of such objection or request, as applicable. The Debtors shall pay in accordance with the terms and conditions of this Interim Order within fifteen (15) days after receipt of the applicable invoice (a) the full amount invoiced if no objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which an objection has been timely filed. All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents. Notwithstanding anything in this Paragraph or the DIP Documents to the contrary, any fees, costs and expenses of the DIP Agent and the DIP Lenders (including professional fees) in excess of the Approved Budget will be paid-in-kind and added to the DIP Obligations.

8.  <u>Indemnification</u>. Subject to entry of a Final Order, the Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Parties and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "<u>Indemnified Party</u>") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorney's fees) or disbursements

01:19353964.1

of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of any of the DIP Documents or any other document contemplated hereby or thereby or the transactions contemplated thereby or by this Interim Order (including, without limitation, the exercise by the DIP Parties of discretionary rights granted under the DIP Documents) or any action taken or omitted by the DIP Agent or the DIP Lenders under any of the DIP Documents or any document contemplated hereby or thereby; provided that the Debtors shall not have any obligation to indemnify and hold harmless any Indemnified Party under this Paragraph with respect to any matter solely resulting from (a) the fraud, gross negligence or willful misconduct of such Indemnified Party, (b) violations by such Indemnified Party of this Interim Order, or from breaches by such Indemnified Party of the DIP Documents, in each case as determined by a court of competent jurisdiction in a final non-appealable judgment or order; or (c) violations of the Intercreditor Agreements, provided that this clause (c) shall only apply to causes of action or claims brought by the TLA Agent or the TLA Lenders.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's (a) fraud, gross negligence or willful misconduct or (b) violations of this Interim Order, the DIP Documents or, solely with respect to the TLA Agent and the TLA Lenders, the Senior Intercreditor Agreement.  All indemnities of the Indemnified Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

9.      DIP Superpriority Claims.  In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute senior administrative expense claims against each Debtor, on a joint and several basis, (the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the payment in full in cash of any amounts due (i) in respect of the TLA Superpriority Claims and (ii) under the Carve-Out; provided, further that the DIP Superpriority Claims shall have recourse to and be payable from all pre-petition and post-petition property of the Debtors and their estates and all proceeds thereof, including, subject to the entry of the Final Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.

10.     DIP Liens.  As security for the DIP Obligations, the DIP Agent, for the benefit of the DIP Lenders, is hereby granted (effective upon the date of this Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instrument or otherwise or the possession or control by the DIP Parties), as contemplated under the DIP Documents, valid, perfected, and unavoidable security interests in and liens upon (such security interests and liens, collectively, the "DIP Liens") any and all present and after-acquired

tangible and intangible property and assets of the Debtors and their estates, whether real or personal, of any nature whatsoever and wherever located, including, without limitation: (a) all Prepetition Collateral; (b) all accounts, chattel paper, deposit accounts, documents (as defined in the UCC), equipment, general intangibles, instruments, inventory, and investment property and support obligations; (c) Commercial Tort Claims; (d) all books and records pertaining to the other property described in this Paragraph 10; (e) all other goods (including but not limited to fixtures) and personal property of such Debtor, whether tangible or intangible and wherever located; (f) subject to the entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code; and (g) to the extent not covered by the foregoing, all other assets or property of the Debtors, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing, and in each case to the extent of any Debtor's respective interest therein (all of which being hereinafter collectively referred to as the "DIP Collateral"); provided, however, that with respect to the Lease Collateral (defined herein), no liens or encumbrances shall be granted or extend to the Debtors' unexpired real property leases themselves under this Interim Order, except as permitted in the applicable lease or pursuant to applicable law, but rather any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such leases; provided further, however, that (i) the DIP Collateral shall not include either (a) Excluded Property (as defined in the DIP Credit Agreement) or (b) any avoidance action under chapter 5 of the Bankruptcy Code (but, subject to the entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy

Code shall be included in the DIP Collateral), (ii) the DIP Liens shall be subject to the payment in full in cash of the amounts due under the Carve-Out and (iii) the DIP Liens shall be junior to the TLA Liens and the TLA Replacement Liens (other than in the Debtors' unexpired real property leases and the proceeds thereof (the "Lease Collateral")), ~~and~~ Permitted Liens, as that term is defined in the DIP Credit Agreement, ~~that are senior to the TLA Liens~~, and otherwise *and any valid perfected unavoidable security interest or lien in existence as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code* have the priority as follows:

> (a)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected liens upon and security interests in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected unavoidable security interest or lien on the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code); provided, that, the liens and security interests granted to the Debtors in such DIP Collateral (other than in the Lease Collateral) shall be junior to the TLA Liens and the TLA Replacement Liens;

> (b)    subject to clause (c) below, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected lien upon and security interest in all of the Debtors' right, title and interest in, to and under all DIP Collateral which as of the Petition Date was encumbered by the Prepetition Liens, junior only to the TLA Liens, the TLA Replacement Liens and the Permitted Liens, and senior to any other lien upon, or security interest in, the DIP Collateral, including, for the avoidance of doubt, the TLB Liens, the TLB Replacement Liens, the TLC Liens, the TLC Replacement Liens, the TLD Liens and the TLD Replacement Liens;

(c)    pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, senior, priming, fully perfected lien upon and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral, (A) junior only to (i) the Carve-Out, (ii) the TLA Liens, (iii) the TLA Replacement Liens (other than in the Lease Collateral), (iv) the Permitted Liens, as that term is defined in the DIP Credit Agreement, in each case that are senior to the TLA Liens, and (v) a valid perfected unavoidable security interest or lien in existence as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code ~~that are senior to the TLA Liens~~, and (B) senior to any other lien upon, or security interest in, the DIP Collateral, including, for the avoidance of doubt, the TLB Liens, the TLB Replacement Liens, the TLC Liens, the TLC Replacement Liens, the TLD Liens and the TLD Replacement Liens; and

(d)    the DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, , (ii) except as expressly set forth herein or in the DIP Documents, or as otherwise ordered by the Court, any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases (for the avoidance of doubt, excluding any lien or security interest heretofore or hereinafter granted to the TLA Agent or the TLA Lenders), including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors to the extent permitted by applicable non-bankruptcy law or (iii) any intercompany or affiliate liens of the Debtors.  The DIP Liens shall not be subject to sections 506(c) (subject to final order), 510(b)–(c) (as opposed to section 510(a), which is applicable), 549, 550 or 551 of the Bankruptcy Code.

11.    Adequate Protection.

(a)    As adequate protection of the interest of the TLA Agent and the TLA Lenders in the TLA Collateral, the TLA Agent and the TLA Lenders are hereby granted:

(i)    payment of regularly scheduled cash interest, calculated at the non-default rate under the TLA Agreement;

(ii)    subject to the limitations set forth below, payment upon demand of all costs, expenses and other amounts payable under the terms of the TLA Loan Documents and all other reasonable out-of-pocket costs and expenses of the TLA Agent and TLA Lenders in accordance with the terms of the TLA Loan Documents (including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of one lead counsel (which shall be Klee, Tuchin, Bogdanoff & Stern LLP), one Delaware counsel (which shall be Richards, Layton & Finger PA) and any other necessary local or regulatory counsel in connection with advising the TLA Agent and TLA Lenders), subject to receiving a written invoice therefor, and regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget. None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee, counsel to the DIP Agent, and counsel to the Committee (if any); provided further, however, that such invoices may contain Redactions, except that copies of invoices provided to the U.S. Trustee shall not be redacted, and the provision of such invoices (including the unredacted copies provided to

the U.S. Trustee) shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. Unredacted copies of such invoices provided to the U.S. Trustee shall be subject to and protected under section 107(c)(3)(B) of the Bankruptcy Code. If any of the Debtors, U.S. Trustee, the DIP Agent, or the Committee (if any) objects to the reasonableness of the fees and expenses of any TLA Agent or the TLA Lenders, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Debtors, the U.S. Trustee, the DIP Agent, or the Committee (if any), as the case may be, shall file with the Court and serve on the TLA Agent and TLA Lenders a Reasonableness Fee Objection. Without limiting the foregoing, if the DIP Agent or the Committee (if any) objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the TLA Agent and TLA Lenders subject to such Redaction objection shall file with the Court and serve on counsel to the Debtors, the U.S. Trustee, counsel to the DIP Agent, and counsel to the Committee (if any) a Redaction Fee Objection. Any hearing on an objection or request, as applicable, regarding payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the propriety of the Redactions and the reasonableness of the particular items or categories of the fees, costs, and expenses, in each case which are the subject of such objection or request, as applicable. The Debtors shall pay in accordance with the terms and conditions of this Interim Order within fifteen (15) days after receipt of the applicable invoice (a) the full amount invoiced if no objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which an objection has been timely filed, in each case regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget. All

such fees, costs, expenses and other amounts owed or payable to the TLA Agent and the TLA Lenders shall be secured by the TLA Liens and TLA Replacement Liens (as defined below), and afforded all of the priorities and protections afforded to the TLA Obligations under this Interim Order and the TLA Loan Documents. Notwithstanding anything in this Paragraph to the contrary, any fees, costs and expenses of the TLA Agent and the TLA Lenders (including professional fees) in excess of the Approved Budget will be paid-in-kind and added to the TLA Obligations;

(iii)    solely to the extent of the Diminution in Value of the interest of the TLA Agent and TLA Lenders in the TLA Collateral from and after the Petition Date, continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in the DIP Collateral, which Liens shall be (1) senior to the (v) liens in favor of the DIP Parties securing the DIP Obligations (other than with respect to the Lease Collateral, in which the liens in favor of the DIP Parties securing the DIP Obligations shall be senior to the TLA Liens and TLA Replacement Liens), (w) the TLB Liens and the TLB Replacement Liens (as defined herein), (x) the TLC Liens and the TLC Replacement Liens (as defined herein), (y) the TLD Liens and the TLD Replacement Liens (as defined herein) and (z) all other liens and security interests whatsoever in the DIP Collateral, and (2) junior and subject only to the Carve-Out and the liens in favor of the DIP Parties in the Lease Collateral and Permitted Liens, as that term is defined in the DIP Credit Agreement, ~~that are senior to the TLA Liens~~ (the "TLA Replacement Liens");

(iv)    solely to the extent of the Diminution in Value of the interest of the TLA Agent and TLA Lenders in the TLA Collateral from and after the Petition Date,

superpriority administrative expense claims (the "TLA Superpriority Claims") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which TLA Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors (excluding avoidance actions under chapter 5 of the Bankruptcy Code, but, subject to the entry of the Final Order, including the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided that the TLA Superpriority Claims shall be subject to the payment in full in cash of the amounts due under the Carve-Out; provided, further, that, for the avoidance of doubt, the TLA Superpriority Claims shall be paid in cash in full prior to any payment of the DIP Superpriority Claims, the TLB Superpriority Claims, the TLC Superpriority Claims, and the TLD Superpriority Claims; and

(v)     access to the Debtors' books and records, delivery of such financial or any other reports as are provided to the DIP Agent contemporaneously with delivery of the same to the DIP Agent, and reasonable advance notice of, and an invitation to participate in, all meetings that include the DIP Lenders.

In the event the TLA Obligations are irrevocably paid in full in cash and the Investigation Termination Date or the 363 Closing Date has passed without any Challenge filed against the TLA Agent or TLA Lenders or otherwise relating to the TLA Liens or TLA Obligations, the Debtors' obligation to provide the TLA Lenders and the TLA Agent the adequate protection pursuant to this Paragraph shall terminate on and as of the date of such payment, the Investigation Termination Date or the 363 Closing Date, whichever is later, without further notice to or action of any person.  In the event that any portion of the TLA Obligations is ordered by the Bankruptcy Court to be reinstated or the proceeds of the repayment thereof are disgorged for reasons other than a successful challenge of the TLA Liens or Obligations, for so long as such portion of the TLA Obligations remains outstanding, the adequate protection provided for in this Paragraph shall be reinstated with respect to such outstanding TLA Obligations until the TLA Obligations are paid in full in cash as if such previous payment or repayment thereof had never occurred.

(b)     As adequate protection of the interest of the TLB Agent and the TLB Lenders in the TLB Collateral, the TLB Agent and the TLB Lenders are hereby granted:

(i)     payment of regularly scheduled paid-in-kind interest, calculated at the non-default rate under the TLB Agreement;

(ii)     subject to the limitations set forth below, payment upon demand of all costs, expenses and other amounts payable under the terms of the TLB Loan Documents and all other reasonable out-of-pocket costs and expenses of the TLB Agent and TLB Lenders in accordance with the terms of the TLB Loan Documents (including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of one lead counsel (which shall be Stroock & Stroock & Lavan

LLP), one Delaware counsel (which shall be Pachulski, Stang, Ziehl & Jones LLP) and any other necessary local or regulatory counsel in connection with advising the TLB Agent and TLB Lenders), subject to receiving a written invoice therefor. None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee, counsel to the TLA Agent, counsel to the DIP Agent, and counsel to the Committee (if any); provided further, however, that such invoices may contain Redactions, except that copies of invoices provided to the U.S. Trustee shall not be redacted, and the provision of such invoices (including the unredacted copies provided to the U.S. Trustee) shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. Unredacted copies of such invoices provided to the U.S. Trustee shall be subject to and protected under section 107(c)(3)(B) of the Bankruptcy Code. If any of the Debtors,, U.S. Trustee, the TLA Agent, the DIP Agent, or the Committee (if any) objects to the reasonableness of the fees and expenses of any TLB Agent or the TLB Lenders, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Debtors, the U.S. Trustee, the TLA Agent, the DIP Agent, or the Committee (if any), as the case may be, shall file with the Court and serve on the TLB Agent and TLB Lenders a Reasonableness Fee Objection. Without limiting the foregoing, if the TLA Agent, the DIP Agent, or the Committee (if any) objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the TLB Agent and TLB Lenders subject to such Redaction

objection shall file with the Court and serve on counsel to the Debtors, the U.S. Trustee, counsel to the TLA Agent, counsel to the DIP Agent, and counsel to the Committee (if any) a Redaction Fee Objection. Any hearing on an objection or request, as applicable, regarding payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the propriety of the Redactions and the reasonableness of the particular items or categories of the fees, costs, and expenses, in each case which are the subject of such objection or request, as applicable. The Debtors shall pay in accordance with the terms and conditions of this Interim Order within fifteen (15) days after receipt of the applicable invoice (a) the full amount invoiced if no objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which an objection has been timely filed. All such fees, costs, expenses and other amounts owed or payable to the TLB Agent and the TLB Lenders shall be secured by the TLB Liens and the TLB Replacement Liens (as defined below), and afforded all of the priorities and protections afforded to the TLB Obligations under this Interim Order and the TLB Loan Documents. Notwithstanding anything in this Paragraph to the contrary, any fees, costs and expenses of the TLB Agent and the TLB Lenders (including professional fees) in excess of the Approved Budget will be paid-in-kind and added to the TLB Obligations;

(iii)    solely to the extent of the Diminution in Value of the interest of the TLB Agent and TLB Lenders in the TLB Collateral from and after the Petition Date, continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in the DIP Collateral, which Liens shall be (A) junior and subject to (w) the TLA Liens and the TLA Replacement Liens (on the same terms that the TLB Liens are subordinate and junior in priority to the TLA Liens as set

forth in the Senior Intercreditor Agreement), (x) the liens in favor of the DIP Parties securing the DIP Obligations, (y) the Carve-Out, and (z) Permitted Liens as that term is defined in the DIP Credit Agreement ~~that are senior to the TLA Liens~~, and (B) senior to the TLC Liens, the TLC Replacement Liens, the TLD Liens and the TLD Replacement Liens  (the "TLB Replacement Liens");

(iv)    solely to the extent of the Diminution in Value of the interest of the TLB Agent and TLB Lenders in the TLB Collateral from and after the Petition Date, superpriority administrative expense claims (the "TLB Superpriority Claims") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which TLB Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors (excluding avoidance actions under chapter 5 of the Bankruptcy Code, but, subject to the entry of the Final Order, including the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided that the TLB Superpriority Claims shall be subject to the payment in full in cash of the amounts due under (x) the TLA Superpriority Claims, (y) the DIP Superpriority Claims, and (z) the Carve-Out; and

(v)   access to the Debtors' books and records and such financial reports as are provided to the DIP Agent.

In the event the TLB Obligations are irrevocably paid in full in cash and the Investigation Termination Date or the 363 Closing Date has passed without any Challenge filed against the TLB Agent or TLB Lenders or otherwise relating to the TLB Liens or TLB Obligations, the Debtors' obligation to provide the TLB Lenders and the TLB Agent the adequate protection pursuant to this Paragraph shall terminate on and as of the date of such payment, the Investigation Termination Date or the 363 Closing Date, whichever is later, without further notice to or action of any person. In the event that any portion of the TLB Obligations is ordered by the Bankruptcy Court to be reinstated or the proceeds of the repayment thereof are disgorged for reasons other than a successful challenge of the TLB Liens or Obligations, for so long as such portion of the TLB Obligations remains outstanding, the adequate protection provided for in this Paragraph shall be reinstated with respect to such outstanding TLB Obligations until the TLB Obligations are paid in full in cash as if such previous payment or repayment thereof had never occurred.

(c)   As adequate protection of the interest of the TLC Agent and the TLC Lenders in the TLC Collateral, the TLC Agent and the TLC Lenders are hereby granted:

(i)   solely to the extent of the Diminution in Value of the interest of the TLC Agent and TLC Lenders in the TLC Collateral from and after the Petition Date, continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in the DIP Collateral, which Liens shall be junior and subject to (v) the TLA Liens and the TLA Replacement Liens, (w) the liens in favor of the DIP Parties securing the DIP Obligations, (x) the TLB Liens and the TLB

Replacement Liens (y) the Carve-Out and and (z) Permitted Liens, as that term is defined in the DIP Credit Agreement, ~~that are senior to the TLA Liens~~ (the "TLC Replacement Liens"), in each case on the same terms that the TLC Liens and the TLD Liens are subordinate and junior in priority to the TLA Liens and the TLB Liens as set forth in the Junior Intercreditor Agreement; and

(ii)    solely to the extent of the Diminution in Value of the interest of the TLC Agent and TLC Lenders in the TLC Collateral from and after the Petition Date, superpriority administrative expense claims (the "TLC Superpriority Claims") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which TLC Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors (excluding avoidance actions under chapter 5 of the Bankruptcy Code, but, subject to the entry of the Final Order, including the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided that the TLC Superpriority Claims shall be subject to the payment in full in cash of the amounts due under (w) the TLA Superpriority Claims, (x) the DIP Superpriority Claims, (y) the TLB Superpriority Claims and (z) the Carve-Out.

In the event the TLC Obligations are irrevocably paid in full in cash and the Investigation Termination Date or the 363 Closing Date has passed without any Challenge filed against the TLC Agent or TLC Lenders or otherwise relating to the TLC Liens or TLC Obligations, the Debtors' obligation to provide the TLC Lenders and the TLC Agent the adequate protection pursuant to this Paragraph shall terminate on and as of the date of such payment, the Investigation Termination Date or the 363 Closing Date, whichever is later, without further notice to or action of any person. In the event that any portion of the TLC Obligations is ordered by the Bankruptcy Court to be reinstated or the proceeds of the repayment thereof are disgorged for reasons other than a successful challenge of the TLC Liens or Obligations, for so long as such portion of the TLC Obligations remains outstanding, the adequate protection provided for in this Paragraph shall be reinstated with respect to such outstanding TLC Obligations until the TLC Obligations are paid in full in cash as if such previous payment or repayment thereof had never occurred.

(d)     As adequate protection of the interest of the TLD Agent and the TLD Lenders in the TLD Collateral, the TLD Agent and the TLD Lenders are hereby granted:

(i)     solely to the extent of the Diminution in Value of the interest of the TLD Agent and TLD Lenders in the TLD Collateral from and after the Petition Date, continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in the DIP Collateral, which Liens shall be junior and subject to (u) the TLA Liens and the TLA Replacement Liens, (v) the liens in favor of the DIP Parties securing the DIP Obligations, (w) the TLB Liens and the TLB Replacement Liens (x) the TLC Liens and the TLC Replacement Liens, (y) the Carve-Out and (z) Permitted Liens as that term is defined in the DIP Credit Agreement, that are

~~senior to the TLA Liens~~ (the "TLD Replacement Liens" and together with the TLA Replacement Liens, the TLB Replacement Liens and the TLC Replacement Liens, the "Prepetition Lender Replacement Liens"), in each case on the same terms that the TLC Liens and the TLD Liens are subordinate and junior in priority to the TLA Liens and the TLB Liens as set forth in the Junior Intercreditor Agreement and the TLD Liens are subordinate and junior in priority under that certain Intercreditor Agreement, dated October 3, 2013, by and among certain of the Debtors, the TLC Agent, the TLC Lenders, the TLD Agent, and the TLD Lenders; and

        (ii)    solely to the extent of the Diminution in Value of the interest of the TLD Agent and TLD Lenders in the TLD Collateral from and after the Petition Date, superpriority administrative expense claims (the "TLD Superpriority Claims" and together with the TLA Superpriority Claims, the TLB Superpriority Claims and the TLC Superpriority Claims, the "Prepetition Lender Superpriority Claims") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which TLD Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors (excluding avoidance actions under chapter 5 of the Bankruptcy Code, but, subject to the entry of the Final Order, including the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not

such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided that the TLD Superpriority Claims shall be subject to the payment in full in cash of the amounts due under (v) the TLA Superpriority Claims, (w) the DIP Superpriority Claims, (x) the TLB Superpriority Claims, (y) the TLC Superpriority Claims and (z) the Carve-Out.

In the event the TLD Obligations are irrevocably paid in full in cash and the Investigation Termination Date or the 363 Closing Date has passed without any Challenge filed against the TLD Agent or TLD Lenders or otherwise relating to the TLD Liens or TLD Obligations, the Debtors' obligation to provide the TLD Lenders and the TLD Agent the adequate protection pursuant to this Paragraph shall terminate on and as of the date of such payment, the Investigation Termination Date or the 363 Closing Date, whichever is later, without further notice to or action of any person.  In the event that any portion of the TLD Obligations is ordered by the Bankruptcy Court to be reinstated or the proceeds of the repayment thereof are disgorged for reasons other than a successful challenge of the TLD Liens or Obligations, for so long as such portion of the TLD Obligations remains outstanding, the adequate protection provided for in this Paragraph shall be reinstated with respect to such outstanding TLD Obligations until the TLD Obligations are paid in full in cash as if such previous payment or repayment thereof had never occurred.

All Adequate Protection Liens granted by any subsection of this paragraph 11 are subject to being set aside, all Adequate Protection Claims granted by any subsection of this paragraph 11 are subject to being disallowed, and all Adequate Protection payments authorized by any subsection of this paragraph 11 are subject to disgorgement, if and to the extent that the

underlying Pre-Petition Lien or Claim is successfully challenged pursuant to paragraph 15 of this Interim Order.

      12.    <u>Adequate Protection Reservation; Section 507(b) Reservation</u>.

      The receipt by the TLA Agent, the TLA Lenders, the TLB Agent, the TLB Lenders, the TLC Agent, the TLC Lenders, the TLD Agent and the TLD Lenders of the adequate protection provided pursuant to this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the TLA Agent, the TLA Lenders, the TLB Agent, the TLB Lenders, the TLC Agent, the TLC Lenders, the TLD Agent or the TLD Lenders to seek additional forms of adequate protection at any time, subject to the terms of the Intercreditor Agreements. Subject only to the Carve-Out described in Paragraph 13 hereof, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in connection with any request for additional adequate protection by any party.

      13.    <u>Carve-Out</u>.

      (a) As used in this Interim Order, the term "<u>Carve-Out</u>" shall mean:

(i)      all fees required to be paid, both prior to and after delivery of a Carve-Out Trigger Notice, to the Clerk of the Bankruptcy Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a), together with the statutory rate of interest pursuant to 31 U.S.C. § 3717 (collectively, the "Statutory Fees");

(ii)      to the extent allowed by the Bankruptcy Court at any time, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors or the Committee (if any) pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than ordinary course professionals) (collectively, the "Professionals") at any time before or on the date of the delivery by the DIP Agent at the direction of the Required DIP Lenders (as defined in the DIP Credit Agreement) or the TLA Agent of a Carve-Out Trigger Notice (as defined below) up to an amount not to exceed the amount of such fees, disbursements, costs and expenses for each Professional (on a professional-by-professional, and not an aggregate basis) in the Approved Budget for the period prior to delivery of the Carve-Out Trigger Notice, whether such amounts are allowed by the Bankruptcy Court prior to or after delivery of such Carve-Out Trigger Notice (and including amounts incurred but not invoiced prior to the delivery of the Carve-Out Trigger Notice); provided, that, there shall be a dollar-

for-dollar reduction of the Carve-Out for any unused retainers held by or on behalf of the Professionals as of the delivery of the Carve-Out Trigger Notice; and

(iii)   all unpaid fees, disbursements, costs and expenses incurred by the Professionals on or after the day following the delivery by the DIP Agent at the direction of the Required DIP Lenders or the TLA Agent of the Carve-Out Trigger Notice up to an amount not to exceed the amount of such fees, disbursements, costs and expenses for each Professional (on a professional-by-professional, and not an aggregate basis) in the Approved Budget for the relevant time period following the delivery of the Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, in an aggregate amount not to exceed $100,000; provided, that, without duplication of the above reduction for retainers, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers held by or on behalf of the Professionals as of the delivery of the Carve-Out Trigger Notice (such amount set forth in clause (iii), the "Post-Carve-Out Trigger Notice Cap", and, together with such amounts set forth in clauses (i) and (ii) above, the "Carve-Out").

(b)   As used herein, the term "Carve-Out Trigger Notice" means a written notice provided by the DIP Agent (at the direction of the Required DIP Lenders), or the TLA Agent, to the Debtors, the TLA Agent (if not delivering the Carve-Out Trigger Notice), the DIP Agent (if not delivering the Carve-Out Trigger Notice), the U.S. Trustee and any Committee that the Carve-Out is invoked, which notice can be delivered only by the DIP Agent upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), by the TLA Agent upon a TLA Event of Default (as defined below), or by either if the Final Maturity Date has occurred.  Notwithstanding anything to the contrary contained in this Interim Order or in any DIP Documents, (a) the liens and claims granted to any of the DIP Parties or any of the Prepetition Secured Parties (including, without limitation, the DIP Liens, DIP Superpriority Claims, Prepetition Lender Superpriority Claims, Prepetition Lender Replacement Liens, Prepetition Secured Obligations, and Prepetition Liens) under, pursuant to or in connection with the DIP Facility, any DIP Document, this Interim Order, or any Prepetition Credit Document shall be subject to the payment in full in cash of the amounts due under the Carve-Out; and (b) the Carve-Out shall be paid from the following sources in the following order:  first, from the

Debtors' unencumbered funds; second, from proceeds of the DIP Collateral that do not constitute TLA Collateral; and, third, from proceeds of the TLA Collateral.

(c)    After receipt of the Carve-Out Trigger Notice, the Debtors shall provide notice by email and facsimile to all Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) and by filing a notice thereof on the docket of the Bankruptcy Court within two (2) Business Days after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Professionals is subject to and limited by the Carve-Out.

(d)    Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered in accordance with this Interim Order: (i) the Debtors shall be permitted to pay administrative expenses of Professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable by way of order of the Court approving a fee application on notice, or pursuant to procedures set forth in any interim compensation order this Court may enter, including on an interim basis, solely to the extent set forth in the DIP Credit Agreement and the Approved Budget (for the avoidance of doubt, on a professional-by-professional, and not an aggregate basis); and (ii) such payments shall not reduce, or be deemed to reduce, the Carve-Out.

(e)    Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, TLA Agent, TLB Agent, DIP Parties, Committee (if

any), U.S. Trustee, or any other party-in-interest to object to the allowance and payment of any amounts incurred or requested.

14.    <u>Limitation on Use of Cash Collateral and DIP Facility Proceeds</u>. Notwithstanding anything herein to the contrary, no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or any Committee, in connection with any of the following: (i) the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Parties or Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof) (each, a "<u>Loan Party Claim</u>"), including, without limitation, (a) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof, (b) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Obligations or Prepetition Liens, (c) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties, (d) investigating or asserting any so-called "lender liability" claims and causes of action

against the Prepetition Secured Parties or the DIP Parties and (e) investigating or asserting any action seeking to invalidate, set aside, avoid or (other than as contemplated by the Intercreditor Agreements, this Interim Order, and Bankruptcy Code section 510(a)) subordinate, in whole or in part, the Prepetition Credit Agreements or the DIP Loans; (ii) the assertion of any claims or causes of action against the DIP Parties or the Prepetition Secured Parties, including, without limitation, claims or actions to hinder or delay the assertions, enforcement or realization on the DIP Collateral or the liens securing the Prepetition Secured Obligations in accordance with this Interim Order (including attempting to stay the exercise of any right or remedy described in clause (e), clause (f) or clause (g) of Paragraph 24 of this Interim Order); (iii) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties hereunder or under the DIP Documents, the TLA Loan Documents or the TLB Loan Documents, in each of the foregoing cases without such applicable parties' prior written consent; (iv) the payment of any amount on account of any claims arising prior to the Petition Date unless such payments are (x) approved by the TLA Agent, the TLB Agent and (y) in accordance with the DIP Credit Agreement or (z) are approved by order of the Bankruptcy Court; or (v) any purpose that is prohibited under the Bankruptcy Code; provided, however, that no more than $50,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral or the Cash Collateral may be used by the Committee (if any) to investigate any Loan Party Claim or Lien.

15.    Reservation of Certain Third Party Rights. The Committee (if any) shall have a maximum of sixty (60) calendar days from the date of the Committee's appointment (if any) but not to exceed under any circumstances seventy-five (75) calendar days from entry of this Interim Order, and any other party in interest (other than the Debtor) shall have no later than

seventy-five (75) calendar days from entry of this Interim Order (collectively, the "Investigation Termination Date") to commence an appropriate contested matter or adversary proceeding (a "Challenge") asserting any Loan Party Claim; provided, however, that if the case converts to a Chapter 7, or if a Chapter 11 trustee is appointed, in each case prior to the Investigation Termination Date, the Investigation Termination Date shall be extended for the Chapter 7 or Chapter 11 trustee to 45 days after their appointment.  Notwithstanding the foregoing, subject to entry of a Final Order, from and after consummation of any sale transaction pursuant to section 363 of the Bankruptcy Code (such date of consummation, the "363 Closing Date"), no person or entity, including a Committee, any chapter 11 trustee appointed in these Chapter 11 Cases or any chapter 7 trustee in any chapter 7 case of the Debtors, shall be entitled to commence any Challenge asserting any Loan Party Claim.   If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as extended by the written consent of the applicable Prepetition Agent at the direction of the applicable Prepetition Lenders or the DIP Agent at the direction of the Required DIP Lenders) or the 363 Closing Date, then: (a) the agreements, acknowledgements and stipulations contained in Paragraph C of this Interim Order shall be irrevocably binding on the Debtors, any Committee, all creditors of the Debtors, and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter 7 cases, without further action by any party or this Court, and the Debtors, any Committee, all creditors of the Debtors, and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter 7 cases, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Prepetition Liens of the

Prepetition Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Secured Obligations shall be deemed to be finally allowed claims for all purposes against each of the Debtors, including in any subsequent chapter 7 cases, in the amounts set forth in Paragraph C, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise. Notwithstanding anything to the contrary herein: (x) if any such Challenge is timely commenced, the stipulations contained in Paragraph C of this Interim Order shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith and then only with respect to the stipulations that are subject to the Challenge and not to any stipulations not subject to the Challenge) except to the extent that such stipulations are successfully challenged in such Challenge; and (y) the Prepetition Secured Parties and the DIP Parties reserve all of their rights to contest on any grounds any Challenge and preserve any and all of their rights to appeal and stay any orders issued in connection with a successful Challenge. For the avoidance of doubt, nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates.

16.    <u>Landlord Agreements</u>.  Subject to entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtors to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed unenforceable and shall have no force and effect with respect to the

transactions granting post-petition liens in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders or Prepetition Lenders in accordance with the terms of the DIP Documents, this Interim Order or the Final Order.

17.    Bankruptcy Code Section 506(c) Waiver. Without limiting the Carve-Out, subject to the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or Prepetition Secured Parties upon, the DIP Collateral or the Prepetition Collateral (as applicable) and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases or any subsequent chapter 7 cases at any time shall be charged against the DIP Agent, any of the DIP Lenders, the Prepetition Secured Parties or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order).

18.    No Marshaling/Application of Proceeds. Subject to Final Order, in no event shall the DIP Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable), and all proceeds thereof shall be received and used in accordance with this Interim Order.

19.    Section 552(b). Upon entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral.

20.     _Disposition of Collateral; Application of Proceeds_.  Except as expressly permitted by the DIP Credit Agreement, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or the Prepetition Collateral other than in the ordinary course of business without an order of the Court or the prior written consent of the DIP Agent (subject to the consent of the Required DIP Lenders) and the TLA Agent and, subject to the terms and conditions of the Prepetition Credit Documents, the other Prepetition Agents (subject to obtaining any required consents of the applicable Prepetition Lenders under the applicable Prepetition Credit Documents) (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent or any Prepetition Agent, as applicable, or from any order of this Court).  Notwithstanding anything otherwise provided herein, and except as expressly permitted by the DIP Documents or an order of the Court, upon the sale of any, all or substantially all of the collateral secured by the TLA Liens and the TLA Replacement Liens, the Debtors shall use cash in an amount equal to 100% of any net cash proceeds of such sale to immediately satisfy (v) any outstanding TLA Obligations to the extent required by the TLA Loan Documents, (w) following the payment in full of the TLA Obligations, to immediately satisfy any outstanding DIP Obligations to the extent required by the DIP Documents, (x) following the payment in full of the DIP Obligations, to immediately satisfy any outstanding TLB Obligations to the extent required by the TLB Loan Documents, (y) following the payment in full of the TLB Obligations, to immediately satisfy any outstanding TLC Obligations to the extent required by the TLC Loan Documents and (z) following the payment in full of the TLC Obligations, to immediately satisfy any outstanding TLD Obligations to the extent required by the TLD Loan Documents; _provided_, _however_, that, notwithstanding the foregoing, unless otherwise ordered by

the Court, the net cash proceeds of any Lease Collateral shall be used to immediately satisfy any outstanding DIP Obligations to the extent required by the DIP Documents until the payment in full of the DIP Obligations, and thereafter shall be used to satisfy any outstanding TLA Obligations and thereafter any outstanding TLB Obligations. Notwithstanding the sale of any, all or substantially all of the Prepetition Collateral or the DIP Collateral, each of the Prepetition Agents and the DIP Agent shall retain their Prepetition Liens, Prepetition Lender Replacement Liens, and DIP Liens, as applicable, in the net sale proceeds of the Prepetition Collateral and DIP Collateral, as applicable, until the net proceeds of such sale are applied in accordance with the priorities set forth in this Paragraph 21.

21.    <u>Proceeds of Subsequent Financing</u>.  Unless otherwise ordered by the Court, if at any time prior to the repayment in full of the DIP Obligations, any of the Debtors or any trustee obtains credit or incurs debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code, whether or not in violation of the DIP Documents or this Interim Order, then all of the cash proceeds derived from such credit or debt shall immediately be used to satisfy any outstanding TLA Obligations secured by the TLA Liens and TLA Replacement Liens with any excess thereafter turned over to the DIP Agent and distributed in accordance with the terms of the DIP Documents; <u>provided</u>, <u>however</u>, that in the event of a refinancing solely of the DIP Obligations, the cash proceeds derived from such credit or debt may be used solely to satisfy any outstanding DIP Obligations.

22.    <u>Automatic Effectiveness of Liens</u>.  The DIP Liens and Prepetition Lender Replacement Liens shall not be subject to a Challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the

Petition Date without any further action by the Debtors, the DIP Parties or any of the applicable Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions. If the DIP Agent, the TLA Agent, the TLB Agent, the TLC Agent or the TLD Agent hereafter requests that the Debtors execute and deliver to the DIP Agent, the TLA Agent, the TLB Agent, the TLC Agent or the TLD Agent, as applicable, financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Agent, the TLA Agent, the TLB Agent, the TLC Agent or the TLD Agent, as applicable, to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or Prepetition Lender Replacement Liens, as applicable, the Debtors are hereby authorized to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent, the TLA Agent, the TLB Agent, the TLC Agent or the TLD Agent, as applicable, is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and the Prepetition Lender Replacement Liens. The DIP Agent, the TLA Agent, the TLB Agent, the TLC Agent and the TLD Agent, as applicable, each in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of

deeds or similar office in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

23.    TLA Buyout Right.    The TLA Agent and the TLA Lenders, at any time and in their sole and absolute discretion, shall have the option (the "Purchase Option") to purchase from the DIP Lenders all (but not less than all) of the DIP Loan by giving written notice (a "Purchase Notice") to the DIP Agent.  The Purchase Notice shall be irrevocable once delivered.  On the date specified by the TLA Agent in the Purchase Notice (which shall not be less than three (3) Business Days nor more than ten (10) Business Days after the receipt by the DIP Agent of the Purchase Notice), the DIP Lenders shall sell to the TLA Agent and the TLA Lenders, and the TLA Agent and the TLA Lenders who have elected to participate in such purchase shall purchase from the DIP Lenders, the DIP Loan at par plus all accrued and unpaid interest and fees under the DIP Loan.  In connection with such Purchase Option, the DIP Agent will resign effective upon the consummation of the Purchase Option and all documented accrued and unpaid costs and expenses of the DIP Agent shall be paid at such time.  Upon the consummation of the Purchase Option, the TLA Agent and such TLA Lenders automatically shall have all of the rights, benefits and privileges as the DIP Parties have under this Interim Order, including the benefit of all of the findings in favor of the DIP Parties under this Interim Order, without the necessity of any further order of the Bankruptcy Court as if the TLA Agent and such TLA Lenders were the DIP Agent and the DIP Lenders under this Interim Order at all times from and following the entry thereof.

24.    Automatic Stay; Rights and Remedies Upon Event of Default.  Subject to the following sentences of this Paragraph, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits,

privileges, remedies and provisions of this Interim Order, the DIP Documents, and the TLA Loan Documents in each case without further notice, motion, application to, order of, or hearing before, this Court.  Subject to the provisions of the DIP Credit Agreement and the TLA Loan Documents, as applicable, and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Parties, the TLA Agent, and the TLA Lenders (or any of their respective agents), as applicable, to exercise, upon the occurrence and during the continuance of, in the case of the DIP Agent and the DIP Lenders, any Event of Default under the DIP Credit Agreement or, in the case of the TLA Agent and the TLA Lenders, any TLA Event of Default (as defined below), as applicable, all rights and remedies provided for in the DIP Documents and the TLA Loan Documents, as applicable, and to take any or all of the following actions without further notice, motion or application to, order of or hearing before, this Court: (a) immediately terminate the Debtors' rights, if any, under this Interim Order or the DIP Credit Agreement to use Cash Collateral, except to the extent such cash may be used for the Carve-Out; (b) in the case of the DIP Agent and the DIP Lenders, cease making any DIP Loans to the Debtors; (c) in the case of the DIP Agent and the DIP Lenders, declare the Individual Commitments of each DIP Lender to make DIP Loans to be terminated, whereupon such Individual Commitments and obligation shall be terminated; (d)(1) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations, or (2) declare the unpaid principal amount of all outstanding TLA Obligations, all interest accrued and unpaid thereon, and all other TLA Obligations, in each case to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors; (e) freeze monies or balances in the Debtors' accounts; (f) immediately

01:19353964.1

set off any and all amounts in accounts maintained by the Debtors with the DIP Agent, any of the DIP Lenders, the TLA Agent, or any of the TLA Lenders (or any of their respective agents), as applicable, against the DIP Obligations and the TLA Obligations, as applicable, enforce all rights and remedies against the DIP Collateral in the possession of any of the DIP Lenders and the TLA Lenders, as applicable, for application towards the DIP Obligations and the TLA Obligations, as applicable, and otherwise proceed to protect, or enforce all rights and remedies of the DIP Parties, the TLA Agent, and the TLA Lenders under the DIP Credit Agreement, any of the other DIP Documents, or the TLA Loan Documents, as applicable, or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in the DIP Credit Agreement, the other DIP Documents, or the TLA Loan Documents, as applicable, or any instrument pursuant to which the DIP Obligations and TLA Obligations, as applicable, are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the DIP Parties, the TLA Agent, and the TLA Lenders, as applicable; and (g) take any other actions or exercise any other rights or remedies permitted under this Interim Order or the Final Order, as applicable, the DIP Documents and the TLA Loan Documents, as applicable, or applicable law to effectuate the repayment of the DIP Obligations and the TLA Obligations, as applicable; provided, however, that prior to the exercise of any right or remedy described in clauses (e), (f) or (g) of this Paragraph, the DIP Agent and the TLA Agent, as applicable, shall be required to provide five (5) Business Days' written notice to the Debtors (with a copy to their bankruptcy counsel), counsel to any Committee, counsel to the DIP Parties, counsel to the Prepetition Secured Parties and the U.S. Trustee.  Unless the Court orders otherwise, at the end of the five (5) Business Day notice period, the automatic stay,

as to the DIP Parties, the TLA Agent, and the TLA Lenders, as applicable, shall automatically be terminated at the end of such notice period, without further notice or order, and, upon expiration of such notice period, (x) the DIP Parties shall be permitted to exercise all rights and remedies set forth in this Interim Order, the DIP Credit Agreement and the other DIP Documents, as applicable, and as otherwise available at law, and (y) the TLA Agent and the TLA Lenders, as applicable, shall be permitted to exercise all rights and remedies set forth in this Interim Order and the TLA Loan Documents, as applicable, and as otherwise available at law, in each case including, but not limited to, the right to foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations and the TLA Obligations, as applicable, and occupy the Debtors' premises (subject to the rights of any landlord under applicable non-bankruptcy law) to sell or otherwise dispose of the DIP Collateral, without further notice, motion or application to, order of or hearing before, this Court; provided, however, that, notwithstanding the foregoing, until and unless the TLA Obligations are irrevocably paid in full, and notwithstanding anything in this Interim Order or the DIP Documents to the contrary, unless the TLA Agent and the TLA Lenders provide their prior written consent, the DIP Agent and the DIP Lenders may not exercise any rights or remedies described in clauses (e), (f) or (g) of this Paragraph with respect to the DIP Collateral other than with respect to the Lease Collateral; provided, further, that notwithstanding anything in this Interim Order to the contrary, following the exercise by the DIP Agent or the DIP Lenders of any of their respective rights or remedies as set forth in this paragraph or under the DIP Documents or applicable law in respect of the DIP Collateral with the prior written consent of the TLA Agent and the TLA Lenders, to the extent required above, no collateral, or proceeds thereof, that is subject to the Prepetition Liens or Prepetition Lender Replacement Liens (other than the Lease

Collateral), shall be used to pay any DIP Obligations until after the TLA Obligations have been irrevocably paid in full.  The rights and remedies of the DIP Parties, the TLA Agent, and the TLA Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Parties, the TLA Agent, or the TLA Lenders may have under the DIP Documents, the TLA Loan Documents, or otherwise.  The Debtors shall cooperate with the DIP Parties, the TLA Agent, and the TLA Lenders, as applicable, in their exercise of their rights and remedies, whether against the DIP Collateral or otherwise.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.  The delay or failure to exercise rights and remedies under the applicable DIP Documents, TLA Loan Documents, or this Interim Order by the DIP Agent, the DIP Lenders, the TLA Agent, or the TLA Lenders, as applicable, shall not constitute a waiver of the applicable DIP Agent's, DIP Lender's, TLA Agent's, or TLA Lender's rights hereunder, thereunder or otherwise, unless such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents and this Interim Order or TLA Loan Documents, as applicable.  Upon the DIP Parties becoming entitled to exercise (and exercising) any rights or remedies described in clauses (e), (f) or (g) of this Paragraph with respect to the DIP Collateral (other than the Lease Collateral), unless otherwise ordered by the Court, the TLA Agent and the TLA Lenders shall automatically have relief from the automatic stay to enforce all of their rights and remedies, including, without limitation, all of their potential rights and remedies specified above, without the need for any further order of the Bankruptcy Court, whether or not a TLA Event of Default has occurred.  The occurrence of any one or more of the following is referred to herein as a "TLA Event of Default":

(1) the breach of, or failure to comply with, any terms (including defined terms) or provisions, or any rights, benefits, privileges or remedies of the TLA Agent and/or the TLA Lenders, in each case, under this Interim Order, the Senior Intercreditor Agreement, any TLA Loan Document, the DIP Credit Agreement or any other DIP Document, which concern or relate to (i) any DIP Collateral and/or any TLA Collateral, as applicable, or (ii) the priority, validity, enforceability, scope and any other matters with respect to any of the TLA Liens, the TLA Replacement Liens and the TLA Superpriority Claims, as applicable; or

(2) the failure to pay any amounts to the TLA Agent and the TLA Lenders required to be paid pursuant to paragraph 11(a) of this Interim Order within five (5) days after such payment is otherwise due under the TLA Loan Documents or, in the case of fees, costs and expenses, within five (5) days after such payment is due under paragraph 11(a)(ii); or

(3) the breach of, or failure to comply with, any consent, or approval rights, or any other rights, benefits, privileges or remedies of the TLA Agent and/or any TLA Lender set forth in any terms (including any defined terms) or provisions under this Interim Order, the DIP Agreement or any other DIP Document to the extent afforded hereunder or thereunder, as the case may be, including, but not limited to, with respect to whether a budget is an Approved Budget, with respect to increasing the amount of the Commitment above $4,000,000.00, or with respect to any future order of this Court concerning or relating to the Chapter 11 Cases (including, without limitation, the Final Order, any bidding procedures order, and any sale order); or

(4) the breach of, failure to comply with, or extension of (without the prior written consent of the TLA Lenders), the Availability Period, the Final Maturity Date or the Stated Maturity Date; or

(5) the use of proceeds of the DIP Facility and Cash Collateral for any purpose not covered by a line item set forth in the Approved Budget; or

(6) the occurrence of any "Event of Default" under Sections 9.01(h), (k) - (r), and (t)-(x) of the DIP Credit Agreement;

provided that, notwithstanding the foregoing, no TLA Event of Default will include any Operating Disbursements Variance or any Receipts Variance.

During the Interim Period, there shall be no Event of Default or TLA Event of Default based upon the failure to comply with the milestones set forth on Schedule 7.01(s) of the DIP Credit Agreement (which are detailed on pages 35 and 36 of the DIP Motion), provided, however, that the parties reserve their rights to seek the approval of such an Event of Default or TLA Event of Default at the Final Hearing.

25.     Maintenance of DIP Collateral.  Unless the DIP Agent (at the direction of

the Required DIP Lenders) and TLA Agent may otherwise consent in writing, until (x) the

indefeasible payment in full or otherwise acceptable satisfaction of (i) all adequate protection

obligations owing to the TLA Agent, TLA Lenders, the DIP Agent and the DIP Lenders, (ii) all

TLA Obligations and (iii) all DIP Obligations and (y) the termination of the DIP Agent's and the

DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall (a) insure the

DIP Collateral as required under the DIP Facilities and (b) maintain the cash management system

in effect as of the Petition Date, as modified by any order that may be entered by the Court in

accordance with the DIP Documents with the consent of the DIP Parties, the TLA Agent and the

TLB Agent.

      26.    . <u>Access to Collateral</u>.  Notwithstanding anything to the contrary in this

Interim Order, the DIP Documents, or the TLA Loan Documents, upon the occurrence of an

Event of Default or TLA Event of Default, the rights of the DIP Agent, or the TLA Agent, as

applicable, to enter onto any leased premises of the Debtors for the purpose of exercising any

remedy with respect to DIP Collateral located thereon shall be limited to (i) any such rights

agreed to in writing by the applicable landlord in favor of the respective DIP Agent or TLA

Agent, as applicable (including, without limitation, in the governing lease agreement itself or in

any landlord waiver or similar agreement), (ii) any rights that the respective DIP Agent or TLA

Agent, as applicable, may have under applicable non-bankruptcy law, if any, or (iii) such rights

as may be granted by the Court on a separate motion with notice to the applicable landlords of

the leased premises and an opportunity for such landlords to respond and be heard.

      27.    <u>Binding Effect</u>.  The provisions of this Interim Order shall be binding

upon and inure to the benefit of the Debtors, the DIP Parties, the Prepetition Secured Parties and

their respective successors and assigns, including without limitation, any trustee hereafter

appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event

of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

28. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any chapter 11 plan in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Documents and the TLA Replacement Liens and TLA Superpriority Claims (and with respect to the entry of any order as set forth in clause (ii) or (iii) of this Paragraph, the TLB Replacement Liens, TLB Superpriority Claims, TLC Replacement Liens, TLC Superpriority Claims, TLD Replacement Liens and TLD Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Documents, as applicable, and to the maximum extent permitted by law, until all of the DIP Obligations and TLA Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a chapter 11 plan.

29. <u>Modifications of DIP Documents</u>. Subject to the limitations set forth below, the Debtors and the DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the DIP Documents without further notice, motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon notice to counsel for

any Committee, the U.S. Trustee and the Prepetition Agents, any party requesting notice under

B.R. 2002, and all parties affected by the modification or amendment; provided, that any

forbearance from, or waiver of, (a) a breach by the Debtors of a covenant, representation or any

other agreement or (b) a default or an Event of Default, in each case under the DIP Documents,

shall not require an order of this Court; provided, further, that, (i) no term (including any defined

term) or provision under the DIP Documents the breach of which would constitute a TLA Event

of Default, may be amended or otherwise modified (including by waiver or consent), by any DIP

Agent, any of the DIP Lenders and/or any of the Debtors, in each case under this clause (i)

without the prior written consent of the TLA Agent and the TLA Lenders, and (ii) none of the

DIP Agents or the DIP Lenders may forbear with respect to, or waive (including by consent), any

TLA Event of Default or any term (including any defined term) or provision which if breached

would constitute a TLA Event of Default, in each case, under this clause (ii), without the prior

written consent of the TLA Agent and the TLA Lenders.

      30.    Insurance Policies.    Upon entry of this Interim Order, on each insurance

policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP

Agent, the DIP Lenders, the TLA Agent, and the TLA Lenders shall be, and shall be deemed to

be, without any further action by or notice to any person, named as additional insureds; and

(ii) the DIP Agent, on behalf of the DIP Lenders, and the TLA Agent, on behalf of the TLA

Lenders, shall be, and shall be deemed to be, without any further action by or notice to any

person, named as a loss payee. The Debtors are authorized and directed to take any actions

necessary to have the DIP Agent, the DIP Lenders, the TLA Agent, and the TLA Lenders (as

applicable) be added as an additional insured and loss payee on each insurance policy maintained

by the Debtors which in any way relates to the DIP Collateral.

31.     <u>Protection Under Section 364(e) of the Bankruptcy Code</u>.  The DIP Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the record of these Chapter 11 Cases, the DIP Lenders and the Prepetition Secured Parties are afforded the protections set forth in section 364(e) of the Bankruptcy Code. <u>Effect of Dismissal or Conversion of Chapter 11 Cases</u>.  If the Chapter 11 Cases are dismissed or converted, then such dismissal or conversion of the Chapter 11 Cases shall not affect the rights of the DIP Parties and the Prepetition Secured Parties under their respective DIP Documents, Prepetition Credit Documents, or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Parties and the Prepetition Secured Parties shall remain in full force and effect.

32.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein.  The provisions set forth in this Paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

33.     <u>Rights of Access and Information</u>.  The representatives, advisors, consultants, agents and/or employees of the DIP Agent, the DIP Lenders, the TLA Agent, the TLB Agent, the TLA Lenders and the TLB Lenders shall be afforded reasonable access to the Debtors' premises during normal business hours and without unreasonable interference with the proper operation of the Debtors' businesses and their books and records in accordance with this

Interim Order, the DIP Documents and the Prepetition Credit Documents and the Debtors shall reasonably cooperate with, consult with, and provide to such persons all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of any of the Debtors.

34. <u>No Impact on Certain Contracts or Transactions</u>. Except as expressly otherwise set forth herein, nothing in this Interim Order shall be construed to convey on any DIP Lender or any Prepetition Secured Party any consent, voting or other rights beyond those (if any) set forth in the DIP Documents or the Prepetition Credit Documents, as applicable. The DIP Obligations and DIP Facility collectively constitute the "DIP Financing" (as defined in the Junior Intercreditor Agreement) and as such shall be subject to the applicable operative terms of the Junior Intercreditor Agreement.

35. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary other than the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

36. <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for all obligations hereunder, including without limitation, the DIP Superpriority Claims and the Prepetition Lenders Superpriority Claims and in accordance with the terms of the DIP Facility and the DIP Documents.

37. <u>Limitations on Liability.</u> Subject to the entry of the Final Order, in determining to make extensions of credit under the DIP Facility, permitting the use of Cash

Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Documents, or the Prepetition Credit Documents, as applicable, none of the DIP Agent, the DIP Lenders, TLA Agent, the TLA Lenders, the TLB Agent, the TLB Lenders, or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, TLA Agent, the TLA Lenders, the TLB Agent, the TLB Lenders, or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

38.    <u>PACA</u> Reservation.   Nothing in this Interim Order shall prejudice or impair the rights of any party under the Perishable Agricultural Commodities Act, which rights are expressly preserved.

39.    <u>Findings of Fact and Conclusions of Law</u>. This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions

of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

40.     *Choice of Law; Jurisdiction.*  The DIP Facility and DIP Documents (and the rights and obligations of the parties thereto) provide that they shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.  The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or DIP Documents.

41.     *Controlling Effect of Interim Order.*  To the extent any provision of this Interim Order conflicts with any provision of the Motion or any DIP Document, the provisions of this Interim Order shall control.

42.     *Service.*  Service of this Interim Order and notice of a final hearing shall be made upon the Debtors' top 30 general unsecured creditors, any Committee (if and when it is appointed), the applicable state and federal taxing authorities, any federal or state regulatory authorities governing the Debtors' industry, SEC, the U.S. Attorney's Office, Delaware Attorney General, US Trustee, the Debtors' landlords, and any person who, as of the date hereof, has filed a notice pursuant to Bankruptcy Rule 2002.

43.     *Objections.*  Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before 4:00 p.m. (prevailing Eastern time)

01:19353964.1

on October 21, 2016, with a copy served upon: (i) counsel to the Debtors, Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178 (Attn: Neil E. Herman, Esq., Patricia F. Brennan, Esq. and James O. Moore, Esq.) and Young Conaway Stargatt & Taylor, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael Nestor, Esq. and Kenneth Enos, Esq.); (ii) counsel to the DIP Lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Jayme T. Goldstein, Esq. and Daniel P. Ginsberg, Esq.) and Pachulski, Stang, Ziehl & Jones LLP, 919 North Market Street, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq.); (iii) counsel to the TLA Agent, (a) Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, CA 90067 (Attn: Michael L. Tuchin, Esq. and David M. Guess, Esq.) and (b) Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq.); (iv) counsel to be selected by the Committee (if any) upon its formation if selected by such date, and (v) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Juliet Sarkessian, Esq.).

44.    Final Hearing. A final hearing on the Motion shall be heard before this Court on October 28, 2016 at 10 a.m. in Courtroom No. 6 at the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801.

Dated: October 4, 2016.

_____
Christopher S. Sontchi
United States Bankruptcy Judge