**EXHIBIT A**

**DIP CREDIT AGREEMENT**

*__DRAFT 10/3/2016__*

SENIOR SECURED
DEBTOR-IN-POSSESSION CREDIT AGREEMENT


Dated as of October [●], 2016


Among


GARDEN FRESH RESTAURANT CORP.,
as the Borrower,


GARDEN FRESH HOLDINGS, INC.,
as Parent,


THE SUBSIDIARIES OF THE BORROWER IDENTIFIED HEREIN,
as Guarantors,


CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent and Collateral Agent,


and


THE LENDERS PARTY HERETO,
as DIP Lenders

NY 76357801v4
NY 76357801v7
NY 76357801v8

# TABLE OF CONTENTS

Page

ARTICLE I  DEFINITIONS; CERTAIN TERMS..........................................................................2
    Section 1.01    Definitions.................................................................................2
    Section 1.02    Terms Generally.......................................................................36
    Section 1.03    Certain Matters of Construction...............................................37
    Section 1.04    Accounting and Other Terms....................................................37
    Section 1.05    Time References ......................................................................38
ARTICLE II  THE LOAN ......................................................................................................38
    Section 2.01    Commitments..........................................................................38
    Section 2.02    Making the Initial DIP Loan ...................................................40
    Section 2.03    Repayment of Loans; Evidence of Debt .................................40
    Section 2.04    Interest....................................................................................41
    Section 2.05    Reduction of Commitment; Prepayment of Loan....................42
    Section 2.06    Fees ........................................................................................44
    Section 2.07    [Reserved.] .............................................................................45
    Section 2.08    [Reserved.] .............................................................................45
    Section 2.09    Taxes......................................................................................45
    Section 2.10    [Reserved] ..............................................................................49
    Section 2.11    Manner of Payment.................................................................49
    Section 2.12    Mitigation Obligations; Replacement of Lenders....................49
ARTICLE III  [RESERVED] ..................................................................................................50
ARTICLE IV  APPLICATION OF PAYMENTS; JOINT AND SEVERAL LIABILITY
    OF Borrower .........................................................................................50
    Section 4.01    Payments; Computations and Statements ................................50
    Section 4.02    Sharing of Payments ...............................................................51
    Section 4.03    Apportionment of Payments ...................................................51
    Section 4.04    [Reserved] ..............................................................................52
    Section 4.05    [Reserved] ..............................................................................52
ARTICLE V  CONDITIONS TO LOAN...................................................................................52
    Section 5.01    Conditions Precedent to Effectiveness and Initial DIP Loans................52

-i-

Section 5.02    Conditions Precedent to DIP Loans after the Closing Date....................57

ARTICLE VI REPRESENTATIONS AND WARRANTIES .....................................................58

Section 6.01    Representations and Warranties...............................................................58

ARTICLE VII COVENANTS OF THE LOAN PARTIES.........................................................71

Section 7.01    Affirmative Covenants...........................................................................71

Section 7.02    Negative Covenants ..............................................................................80

Section 7.03    [Reserved.].............................................**Error! Bookmark not defined.**

ARTICLE VIII MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS RECEIVABLE AND OTHER COLLATERAL ...................................................90

Section 8.01    Collection of Accounts Receivable; Management of Collateral.............90

Section 8.02    [Intentionally omitted.] ..........................................................................92

Section 8.03    Collateral Custodian...............................................................................92

ARTICLE IX EVENTS OF DEFAULT.......................................................................................92

Section 9.01    Events of Default ..................................................................................92

ARTICLE X DIP AGENTS...........................................................................................................101

Section 10.01    Appointment .........................................................................................101

Section 10.02    Nature of Duties; Delegation ...............................................................102

Section 10.03    Rights, Exculpation, Etc ......................................................................102

Section 10.04    Reliance.................................................................................................103

Section 10.05    Indemnification .....................................................................................103

Section 10.06    DIP Agents Individually .......................................................................104

Section 10.07    Successor Agent.....................................................................................104

Section 10.08    Collateral Matters..................................................................................105

Section 10.09    Agency for Perfection ...........................................................................107

Section 10.10    No Reliance on any DIP Agent's Customer Identification Program.................................................................................................107

Section 10.11    No Third Party Beneficiaries .................................................................108

Section 10.12    No Fiduciary Relationship .....................................................................108

Section 10.13    Reports; Confidentiality; Disclaimers....................................................108

Section 10.14    Intercreditor Agreements ......................................................................109

Section 10.15    [Intentionally Omitted] .........................................................................109

Section 10.16    Administrative Agent May File Proofs of Claim....................................109

-ii-

ARTICLE XI  GUARANTY ..................................................................................................110

    Section 11.01    Guaranty ..............................................................................................110

    Section 11.02    Guaranty Absolute ...............................................................................110

    Section 11.03    Waiver ..................................................................................................111

    Section 11.04    Continuing Guaranty; Assignments .....................................................111

    Section 11.05    Subrogation ..........................................................................................112

ARTICLE XII  MISCELLANEOUS ....................................................................................112

    Section 12.01    Notices, Etc .........................................................................................112

    Section 12.02    Amendments, Etc .................................................................................115

    Section 12.03    No Waiver; Remedies, Etc ...................................................................118

    Section 12.04    Expenses; Taxes; Attorneys' Fees ......................................................118

    Section 12.05    Right of Set-off ...................................................................................119

    Section 12.06    Severability .........................................................................................119

    Section 12.07    Assignments and Participations ...........................................................119

    Section 12.08    Counterparts ........................................................................................123

    Section 12.09    GOVERNING LAW ............................................................................123

    Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE ........................................................................................124

    Section 12.11    WAIVER OF JURY TRIAL, ETC .....................................................125

    Section 12.12    Consent by the DIP Agents and DIP Lenders ......................................125

    Section 12.13    No Party Deemed Drafter ....................................................................125

    Section 12.14    Reinstatement; Certain Payments ........................................................125

    Section 12.15    Indemnification; Limitation of Liability for Certain Damages .............126

    Section 12.16    Records ................................................................................................127

    Section 12.17    Binding Effect .....................................................................................127

    Section 12.18    Interest .................................................................................................128

    Section 12.19    Confidentiality .....................................................................................129

    Section 12.20    Public Disclosure ................................................................................129

    Section 12.21    Integration ...........................................................................................130

    Section 12.22    USA Patriot Act ..................................................................................130

    Section 12.23    Intercreditor Agreement and Other Agreements ..................................130

NY 76357801v4
NY 76357801v7
NY 76357801v8

## SCHEDULE AND EXHIBITS

| | |
|---|---|
| Schedule 1.01(A) | DIP Lenders and DIP Lenders' Commitments |
| Schedule 1.01(B) | Restaurant Closures |
| Schedule 6.01(e) | Capitalization; Subsidiaries |
| Schedule 6.01(f) | Litigation; Commercial Tort Claims |
| Schedule 6.01(i) | ERISA |
| Schedule 6.01(l) | Nature of Business |
| Schedule 6.01(o) | Real Property |
| Schedule 6.01(r) | Environmental Matters |
| Schedule 6.01(s) | Insurance |
| Schedule 6.01(v) | Bank Accounts |
| Schedule 6.01(w) | Intellectual Property |
| Schedule 6.01(x) | Material Contracts |
| Schedule 6.01(z) | Employee and Labor Matters |
| Schedule 6.01(dd) | Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office; FEIN |
| Schedule 6.01(ee) | Collateral Locations |
| Schedule 6.01(gg) | Existing Credit Card Agreements |
| Schedule 7.01(o) | Post-Closing Covenants |
| Schedule 7.01(s) | Milestones |
| Schedule 7.02(a) | Existing Liens |
| Schedule 7.02(b) | Existing Indebtedness |
| Schedule 7.02(e) | Existing Investments |
| Schedule 8.01 | Blocked Accounts |
| | |
| Exhibit A | [Reserved] |
| Exhibit B | Form of Security Agreement |
| Exhibit C | Form of Notice of Borrowing |
| Exhibit D | Budget |
| Exhibit E | Form of Assignment and Acceptance |

NY 76357801v4
NY 76357801v7
NY 76357801v8

## SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of October [●], 2016 (this "Agreement"), by and among Garden Fresh Holdings, Inc., a Delaware corporation (the "Parent"), Garden Fresh Restaurant Corp., a Delaware corporation, as borrower and debtor-in-possession in the Chapter 11 Cases (as defined below) ("Garden Fresh" or the "Borrower"), each other subsidiary and affiliate of the Parent listed as a "Guarantor" on the signature pages hereto (each a "Guarantor" and, together with the Parent, the "Guarantors" and, collectively with the Borrower, the "Loan Parties" and each a "Loan Party"), the lenders from time to time party hereto (each a "DIP Lender" and collectively, the "DIP Lenders"), Cortland Capital Market Services LLC, a Delaware limited liability company, as collateral agent for the DIP Lenders (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent") and as administrative agent for the DIP Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent" and together with the Collateral Agent, each a "DIP Agent" and collectively, the "DIP Agents").

### RECITALS

WHEREAS, each Loan Party filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on the Petition Date;

WHEREAS, each Loan Party is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Borrower obtained financing from the Prepetition Term Loan A Lenders, the Prepetition Term Loan B Lenders, the Prepetition Term Loan C Lenders and the Prepetition Term Loan D Lenders;

WHEREAS, the Loan Parties have asked the DIP Lenders to extend financial accommodations pursuant to a credit facility (the "DIP Facility") to the Borrower in the form of term loans in an aggregate principal amount not to exceed $3,000,000 for the purposes described herein and on the terms and conditions set forth herein;

WHEREAS, to provide security for the repayment of the DIP Loans and payment of the other DIP Obligations of the Borrower hereunder, the Loan Parties have agreed to provide the DIP Agents and the DIP Lenders, in each case, subject to the Carve-Out (as defined below), and the lien priority set forth in the Orders (as defined below ) with Liens (as defined below) on the DIP Collateral (as defined below); and

WHEREAS, the DIP Lenders are willing to make the requested credit facility available on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

# ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01   Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"Account Debtor" means each debtor, customer or obligor in any way obligated on or in connection with any Account Receivable, including any Existing Credit Card Issuer or Existing Credit Card Processor.

"Account Receivable" means, with respect to any Person, any and all rights of such Person to payment for goods sold and/or services rendered, including accounts, general intangibles (including all Credit Card Receivables and all rights to payment, including those arising in connection with bank and non-bank credit cards) and any and all such rights evidenced by chattel paper, instruments or documents, whether due or to become due and whether or not earned by performance, and whether now or hereafter acquired or arising in the future, and any proceeds arising therefrom or relating thereto.

"Acquisition" means the acquisition (whether by means of a merger, consolidation or otherwise) of all of the Equity Interests of any Person or all or substantially all of the assets of (or any division or business line of) any Person.

"Action" has the meaning specified therefor in Section 12.12.

"Additional Amount" has the meaning specified therefor in Section 2.09(a).

"Adequate Protection Claims" means any claims arising pursuant to the Adequate Protection Provisions.

"Adequate Protection Liens" means, collectively, any Liens granted in respect of the Prepetition Term Loan A Obligations and the Prepetition Term Loan B Obligations pursuant to the Adequate Protection Provisions, which Liens shall have the priorities set forth in the Orders.

"Adequate Protection Provisions" means the provisions in paragraphs 11 and 12 of the Interim Order or the Final Order, as applicable, that provide adequate protection for the Prepetition Term Loan A Obligations and the Prepetition Term Loan B Obligations.

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent's Account" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the DIP Agents and the DIP Lenders under this Agreement and the other DIP Loan Documents.

-2-

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the general management and policies of such Person whether by contract or otherwise.  Notwithstanding anything herein to the contrary, in no event shall any DIP Agent or any DIP Lender and their respective affiliates be considered an "Affiliate" of any Loan Party.

"Agreement" has the meaning specified therefor in the preamble hereto.

"Anti-Terrorism Laws" means any laws relating to terrorism or money laundering, including, without limitation, (i) the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957), (ii) the Bank Secrecy Act, as amended by the USA PATRIOT Act, (iii) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), (iv) the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and implementing regulations by the United States Department of the Treasury, (v) any law prohibiting or directed against terrorist activities or the financing of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B), or (vi) any similar laws enacted in the United States or any other jurisdictions in which the parties to this agreement operate, as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"Apollo" means Apollo Investment Corporation, a Maryland corporation.

"Approved Budget" means the Initial Budget, as updated pursuant to Section 7.01(a)(xxii) during the continuance of the Chapter 11 Cases, solely to the extent such update is in form and substance satisfactory to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning DIP Lender and an assignee, and accepted by the Administrative Agent, in accordance with Section 12.07 hereof and substantially in the form of Exhibit E hereto or such other form reasonably acceptable to the Administrative Agent.

"Auction" means an auction conducted in connection with a Section 363 Sale pursuant to the Bidding Procedures to determine the highest and/or best bid for the Loan Parties' assets.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief financial officer, treasurer, controller, president, general counsel, secretary, assistant secretary or any vice president of such Person.

NY 76357801v7
NY 76357801v8

"Availability Period" means in respect of the DIP Loans, the period from and including the Closing Date to the earliest of (i) the date that is 12 weeks from the Petition Date and (ii) the date of termination of the DIP Loan Commitments pursuant to the terms hereof.

"Bankruptcy Code" means title 11 of the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended and in effect from time to time, and any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

"Bidding Procedures" means bidding procedures to be used at an Auction in connection with a Section 363 Sale (in form and substance reasonably satisfactory to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders), which shall be filed with, and approved by an order of, the Bankruptcy Court.

"Blocked Person" has the meaning assigned to such term in Section 6.01(hh).

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" means, (a) with respect to any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) with respect to a partnership, the board of directors or equivalent governing body of the general partner of the partnership, (c) with respect to a limited liability company, the managing member or members or any controlling committee or board of managers of such company or the sole member or the managing member thereof, and (d) with respect to any other Person, the entity, individual, board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Borrowing" means a making of a DIP Loan to the Borrower by each of the DIP Lenders pursuant to Section 2.01.

"BP" means BP Salad Holdings, LLC.

"BP Parties" means BP and each of its Affiliates and Related Funds.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the sum of, without duplication, (a) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed and including all Capitalized Lease Obligations paid or payable during such period, plus (b) to the extent not covered by clause (a) above, the aggregate

-4-

of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Equity Interests of, any other Person.

"Capitalized Lease" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is (a) required under GAAP to be capitalized on the balance sheet of such Person or (b) a transaction of a type commonly known as a "synthetic lease" (i.e., a lease transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes); provided that no Non-Financing Lease shall be deemed a Capitalized Lease regardless of the GAAP treatment of such Non-Financing Lease.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning set forth in the Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (from and after the date the Final Order is entered).

"Cash Collateral" has the meaning specified therefor in the Orders.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within one year from the date of acquisition thereof; (b) commercial paper, maturing not more than one year after the date of issue rated P1 by Moody's or A1 by Standard & Poor's; (c) certificates of deposit maturing not more than one year after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000; and (f) marketable tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within one year from the date of acquisition thereof.

"Cash Management Order" means, as the context requires, that certain (i) Interim Order (I) Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving The Requirements of 11 U.S.C. § 345(B) On An Interim Basis, (IV) Authorizing The Continuation Of Intercompany Transactions And Granting Administrative Expense Status To Certain Postpetition Intercompany Claims, and (V) Maintaining The Ability To Use Debit, Wire and Ach Payments or (ii) Final Order (I) Approving Continued Use of Cash Management System, (II) Authorizing Use of

-5-

Prepetition Bank Accounts and Business Forms, (III) Waiving The Requirements of 11 U.S.C. § 345(B) On An Interim Basis, (IV) Authorizing The Continuation Of Intercompany Transactions And Granting Administrative Expense Status To Certain Postpetition Intercompany Claims, and (V) Maintaining The Ability To Use Debit, Wire and Ach Payments, in each case, entered by the Bankruptcy Court, which shall be in form and substance reasonably satisfactory to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

"Cerberus" means Cerberus Business Finance, LLC, a Delaware limited liability company.

"CFC" means a controlled foreign corporation (as that term is defined in Section 957 of the Internal Revenue Code).

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means each occurrence of any of the following:

(a)     the Permitted Holders shall cease to have beneficial ownership (as defined in Rule 13(d)(3) under the Exchange Act) and control, in the aggregate, directly or indirectly, of more than 50% on a fully diluted basis of the aggregate outstanding voting power and economic interests of the Equity Interests of the Parent (or its direct or indirect ultimate parent holding company);

(b)     any Loan Party ceases to own and control 100% of the voting and economic interests of the Equity Interests of such Loan Party's Subsidiaries, unless otherwise permitted hereunder;

(c)     at any time the Permitted Holders cease to have the power, directly or indirectly, to appoint, or cease to have appointed or caused the appointment of, within 10 Business Days of the applicable vacancy, a majority of the individuals who compose the Board of Directors of the Parent;

(d)     the Parent consolidates or amalgamates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person (other than in connection with any transaction permitted pursuant to the DIP Loan Documents), or (ii) any entity consolidates or amalgamates with or merges into the Parent, which in either

-6-

event (i) or (ii) is pursuant to a transaction in which the outstanding voting Equity Interests of the Parent is reclassified or changed into or exchanged for cash, securities or other property, other than any such transaction in which the Permitted Holders have beneficial ownership, directly or indirectly, in the aggregate of more than 50% of the aggregate voting power and economic interests of all Equity Interests (on a fully diluted basis) of the resulting, surviving or transferee entity; or

(e)    any "change of control" or similar event under the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents or the Sponsor Subordinated Debt Documents.

"Chapter 11 Cases" means the voluntary cases under chapter 11 of the Bankruptcy Code of the Borrower and its affiliated debtors and debtors-in-possession in the Bankruptcy Court.

"Closing Date" has the meaning specified therefor in Section 5.01.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Agent Advances" has the meaning specified therefor in Section 10.08(a).

"Collateral Documents" means the Security Agreement, any Copyright Security Agreement, the Orders, any Patent Security Agreement, any Trademark Security Agreement, any Mortgage, and such other mortgages, debentures, charges, pledges, security agreements, joinder agreements, documents and instruments as may in each case be reasonably required by the Required DIP Lenders and/or are entered into in connection with this Agreement.

"Committee" means the official committee of unsecured creditors that may be appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

"Compliance Certificate" has the meaning specified therefor in Section 7.01(a)(iv).

"Consortium Agreements" means, collectively, the Consortium Services Agreement; the limited liability company agreement of Associated Concepts Group, LLC; and the Members' Agreement, dated June 18, 2012, among Associated Concepts Group, LLC and each Member (as defined therein).

"Consortium Services Agreement" means that certain Consortium Services Agreement, dated as of October 15, 2012, by and among certain of the Borrower and Guarantors and Associated Concepts Group, LLC, a Delaware limited liability company.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether

-7-

directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Copyright Security Agreement" has the meaning specified therefor in the Security Agreement.

"Credit Card Receivables" means, with respect to each Loan Party, collectively, (a) all present and future rights of such Loan Party to payment from any Existing Credit Card Issuer, Existing Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of such Loan Party to payment from any Existing Credit Card Issuer, Existing Credit Card Processor or other third party in connection with the sale or transfer of Accounts (as defined in the Uniform Commercial Code) arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Existing Credit Card Issuer or Existing Credit Card Processor under the Existing Credit Card Agreements or otherwise.

"Debtor Relief Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

-8-

"Default" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"DIP Agent" and "DIP Agents" have the respective meanings specified therefor in the preamble hereto.

"DIP Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person in favor of the Collateral Agent, for the benefit of the DIP Lenders, as security for all or any part of the DIP Obligations (including, for the avoidance of doubt, all collateral securing the Prepetition Term Loan A Obligations and Prepetition Term Loan B Obligations) whether pursuant to the DIP Loan Documents or otherwise.

"DIP Facility" has the meaning specified therefor in the recitals hereto.

"DIP Lender" and "DIP Lenders" has the meaning specified therefor in the preamble hereto and shall include any financial institution or other Person that from time to time becomes a party hereto as a DIP Lender in compliance with the requirements of Section 12.07 (if any), in each case together with its successors.

"DIP Liens" means the Liens and security interests granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Collateral Documents and the Orders, which such Liens and security interests shall have the priorities set forth in the Orders.

"DIP Loans" means, collectively, the Initial DIP Loans and the Delayed Draw DIP Loans, including, in each case, the PIK Loans, made by the DIP Lenders pursuant to this Agreement.

"DIP Loan Advance" has the meaning specified therefor in Section 2.01.

"DIP Loan Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make a portion of the DIP Loans to the Borrower in the amount set forth in Schedule 1.01(A) hereto or such higher amount as may be provided under Section 2.01.

"DIP Loan Documents" means this Agreement, the Fee Letter, any Guaranty, the Intercompany Subordination Agreement, the Orders, the Funds Flow Direction, the Security Agreement, any other Collateral Document, any note or notes executed by Borrower in favor of any DIP Lender and any other agreement, instrument, certificate, report and other document executed and delivered (now or in the future) pursuant hereto or thereto, in connection herewith or therewith) or otherwise evidencing or securing the DIP Loan or any other DIP Obligation.

"DIP Obligations" means all present and future indebtedness, obligations (including indemnification obligations) liabilities, fees, premiums, guarantees, covenants and duties of any kind and description, of each Loan Party owed to the DIP Agents and the DIP Lenders arising under or in connection with this Agreement, the Orders or any other DIP Loan Document, whether direct or indirect, whether or not the right of payment in respect of such

-9-

claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by the Chapter 11 Cases.  Without limiting the generality of the foregoing, the DIP Obligations of each Loan Party under the DIP Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the DIP Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any DIP Agent or any DIP Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"Disbursements Line" has the meaning specified therefor in Section 7.02(t).

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells (including, without limitation, any sale and leaseback transaction), assigns, transfers, conveys, licenses, leases or otherwise disposes of any property or assets (whether now owned or hereafter acquired, but exclusive of the issuance of Equity Interests by such Person) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. "Disposition" shall not include the expiration of a Lease by its terms or non-renewal of a Lease.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than as a result of a contingent event (provided that the DIP Obligations are first repaid in full)), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a contingent event (provided that the DIP Obligations are first repaid in full)), in whole or in part, on or prior to the date which is one year after the Final Maturity Date, (b) is convertible into or exchangeable for (i) debt securities or (ii) any Equity Interests referred to in clause (a) above, in each case at any time prior to the date which is one year after the Final Maturity Date, (c) contains any repurchase obligation that may come into effect either (i) prior to payment in full of all DIP Obligations or (ii) prior to the date that is one year after the Final Maturity Date (other than as a result of a contingent event (provided that the DIP Obligations are first repaid in full)) or (d) provides for scheduled payments or the payment of cash dividends or distributions prior to the date that is one year after the Final Maturity Date.

"Domestic Subsidiary" means any Subsidiary that is not a CFC.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the six (6) calendar years preceding the date of any borrowing hereunder) for employees of any Loan Party or to which any Loan Party has any liability (including any contingent liability with respect to any of its ERISA Affiliates).

"Environmental Actions" means any action, complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment,

-10-

letter, consent decree, settlement or other written communication from any Person or Governmental Authority relating to (a) violation of, non-compliance with or alleged violation of or non-compliance with, any Environmental Law by any Loan Party or any of its Subsidiaries or any of their predecessors in interest in connection with the ownership or operation of the assets, the facilities, the properties or the business of any Loan Party or any of its Subsidiaries or any of their respective predecessors in interest; (b) any actual or alleged liabilities, responsibilities or obligations of any Loan Party or any of its Subsidiaries arising under Environmental Law (i) relating to adverse environmental conditions at, on, under or migrating from any assets, facilities or properties owned or operated by any Loan Party or any of its Subsidiaries or any of their respective predecessors in interest; or (ii) resulting from or in connection with the operation of the assets, the facilities, the properties or the business of any Loan Party or any of its Subsidiaries or any of their respective predecessors in interest; or (c) any Release or threatened Release of Hazardous Materials (i) in, at, on, under, emanating or migrating from or to any assets, properties or businesses owned or operated by any Loan Party or any of its Subsidiaries or any of their respective predecessors in interest, (ii) in, at, on, under, emanating or migrating from any adjoining properties or businesses, or (iii) in, at, on, under, emanating or migrating from any facilities which received Hazardous Materials generated, transported, treated, stored, used or disposed of by any Loan Party or any of its Subsidiaries or any of their respective predecessors in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other present or future federal, state, local or foreign statute, ordinance, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or human health and safety (as it relates to exposure to Hazardous Materials) or relating to the protection of the environment or human health and safety (as it relates to exposure to Hazardous Materials) or the Release, deposit or migration of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, natural resource damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Environmental Action or in connection with any adverse environmental condition at, on, under or migrating from any assets, facilities or properties owned or operated by any Loan Party or any of its Subsidiaries or any of their respective predecessors in interest or any Release of Hazardous Materials resulting from the ownership, lease, sublease or other occupation of property or the operation of any Loan Party or any of its Subsidiaries or any of their respective predecessors in interest.

-11-

NY 76357801v7
NY 76357801v8

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals, registrations or other written documents required by any Governmental Authority under any Environmental Laws.

"Equipment" means equipment (as that term is defined in the Uniform Commercial Code), and includes machinery, machine tools, motors, furniture, furnishings, vehicles (including motor vehicles), computer hardware, tools, parts, and goods (other than consumer goods, farm products, Inventory or fixtures), wherever located, including all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

"Equity Interest" means (a) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, and (b) with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by Parent of any cash capital contributions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" has the meaning specified therefor in Section 2.09(a).

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Existing Blocked Accounts" means "Blocked Accounts" as defined under the Prepetition Term Loan A Financing Agreement and the Prepetition Term Loan B Financing Agreement.

NY 76357801v7
NY 76357801v8

"Existing Control Agreement" means any "Control Agreement" as defined under the Prepetition Term Loan A Financing Agreement and the Prepetition Term Loan B Financing Agreement.

"Existing Credit Card Acknowledgments" means "Credit Card Acknowledgments" as defined under the Prepetition Term Loan A Financing Agreement and the Prepetition Term Loan B Financing Agreement.

"Existing Credit Card Agreements" means "Credit Card Agreements" as defined under the Prepetition Term Loan A Financing Agreement and the Prepetition Term Loan B Financing Agreement.

"Existing Credit Card Issuers" means "Credit Card Issuers" as defined under the Prepetition Term Loan A Financing Agreement and the Prepetition Term Loan B Financing Agreement.

"Existing Credit Card Processor" means any "Credit Card Processor" as defined under the Prepetition Term Loan A Financing Agreement and the Prepetition Term Loan B Financing Agreement.

"Extraordinary Receipts" means any cash received by any Loan Party not in the ordinary course of business (and not consisting of proceeds of Dispositions or Indebtedness), including, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (excluding, so long as no Event of Default has occurred and is continuing, business interruption), (d) proceeds of judgments, proceeds of settlements or other consideration of any kind received in connection with any cause of action, (e) proceeds of condemnation awards (and payments in lieu thereof), and (f) indemnity payments.

"Facility" means any real property, including, without limitation, the land on which such facility is located, all buildings and other improvements thereon, all fixtures located at or used in connection with such facility, all whether now or hereafter existing, owned, leased, operated or used by any Loan Party.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version to the extent such version is substantively comparable and not materially more onerous to comply with) and any regulations promulgated thereunder or official interpretations thereof, and any applicable intergovernmental agreement with respect thereto.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so

-13-

published for any day which is a Business Day, the rate as determined by the Administrative Agent in a commercially reasonable manner.

"Fee Letter" means the fee letter, dated as of the date hereof, among the Borrower and the DIP Agents and any fee letter designated therein as a Fee Letter for the purposes of this Agreement.

"Final Maturity Date" means the earliest of: (i) the Stated Maturity Date, (ii) the date of consummation of any Section 363 Sale, (iii) if the Final Order has not been entered, the date that is thirty (30) calendar days after the Petition Date, (iv) the Plan Effective Date; and (v) the date of the acceleration of the DIP Obligations in accordance with the terms set forth herein.

"Final Order" means a final order of the Bankruptcy Court approving the DIP Facility, the DIP Loans and the DIP Loan Documents in form and substance satisfactory to the DIP Agents, the Required DIP Lenders and the Prepetition Term Loan A Required Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to the possibility of appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agents (at the direction of the Required DIP Lenders) and the Prepetition Term Loan A Required Lenders.

"Financial Statements" means (a) the audited consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended on September 30, 2015, and the related consolidated statement of operations and cash flows for the Fiscal Year then ended, and (b) the unaudited consolidated balance sheet of the Parent and its Subsidiaries for the 11 months ended August 31, 2016, and the related consolidated statement of operations and cash flows for the eleven months then ended.

"Fiscal Year" means the twelve-month annual accounting period of Garden Fresh ending on September 30 of each year.

"Funds Flow Direction" means that certain Funds Flow Direction Letter, dated as of the Closing Date from the Loan Parties to the Administrative Agent and the DIP Lenders.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, provided, however, that for the purpose of Section 7.02 and Section 7.03 hereof and the definitions used therein, "GAAP" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements, provided, further, however, that if there occurs after the date of this Agreement any change in GAAP that affects in any respect any of the covenants contained in Section 7.02 or the calculation of any covenant contained in Section 7.03 hereof, and in each case, the definitions used therein, the Required DIP Lenders and the Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to such negative covenants or the calculation of such financial covenants with the intent of having the respective positions of the DIP Lenders and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 7.02 and Section 7.03 hereof shall be calculated as if no such change in GAAP had occurred.  Notwithstanding

-14-

anything to the contrary contained herein, to the extent a calculation or financial statement item contained herein must be in compliance with GAAP, it is understand and agreed by all parties that Non-Financing Leases shall be treated as operating leases regardless of the GAAP treatment and this aberration from GAAP is permitted and consented to by the Administrative Agent and DIP Lenders.

"Garden Fresh" has the meaning specified therefor in the preamble hereto.

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture agreement, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"Governmental Authority" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed DIP Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" means (a) the Parent and each Subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, and (b) each other Person which guarantees all or any part of the DIP Obligations.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in ARTICLE XI hereof and (b) each other guaranty, in form and substance reasonably satisfactory to the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders guaranteeing all or part of the DIP Obligations.

"Hazardous Material" means (a) any element, compound, chemical, substance, material, or waste that is defined in or regulated under Environmental Law, including those listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws; (b) oil, petroleum, petroleum derived substances, petroleum refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including,

-15-

without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement, in each case, entered into in the ordinary course of business and not for speculation purposes.

"Highest Lawful Rate" means, with respect to any DIP Agent or any DIP Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the DIP Obligations under laws applicable to such DIP Agent or such DIP Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Holdings" means GF Holdings, Inc., a Delaware corporation.

"Holdout Lender" has the meaning specified therefor in Section 12.02(b).

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses or other accounts payable incurred in the ordinary course of such Person's business and not more than 60 days past due, unless the payment of such account payables is being contested in good faith by appropriate proceedings promptly initiated and diligently being conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor), including, without limitation, the fair value of earn-outs and seller notes; (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person (it being understood for the avoidance of doubt that no operating lease shall constitute Indebtedness solely by virtue of a change in GAAP occurring after the Closing Date); (f) all unpaid reimbursement obligations and liabilities, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis reasonably satisfactory to the Required DIP Lenders and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations in respect of the foregoing; and (j) all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of

-16-

such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.  The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer, to the extent such Indebtedness has recourse to such Person.  Any amount of any Indebtedness for which recourse is expressly limited to a specific asset shall be limited to the fair market value of such asset.  For the avoidance of doubt, "Indebtedness" shall not include obligations of the Loan Parties under Non-Financing Leases.

"Indemnified Matters" has the meaning specified therefor in Section 12.15.

"Indemnitees" has the meaning specified therefor in Section 12.15.

"Initial Budget" means a cash flow forecast setting forth all cumulative and line-item cash receipts and expenditures on a weekly basis for the period beginning as of the week of the Closing Date through and including the 13th week after the Closing Date, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Facility for such period, which shall include, among other things, available cash, cash flow, payment of trade payables and ordinary course expenses, total cash expenditures and Capital Expenditures, fees and expenses relating to the DIP Facility, and working capital and other general corporate needs, which forecast shall be in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Required DIP Lenders) and the Prepetition Term Loan A Required Lenders.

"Initial DIP Loans" has the meaning specified therefor in Section 2.01(a).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intercompany Subordination Agreement" means an Intercompany Subordination Agreement made by the Loan Parties in favor of the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders, in form and substance reasonably satisfactory to the Required DIP Lenders.

"Interim Hearing" has the meaning specified therefor in the Interim Order.

"Interim Order" means the interim order entered by the Bankruptcy Court in the Chapter 11 Cases approving the DIP Facility, the DIP Loans and the DIP Loan Documents on an interim basis, in form and substance satisfactory to the Administrative Agent, the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies, materials and finished goods of every nature used or usable in connection with the shipping,

-17-

storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account Receivable or cash, but excluding Equipment.

"Investment" means, with respect to any Person, (x) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts Receivable arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (y) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (z) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP, with the value of each Investment measured at the time made and without giving effect to subsequent changes in value or any write-ups, write-downs or write-offs thereof but giving effect to any return or distributions received by Parent and its Subsidiaries with respect thereto.

"Junior Obligations" means, collectively, principal and interest in respect of the Prepetition Term Loan C Obligations, Prepetition Term Loan D Obligations, and any accrued management fees payable to the Permitted Holders; each of the foregoing is, individually, a "Junior Obligation".

"Lease" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.  For the avoidance of doubt, "Lien" shall not be deemed to include licenses of intellectual property.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrower, in which the Borrower will be charged the DIP Loan and all other DIP Obligations incurred by, the Borrower.

"Loan Party" has the meaning specified therefor in the preamble hereto.

"Management Agreement" means that certain Management Services Agreement, dated as of October 18, 2005, between Garden Fresh and the Sun Manager, as amended by that certain Amendment No. 1 to Management Services Agreement, dated as of October 10, 2012, and that certain Amendment No. 2 to Management Services Agreement, dated as of October 3, 2013, and as amended in accordance with Section 7.02(m) and as in effect on the Petition Date.

-18-

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, business, assets, properties or financial condition of the Loan Parties taken as a whole, (b) the ability of the Loan Parties, taken as a whole, to perform any of their obligations under the DIP Loan Documents, (c) the legality, validity or enforceability of this Agreement, the Orders or any other material DIP Loan Document or any of the Prepetition Term Loan A Loan Documents, (d) the rights and remedies of any DIP Agent or any DIP Lender under the Orders, any DIP Loan Document, or of the Prepetition Term Loan A Agent or any Prepetition Term Loan A Lender under the Orders or any Prepetition Term Loan A Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders (except as otherwise contemplated in this Agreement, the Security Agreement or the Orders) and the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders (except as otherwise contemplated in the Prepetition Term Loan A Loan Documents or the Orders), in each case, on any of the DIP Collateral; provided, that, under clauses (a) through (e), other than the commencement of the Chapter 11 Cases, the continuation of the Chapter 11 Cases and the consequences that would normally result therefrom.

"Material Contract" means, with respect to any Person, (a) the Management Agreement, (b) the Prepetition Term Loan A Loan Documents, (c) the Prepetition Term Loan B Loan Documents, (d) the Prepetition Term Loan C Loan Documents, (e) the Prepetition Term Loan D Loan Documents, (f) the Sponsor Subordinated Debt Documents, and (g) each other contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $1,000,000 or more in any Fiscal Year (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or premium) and (h) all other contracts or agreements the loss of which could reasonably be expected to result in a Material Adverse Effect on such Person (viewed on a consolidated basis with its parent and subsidiary companies).

"Maximum Judgment Amount" has the meaning specified therefor in Section 9.01(k).

"Maximum Term Loan A Principal Amount" has the meaning set forth in the Prepetition Term Loan A/B Intercreditor Agreement for the term "Maximum First Lien Principal Amount".

"Minimum Liquidity" means the sum of (i) all cash amounts on deposit in Existing Blocked Accounts of the Loan Parties and (ii) all pending deposits that are to be credited to such Existing Blocked Accounts minus the sum of (x) the aggregate amount of outstanding un-cashed checks (other than checks with respect to payroll payments) that are to be drawn on such Existing Blocked Accounts and (y) un-cashed checks with respect to payroll payments that are to be drawn on such Existing Blocked Accounts which have been outstanding for more than one (1) week.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

-19-

"Mortgage" means a mortgage, deed of trust or deed to secure debt, in form and substance reasonably satisfactory to the Required DIP Lenders, made by a Loan Party in favor of the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders, securing the DIP Obligations and delivered to the Collateral Agent pursuant to the provisions hereof.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years or to which any Loan Party has any liability (including any contingent liability with respect to any of its ERISA Affiliates).

"Net Cash Proceeds" means, (a) with respect to any Disposition or any Extraordinary Receipts resulting from casualty insurance or condemnation events by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (i) reasonable and documented expenses and transaction costs (including, without limitation, sales commissions and legal, accounting and investment banking fees) related thereto incurred by such Person or such Subsidiary in connection therewith, (ii) any amount required to be provided by such Person, as a reserve, in accordance with GAAP against any liabilities associated with such Disposition or Extraordinary Receipts resulting from casualty insurance or condemnation events, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with any such Disposition or Extraordinary Receipts resulting from casualty insurance or condemnation events (provided however, that the amount of any such reserve, at the time that such reserve is no longer required in accordance with GAAP and to the extent that such amount is not actually applied to the liability for which it was reserved, shall be deemed to be part of the Net Cash Proceeds of such disposition and remitted to the Administrative Agent for application to the DIP Loan in accordance with Section 2.05(c)), and (iii) sales taxes paid by such Person (after taking into account any available tax credits or deductions and any tax sharing arrangements and any tax distributions reasonably expected to be made thereto), (b) with respect to the issuance or incurrence of any Indebtedness by any Person or any of its Subsidiaries, or an Equity Issuance, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary in connection therewith, after deducting therefrom only reasonable and documented expenses and transaction costs (including, without limitation, sales commissions and legal, accounting and investment banking fees) incurred by such Person or such Subsidiary in connection therewith and (c) with respect to Extraordinary Receipts other than those resulting from casualty insurance or condemnation events, the aggregate cash proceeds received by such Person in connection therewith, net of (i) the direct costs incurred in collecting such amount and (ii) taxes paid (after taking into account any available tax credits or deductions and any tax sharing arrangements and any tax distributions reasonably expected to be made thereto); in each case of clause (a) , (b) and (c) to the extent, but only to the extent, that the amounts so deducted are (x) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries (other than a portfolio company controlled by Sun or any of its

-20-

Affiliates) and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"New Lending Office" has the meaning specified therefor in Section 2.09(a).

"Non-Financing Leases" means any lease for real or personal property that are treated as capital or operating leases under GAAP so long as such leases are not, as a matter of economic substance, a secured financing transaction or other means of financing the acquisition or maintenance of such real or personal property.

"Non-U.S. Lender" has the meaning specified therefor in Section 2.09(d).

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"OFAC Sanctions Programs" means the laws, regulations and Executive Orders administered by OFAC, including but not limited to, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as it has been or shall thereafter be renewed, extended, amended, or replaced, and the list of Specially Designated Nationals and Blocked Persons administered by OFAC, as such list may be amended from time to time.

"Operating Account" has the meaning specified therefor in Section 8.01(a).

"Operating Disbursement Variance" has the meaning specified therefor in Section 7.02(t).

"Operating Lease Obligations" means all obligations for the payment of rent for any real or personal property under leases or agreements to lease, other than Capitalized Lease Obligations.

"Orders" means, collectively, the Interim Order and the Final Order, and separately, the Interim Order or the Final Order, as context requires.

"Other Taxes" has the meaning specified therefor in Section 2.09(b).

"paid in full" has the meaning specified in Section 1.02.

"Parent" has the meaning specified therefor in the preamble hereto.

"Participant Register" has the meaning specified therefor in Section 12.07(g).

"Patent Security Agreement" has the meaning specified therefor in the Security Agreement.

"Payment Office" means the Administrative Agent's office located at 225 West Washington Street, Suite 2100, Chicago, IL 60606 (Telephone:  (312) 564-5100), or at such other office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Borrower.

-21-

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Permitted Dispositions" means (a) sales or other dispositions of Inventory to buyers in the ordinary course of business consistent with past practice, (b) sales or other dispositions of surplus, obsolete or worn-out Equipment in the ordinary course of business so long as the aggregate fair market value of all such sales and dispositions does not exceed $200,000, exclusive of anticipated store closures approved by the Required DIP Lenders, during the period from the Closing Date to the Final Maturity Date, (c) the use or transfer of Cash and Cash Equivalents by Parent and its Subsidiaries in a manner that is not prohibited by the terms of this Agreement or the other DIP Loan Documents, (d) the licensing by any Loan Party of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business consistent with past practice, (e) the transfer, assignment, cancellation, abandonment or other disposition of patents, trademarks, copyrights or other intellectual property rights which are, in the reasonable judgment of a Loan Party, no longer used or useful or material in the business of any Loan Party, (f) the granting of licenses, leases or subleases to other Persons in the ordinary course of business consistent with past practice and not materially interfering with the conduct of business of any of the Loan Parties, (g) sales or other dispositions of assets from any Loan Party (other than Parent) to any other Loan Party (other than Parent), (h) the expiration of any contract, contract right or other agreement in accordance with its term, (i) any involuntary condemnation, seizure or taking, by eminent domain or otherwise, or confiscation or requisition of use of property, (j) any insured casualty or destruction of any owned or leased real property (including any Facilities subject to a Mortgage), (k) to the extent approved by the Required DIP Lenders, the termination or sublease of Leases for corporate locations (including central kitchen and distribution locations), (l) to the extent approved in writing by the Required DIP Lenders, the termination or sublease of third-party subleases, (m) to the extent approved by the Prepetition Term Loan A Required Lenders and the Required DIP Lenders, the termination or sublease of Equipment leases, (n) to the extent approved by the Required DIP Lenders in writing, the termination or sublease of Restaurant Leases for underperforming Restaurants; (o) the disposition, pursuant to capital lease agreements or similar arrangements, of Equipment and leasehold improvements located at corporate locations (including central kitchen and distribution locations) or Restaurants to the extent approved by the Prepetition Term Loan A Required Lenders and the Required DIP Lenders in their sole discretion or (p) liquidation sales related to the closure of the underperforming Restaurants set forth on Schedule 1.01(B); provided, however, that Net Cash Proceeds from such liquidation sales in an amount not to exceed $500,000 may be used by the Borrower for operating expenses (and any Net Cash Proceeds from such liquidation sales in excess thereof shall be used to prepay the Prepetition Term Loan A Obligations in accordance with the Prepetition Term Loan A Loan Documents).

"Permitted Holder" means Sun and its Affiliates.

"Permitted Indebtedness" means:

(a)    any Indebtedness owing to any DIP Agent or any DIP Lender under this Agreement and the other DIP Loan Documents;

-22-

(b)     Indebtedness (other than Indebtedness described in clauses (c) and (d) below) listed on Schedule 7.02(b) to the Prepetition Term Loan B Financing Agreement to the extent (x) existing on the Petition Date immediately prior to the Chapter 11 Cases, and (y) permitted under the Prepetition Term Loan B Debt Documents;

(c)     Indebtedness evidenced by Capitalized Lease Obligations entered into in order to finance Capital Expenditures made by the Loan Parties in accordance with the provisions of Section 7.02(g), which Indebtedness, when aggregated with the principal amount of all Indebtedness incurred under this clause (c) and clause (d) of this definition, does not exceed $100,000 at any time outstanding;

(d)     Indebtedness permitted by clause (e) of the definition of "Permitted Lien";

(e)     Intercompany Indebtedness owed from Loan Party to another Loan Party;

(f)     obligations in respect of performance, statutory, customs, stay, utility, bid and appeal bonds and other obligations of a like nature arising in the ordinary course of business and, to the extent not exceeding $750,000 at any time outstanding, performance and surety bonds and similar completion guaranties;

(g)     Indebtedness owed to insurance companies to finance insurance premiums in the ordinary course of business, solely to the extent, and in the aggregate amount not to exceed the amount, outstanding on the Petition Date;

(h)     [Reserved];

(i)     the Prepetition Term Loan A Obligations, the Prepetition Term Loan B Obligations, the Prepetition Term Loan C Obligations and the Prepetition Term Loan D Obligations, solely to the extent that such Prepetition Term Loan A Obligations, Prepetition Term Loan B Obligations, Prepetition Term Loan C Obligations and Prepetition Term Loan D Obligations, and the Liens that secure such Prepetition Term Loan A Obligations, Prepetition Term Loan B Obligations, Prepetition Term Loan C Obligations and Prepetition Term Loan D Obligations (as applicable), are subject to the terms of all intercreditor agreements relating thereto existing on the Petition Date (as modified by, and subject to, the Orders); provided, that the principal amount of the Prepetition Term Loan A shall not at any time exceed the Maximum Term Loan A Principal Amount;

(j)     [Reserved];

(k)     [Reserved];

(l)     Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business consistent with past practice and not to exceed $1,100,000 in the aggregate at any time outstanding (it being agreed, for the avoidance of doubt, that any such obligation shall not be counted toward such cap unless and until such obligation constitutes Indebtedness

-23-

pursuant to the applicable clause of the definition of "Indebtedness" contained in this Section 1.01);

(m)    Indebtedness consisting of Non-Financing Leases;

(n)    Indebtedness in respect of guarantees by a Loan Party in respect of Indebtedness of any other Loan Party permitted hereunder;

(o)    [Reserved];

(p)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts, to the extent such arrangement is customary and is entered into in the ordinary course of business consistent with past practice;

(q)    [Reserved];

(r)    [Reserved];

(s)    [Reserved];

(t)    Indebtedness in connection with the issuance of gift cards to customers in the ordinary course of business consistent with past practice;

(u)    Indebtedness due to any landlord in connection with the financing by such landlord of leasehold improvements, so long as the aggregate outstanding amount of such Indebtedness does not exceed $200,000 in any Fiscal Year or $500,000 in the aggregate at any time;

(v)    [Reserved]; and

(w)    [Reserved].

"Permitted Intercompany Loans" means loans made by a Loan Party to another Loan Party, provided that, in the case of loans made to or by the Parent and/or Holdings, such loan shall only be permitted to the extent a distribution is otherwise permitted to be made under Section 7.02(h).

"Permitted Investments" means:

(x)    Investments in cash and Cash Equivalents;

(y)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business consistent with past practice;

(z)    advances made in connection with purchases of goods or services in the ordinary course of business consistent with past practice;

-24-

(aa)    Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business consistent with past practice or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

(bb)    Investments existing on the date hereof, as set forth on Schedule 7.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof (except for any increase in the value thereof)[1];

(cc)    Permitted Intercompany Loans;

(dd)    Loans and advances by the Borrower to employees for moving, entertainment, travel and other similar expenses in the ordinary course of business not to exceed $100,000 in the aggregate at any time outstanding;

(ee)    equity investments by Parent or any of its Subsidiaries in other Subsidiaries of Parent that are Loan Parties;

(ff)    [Reserved];

(gg)    [Reserved];

(hh)    Investments consisting of endorsements for the collection or deposits in the ordinary course of business consistent with past practice;

(ii)    Investments received in connection with good faith settlement of delinquent accounts receivable and disputes with any customers, franchisees or suppliers in the ordinary course of business consistent with past practice in an aggregate outstanding amount at any one time not in excess of $50,000;

(jj)    [Reserved];

(kk)    Investments in deposit accounts, commodities accounts, securities accounts and other similar accounts opened in the ordinary course of business consistent with past practice so long as such accounts are subject to a control agreement in favor of the Collateral Agent, for the benefit of the Secured Parties;

(ll)    [Reserved];

(mm)    security deposits provided to landlords, utility companies and governmental authorities in the ordinary course of business consistent with past practice;

(nn)    [Reserved]; and

---

[1] Subject to review of Schedule 7.02(e).

-25-

NY 76357801v7
NY 76357801v8

(oo)    Investments consisting of capital lease agreements or similar arrangements for Equipment and leasehold improvements located at corporate locations (including central kitchen and distribution locations) or Restaurants in the amounts not to exceed those set forth in the Approved Budget.

"Permitted Liens" means:

(pp)    the DIP Liens and the Adequate Protection Liens;

(qq)    Liens for taxes, assessments, levies and governmental charges the payment of which is not required under Section 7.01(c) (ignoring for purposes of this definition the phrase "other than a Permitted Lien");

(rr)    Liens imposed by law, such as carriers', warehousemen's, mechanics', landlord's, materialmen's and other similar Liens arising in the ordinary course of business consistent with past practice and securing obligations (other than Indebtedness for borrowed money) that (i) are not overdue by more than 60 days, (ii) are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor and (iii) are not in excess of $25,000 individually or $250,000 in the aggregate and solely to the extent the rights and remedies of the holder of such Lien are stayed or enjoined by the Bankruptcy Court pursuant to the Chapter 11 Cases;

(ss)    (i) purchase money Liens on Equipment acquired or held by any Loan Party or any of its Subsidiaries in the ordinary course of its business consistent with past practice to secure the purchase price of such Equipment or Indebtedness incurred solely for the purpose of financing the acquisition of such Equipment or (ii) Liens existing on such Equipment at the time of its acquisition; provided, however, that (A) no such Lien shall extend to or cover any other property of any Loan Party or any of its Subsidiaries, (B) the principal amount of the Indebtedness secured by any such Lien shall not exceed the lesser of 80% of the fair market value or the cost of the property so held or acquired and (C) the aggregate principal amount of Indebtedness secured by any or all such Liens shall not exceed at any one time outstanding $1,000,000;

(tt)    deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations permitted by clause (f) of the definition of Permitted Indebtedness, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business consistent with past practice and secure obligations not past due or are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(uu)    easements, covenants, conditions, restrictions, rights-of-way, encroachments, environmental institutional control and land use limitations utilized in connection with environmental remedial matters, municipal and zoning restrictions and similar

-26-

charges or encumbrances on real property and minor irregularities in the title thereto that (i) do not (A) secure obligations for the payment of money or (B) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business or (ii) are disclosed in the applicable title insurance policy provided to and accepted by the Collateral Agent;

(vv)     the Prepetition Permitted Priority Liens;

(ww)   Liens on real property or Equipment securing Indebtedness permitted by subsection (c) of the definition of Permitted Indebtedness;

(xx)     any interest or title of a licensor, sublicensor, lessor or sublessor in and to personal property (other than Accounts Receivable or Inventory) licensed, sublicensed, leased or subleased (other than through a Capital Lease) by a Loan Party, in each case extending only to such personal property and incurred in the ordinary course of business consistent with past practice;

(yy)     the Prepetition Term Loan A Liens, the Prepetition Term Loan B Liens, the Prepetition Term Loan C Liens and the Prepetition Term Loan D Liens;

(zz)     judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.01(k) and solely to the extent the rights and remedies of the holder of such Liens are stayed or enjoined by the Bankruptcy Court pursuant to the Chapter 11 Cases;

(aaa)   rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business consistent with past practice and Liens in favor of collecting banks arising under Section 4-210 of the Uniform Commercial Code;

(bbb)   [Reserved];

(ccc)   precautionary UCC financing statement filings regarding operating leases;

(ddd)   [Reserved];

(eee)   unperfected interests of seller to reclaim goods delivered under §2-507 of the Uniform Commercial Code;

(fff)    the landlord's interest in any security deposit provided by any Loan Party under any Lease entered into in the ordinary course of business consistent with past practice;

(ggg)   [Reserved];

(hhh)   [Reserved]; and

(iii)     Liens in favor of insurers (or other Persons financing the payment of insurance premiums) securing Indebtedness of the type described in clause (g) of the definition

-27-

of "Permitted Indebtedness" financing the premiums payable in respect of insurance policies issued by such insurers and existing on the Petition Date; provided that such Liens attach only to returned premiums in respect of such policies and are in existence on the Petition Date (and non-avoidable).

"Permitted Variances" has the meaning specified therefor in Section 7.02(t).

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petition Date" means October [●], 2016.

"PIK Interest " has the meaning specified therefor in Section 2.04(a).

"PIK Loans" has the meaning specified therefor in Section 2.01(b).

"Plan" means a plan of reorganization of the Loan Parties in the Chapter 11 Cases (including all related schedules, supplements, exhibits and orders, as applicable), which shall be in form and substance satisfactory to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

"Plan Effective Date" means the effective date of the Plan.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00%, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any portion of the DIP Loan then outstanding prior to an Event of Default plus 2.00%.

"Prepetition Permitted Priority Liens" means all Liens permitted by the Prepetition Term Loan A Financing Agreement and expressly senior to the Prepetition Term Loan A Liens existing on the Petition Date (solely to the extent any such permitted Liens were incurred and valid, binding, enforceable, properly perfected, and nonavoidable as of the Petition Date).

"Prepetition Term Loan A" means the loans and other credit extensions (including the revolving loans and issuance of letters of credit) made by the Prepetition Term Loan A Lenders pursuant to the Prepetition Term Loan A Financing Agreement.

"Prepetition Term Loan A Agent" means Cerberus, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan A Financing Agreement, together with its successors and assigns in such capacity.

"Prepetition Term Loan A/B Intercreditor Agreement" means the Intercreditor Agreement, dated as of October 3, 2013, by and among the Prepetition Term Loan B Agent, the Prepetition Term Loan B Lenders, the Prepetition Term Loan A Agent, the Prepetition Term Loan A Lenders and the Loan Parties, pursuant to which the Liens granted to the Prepetition

-28-

Term Loan B Agent to secure the Prepetition Term Loan B Obligations are subordinated to the Liens granted to Prepetition Term Loan A Agent, as amended, restated, amended and restated, replaced or otherwise modified from time to time in accordance with the terms thereof.

"Prepetition Term Loan A Financing Agreement" means the Financing Agreement, dated as of the October 3, 2013, by and among the Prepetition Term Loan A Agent, Ares Capital Corporation, as documentation agent, the Prepetition Term Loan A Lenders, and the Loan Parties, as amended, restated, amended and restated, refinanced, replaced or otherwise modified from time to time, in each case to the extent permitted under this Agreement and subject to the Orders.

"Prepetition Term Loan A Lenders" means the Persons party to the Prepetition Term Loan A Financing Agreement as lenders (or letter of credit issuers, as the context dictates) from time to time.

"Prepetition Term Loan A Liens" means all Liens existing on the Petition Date which secure (or purport to secure) the Prepetition Term Loan A Obligations, which Liens have the priorities set forth in the Orders.

"Prepetition Term Loan A Loan Documents" means the "Loan Documents" as defined under the Prepetition Term Loan A Financing Agreement, as amended, restated, amended and restated, refinanced, replaced or otherwise modified from time to time, in each case to the extent permitted under this Agreement and subject to the Orders.

"Prepetition Term Loan A Obligations" means the "Obligations" as defined under the Prepetition Term Loan A Financing Agreement, which principal and letter of credit amounts (exclusive of interest, fees and other amounts) as of the Petition Date was not less than $87,366,250.00.

"Prepetition Term Loan A Required Lenders" means the "Required Lenders" as defined in the Prepetition Term Loan A Financing Agreement..

"Prepetition Term Loan B" means the loans and other credit extensions made by the Prepetition Term Loan B Lenders pursuant to the Prepetition Term Loan B Financing Agreement.

"Prepetition Term Loan B Agent" means Cortland Capital Market Services LLC, a Delaware limited liability company, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan B Financing Agreement, together with its successors and assigns in such capacity.

"Prepetition Term Loan B Financing Agreement" means the Financing Agreement, dated as of the October 3, 2013, by and among the Prepetition Term Loan B Agent, the Prepetition Term Loan B Lenders, and the Loan Parties, as amended, restated, amended and restated, refinanced, replaced or otherwise modified from time to time, in each case to the extent permitted under the Prepetition Term Loan B Financing Agreement, this Agreement and subject to the Orders.

-29-

"Prepetition Term Loan B Lenders" means the Persons party to the Prepetition Term Loan B Financing Agreement as lenders from time to time.

"Prepetition Term Loan B Liens" means all Liens existing on the Petition Date which secure the Prepetition Term Loan B Obligations (solely to the extent any such Liens were incurred and valid, binding, enforceable and properly perfected as of the Petition Date), which Liens have the priorities set out in the Orders; provided that (i) no such Lien shall at any time be extended to cover any additional property not subject thereto on the Petition Date and (ii) the principal amount of the Indebtedness secured by such Liens shall not be extended, renewed, refunded or refinanced.

"Prepetition Term Loan B Loan Documents" means the Prepetition Term Loan B Financing Agreement and all agreements, instruments and documents executed and delivered in connection therewith, as amended, restated, amended and restated, refinanced, replaced or otherwise modified from time to time, in each case to the extent permitted under this Agreement and subject to the Orders.

"Prepetition Term Loan B Obligations" means any obligations with respect to the Prepetition Term Loan B (including without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto), which as of the Petition Date was equal to $35,662,159.70.

"Prepetition Term Loan C" means the loans made by the Prepetition Term Loan C Lenders pursuant to the Prepetition Term Loan C Financing Agreement.

"Prepetition Term Loan C Agent" means Apollo, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan C Financing Agreement, together with its successors and assigns in such capacity.

"Prepetition Term Loan C/D Intercreditor Agreement" means the Intercreditor and Subordination Agreement, dated as of October 3, 2013, by and among the Prepetition Term Loan D Agent and the Prepetition Term Loan D Lenders, the Prepetition Term Loan C Agent and the Prepetition Term Loan C Lenders, the Prepetition Term Loan B Agent, the Prepetition Term Loan B Lenders, the Prepetition Term Loan A Agent, the Prepetition Term Loan A Lenders and the Loan Parties, pursuant to which the Liens granted to the Prepetition Term Loan C Agent and the Prepetition Term Loan D Agent to secure the Prepetition Term Loan C Obligations and the Prepetition Term Loan D Obligations, respectively, are subordinated in right of payment to the payment in full of the Prepetition Term Loan A Obligations and the Prepetition Term Loan B Obligations and to the Liens granted to the Prepetition Term Loan A Agent and the Prepetition Term Loan B Agent, as amended, restated, amended and restated, replaced or otherwise modified from time to time in accordance with the terms thereof.

"Prepetition Term Loan C Financing Agreement" means the Prepetition Term Loan Agreement, dated as of October 3, 2013, by and among the Prepetition Term Loan C Agent, Apollo, as a lender, Sun Garden Fresh Finance, LLC, a Delaware limited liability company, as a lender, and the Loan Parties, as amended, restated, amended and restated,

-30-

refinanced, replaced or otherwise modified from time to time, in each case to the extent permitted under this Agreement and the Orders.

"Prepetition Term Loan C Lenders" means the Persons party to the Prepetition Term Loan C Financing Agreement as lenders from time to time.

"Prepetition Term Loan C Loan Documents" means the Prepetition Term Loan C Financing Agreement and all agreements, instruments and documents executed and delivered in connection therewith, as amended, restated, amended and restated, refinanced, replaced or otherwise modified from time to time, in each case to the extent permitted under this Agreement and the Orders.

"Prepetition Term Loan C Obligations" means any obligations with respect to the Prepetition Term Loan C (including without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto), which as of the Petition Date was equal to $19,804,836.85.

"Prepetition Term Loan D" means the loans made by the Prepetition Term Loan D Lenders pursuant to the Prepetition Term Loan D Financing Agreement.

"Prepetition Term Loan D Agent" means Apollo, in its capacity as administrative agent and collateral agent under the Prepetition Term Loan D Financing Agreement, together with its successors and assigns in such capacity.

"Prepetition Term Loan D Financing Agreement" means the Prepetition Term Loan Agreement, dated as of October 3, 2013, by and among the Prepetition Term Loan D Agent, the Prepetition Term Loan D Lenders and the Loan Parties, as amended, restated, amended and restated, refinanced, replaced or otherwise modified from time to time, in each case to the extent permitted under this Agreement and the Orders.

"Prepetition Term Loan D Lenders" means the Persons party to the Prepetition Term Loan D Financing Agreement as lenders from time to time.

"Prepetition Term Loan D Loan Documents" means the Prepetition Term Loan D Financing Agreement and all agreements, instruments and documents executed and delivered in connection therewith, as amended, restated, amended and restated, refinanced, replaced or otherwise modified from time to time in accordance with the terms thereof, in each case to the extent permitted under this Agreement and the Orders.

"Prepetition Term Loan D Obligations" means any obligations with respect to the Prepetition Term Loan D (including without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto), which as of the Petition Date was equal to $51,944,897.38.

"Pro Rata Share" means the percentage obtained by dividing (i) such DIP Lender's DIP Loan Commitment, by (ii) the Total DIP Loan Commitment, provided that if the Total DIP Loan Commitment has been reduced to zero, the numerator shall be the aggregate

-31-

unpaid principal amount of such DIP Lender's portion of the DIP Loan and the denominator shall be the aggregate unpaid principal amount of all DIP Loans.

"Purchase Option" has the meaning set forth in the Orders.

"Qualified Equity Interests" means, with respect to any Person, all Equity Interests of such Person that are not Disqualified Equity Interests.

"Receipts Line" has the meaning specified therefor in Section 7.02(t).

"Register" has the meaning specified therefor in Section 12.07(d).

"Registered Loans" has the meaning specified therefor in Section 12.07(d).

"Regulation T," "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, (i) an Affiliate of such Person, or (ii) a fund or account managed or advised by (A) such Person or (B) an Affiliate of or investment manager or adviser to such Person.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or real property.

"Remedial Action" means all actions required by Environmental Laws taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, investigate or in any other way address Hazardous Materials; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the environment; (c) restore or reclaim natural resources of the environment; (d) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (e) perform any other actions authorized by 42 U.S.C. § 9601 et seq.

"Remedies Notice Period" has the meaning ascribed to such term in the Orders, as applicable.

"Replacement DIP Lender" has the meaning specified therefor in Section 12.02(b).

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

NY 76357801v7
NY 76357801v8

"<u>Required DIP Lenders</u>" means DIP Lenders whose Pro Rata Shares aggregate more than 50%.

"<u>Requirements of Law</u>" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Restaurant</u>" means a restaurant owned and operated by the Loan Parties.

"<u>Restaurant Leases</u>" means, collectively, all leases or subleases of restaurants entered into by Parent and its Subsidiaries, in each case as lessee or sublessee thereunder and in each case as the same is from time to time amended, restated, modified or supplemented.

"<u>Restructuring Support Agreement</u>" means that certain Forbearance and Restructuring Support Agreement dated as of [●], 2016 by and among the Loan Parties, each Prepetition Term Loan A Lender party thereto as a Consenting TLA Lender, each Prepetition Term Loan B Lender party thereto as a Consenting TLB Lender, each Prepetition Term Loan C Lender party thereto as a Consenting TLC Lender, each Prepetition Term Loan D Lender party thereto as a Consenting TLD Lender, each person party thereto as a Consenting Equity Holder, the Prepetition Term Loan A Agent, the Prepetition Term Loan B Agent, the Prepetition Term Loan C Agent, the Prepetition Term Loan D Agent and Sun Capital Partners Management IV, LLC.

"<u>SEC</u>" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"<u>Section 363 Order</u>" means a final order issued by the Bankruptcy Court approving a Section 363 Sale, which such final order shall be in form and substance satisfactory to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

"<u>Section 363 Sale</u>" means a sale of all or substantially all of the Loan Parties' assets to the winning bidder at an Auction pursuant to Bankruptcy Code section 363 and the Section 363 Order.

"<u>Secured Parties</u>" means the DIP Lenders and the DIP Agents.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"<u>Securitization</u>" has the meaning specified therefor in Section 12.07(j).

NY 76357801v7
NY 76357801v8

"Security Agreement" means a Pledge and Security Agreement, in form and substance reasonably satisfactory to Required DIP Lenders, made by a Loan Party in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit B, securing the DIP Obligations and delivered to the Collateral Agent.

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person on a going concern basis is not less than the total amount of the liabilities of such Person, (b) the present fair salable value of the assets of such Person on a going concern basis is not less than the amount that will be required to pay the probable liability of such Person on its existing debts as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (e) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital.

"Sponsor Subordinated Debt" means, collectively, any Indebtedness (including without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto) owing to an Affiliate of Sun incurred prior to and outstanding on the Petition Date.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGrawHill Companies, Inc. and any successor thereto.

"Stated Maturity Date" means October [●], 2017.

"Subordinated Indebtedness" means all Indebtedness (including, without limitation, the Prepetition Term Loan C Obligations, the Prepetition Term Loan D Obligations and any Sponsor Subordinated Debt) of any Loan Party incurred prior to and existing on the Petition Date which has been expressly subordinated in right of payment to all Prepetition Term Loan A Obligations and Prepetition Term Loan B Obligations.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person; provided, that Associated Concepts Group, LLC shall not be deemed to be a Subsidiary.

"Sun" means Sun Garden Fresh, LLC.

-34-

"Sun Manager" means Sun Capital Partners Management IV, LLC.

"Superpriority Claims" means, collectively, all superpriority administrative expense claims (having the priorities set forth in the Orders) of (a) the DIP Agents and the DIP Lenders on account of the DIP Obligations, (b) the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders on account of the Prepetition Term Loan A Obligations and (c) the Prepetition Term Loan B Agent and the Prepetition Term Loan B Lenders on account of the Prepetition Term Loan B Obligations, which claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out.

"Taxes" or "taxes" has the meaning specified therefor in Section 2.09(a).

"Termination Event" means (a) a Reportable Event with respect to any Employee Plan, (b) any event that causes any Loan Party to incur liability (including any such liability that a Loan Party is liable for with respect to any ERISA Affiliate) under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition which could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan.

"Test Date" means, for all purposes hereunder, the second Sunday of each two week period commencing with the second full week after the Closing Date (which such first "Test Date", for the avoidance of doubt, shall be October 23, 2016).

"Test Period" means, with respect to each Test Date, the cumulative period commencing on the Petition Date and ending on such Test Date.

"TLA Event of Default" has the meaning specified therefor in the Orders.

"Total DIP Loan Commitment" means the sum of the amounts of the DIP Lenders' DIP Loan Commitments.

"Total Receipts Variance" has the meaning specified therefor in Section 7.02(t).

"Trademark Security Agreement" has the meaning specified therefor in the Security Agreement.

"Transferee" has the meaning specified therefor in Section 2.09(a).

"Treasury Rate" means, as of any date of determination, the yield to maturity as of such date of determination of United States Treasury securities with a constant maturity (as

-35-

compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two (2) Business Days prior to such date of determination (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date of determination until the second anniversary of the Closing Date.

"Ultimate Parent" means Garden Fresh Restaurant Intermediate Holding, LLC, a Delaware limited liability company.

"Uniform Commercial Code" has the meaning specified therefor in Section 1.04.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001).

"US Dollars", "US Dollar", "US$" and the symbol "$"each means lawful currency of the United States of America.

"Variance Report" has the meaning specified therefor in Section 7.01(a)(xxi).

"WARN" has the meaning specified therefor in Section 6.01(z).

Section 1.02   Terms Generally.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and (f) all references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Except as specified in Section 4.03(d) hereof, any reference herein or in any other DIP Loan Document to "paid in full" or words of similar import (including, without limitation, any words qualified by "in cash") relating to the satisfaction or repayment in full of the DIP Obligations shall mean the repayment in full in cash of all DIP Obligations other than unasserted contingent indemnification DIP Obligations.

-36-

Section 1.03    Certain Matters of Construction.  References in this Agreement to "determination" by any DIP Agent or the Required DIP Lenders include good faith estimates by such DIP Agent or the Required DIP Lenders (in the case of quantitative determinations) and good faith beliefs by such DIP Agent or the Required DIP Lenders (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist (provided that the DIP Agents or the Required DIP Lenders shall not be deemed to have any knowledge of such an Event of Default unless the DIP Agents or the Required DIP Lenders have actual knowledge or have received written notice thereof) at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement and the Orders or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required DIP Lenders and, to the extent expressly required hereunder, the Prepetition Term Loan A Agent and/or the Prepetition Term Loan A Required Lenders.  Any Lien referred to in this Agreement or any other DIP Loan Document as having been created in favor of any DIP Agent, any agreement entered into by any DIP Agent pursuant to this Agreement or any other DIP Loan Document, any payment made by or to or funds received by any DIP Agent pursuant to or as contemplated by this Agreement or any other DIP Loan Document, or any act taken or omitted to be taken by any DIP Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the DIP Agents and the DIP Lenders.  Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other DIP Loan Document, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Loan Party or (ii) the knowledge that a senior officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

Section 1.04    Accounting and Other Terms.

(a)    Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP applied on a basis consistent with those used in preparing the Financial Statements.  Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.  Notwithstanding anything to

-37-

the contrary contained herein, to the extent a calculation or financial statement item contained herein must be in compliance with GAAP, it is understood and agreed by all parties that Non-Financing Leases shall be treated as operating leases regardless of the GAAP treatment and this aberration from GAAP is permitted and consented to by the Required DIP Lenders. Notwithstanding anything in this Agreement to the contrary, any change in GAAP or the application or interpretation thereof that would require operating leases to be treated in the same manner as a capital lease shall not be given effect in the definitions of Indebtedness or Liens or any related definitions or in the computation of any financial covenant.

(b)     All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Collateral Agent may otherwise determine.

Section 1.05   Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any DIP Agent or DIP Lender, such period shall in any event consist of at least one full day.

## ARTICLE II

## THE LOAN

Section 2.01   DIP Loan Commitments.

(a)     Subject to the terms and conditions of this Agreement, the Orders and the Approved Budget, and in reliance upon the representations and warranties set forth herein, each DIP Lender agrees (severally, not jointly) to make the following advances to the Borrower (each a "DIP Loan Advance") in respect of the DIP Loan: (i) an initial DIP Loan Advance on the Closing Date in an amount equal to such DIP Lender's Pro Rata Share of an aggregate principal amount not exceeding $1,000,000 (the "Initial DIP Loan") and (ii) one or more additional DIP Loan Advances in an amount equal to such DIP Lender's Pro Rata Share of an aggregate principal amount not exceeding $1,000,000 unless otherwise agreed (the "Delayed-Draw DIP Loans"), in each case, on any Business Day during the Availability Period as follows (x) a DIP Loan Advance in an aggregate principal amount equal to $2,000,000 on or about the date on which the Final Order is entered, (y) on the date of consummation of the transaction contemplated by Restructuring Support Agreement, a DIP Loan Advance in an aggregate principal amount equal to $500,000 and (z) on any date after the DIP Loan Advance described in clause (x), to the extent of an increase in aggregate DIP Loan Commitments pursuant to the terms hereof, a DIP Loan Advance in an aggregate principal amount of such increase.  Each

NY 76357801v7
NY 76357801v8

Borrowing shall consist of DIP Loan Advances made simultaneously by the DIP Lenders in accordance with their respective Pro Rata Share of the Total DIP Loan Commitment, provided, however, in no event shall any DIP Lender be required to make any DIP Loan Advance in an amount, when taken together with all other DIP Loan Advances made hereunder by such DIP Lender, that exceeds such DIP Lender's DIP Loan Commitment. Each DIP Loan shall only be required to be made, and may only be requested by the Borrower, if, and only if, the Approved Budget shows a need for such amounts in the immediately subsequent week, as determined by the Required DIP Lenders.

(b)     Each DIP Lender also severally agrees that, from and after the date of any PIK Interest payment, the amount of such PIK Interest payment shall be an additional loan to the Borrower by such DIP Lender in a principal amount equal to such DIP Lender's Pro Rata Share of such PIK Interest payment (all such PIK Interest payments from time to time, collectively, the "PIK Loans").

(c)     Any principal amount of the DIP Loan which is repaid or prepaid may not be reborrowed.

(d)     At the written request of the Borrower, the DIP Lenders may choose to increase the aggregate DIP Loan Commitments in an additional amount (i) in their sole discretion, not to exceed $500,000 in the aggregate together with any outstanding Collateral Agent Advance provided under Section 10.08(a), (ii) in their discretion, with the consent of the Prepetition Term Loan A Required Lenders, not to exceed $4,500,000 in the aggregate and (iii) in their sole discretion, that is required solely for purposes of making any adequate protection payments to the Prepetition Term Loan A Lenders as required pursuant to the applicable Order.

-39-

Section 2.02    Making the DIP Loans.

(a)    For each Borrowing, the Borrower shall give the Administrative Agent prior written notice (in substantially the form of Exhibit C hereto (a "Notice of Borrowing")), not later than 12:00 noon (New York City time) on the date which is three (3) Business Days prior to the proposed date of Borrowing (or such shorter period as the Required DIP Lenders and the Administrative Agent are willing to accommodate). Such Notice of Borrowing shall specify the proposed date of Borrowing, which must be a Business Day, and the account of the Borrower (including wiring instructions) into which any of the DIP Loan proceeds are to be distributed. The Administrative Agent and the DIP Lenders may act without liability upon the basis of written or telecopied notice believed by the Administrative Agent in good faith to be from the Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Borrower to the Administrative Agent). The Administrative Agent and each DIP Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request the Initial DIP Loan on behalf of the Borrower until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the DIP Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing. Each DIP Loan requested hereunder shall be in incremental amounts equal to $1,000,000; provided, however, a requested DIP Loan may be lower to the extent any remaining DIP Loan Commitment is less than $1,000,000.

(b)    Any DIP Loan under this Agreement shall be made by each DIP Lender on the relevant date of Borrowing in the amount of such DIP Lender's DIP Loan Commitment, it being understood that no DIP Lender shall be responsible for any default by any other DIP Lender in that other DIP Lender's obligations to make a DIP Loan in the amount of such DIP Lender's DIP Loan Commitment, nor shall the DIP Loan Commitment of any DIP Lender be increased or decreased as a result of the default by any other DIP Lender in that other DIP Lender's obligation to make a DIP Loan in the amount of such DIP Lender's DIP Loan Commitment, and each DIP Lender shall be obligated to make the DIP Loan required to be made by it by the terms of this Agreement regardless of the failure to do so by any other DIP Lender. Following receipt of a Notice of Borrowing, the Administrative Agent shall notify each DIP Lender of its Pro Rata Share of such Borrowing. Each DIP Lender shall send its Pro Rata Share of such Borrowing to the Administrative Agent at the Administrative Agent's Account by wire transfer of immediately available funds no later than 12:00 noon on the proposed Borrowing date. Upon receipt of all such requested funds and confirmation of the conditions precedent being met, Administrative Agent shall send the funds to the Borrower at the account specified in the Notice of Borrowing.

Section 2.03    Repayment of DIP Loans; Evidence of Debt.

(a)    The entire outstanding unpaid principal amount of the DIP Loan and all accrued and unpaid interest thereon and fees and expenses hereunder, shall be due and payable on the Final Maturity Date or, if earlier, the date of acceleration in accordance with the terms hereto.

-40-

(b)     Each DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such DIP Lender resulting from the DIP Loan made by such DIP Lender, including the amounts of principal and interest payable and paid to such DIP Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of the DIP Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each DIP Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the DIP Lenders and each DIP Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to Section 2.03(c) or Section 2.03(d) shall, absent manifest error, be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any DIP Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the DIP Loan in accordance with the terms of this Agreement. If there is any conflict between the accounts maintained by the DIP Lender pursuant to Section 2.03(b) and the accounts maintained by the Administrative Agent pursuant to Section 2.03(c), the accounts maintained by the Administrative Agent shall control.

(e)     Any DIP Lender may request that the DIP Loan made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such DIP Lender a promissory note payable to the order of such DIP Lender (or, if requested by such DIP Lender, to such DIP Lender and its registered assigns) in a form reasonably acceptable to the Borrower and requesting DIP Lender. Thereafter, the DIP Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(f)     The Total DIP Loan Commitments shall be permanently reduced by an amount equal to the amount of each DIP Loan Advance extended upon the making of such DIP Loan Advance and each DIP Lender's DIP Loan Commitment shall be permanently reduced on a pro rata basis with the amount of such DIP Lender's DIP Loan Advance. Notwithstanding the foregoing, all of the DIP Commitments shall automatically terminate at the earlier of (x) 5:00 p.m., New York time, on [●]$^2$, 2016 if the Closing Date shall have not occurred by such time and (y) upon the occurrence of a Change of Control.

Section 2.04    Interest.

(a)     Interest Rate. The DIP Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of each advance of the DIP Loan until repaid, at a rate per annum equal to 15.50%, consisting solely of paid-in-kind interest, which amount shall be added to the principal amount of the DIP Loan pursuant to clause (c) below ("PIK Interest").

---

$^2$ NTD: This date should be 5 Business Days after the Petition Date.

-41-

(b)    Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, the DIP Loans and all fees, indemnities or any other DIP Obligations of the Loan Parties under this Agreement and the other DIP Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.  For the avoidance of doubt, Post-Default Rate interest in excess of the rate of interest then otherwise applicable shall be due and payable in cash.

(c)    Interest Payment.  Interest on the DIP Loan shall accrue monthly and shall be paid in kind by being added to the principal amount of the DIP Loan monthly, in arrears, on the first Business Day of the next succeeding calendar month, after which time such PIK Interest amounts shall be considered principal of the DIP Loan for all purposes under this Agreement and shall be payable at maturity (whether upon demand, by acceleration or otherwise), provided, that any interest at the Post-Default Rate (in excess of the rate of interest that would have otherwise been applicable) shall be payable on demand, in cash and paid by wire transfer of immediately available US Dollar funds to the Administrative Agent's Account.

(d)    General.  All interest on the DIP Loan shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05    Reduction of DIP Loan Commitments; Prepayment of DIP Loan.

(a)    Reduction of DIP Loan Commitments.  The Total DIP Loan Commitment shall terminate upon the making of the DIP Loans on or after the Closing Date.

(b)    Optional Prepayment.  The Borrower may not voluntarily prepay the principal of the DIP Loan, in whole or in part, without the prior written consent of the Required DIP Lenders and the Prepetition Term Loan A Required Lenders provided that, in the event of a 100% refinancing of the DIP Loan Obligations, such consent shall only be required from the Required DIP Lenders (in which case, prior notice shall be sent to the Administrative Agent at least one Business Day prior to such prepayment).

(c)    Mandatory Prepayment.

(i)    [Reserved.]

(ii)    [Reserved.]

(iii)    [Reserved.]

(iv)    [Reserved]

(v)    Immediately upon any (A) Disposition (other than with respect to any Lease, addressed in clause (B) below) by any Loan Party or its

-42-

Subsidiaries (excluding a Permitted Disposition of the type described in clauses (a), (b), (c), (d), (f), (g), (h), (k), (l) and (p) (and, with respect to clause (p), not to exceed the $500,000 provided therein) of the definition of Permitted Disposition), the Borrower shall prepay the outstanding principal amount of, <u>first</u>, the Prepetition Term Loan A Obligations in accordance with the Prepetition Term Loan A Financing Agreement, and, <u>second</u>, if the Prepetition Term Loan A Obligations have been repaid in full in cash, the DIP Loan in accordance with clause (d) below and (B) Disposition with respect to any Lease by any Loan Party or its Subsidiaries, the Borrower shall repay the outstanding principal amount of, <u>first</u>, the DIP Loan in accordance with clause (d) below and, <u>second,</u> if the DIP Loan has been repaid in full in cash, the Prepetition Term Loan A Obligations in accordance with the terms in the Prepetition Term Loan A Financing Agreement, in each case, under clauses "first" and "second" under clauses (A) and (B), in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition. Nothing contained in this Section 2.05(c)(v) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than a Permitted Disposition.

(vi)     Immediately upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrower shall, with 100% of the Net Cash Proceeds thereof, prepay the outstanding principal amount of, <u>first,</u> the Prepetition Term Loan A Obligations in accordance with the Prepetition Term Loan A Financing Agreement, and, <u>second</u>, if the Prepetition Term Loan A Obligations have been repaid in full in cash, the DIP Loan in accordance with clause (d) below.  The provisions of this Section 2.05(c)(vi) shall not be deemed to be implied consent to any such issuance or incurrence of Indebtedness otherwise prohibited by the terms and conditions of this Agreement. Notwithstanding the foregoing, the requirement in this Section 2.05(c)(vi) to prepay the Prepetition Term Loan A Obligations prior to payment of the DIP Obligations shall not apply to the proceeds of any Indebtedness issued or incurred for the purposes of refinancing 100% of the outstanding DIP Obligations and any Net Cash Proceeds of such Indebtedness shall first be used to prepay the outstanding DIP Obligations.

(vii)    Immediately upon the receipt by any Loan Party or any of its Subsidiaries of any (A) Extraordinary Receipts (other than with respect to any Lease), the Borrower shall prepay the outstanding principal of <u>first</u>, the Prepetition Term Loan A Obligations in accordance with the terms in the Prepetition Term Loan A Financing Agreement, and <u>second</u>, if the Prepetition Term Loan A Obligations have been repaid in full in cash, the DIP Loan in accordance with clause (d) below, and (B) Extraordinary Receipts with respect to any Lease, the Borrower shall prepay the outstanding principal of <u>first,</u> the DIP Loan in accordance with clause (d) below, and <u>second,</u> if

-43-

the DIP Loan has been repaid in full in cash, the Prepetition Term Loan A Obligations in accordance with the terms in the Prepetition Term Loan A Financing Agreement, in each case under clauses "first" and "second" of clauses (A) and (B), in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable and documented fees, costs and expenses incurred in collecting such Extraordinary Receipts.

(d)     Application of Payments; DIP Lender Option to Decline Mandatory Prepayments.  Borrower shall provide the Administrative Agent and the Prepetition Term Loan A Agent at least five (5) Business Days prior written notice of any mandatory prepayment required under Section 2.05(c) above, and each such notice shall specify the reason for the prepayment and shall include a detailed calculation of the amount required to be prepaid hereunder.  Upon receipt of each such notice, Administrative Agent shall promptly notify the DIP Lenders of the mandatory prepayment, and in the event that each DIP Lender shall have the right in its sole discretion to decline such prepayment by sending notice of such to the Administrative Agent at least two (2) Business Days prior to the date of prepayment.  If any DIP Lender fails to decline such prepayment at least two (2) Business Days prior to the date of prepayment, then such DIP Lender will be deemed to have accepted the prepayment.  Each prepayment required to be made pursuant to Section 2.05(c) above that is not timely declined by a DIP Lender shall be paid by Borrower and applied to such DIP Lender's Pro Rata Share of the DIP Loan.  Any prepayment proceeds timely declined by a DIP Lender may be retained by the Borrower.  Notwithstanding any other provision contained herein to the contrary, the DIP Agents and the DIP Lenders acknowledge and agree that, to the extent of any inconsistency between this Agreement and the terms of any Lease with respect to the application and use of any casualty or condemnation proceeds received by any tenant under such Lease which is a Borrower under this Agreement, the terms of such Lease shall prevail and no Borrower shall be required to be in default of any such Lease in order to comply with this Agreement.

(e)     Interest and Fees.  Any prepayment made on the DIP Loan pursuant to this Section 2.05 shall be accompanied by (i) accrued interest on the principal amount being prepaid to the date of prepayment and (ii) the payment of all fees and expenses accrued to such date pursuant to this Agreement and the other DIP Loan Documents.

(f)     Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05.

Section 2.06   Fees.

(a)     [Reserved]

(b)     Audit and Collateral Monitoring Fees.  The Borrower acknowledges that pursuant to Section 7.01(f), representatives of the Required DIP Lenders may visit any or all of the Loan Parties and/or conduct audits, inspections, appraisals and/or valuations of any or all of the Loan Parties in a manner so as to not unduly disrupt the business of the Loan Parties, provided, that, if the Required DIP Lenders elect to exercise their rights hereunder, they shall provide to the Prepetition Term Loan A Agent reasonable prior notice in order for the Prepetition

-44-

Term Loan A Agent or the Prepetition Term Loan A Lenders to participate in any audits, inspections, appraisals and/or valuations. The Borrower agrees to pay the reasonable out-of-pocket cost of all visits, audits, inspections, appraisals and valuations conducted by a third party on behalf of the DIP Agents or the Required DIP Lenders. The foregoing notwithstanding, so long as no Event of Default has occurred and is continuing, the Borrower shall not be required to pay for more than one such visit, audit or inspection during any Fiscal Year.

(c)  Fee Letter.  As and when due and payable under the terms of the Fee Letter, the Borrower shall pay the fees and amounts set forth in the Fee Letter. Such fees and amounts shall be fully earned when paid and should not be refundable under any circumstance.

Section 2.07   [Reserved.]

Section 2.08   [Reserved.]

Section 2.09   Taxes.

(a)  Any and all payments by any Loan Party hereunder or under any other DIP Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto ("Taxes" or "taxes"), except for (i) taxes imposed on the net income (however denominated) (or franchise taxes imposed in lieu thereof) of any DIP Agent or any DIP Lender (or any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")) or, in the case of a pass-through entity, any of its beneficial owners by the United States or the jurisdiction in which such Person is organized or has its principal lending office, or with which such person has any other present or former connection (other than a connection arising solely from entering into, receiving any payment under or enforcing its rights under this Agreement or any other DIP Loan Document), (ii) any branch tax profits imposed by the United States or any similar tax imposed by any other jurisdiction in which such Loan Party is located or (iii) any U.S. federal withholding taxes imposed under FATCA (each such tax, an "Excluded Tax"), (all nonexcluded taxes, levies, imposts, deductions, charges withholdings and liabilities, collectively or individually, imposed on any payment by any Loan Party or on account of any DIP Obligation hereunder, "Indemnified Taxes"). If any Loan Party shall be required to deduct any Indemnified Taxes from or in respect of any sum payable hereunder to any DIP Agent or any DIP Lender (or any Transferee), (i) the sum payable shall be increased by the amount (an "Additional Amount") necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.09) such DIP Agent or such DIP Lender (or such Transferee) shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)  In addition, each Loan Party agrees to pay to the relevant Governmental Authority in accordance with applicable law any present or future stamp, documentary, intangibles, transfer, recording or filing taxes or any other excise or property taxes, charges or similar taxes or levies that arise from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security

-45-

interest under, or otherwise with respect to, this Agreement or any other DIP Loan Document ("Other Taxes"). Each Loan Party shall deliver to each DIP Agent and each DIP Lender official receipts in respect of any Indemnified Taxes or Other Taxes payable hereunder promptly after payment of such Indemnified Taxes or Other Taxes.

(c)     The Loan Parties hereby jointly and severally indemnify and agree to hold each DIP Agent and each DIP Lender harmless from and against Indemnified Taxes and Other Taxes (including, Indemnified Taxes and Other Taxes imposed on any amounts payable under this Section 2.09) paid by such Person, whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Indemnified Taxes or Other Taxes.

(d)     Each DIP Lender (or Transferee) that is organized under the laws of a jurisdiction outside the United States (a "Non-U.S. Lender") agrees that it shall, no later than the Closing Date deliver to the Borrower or the Administrative Agent (who shall promptly provide a copy thereof to the Borrower) (or, in the case of a participant, to the DIP Lender granting the participation only) a properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI or W-8IMY (including the appropriate attachments thereto) or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax and payments of interest hereunder along with any other appropriate documentation establishing such exemption or reduction. If a payment made to any DIP Lender by or on account of any DIP Loan Documents hereunder would be subject to U.S. federal withholding Tax imposed under FATCA if such recipient fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such other documentation reasonably requested by the Borrower or the Administrative Agent sufficient for the Borrower or the Administrative Agent to comply with their obligations under FATCA and to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (d)(i), "FATCA" shall include any amendment made to FATCA after the date of this Agreement. In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Non-U.S. Lender shall provide a certificate to the Administrative Agent and the Borrower in which it represents to the Administrative Agent and the Borrower that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Internal Revenue Code is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of Parent and is not a controlled foreign corporation related to Parent (within the meaning of Section 864(d)(4) of the Internal Revenue Code), and such Non-U.S. Lender agrees that it shall promptly notify the Administrative Agent and the Borrower (or, in the case of a participant, the DIP Lender granting the participation only) in the event any such representation is no longer accurate. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes

-46-

a Transferee hereunder) and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "New Lending Office"). In addition, such Non-U.S. Lender shall deliver such forms within 20 days after receipt of a written request therefor from the Administrative Agent, the assigning DIP Lender or the DIP Lender granting a participation, as applicable. If the lapse of time or a change in circumstances renders a previous certification obsolete or inaccurate in any material respect, the Non-U.S. Lender shall deliver to the Administrative Agent (who shall promptly deliver a copy thereof to the Borrower) (or, in the case of a participant, to the DIP Lender granting the participation only) new, properly completed and duly executed copies of the applicable Internal Revenue Service Form establishing such exemption or reduction and any related documentation as may be required to establish such Non-U.S. Lender's entitlement to a continued exemption from or reduction in United States withholding tax if such Non-U.S. Lender or beneficial owner continues to be so entitled.

(i)     Each DIP Lender (or Transferee) and DIP Agent that is a "United States person" (within the meaning of Section 7701(a)(30) of the Internal Revenue Code) (each a "U.S. Lender") agrees that it shall, no later than the Closing Date (or, in the case of a DIP Lender which becomes a party hereto pursuant to Section 12.07 after the Closing Date, promptly after the date upon which such DIP Lender becomes a party hereto) deliver to the Administrative Agent (who shall promptly provide a copy thereof to the Borrower or, in the case of a participant, to the DIP Lender granting the participation only) a complete and duly executed copy of Internal Revenue Service Form W-9 or successor form certifying that such DIP Lender (or Transferee) is not subject to United States backup withholding tax on the date it becomes a party to this Agreement. In addition, such U.S. Lender shall deliver such forms within 20 days after receipt of a written request therefore from the Administrative Agent, the assigning DIP Lender or the DIP Lender granting a participation, as applicable.

(ii)    Notwithstanding any other provision of this Section 2.09, a DIP Lender shall not be required to deliver any form pursuant to this Section 2.09(d) that such DIP Lender is not legally able to deliver. Upon written request by the Borrower, the Administrative Agent shall provide to the Borrower any U.S. Internal Revenue Service Form received by the Administrative Agent pursuant to clauses (d)(i) and (d)(ii) above.

(e)     The Loan Parties shall not be required to indemnify any DIP Lender, DIP Agent or Transferee, or pay any additional amounts to any DIP Lender, DIP Agent or Transferee, in respect of United States Federal withholding or backup withholding tax pursuant to this Section 2.09 to the extent that (i) the obligation to withhold amounts with respect to United States Federal withholding or backup withholding tax existed on the date such DIP Lender, DIP Agent or Transferee became a party to this Agreement (or, in the case of a Transferee that is a participation holder, on the date such participation holder became a Transferee hereunder other than pursuant to an assignment request of Borrower under Section 2.12) or, with respect to payments to a New Lending Office, the date such DIP Lender, DIP Agent or Transferee

-47-

designated such New Lending Office with respect to a DIP Loan; provided, however, that this clause (i) shall not apply to the extent the indemnity payment or additional amounts any Transferee, or DIP Lender (or Transferee) would be entitled to receive (without regard to this clause (i)) do not exceed the indemnity payment or additional amounts that the Person making the assignment, participation or transfer to such Transferee, or DIP Lender (or Transferee) making the designation of such New Lending Office, would have been entitled to receive in the absence of such assignment, participation, transfer or designation of a New Lending Office, or (ii) the obligation to pay such additional amounts would not have arisen but for a failure by such DIP Lender or the Administrative Agent to comply with the provisions of clause (d) above.

(f)     Any DIP Agent or any DIP Lender (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section 2.09 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require such DIP Agent or such DIP Lender (or Transferee) to disclose any information such DIP Agent or such DIP Lender (or Transferee) deems confidential and would not, in the sole determination of such DIP Agent or such DIP Lender (or Transferee), be otherwise disadvantageous to such DIP Agent or such DIP Lender (or Transferee).

(g)     If any DIP Agent or any DIP Lender (or a Transferee) determines in its good faith that it has received a refund of any Indemnified Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 2.09, it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Party under this Section 2.09 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of such DIP Agent or such DIP Lender (or a Transferee), as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Party, upon the request of the Administrative Agent or such DIP Lender (or a Transferee), agrees to repay the amount paid over to such DIP Agent or such DIP Lender (or a Transferee) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such DIP Agent or such DIP Lender (or a Transferee) in the event such DIP Agent or such DIP Lender (or a Transferee) is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require any DIP Agent or any DIP Lender (or a Transferee) to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Loan Party or any other Person.

(h)     The obligations of the parties under this Section 2.09 shall survive the termination of this Agreement and the payment of the DIP Loan and all other amounts payable hereunder. Each party's obligations under this Section 2.09 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a DIP Lender and the repayment, satisfaction or discharge or all obligations under any DIP Loan Document.

-48-

Section 2.10   [Reserved].

Section 2.11   <u>Manner of Payment</u>.   Except as this Agreement otherwise expressly provides, all payments on the DIP Loan (including repayments of principal and cash payments of interest) other than PIK Interest shall be made by wire transfer of immediately available US Dollar funds to the Administrative Agent's Account.

Section 2.12   <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)   If any DIP Lender requires the Borrower to pay any additional amounts under Section 2.09, then such DIP Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its DIP Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such DIP Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to such Section in the future, and (ii) would not subject such DIP Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such DIP Lender.

(b)   If any DIP Lender requires the Borrower to pay any additional amounts under Section 2.09 and such DIP Lender has declined or is unable to designate a different lending office in accordance with clause (a) above, then the Borrower may, at its sole expense and effort, upon notice to such DIP Lender and the Administrative Agent, require such DIP Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.07), all of its interests, rights and obligations under this Agreement and the other DIP Loan Documents to an assignee that shall assume such obligations (which assignee may be another DIP Lender, if a DIP Lender accepts such assignment); <u>provided</u> that:

(i)   the Borrower shall have paid to the DIP Agents any assignment fees specified in Section 12.07;

(ii)   such DIP Lender shall have received payment of an amount equal to the outstanding principal of its Loan, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other DIP Loan Documents (including any amounts under Section 2.09) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)   in the case of any such assignment resulting from payments required to be made pursuant to Section 2.09, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)   such assignment does not conflict with applicable law.

A DIP Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such DIP Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

-49-

## ARTICLE III

## [RESERVED]

## ARTICLE IV

## APPLICATION OF PAYMENTS; JOINT AND SEVERAL LIABILITY OF BORROWER

Section 4.01    Payments; Computations and Statements.

(a)    The Borrower will make each payment under this Agreement not later than 2:00 p.m. (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account. All payments received by the Administrative Agent after 2:00 p.m. (New York City time) on any Business Day will, if not credited on the Business Day received, be credited to the Loan Account on the next succeeding Business Day; provided that, solely for the purposes of Section 9.01(a), payments made by 5:00 p.m. (New York City time) on the day when due will be considered timely made. All payments shall be made by the Borrower without set-off, counterclaim, recoupment, deduction or other defense to the DIP Agents and the DIP Lenders. Except as provided in Section 2.02, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the DIP Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any DIP Lender to such DIP Lender, in each case to be applied in accordance with the terms of this Agreement, provided that the Administrative Agent will cause to be distributed all interest and fees received from or for the account of the Borrower not less than once each month and in any event promptly after receipt thereof. The DIP Lenders and the Borrower hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Borrower under any DIP Loan Document. Each of the DIP Lenders and the Borrower agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Section 5.02 have been satisfied. Any amount charged to the Loan Account of the Borrower shall be deemed a Loan hereunder made by the DIP Lenders to the Borrower, subject to Section 2.02 of this Agreement. The DIP Lenders and the Borrower confirm that any charges which the Administrative Agent may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to the Borrower and solely at the Administrative Agent's discretion, provided that the Administrative Agent shall from time to time upon the request of the Collateral Agent, charge the Loan Account of the Borrower with any amount due and payable under any DIP Loan Document. Whenever any payment to be made under any such DIP Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the immediately preceding Business Day. All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such fees are payable. Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

-50-

(b)    [Reserved.]

Section 4.02    <u>Sharing of Payments</u>.  Subject to the senior Liens and enforcement rights and the other rights and remedies of the Prepetition Term Loan A Agent or the Prepetition Term Loan A Lenders set forth in the Orders and the Prepetition Term Loan A/B Intercreditor Agreement, as applicable, and except as provided in Section 2.02 hereof, if any DIP Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any DIP Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the DIP Lenders, such DIP Lender shall forthwith purchase from the other DIP Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing DIP Lender to share the excess payment ratably with each of them; <u>provided, however</u>, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing DIP Lender, such purchase from each DIP Lender shall be rescinded and such DIP Lender shall repay to the purchasing DIP Lender the purchase price to the extent of such recovery together with an amount equal to such DIP Lender's ratable share (according to the proportion of (i) the amount of such DIP Lender's required repayment to (ii) the total amount so recovered from the purchasing DIP Lender of any interest or other amount paid by the purchasing DIP Lender in respect of the total amount so recovered) and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, or (ii) any payment obtained by a DIP Lender as consideration for the assignment of or sale of a participation in its Pro Rata Share of the DIP Loan to any assignee or participant, other than to any Loan Party or any Subsidiary thereof (as to which the provisions of this Section shall apply). The Borrower agrees that any DIP Lender so purchasing a participation from another DIP Lender pursuant to this Section 4.02 may, to the fullest extent permitted by law, exercise all of its rights (including the DIP Lender's right of set-off) with respect to such participation as fully as if such DIP Lender were the direct creditor of the Borrower in the amount of such participation.

Section 4.03    <u>Apportionment of Payments</u>.  Subject to the senior Liens and enforcement rights and the other rights and remedies of the Prepetition Term Loan A Agent or the Prepetition Term Loan A Lenders set forth in the Orders and the Prepetition Term Loan A/B Intercreditor Agreement, as applicable, and subject to Section 2.02 hereof and to any written agreement among the DIP Agents and the DIP Lenders:

(a)    all payments of principal and interest in respect of the outstanding DIP Loan, all payments of fees and all other payments in respect of any other DIP Obligations shall be allocated by the Administrative Agent among such of the DIP Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of the DIP Loan, as designated by the Person making payment when the payment is made.

(b)    Subject to the proviso at the end of this clause, after the occurrence and during the continuance of an Event of Default, the Administrative Agent, upon the direction of the Required DIP Lenders, may apply all proceeds of the DIP Collateral, subject to the provisions of this Agreement, (i) <u>first</u>, ratably to pay the DIP Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the DIP Agents

-51-

until paid in full; (ii) <u>second</u>, ratably to pay the DIP Obligations in respect of any fees and indemnities then due and payable to the DIP Lenders until paid in full; (iii) <u>third</u>, ratably to pay interest then due and payable in respect of the DIP Loan and Collateral Agent Advances until paid in full; (iv) <u>fourth</u>, ratably to pay principal of the DIP Loan and Collateral Agent Advances until paid in full; and (v) <u>fifth</u>, to the ratable payment of all other DIP Obligations then due and payable; <u>provided</u>, that, in the event that the proceeds of such DIP Collateral are subject to Prepetition Term Loan A Liens or the Adequate Protection Liens of the Prepetition Term Loan A Agent or the Prepetition Term Loan A Lenders that, in any such case in this proviso, are senior to the DIP Liens, then such proceeds shall, <u>first</u>, repay the Prepetition Term Loan A Obligations until indefeasibly repaid in full in cash and, <u>thereafter</u>, as provided under subclauses (i) through (v) above.

(c)    In each instance, so long as no Event of Default has occurred and is continuing, Section 4.03(b) shall not be deemed to apply to any payment by the Borrower specified by the Borrower to the Administrative Agent to be for the payment of DIP Obligations then due and payable under any provision of this Agreement or the prepayment of all or part of the principal of the DIP Loan in accordance with the terms and conditions of Section 2.05.

(d)    Solely for purposes of Section 4.03(b), (other than <u>clause (v)</u>), "paid in full" means payment in cash of all amounts owing under the DIP Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding, except to the extent that default or overdue interest (but not any other interest) and loan fees, each arising from or related to a default, are disallowed in any Insolvency Proceeding; <u>provided</u>, <u>however</u>, that for the purposes of <u>clause (v)</u>, "paid in full" means payment in cash of all amounts owing under the DIP Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest, default interest, interest on interest, and expense reimbursement.

(e)    In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other DIP Loan Document (other than the Orders), it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 4.03 shall control and govern.

Section 4.04    [Reserved].

Section 4.05    [Reserved].

## ARTICLE V

## CONDITIONS TO LOAN

Section 5.01    <u>Conditions Precedent to Effectiveness and Initial DIP Loans</u>.  This Agreement shall become effective as of the Business Day (the "<u>Closing Date</u>") when each of the

-52-

following conditions precedent shall have been satisfied or waived in writing in a manner reasonably satisfactory to the Required DIP Lenders, and the obligations of the DIP Lenders to make the DIP Loans shall be subject to the satisfaction or waiver in writing of such conditions precedent in a manner reasonably satisfactory to the Required DIP Lenders:

(a)     <u>Payment of Fees, Etc.</u>  The Borrower shall have paid on or before the date of this Agreement all fees, costs, expenses and taxes then payable pursuant to Section 2.06 and Section 12.04.

(b)     <u>Representations and Warranties; No Event of Default</u>.

(i)     The representations and warranties contained in ARTICLE VI and in each other DIP Loan Document, certificate or other writing delivered to any DIP Agent or any DIP Lender pursuant hereto or thereto on or prior to the Closing Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Closing Date as though made on and as of such date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)), and

(ii)    No Default or Event of Default shall have occurred and be continuing on the Closing Date or would result from this Agreement or the other DIP Loan Documents becoming effective in accordance with its or their respective terms, or the making of the Initial DIP Loans (or other extensions of credit) under this Agreement.

(c)     <u>Legality</u>.  The making of such DIP Loan shall not contravene any law (including any Requirement of Law), rule or regulation applicable to any DIP Agent or any DIP Lender and shall not be enjoined, temporarily, preliminarily or permanently.

(d)     <u>Delivery of Documents</u>.  The DIP Agents shall have received on or before the Closing Date the following, each in form and substance reasonably satisfactory to the Required DIP Lenders and, unless indicated otherwise, dated the Closing Date:

(i)     duly executed Security Agreement;

(ii)    appropriate financing statements on Form UCC-1 to be duly filed in such office or offices as may be necessary or, in the opinion of the Required

-53-

DIP Lenders Agent, desirable to perfect the security interests purported to be created by each Collateral Document;

(iii)   copies of all effective financing statements which name as debtor any Loan Party and which are filed in the offices referred to in paragraph (ii) above, together with copies of such UCC-1 financing statements, none of which, except as otherwise agreed by the Collateral Agent, shall cover any of the DIP Collateral other than Permitted Liens and the results of searches for any intellectual property filing, tax Lien and judgment Lien filed against such Person or its property, which results, except as otherwise agreed to by the Collateral Agent, shall not show any such Liens other than Permitted Liens;

(iv)   [Reserved];

(v)   the Fee Letter, duly executed by the Borrower;

(vi)   the Intercompany Subordination Agreement, duly executed by each Loan Party;

(vii)   the Funds Flow Direction, duly executed by the parties thereto;

(viii)   a copy of the resolutions of each Loan Party, certified as of the Closing Date by an Authorized Officer thereof, authorizing (A) the borrowings hereunder and the transactions contemplated by the DIP Loan Documents to which such Loan Party is or will be a party, and (B) the execution, delivery and performance by such Loan Party of each DIP Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith;

(ix)   a certificate of an Authorized Officer of each Loan Party, certifying the names and true signatures of the representatives of such Loan Party authorized to sign each DIP Loan Document to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers;

(x)   a certificate of the appropriate official(s) of the jurisdiction of organization and except to the extent such failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect, each jurisdiction of foreign qualification of each Loan Party certifying as of a recent date not more than 45 days prior to the Closing Date as to the subsistence in good standing of, and the payment of taxes by, such Loan Party in such jurisdictions;

-54-

(xi)  a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date not more than 45 days prior to the Closing Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction;

(xii)  a copy of the Governing Documents of each Loan Party, together with all amendments thereto, certified as of the Closing Date by an Authorized Officer of such Loan Party;

(xiii)  an opinion of Morgan, Lewis and Bockius LLP, counsel to the Loan Parties, to the DIP Agents and the DIP Lenders;

(xiv)  a certificate of an Authorized Officer of each Loan Party, certifying as to the matters set forth in Section 5.01(b);

(xv)  a copy of (A) the Financial Statements and (B) updated financial projections for the 2017 Fiscal Year, which projections shall be reasonably satisfactory in form and substance to the DIP Lenders;

(xvi)  [Reserved];

(xvii)  [Reserved];

(xviii)  evidence of the insurance coverage required by Section 7.01 and the terms of each Security Agreement and such other insurance coverage with respect to the business and operations of the Loan Parties as the Collateral Agent (acting at the direction of the Required DIP Lenders) may reasonably request and of the type and nature typically maintained by a like business as the business of the Borrower, in each case, where reasonably requested by the Required DIP Lenders and where generally available in the market at regular rates;

(xix)  [Reserved];

(xx)  a certificate of an Authorized Officer of the Borrower stating that (x) each Material Contract in existence on the Petition Date remains in full force and effect, (y) unless disclosed, such Material Contracts have not been amended or otherwise modified, and (y) none of the Loan Parties has breached or defaulted in any material respects with respect to its obligations under such agreements;

(xxi)  an Internal Revenue Service Form W-9 or other applicable tax form completed and duly executed by the Borrower; and

-55-

(xxii) such other agreements, instruments, approvals, opinions and other documents, each reasonably satisfactory to the Required DIP Lenders, in form and substance, as the Required DIP Lenders may reasonably request.

(e) <u>Material Adverse Effect</u>. There shall not have occurred since December 31, 2015, any developments or events which individually or in the aggregate with other such circumstances has had or could reasonably be expected to have a Material Adverse Effect, other than the Chapter 11 Cases.

(f) <u>Approvals</u>. All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the DIP Loan or the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect;

(g) <u>Proceedings; Receipt of Documents</u>. All proceedings in connection with the making of the DIP Loan and the other transactions contemplated by this Agreement and the other DIP Loan Documents, and all documents incidental hereto and thereto, shall be reasonably satisfactory to the DIP Agents and the DIP Lenders, and the DIP Agents shall have received all such information and such counterpart originals or certified or other copies of such documents as the DIP Agents may reasonably request.

(h) <u>Litigation</u>. Other than the Chapter 11 Cases, there shall be no pending or threatened litigation, action, suit or other proceedings (private or governmental) with respect to or affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (A) could reasonably be expected to be adversely determined, and if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (B) relates to this Agreement or any other DIP Loan Document or any transaction contemplated hereby or thereby. None of the Loan Parties holds any commercial tort claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

(i) <u>Notices</u>. The Administrative Agent shall have received a Notice of Borrowing in accordance with Section 2.02 hereof. The representations and warranties set forth in any Notice of Borrowing (or any certificate delivered in connection therewith) shall be deemed to be made again on and as of the date of the relevant DIP Loan and the acceptance of the proceeds thereof.

(j) <u>Validity and Priority of DIP Liens</u>. The Collateral Agent, for the benefit of the DIP Lenders, shall have a valid and perfected DIP Lien on and security interest in the DIP Collateral on the basis and with the priority set forth in the Orders.

(k) <u>Budget</u>. The Administrative Agent and the DIP Lenders shall have received the Initial Budget (attached as <u>Exhibit D</u>).

(l) <u>First Day Motions</u>. All first day motions filed by the Loan Parties and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and

-56-

substance reasonably satisfactory to the Administrative Agent (acting at the direction of the Required DIP Lenders) and the Prepetition Term Loan A Required Lenders.

(m)    <u>Motions and Documents</u>.  All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

(n)    <u>Interim Order</u>.  The Bankruptcy Court shall have entered the Interim Order within three (3) Business Days following the Petition Date.

Section 5.02    <u>Conditions Precedent to DIP Loans made after the Closing Date</u>. The obligation of each DIP Lender on any date to make any DIP Loan is subject to the satisfaction of each of the following conditions precedent:

(a)    <u>Notice of Borrowing</u>.  The Administrative Agent shall have received a Notice of Borrowing in accordance with <u>Section 2.02</u>.  The representations and warranties set forth in any Notice of Borrowing (or any certificate delivered in connection therewith) shall be deemed to be made again on and as of the date of the relevant DIP Loan and the acceptance of the proceeds thereof.

(b)    <u>Representations and Warranties; No Defaults</u>.  The following statements shall be true on such date, both before and after giving effect to such DIP Loan:  (i) the representations and warranties set forth in Article VI and in each other DIP Loan Document, certificate or other writing delivered to any DIP Agent or DIP Lender pursuant hereto or thereto shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date or, to the extent such representations and warranties expressly relate to an earlier date, on and as of such earlier date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification)) and (ii) no Default or Event of Default shall have occurred and be continuing or would result from the making of any such DIP Loan on such date.

(c)    <u>Final Order</u>.  With respect to any DIP Loans made after the Closing Date, the Final Order shall have been entered approving the DIP Facility, which Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Agents (at the direction of the Required DIP Lenders) and the Prepetition Term Loan A Required Lenders.

-57-

(d)    Legality.    The making of such DIP Loan shall not contravene any law (including any Requirement of Law), rule or regulation applicable to any DIP Agent or any DIP Lender and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    Material Adverse Effect.    There shall not have occurred since December 31, 2015, any developments or events which individually or in the aggregate with other such circumstances has had or could reasonably be expected to have a Material Adverse Effect, other than the Chapter 11 Cases.

(f)    Consistent with Budget.    The making of such DIP Loan is in accordance with the Budget, or has otherwise been approved in writing by the Administrative Agent at the direction of the Required DIP Lenders.

(g)    Additional Matters.    The Borrower shall have delivered to the Administrative Agent such other documents and information with respect to the business, property, condition (financial or otherwise), legal, financial or corporate or similar affairs or operations of any Loan Party as the Administrative Agent, or DIP Lender through the Administrative Agent, may reasonably request, with copies thereof provided by the Borrower to the Prepetition Term Loan A Agent for delivery to the Prepetition Term Loan A Lenders.

(h)    Exit Budget Condition.    With respect to any Delayed-Draw DIP Loan described in Section 2.01(a)(ii)(y), the Exit Budget Condition (as defined in the Restructuring Support Agreement) shall have been satisfied and the TLB Buyer (as defined in the Restructuring Support Agreement) does not elect to terminate the TLB Sale Transaction (as defined in the Restructuring Support Agreement).

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01    Representations and Warranties.    Each Loan Party hereby represents and warrants to the DIP Agents and the DIP Lenders on the Closing Date, the date each DIP Loan is made and each date of delivery of an Approved Budget as follows:

(a)    Organization, Good Standing, Etc.    Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) upon entry of the Orders, as applicable, has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrower, to make the Borrowings hereunder, and to execute and deliver each DIP Loan Document to which it is a party, and to consummate the transactions contemplated thereby, (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except, in the case of jurisdictions of foreign qualification, where the failure to be so qualified or in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and (iv) is a debtor-in-possession in one of the Chapter 11 Cases.

-58-

(b)    _Authorization, Etc._  Upon entry of the Orders, as applicable, the execution, delivery and performance by each Loan Party of each DIP Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene any of its Governing Documents or any applicable Requirement of Law or any Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any DIP Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties. The execution, delivery and performance by each Loan Party of each DIP Loan Document to which it is or will be a party will not contravene or result in a default under the Restaurant Leases, except as could not reasonably be expected to have a Material Adverse Effect.

(c)    _Governmental Approvals._  Upon entry of the Orders, as applicable, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any DIP Loan Document to which it is or will be a party except for those which have been obtained and/or made.

(d)    _Enforceability of DIP Loan Documents._  Upon entry of the Orders, as applicable, this Agreement is, and each other DIP Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.

(e)    _Capitalization; Subsidiaries._  Schedule 6.01(e) is a complete and correct description of the name, jurisdiction of incorporation or organization and ownership of the outstanding Equity Interests of such Subsidiaries of the Parent in existence as of the Closing Date after giving effect to the transactions contemplated hereunder and under the other DIP Loan Documents. All of the issued and outstanding shares of Equity Interests of such Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights. Except as indicated on such Schedule, all such Equity Interests are owned by the Parent or one or more of its wholly-owned Subsidiaries, free and clear of all Liens except Permitted Liens.

(f)    _Litigation; Commercial Tort Claims._  Except as set forth in Schedule 6.01(f) (or, in the case of any threatened litigation, action, suit or other proceeding, as separately disclosed in writing to the DIP Agents) and in the Chapter 11 Cases, (i) there is no pending or, to the actual knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (A) could reasonably be expected to be adversely determined, and if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (B) relates to this Agreement or any other DIP Loan Document or any transaction contemplated hereby or thereby and (ii) as of the Closing Date, none of the Loan Parties holds any commercial tort claims in

-59-

respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

      (g)    <u>Financial Condition</u>.

      (i)    The Financial Statements, copies of which have been delivered to each DIP Agent and each DIP Lender, fairly present, in all material respects, the consolidated financial condition of the Parent and its Subsidiaries as at the respective dates thereof and the consolidated results of operations of the Parent and its Subsidiaries for the fiscal periods ended on such respective dates, all in accordance with GAAP. Since December 31, 2015 no event or development has occurred that has had or could reasonably be expected to result in a Material Adverse Effect except for the filing of the Chapter 11 Cases and the imposition of the automatic stay in connection therewith.

      (ii)    The Parent has heretofore furnished to each DIP Lender (A) a true and complete copy of the Approved Budget and (B) annual projected financial statements of the Parent and its Subsidiaries for the Fiscal Year ending in 2017. Such projections and the Approved Budget is believed by the Parent at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Parent, and shall have been based on assumptions believed by the Parent to be reasonable at the time made and upon the best information then reasonably available to the Parent, and the Parent shall not be aware, as of the Closing Date, of any facts or information that would lead it to believe that such projections, as so updated, are incorrect or misleading in any material respect.

      (h)    <u>Compliance with Law, Etc.</u> No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any Requirement of Law of any Governmental Authority, in each case, applicable to it or any of its property or assets, or (iii) any material term of any Contractual Obligation (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties, except in the case of clauses (ii) and (iii) to the extent such violations could not reasonably be expected to have a Material Adverse Effect, and no Default or Event of Default has occurred and is continuing.

      (i)    <u>ERISA</u>. Except as set forth on Schedule 6.01(i), or as could not reasonably be expected to result in a Material Adverse Effect, (i) each Employee Plan is in compliance with ERISA and the Internal Revenue Code, (ii) no Termination Event has occurred nor is reasonably expected to occur with respect to any Employee Plan, (iii) the most recent annual report (Form 5500 Series) with respect to each Employee Plan, including any required Schedule B (Actuarial Information) thereto, copies of which have been filed with the Internal Revenue Service and delivered to the DIP Agents, is complete and correct and fairly presents the funding status of such Employee Plan, and, to the knowledge of the Loan Parties, since the date of such report there has been no material adverse change in such funding status, (iv) copies of each material agreement entered into with the PBGC, the U.S. Department of Labor or the

-60-

Internal Revenue Service with respect to any Employee Plan that is sponsored, maintained or contributed to by any Loan Party have been delivered to the DIP Agents, (v) no Employee Plan had an accumulated or waived funding deficiency or permitted decrease which would create a deficiency in its funding standard account or has applied for an extension of any amortization period within the meaning of Section 412 of the Internal Revenue Code at any time during the previous 60 months, and (vi) no Lien imposed under the Internal Revenue Code or ERISA exists or is likely to arise on account of any Employee Plan within the meaning of Section 412 of the Internal Revenue Code. Except as set forth on Schedule 6.01(i), no Loan Party or any of its ERISA Affiliates has incurred any withdrawal liability under ERISA with respect to any Multiemployer Plan, or is aware of any facts indicating that it or any of its ERISA Affiliates may in the future incur any such withdrawal liability, except as could not reasonably be expected to result in a Material Adverse Effect. Except as could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any of its ERISA Affiliates nor any fiduciary of any Employee Plan has (A) engaged in a nonexempt prohibited transaction described in Sections 406 of ERISA or 4975 of the Internal Revenue Code, (B) failed to pay any required installment or other payment required under Section 412 of the Internal Revenue Code on or before the due date for such required installment or payment, (C) engaged in a transaction within the meaning of Section 4069 of ERISA or (D) incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid. Except as could not reasonably be expected to result in a Material Adverse Effect, there are no pending or, to the best knowledge of any Loan Party, threatened claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (1) any Employee Plan or its assets, (2) any fiduciary with respect to any Employee Plan, or (3) any Loan Party or any of its ERISA Affiliates with respect to any Employee Plan. Except as could not reasonably be expected to result in a Material Adverse Effect or as set forth on Schedule 6.01(i) or except as required by Section 4980B of the Internal Revenue Code, no Loan Party maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) which provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or coverage after a participant's termination of employment.

(j) <u>Taxes, Etc.</u> All Federal, material state and local tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party and which have become due and payable on or prior to the date hereof have been paid (other than taxes, assessments, or governmental charges in an aggregate amount at any one time not to exceed $20,000), except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k) <u>Regulations T, U and X</u>. No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or

-61-

carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

        (l)    <u>Nature of Business</u>.

        (i)    No Loan Party is engaged in any business other than as set forth on <u>Schedule 6.01(l)</u> and business activities reasonably related or incidental thereto.

        (ii)    Each of the Parent and Holdings is a holding company and does not have any liabilities (other than liabilities arising or permitted under the DIP Loan Documents, the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents and the Sponsor Subordinated Debt Documents), own any assets (other than the Equity Interests of other Loan Parties, dividends and distributions made on such Equity Interests and other de minimis assets) or engage itself in any operations or business other than actions required for compliance with the DIP Loan Documents and except as expressly permitted by the DIP Loan Documents.

        (m)    <u>Adverse Agreements, Etc.</u>  On the Closing Date, no Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority (except to the extent contained in the Orders), which (either individually or in the aggregate) has, or could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

        (n)    <u>Permits, Etc.</u>  Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent such failure to obtain or noncompliance could not reasonably be expected to result in a Material Adverse Effect. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, except to the extent caused by commencement of the Chapter 11 Cases, and there is no claim that any thereof is not in full force and effect, except to the extent such suspension, revocation, impairment, forfeiture or non-renewal could not reasonably be expected to result in a Material Adverse Effect.

        (o)    <u>Properties</u>.

        Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all tangible property and assets material to its business, free and clear of all Liens, except Permitted Liens and except to the extent the failure to have such valid leasehold interests or licenses could not reasonably be expected to have a Material Adverse Effect.  To

NY 76357801v7
NY 76357801v8

each Loan Party's knowledge, all such properties and assets are in good working order and condition, ordinary wear and tear and casualty and condemnation excepted.

(i)     Schedule 6.01(o) sets forth a complete and accurate list, as of the Closing Date, of the location, by state and street address, of all real property owned or leased by each Loan Party and identifies the interest (fee or leasehold) of such Loan Party therein, other than certain Leases that have been identified to the DIP Lenders in writing as locations the Loan Parties have ceased operations as of the Closing Date.  As of the Closing Date, each Loan Party has valid leasehold interests in the leased properties described on Schedule 6.01(o), except to the extent the failure to have such valid leasehold interests could not reasonably be expected to have a Material Adverse Effect.  Each such Lease is valid and enforceable in accordance with its terms in all material respects and is in full force and effect, except to the extent that the commencement of the Chapter 11 Cases constitutes a default under such leases or the failure of such Lease to be valid and enforceable or in full force and effect could not reasonably be expected to result in a Material Adverse Effect and except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws.  No consent or approval of any landlord or other third party in connection with any such Lease is necessary for any Loan Party to enter into and execute the DIP Loan Documents (except with respect to the landlord waiver pursuant to Section 5.02(a)) to which it is a party, except as set forth on Schedule 6.01(o).  As of the Closing Date and except in respect of the Chapter 11 Cases, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default under any such Lease, except to the extent such event could not reasonably be expected to result in a Material Adverse Effect.

(p)     <u>Full Disclosure</u>.  Each Loan Party has disclosed to the DIP Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the other reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the DIP Agents in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not materially misleading; <u>provided</u> that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. There is no contingent liability or fact that could reasonably be expected to result in a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto or pursuant to the Chapter 11 Cases.

(q)     [Reserved]..

-63-

(r)    Environmental Matters.  Except as set forth on Schedule 6.01(r), (i) the operations of each Loan Party and its Subsidiaries are in compliance with all Environmental Laws, except for any non-compliance that could not reasonably be expected to result in a Material Adverse Effect; (ii) there has been no Release at any of the properties owned, leased or operated by any Loan Party or any of its Subsidiaries, or, to the knowledge of any Loan Party or any of its Subsidiaries, at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries which could reasonably be expected to result in a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Loan Party or any of its Subsidiaries nor does any Loan Party or any of its Subsidiaries have knowledge or notice of any threatened or pending Environmental Action against any Loan Party or any of its Subsidiaries which could reasonably be expected to result in a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any Loan Party or any of its Subsidiaries and no Loan Party or any of its Subsidiaries has knowledge or notice of any threatened or pending Environmental Actions related to any facilities that may have received Hazardous Materials generated by any Loan Party or any of its Subsidiaries which could reasonably be expected to result in a Material Adverse Effect; (v) no property now or formerly owned, leased or operated by a Loan Party or any of its Subsidiaries has been used as a treatment or disposal site for any Hazardous Material, except to the extent that any such use could not reasonably be expected to result in a Material Adverse Effect; (vi) no Loan Party or any of its Subsidiaries has failed to report to the proper Governmental Authority the occurrence of any Release of Hazardous Materials which is required to be so reported under any Environmental Laws and which could reasonably be expected to result in a Material Adverse Effect; (vii) each Loan Party or each Subsidiary thereof holds all Environmental Permits in connection with the operation of the business carried on by it, except for such Environmental Permits as to which any Loan Party's or any of its Subsidiary's failure to maintain or comply with could not reasonably be expected to result in a Material Adverse Effect; and (viii) no Loan Party or any of its Subsidiaries has received any notification pursuant to any Environmental Laws that (A) any Remedial Action work, repairs, construction or Capital Expenditures are required to be made by a Loan Party or any of its Subsidiaries in respect of any of its properties as a condition of continued compliance with any Environmental Laws, or any Environmental Permit issued pursuant thereto or (B) any Environmental Permit referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case of clauses (A) and (B), except as could not reasonably be expected to result in a Material Adverse Effect.

(s)    Insurance.  Each Loan Party keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law or as may be reasonably required by the Required DIP Lenders (including, without limitation, against larceny, embezzlement or other criminal misappropriation).  Schedule 6.01(s) sets forth a list of all insurance maintained by each Loan Party on the Closing Date.

-64-

(t)   <u>Use of Proceeds; Cash Collateral</u>.  The Borrower has at all times used the proceeds of the DIP Loan and all Cash Collateral in accordance with Section 7.02(f).

(u)   <u>Budget</u>.  A true and complete copy of the Approved Initial Budget is attached as Exhibit D hereto.

(v)   <u>Location of Bank Accounts</u>.  Schedule 6.01(v) sets forth a complete and accurate list as of the Closing Date of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Loan Party, together with a description thereof (i.e., the bank or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

(w)   <u>Intellectual Property</u>.  Except as set forth on Schedule 6.01(w) and except with respect to matters of intellectual property infringement, each Loan Party owns or licenses or otherwise has the right to use all material intellectual property licenses, patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, copyright applications and other material intellectual property rights that are reasonably necessary for the operation of its business as currently conducted as of the date hereof, or to the knowledge of such Loan Party, as each Loan Party has planned or committed these businesses to be conducted as of the date hereof.  Set forth on Schedule 6.01(w) is a complete and accurate list as of the Closing Date of (i) all material intellectual property licenses to which each Loan Party is a party (other than non-exclusive licenses of intellectual property granted in the ordinary course of business and commercially available licenses for off-the-shelf software); and (ii) all issued patents, applications for issued patents, registered trademarks, applications for registered trademarks, registered service marks, registered trade names, registered copyrights and applications for registered copyrights owned by each Loan Party.  To the knowledge of such Loan Party, no slogan or other advertising device, product, process, method, substance, part or other material now employed by any Loan Party, and no other operation of the business now conducted by any Loan Party, infringes upon any intellectual property rights owned by any other Person.  No claim or litigation against any Loan Party regarding any of the foregoing is pending or, to the knowledge of such Loan Party, threatened against any Loan Party.

(x)   <u>Material Contracts</u>.  Set forth on Schedule 6.01(x) is a complete and accurate list as of the Closing Date of all Material Contracts of each Loan Party, showing the parties and subject matter thereof and amendments and modifications thereto.  Each such Material Contract (i) is in full force and effect and is binding upon and enforceable against each Loan Party that is a party thereto and, to the knowledge of such Loan Party, all other parties thereto in accordance with its terms, except to the extent that the failure of such Material Contract to be in full force and effect or binding upon and enforceable against the parties thereto could not reasonably be expected to result in a Material Adverse Effect, and except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws, (ii) has not been otherwise amended or modified, except for amendments or modifications which could not reasonably be expected to result in a Material Adverse Effect, and (iii) is not in default due to the action of any Loan Party or, to the knowledge of any Loan Party, any other party thereto, except to the extent that any such default is as a result of the commencement of the Chapter 11 Cases.

-65-

NY 76357801v7
NY 76357801v8

(y)     Investment Company Act.  None of the Loan Parties is (i) an "investment company" or "promoter" of, or "principal underwriter" of or for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the DIP Obligations unenforceable.

(z)     Employee and Labor Matters.  Except as set forth on Schedule 6.01(z) hereof, there is (i) no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party which arises out of or under any collective bargaining agreement, in each case that could reasonably be expected to result in a Material Adverse Effect, (ii) no strike, labor dispute, slowdown, stoppage or similar action against any Loan Party, in each case that could reasonably be expected to result in a Material Adverse Effect or (iii) to the knowledge of any Loan Party, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party, in each case which could reasonably be expected to result in a Material Adverse Effect.  No Loan Party has incurred any material liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state law, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from any Loan Party on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(aa)     Customers and Suppliers.  There exists no actual termination, cancellation or limitation of, or modification to or change in, the business relationship between (i) any Loan Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with any Loan Party are individually or in the aggregate material to the business or operations of such Loan Party, or (ii) any Loan Party, on the one hand, and any material supplier thereof, in each case to the extent that such termination, cancellation, limitation, modification or change could not reasonably be expected to result in a Material Adverse Effect.

(bb)     Consortium Agreements.  Each of the Consortium Agreements, and any rights and obligations thereunder or arising in connection therewith, have been terminated prior to the Closing Date.

(cc)     Interrelated Business.  The Loan Parties make up a related organization of various entities constituting a single economic and business enterprise so that the Loan Parties share an identity of interests such that any benefit received by any one of them benefits the others.  From time to time each Loan Party may render services to or for the benefit of the other Loan Parties, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other

-66-

Loan Parties (including inter alia, the payment by such Loan Party of creditors of the other Loan Parties and guarantees by such Loan Party of indebtedness of the other Loan Parties and provides administrative, marketing, payroll and management services to or for the benefit of the other Loan Parties). The Loan Parties have the same chief executive office, centralized accounting and legal services, certain common officers and directors and generally do not provide consolidating financial statements to creditors.

(dd)   Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office; FEIN. Schedule 6.01(dd) sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of each Loan Party, (ii) the jurisdiction of organization of each Loan Party, (iii) the organizational identification number of each Loan Party (or indicates that such Loan Party has no organizational identification number), (iv) each place of business of each Loan Party, (v) the chief executive office of each Loan Party and (vi) the federal employer identification number of each Loan Party.

(ee)   Locations of Collateral. There is no location at which any Loan Party has any tangible DIP Collateral (except for Inventory in transit) other than (i) those locations listed on Schedule 6.01(ee) and/or Schedule 6.01(o) and (ii) any other locations in the continental United States for which such Loan Party has provided notice to the Collateral Agent in accordance with Section 7.01(l). Schedule 6.01(ee) hereto contains a true, correct and complete list, as of the Closing Date, of the legal names and addresses of each warehouse at which DIP Collateral of each Loan Party is stored. None of the receipts received by any Loan Party from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns.

(ff)   Security Interests.

(i)   Subject to the entry of the Orders and the terms thereof, each DIP Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(ii)   The Collateral Agent's DIP Liens (created pursuant to the DIP Loan Documents together with the Orders and held for the benefit of the Secured Parties) are validly created Liens. The Collateral Agent's DIP Liens on the DIP Collateral (created pursuant to the DIP Loan Documents together with the Orders and held for the benefit of the Secured Parties) will be legal, valid, enforceable and perfected Liens, subject to any provisions with respect to priority set out in the Orders. Pursuant to the terms of the Orders, no filing or other action will be necessary to perfect or protect such DIP Liens and security interests on the DIP Collateral. Pursuant to and to the extent provided in the Orders, the DIP Obligations of the Loan Parties under this Agreement will constitute Superpriority

-67-

Claims and allowed administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over (other than over (x) the Superpriority Claims of the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders and (y) the Carve-Out) all other administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof).

(gg)    Existing Credit Card Agreements.   Set forth in Schedule 6.01(gg) is a correct and complete list of (i) all of the Existing Credit Card Agreements existing as of the Closing Date between and/or among any Loan Party, any of its Affiliates, the Existing Credit Card Issuers, the Existing Credit Card Processors and any of their affiliates, and (ii) the term of such Existing Credit Card Agreements.  Other than with respect to the filing of the Chapter 11 Cases, each Loan Party and, to each Loan Party's knowledge, the other parties thereto, have complied with all of the material terms and conditions of the Existing Credit Card Agreements to the extent necessary for such Loan Party to be entitled to receive all payments thereunder.  The Loan Parties have delivered, or caused to be delivered to the DIP Agents and DIP Lenders, true, correct and complete copies of all of the Existing Credit Card Agreements.

(hh)    Anti-Terrorism Laws.

(i)    General.  None of the Loan Parties nor any Subsidiaries of any Loan Parties, is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Laws.

(ii)    None of the Loan Parties, nor any Subsidiaries of any Loan Parties, or their respective agents acting or benefiting in any capacity in connection with the DIP Loan or other transactions hereunder, is any of the following (each, a "Blocked Person"):

(A)    a Person that is prohibited pursuant to any of the OFAC Sanctions Programs, including a Person named on OFAC's list of Specially Designated Nationals and Blocked Persons;

(B)    a Person that is owned or controlled by, or that owns or controls, or that is acting for or on behalf of, any Person described in (A), above;

(C)    a Person with which any DIP Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; or

-68-

(D)    a Person that is affiliated or associated with a Person described in (A) through (C), above.

(iii)    None of the Loan Parties, nor any of their Subsidiaries (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any OFAC Sanctions Programs.

(ii)    <u>Prepetition Term Loan A</u>.  The Borrower has delivered to the DIP Agents and DIP Lenders complete and correct copies of the Prepetition Term Loan A Loan Documents (including any fee letters relating thereto), including all schedules and exhibits thereto.  The Orders, any other orders of the Bankruptcy Court in connection with the Chapter 11 Cases, the Prepetition Term Loan A Loan Documents (including the Prepetition Term Loan A/B Intercreditor Agreement and the Prepetition Term Loan C/D Intercreditor Agreement) and this Agreement set forth the entire agreement and understanding of the parties thereto relating to the Prepetition Term Loan A Obligations, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby.

(jj)    <u>Prepetition Term Loan B</u>.  The Borrower has delivered to the DIP Agents and DIP Lenders complete and correct copies of the Prepetition Term Loan B Loan Documents (including any fee letters relating thereto), including all schedules and exhibits thereto.  The Orders, any other orders of the Bankruptcy Court in connection with the Chapter 11 Cases, and the Prepetition Term Loan B Loan Documents set forth the entire agreement and understanding of the parties thereto relating to the Prepetition Term Loan B Obligations, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby.

(kk)    <u>Prepetition Term Loan C</u>.  The Borrower has delivered to the DIP Agents and DIP Lenders complete and correct copies of the Prepetition Term Loan C Loan Documents, including all schedules and exhibits thereto.  The Orders and the Prepetition Term Loan C Loan Documents set forth the entire agreement and understanding of the parties thereto relating to the Prepetition Term Loan C Obligations, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby.

(ll)    <u>Sponsor Subordinated Debt</u>.  There is no Sponsor Subordinated Debt outstanding on the Closing Date (other than to the extent constituting any Prepetition Term Loan C Obligations).

(mm)    <u>Prepetition Term Loan D</u>.  The Borrower has delivered to the DIP Agents and DIP Lenders complete and correct copies of the Prepetition Term Loan D Loan Documents, including all schedules and exhibits thereto.  The Orders and the Prepetition Term Loan D Loan Documents set forth the entire agreement and understanding of the parties thereto relating to the Prepetition Term Loan D Obligations, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby.

(nn)    <u>Bankruptcy Matters</u>.

-69-

(i)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof under the circumstances, and proper notice of (x) the motion seeking approval of the DIP Loan Documents and entry of the Orders, as applicable and (y) the hearings for the approval of the Interim Order have been held by the Bankruptcy Court.

(ii)    After the entry of the Orders, as applicable, and pursuant to and to the extent permitted in the Orders, as applicable, the DIP Obligations will constitute allowed superpriority administrative expense claims in the Chapter 11 Cases having priority (except as otherwise set forth in the Orders) over all administrative expense claims and unsecured claims against the Borrower and other Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 326, 330, 331, 503(b), 506(c), (upon entry of the Final Order), 507(a), 507(b), 726, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, in all respects, to the Adequate Protection Claims and any other superpriority administrative expense claims of the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders, and the Carve-Out, in each case, to the extent contemplated by the Orders, as applicable.

(iii)   After the entry of the Orders, as applicable, and pursuant to and to the extent provided in the Orders, as applicable, the DIP Obligations will be secured by a valid and perfected Lien on all of the Loan Parties' pre-Petition Date and post-Petition Date assets, subject, in all respects, to the Carve-Out, to Liens in favor of the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders (including the Adequate Protection Liens and the Prepetition Term Loan A Liens) and the Prepetition Permitted Priority Liens, in each case, to the extent contemplated by the Orders.

(iv)   After the entry of each Order, such Order is in full force and effect, is not subject to appeal, leave to appeal or reconsideration process (as applicable) and has not been vacated, reversed, rescinded, stayed, modified or amended in any manner, and no appeal or leave to appeal of such order has been timely filed or, if timely filed, no stay pending such appeal or leave to appeal is currently effective, in each case, without the prior written consent of the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

(oo)    Perfection Certificate. Except as set forth on the Schedules to this Agreement, there have been no changes to the information set out in the Perfection Certificate dated as of January 28, 2016 and delivered by the Borrower in connection with the Prepetition

-70-

Term Loan B Financing Agreement that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect

## ARTICLE VII

## COVENANTS OF THE LOAN PARTIES

Section 7.01    Affirmative Covenants.    So long as any principal of or interest on any DIP Loan or any other DIP Obligation (other than unasserted contingent indemnification obligations) shall remain unpaid or any DIP Lender shall have any DIP Loan Commitment hereunder, each Loan Party will, and will cause each other Loan Party to, unless the Required DIP Lenders shall otherwise consent in writing:

(a)    Reporting Requirements.    Furnish to each DIP Agent and each DIP Lender and the Prepetition Term Loan A Agent (for distribution to the Prepetition Term Loan A Lenders):

(i)    as soon as available, and in any event within 30 (or, in the case of September of each Fiscal Year of the Parent and its Subsidiaries, 45) days after the end of each fiscal month of the Parent and its Subsidiaries commencing with the first fiscal month of the Parent and its Subsidiaries ending after the Closing Date, internally prepared consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year, and (B) the projections delivered pursuant to Section 7.01(a)(vii), all in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Parent and its Subsidiaries for such fiscal month, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished prior to the Petition Date to the Prepetition Term Loan A Agent and the Prepetition Term Loan B Agent, subject to the absence of footnotes and normal year-end adjustments;

(ii)    [reserved];

(iii)    (X) as soon as available, and in any event within 120 days after the end of each Fiscal Year of the Parent and its Subsidiaries, consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows of the Parent and its Subsidiaries as at the end of such Fiscal Year, setting forth in each case in comparative

-71-

form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year, and (B) the projections delivered pursuant to Section 7.01(a)(vii), all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Parent and satisfactory to the Required DIP Lenders (it being understood that any of KPMG, Grant Thornton, Crowe Horwath, BDO or PWC is satisfactory to the Required DIP Lenders), which opinion shall be without (1) any qualification or exception as to the scope of such audit or (2) any qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of Section 7.02(g) (except for any period within the twelve-month period prior to the Final Maturity Date to the extent such qualification is the result of the DIP Loan (or any portion thereof) being treated as short-term Indebtedness), together with a written statement of such accountants (x) to the effect that, in making the examination necessary for their certification of such financial statements, they have not obtained any knowledge of the existence of an Event of Default or a Default and (y) if such accountants shall have obtained any knowledge of the existence of an Event of Default or such Default, describing the nature thereof, and (Y) immediately, and in any event within 5 Business Days after receipt thereof by any Loan Party or any of its Subsidiaries, copies of all management letters, exception reports or similar letters or reports received by such Loan Party or such Subsidiary in connection with each such audit specified above;

(iv)    simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i) and (iii) of this Section 7.01(a), a certificate in such form as is acceptable to the Required DIP Lenders (a "Compliance Certificate") signed by an Authorized Officer of the Parent (A) stating that such Authorized Officer has reviewed the provisions of this Agreement and the other DIP Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Parent and its Subsidiaries during the period covered by such financial statements with a view to determining whether the Parent and its Subsidiaries were in compliance with all of the provisions of this Agreement and such DIP Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the existence during such period of an Event of Default or Default or, if an Event of Default or Default existed, describing the nature and period of existence thereof and the action which the Parent and its Subsidiaries propose to take or have taken with respect thereto and (B) including a discussion and

-72-

analysis of the financial condition and results of operations of the Parent and its Subsidiaries (including such detail and information as the Required DIP Lenders may reasonably request from time to time) for the portion of the Fiscal Year then elapsed and discussing the reasons for any significant variations from the financial projections for such period and the figures for the corresponding period in the previous Fiscal Year;

(v)     simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clause (i) of this Section 7.01(a), such additional metrics and information, in substantially same form as the monthly "Management Report" that was required by Section 7.01(a)(v) of the Prepetition Term Loan B Financing Agreement;

(vi)    [intentionally omitted];

(vii)   [intentionally omitted];

(viii)  [reserved];

(ix)    promptly after any Loan Party knows that any Governmental Authority is commencing a material non-routine investigation against it, notice of such investigation and, thereafter, prompt reporting of any information relative to such investigation requested by the Required DIP Lenders;

(x)     as soon as possible, and in any event within 5 Business Days of an Authorized Officer's knowledge of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to result in a Material Adverse Effect, the written statement of an Authorized Officer of the Parent setting forth the details of such Event of Default or Default or other event or development that could reasonably be expected to result in a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(xi)    (A) as soon as possible and in any event within 10 days after any Loan Party knows or has reason to know that (1) any Reportable Event with respect to any Employee Plan has occurred that could reasonably be expected to result in any material liability to a Loan Party, (2) any other Termination Event with respect to any Employee Plan has occurred that could reasonably be expected to result in any material liability to a Loan Party, or (3) an accumulated funding deficiency has been incurred or an application has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including installment payments) or an extension of any amortization period under Section 412 of the Internal Revenue Code with respect to an Employee Plan, a statement of an Authorized Officer of Parent setting forth the details of such occurrence and the action, if any, which such Loan Party or such ERISA Affiliate proposes to take with respect thereto, (B) promptly and in

-73-

any event within 10 days after receipt thereof by any Loan Party or promptly after any Loan Party knows or has reason to know of the receipt thereof by any ERISA Affiliate from the PBGC, copies of each notice received by any Loan Party or any ERISA Affiliate thereof of the PBGC's intention to terminate any Employee Plan or to have a trustee appointed to administer any Employee Plan, (C) promptly and in any event within 10 days after the filing thereof with the Internal Revenue Service if requested by any DIP Agent, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Employee Plan with respect to which any Loan Party has the ability to obtain such information, (D) promptly and in any event within 10 days after any Loan Party knows or has reason to know that a required installment within the meaning of Section 412 of the Internal Revenue Code has not been made when due with respect to an Employee Plan, (E) promptly and in any event within 3 days after receipt thereof by any Loan Party or the Loan Party has any knowledge of such receipt by any ERISA Affiliate thereof from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Loan Party or any ERISA Affiliate thereof concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA which could reasonably be expected to result in a Material Adverse Effect or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (F) promptly and in any event within 10 days after any Loan Party thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party;

(xii)    promptly after the commencement thereof but in any event not later than 5 Business Days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(xiii)    as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with any Material Contract if the notice concerns a materially adverse development to the Loan Parties regarding such Material Contract;

(xiv)    as soon as possible and in any event within 5 days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

NY 76357801v7
NY 76357801v8

(xv)    promptly after the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange;

(xvi)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xvii)    promptly upon any DIP Agent's request (acting at the direction of the Required DIP Lenders), the monthly statements received by any Loan Party from any Existing Credit Card Issuers or Existing Credit Card Processors, together with such additional information with respect thereto as shall be reasonably sufficient to enable the DIP Agents to monitor the transactions pursuant to the Existing Credit Card Agreements;

(xviii)    promptly after the date on which a Loan Party commences any proceeding alleging any commercial tort claim alleging damages in excess of $250,000, a brief description of such commercial tort claim and grant of a security interest therein to the Collateral Agent in accordance with the Security Agreement;

(xix)    promptly upon receipt thereof, copies of any notices of default or other material notices given or received pursuant to the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents or the Sponsor Subordinated Debt Documents and promptly after the sending thereof, copies of all certificates and other reports relating to financial covenants and financial tests under the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents and the Sponsor Subordinated Debt Documents;

(xx)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as the DIP Agent or any DIP Lender may from time to time reasonably request;

(xxi)    not later than 1:00 p.m. on the last Business Day of each calendar week, a report (each, a "Variance Report") setting forth the actual cash flows for the immediately preceding Test Period with respect to each line item in the Approved Budget; provided that each Variance Report delivered during the week after a Test Date shall also set forth such cash flows for the Test Period most recently ended, together with the percentage, if any, by which such actual cash flows for each line item exceeded or were less than the cash flows set forth in the Approved Budget for such Test Period; and

-75-

(xxii)   upon reasonable request by either the Required DIP Lenders or the Prepetition Term Loan A Required Lenders, an update to the Approved Budget then in effect, in form and substance satisfactory to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders, for the subsequent 13-week period following such Business Day (it being understood that such update to the Approved Budget then in effect shall contain no differences to the subsequent 12-week period from the Approved Budget then in effect).

(b)   [Reserved.]

(c)   <u>Compliance with Laws, Etc.</u>  Comply, and cause each of its Subsidiaries to comply, in all material respects with all Requirements of Law (excluding Environmental Laws which are the subject of Section 7.01(j) below), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing and could reasonably be expected to result in a Material Adverse Effect), such compliance to include, without limitation, subject to any necessary approvals required by the Bankruptcy Court (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties (other than taxes, assessments and governmental charges or levies or any other such lawful claims of a Governmental Authority in an aggregate amount at any one time not to exceed $20,000), and (ii) paying all other lawful claims of a Governmental Authority which if unpaid could reasonably be expected to become a Lien (other than a Permitted Lien) or charge upon any of its properties, except, in each case, to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(d)   <u>Preservation of Existence, Etc.</u>  Except as expressly permitted by <u>Section 7.02(c)</u>, maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its good standing in the jurisdiction of its organization, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary except where the failure to maintain and preserve such rights and privileges or to become or remain duly qualified and in good standing in a foreign jurisdiction could not reasonably be expected to have a Material Adverse Effect.

(e)   <u>Keeping of Records and Books of Account.</u>  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)   <u>Inspection Rights.</u>  Permit, and cause each of its Subsidiaries to permit, the agents and representatives of the Required DIP Lenders at any time and from time to time during normal business hours and upon reasonable notice (subject to the limitations set forth in <u>Section 2.06(b)</u>), to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit

-76-

accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, review any environmental site assessments, audits, studies and reports in the possession of any Loan Party or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives; <u>provided</u> that as long as no Event of Default has occurred and is continuing, Borrower shall only be obligated to reimburse for one commercial exam per Fiscal Year. In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the representatives and agents of the Required DIP Lenders in accordance with this Section 7.01(f). Borrower and/or any Loan Party shall at all times be given a reasonable opportunity to have an employee, representative or agent accompany the Required DIP Lenders on any such examination, visit, inspection, audit, physical count, valuation, appraisal, review or discussion. Notwithstanding the foregoing, if the Required DIP Lenders elect to exercise their rights hereunder, they shall provide to the Prepetition Term Loan A Agent (for distribution to the Prepetition Term Loan A Lenders) reasonable prior notice to participate in any such discussions and receive any resulting reports.

(g)  <u>Maintenance of Properties, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its tangible properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies real property, so as to prevent any loss or forfeiture thereof or thereunder (in each case, without limiting any Loan Party's right to contest any such lease obligations in accordance with the terms of the applicable lease), except to the extent any such noncompliance has been approved by the Required DIP Lenders and the Prepetition Term Loan A Required Lenders, in each case, such approval not to be unreasonably withheld.

(h)  <u>Maintenance of Insurance.</u>  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to the Required DIP Lenders (provided that the maintenance by any Loan Party of the insurance required to be maintained by the terms of a Lease to which such Loan Party is a party shall presumptively satisfy such requirement). All policies covering the DIP Collateral are to be made payable to the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders, as its interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent or the Required DIP Lenders may require to fully protect the Collateral Agent's interest in the DIP Collateral and to any payments to be made under such policies. All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent, for the benefit of the DIP

-77-

Lenders, and such other Persons as the Collateral Agent, acting at the direction of the Required DIP Lenders, may designate from time to time, and shall provide for not less than 30 days' (10 days in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrower's expense and without any responsibility on either DIP Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, the Collateral Agent shall have the sole right (but subject to the rights of landlords under Leases), in the name of the DIP Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)      Obtaining of Permits, Etc.  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business except where the failure to obtain, maintain and preserve could not reasonably be expected to result in a Material Adverse Effect.

(j)      Environmental.  (i) Keep any property owned by it or any of its Subsidiaries free of any Environmental Liens except for deed restrictions and other institutional controls that are utilized in connection with any mandatory Remedial Actions at such property; (ii) comply, and cause each of its Subsidiaries to comply, in all material respects with Environmental Laws and provide to the Collateral Agent any documentation of such compliance which the Required DIP Lenders may reasonably request, except where failure to comply could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; (iii) promptly provide the DIP Agents written notice of any Release of a Hazardous Material in excess of any reportable quantity from or onto property owned or operated by it or any of its Subsidiaries and take any Remedial Actions required under Environmental Laws to abate said Release, except for such Releases or Remedial Actions that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; and (iv) promptly provide the DIP Agents with written notice within 5 days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Loan Party or any of its Subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party or any of its Subsidiaries, except for Environmental Actions that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect; and (C) notice of a violation, citation or other administrative order from a Governmental Authority issued to any Loan Party or any of its Subsidiaries, except for violations, citations, or other administrative orders that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(k)      Further Assurances.  Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and

-78-

deliver, at its sole cost and expense, such agreements, instruments or other documents as the Required DIP Lenders may require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other DIP Loan Documents, (ii) to subject to valid and perfected Liens any of the DIP Collateral or any other property of any Loan Party and its Subsidiaries (including commercial tort claims, deposit accounts, securities accounts, and commodities accounts, but excluding Excluded Property (as defined in the Security Agreement)), (iii) to establish and maintain the validity and effectiveness of any of the DIP Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, collaterally assign, collaterally transfer and confirm unto each DIP Agent and each DIP Lender the rights now or hereafter intended to be granted to it under this Agreement or any other DIP Loan Document (including, without limitation, upon the occurrence of an Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, causing each Existing Credit Card Issuer and Existing Credit Card Processor to direct all payments (due to any Loan Party) of all credit card charges submitted by any Loan Party to such Existing Credit Card Issuer and Existing Credit Card Processor to the Existing Blocked Accounts). In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Loan Party (A) if a Loan Party has failed to comply with its undertakings in this Section after a written request therefor, authorizes each DIP Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (B) authorizes each DIP Agent to file any financing statement required hereunder or under any other DIP Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (C) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof. Notwithstanding any provision set forth in this Agreement or in any DIP Loan Document to the contrary, in no event shall (a) the assets of any CFC constitute security or secure the payment of the DIP Obligations or (b) more than 65% of the voting (and 100% of the non-voting) Equity Interest of any first-tier Subsidiary of a Loan Party that is a CFC be required to be pledged to secure the DIP Obligations.

(l)     <u>Change in Collateral; Collateral Records</u>.  (i) Give the Collateral Agent not less than 15 days' prior written notice of any change in the location (other than Equipment out for repair or Equipment at employee's homes or otherwise being "used in the field" in the operation of the Borrower's business in the ordinary course of business or in possession of an employee in the ordinary course of business) of any tangible DIP Collateral, other than to (or in-transit between) locations set forth on Schedule 6.01(o) or Schedule 6.01(ee) and any new locations acquired after the Closing Date and added to such Schedule by written notice to the DIP Agents, and with respect to which the Collateral Agent has filed financing statements and otherwise fully perfected its Liens thereon, (ii) advise the Collateral Agent promptly, in sufficient detail, of any Material Adverse Effect relating to the type, quantity or quality of the DIP Collateral or the Lien granted thereon and (iii) execute and deliver, and cause each of its Subsidiaries to execute and deliver, to the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders from time to time, solely for the Collateral Agent's convenience in maintaining a record of DIP Collateral, such written statements and schedules as the Collateral Agent may reasonably require, designating, identifying or describing the DIP Collateral.

(m)    [Reserved].

(n)    <u>Subordination</u>. Cause all Indebtedness and other obligations now or hereafter owed by it to any of its Affiliates (other than the DIP Obligations), to be subordinated in right of payment and security to the DIP Obligations, the Prepetition Term Loan A Obligations and the Prepetition Term Loan B Obligations pursuant to a subordination agreement in form and substance reasonably satisfactory to the Required DIP Lenders, the Prepetition Term Loan A Required Lenders and the Prepetition Term Loan B Lenders, if requested.

(o)    <u>Post-Closing</u>.  To the extent not executed and delivered on the Closing Date, unless otherwise agreed by the Required DIP Lenders in their reasonable discretion, each Loan Party shall execute, deliver to the applicable DIP Agent, and/or perform, as applicable, each item listed on <u>Schedule 7.01(o)</u>[3] within the time frame set forth therein (or such later date as may be permitted by the Required DIP Lenders in their sole discretion).

(p)    <u>Fiscal Year</u>.  Cause the Fiscal Year of the Parent and its Subsidiaries to end on September 30 of each calendar year unless the Required DIP Lenders consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(q)    <u>Lender Meetings</u>.  Upon the reasonable request of the Required DIP Lenders, participate in a meeting with the DIP Lenders at the Borrower' corporate offices (or at such other location as may be agreed to by the Borrower and the Required DIP Lenders (including via telephonic conference call)) at such time as may be agreed to by the Borrower and the Required DIP Lenders; <u>provided</u>, that, if the Required DIP Lenders exercise their rights hereunder, they shall (except in the case of any informal telephonic meetings and conference calls) provide to the Prepetition Term Loan A Agent reasonable prior notice to allow the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders to participate in any such meetings.

(r)    <u>Cash Management Order.</u>  Keep the Cash Management Order in effect at all times on and after the Closing Date.

(s)    <u>Milestones.</u>  The Borrower shall comply with milestones set forth in <u>Schedule 7.01(s)</u>.

Section 7.02    <u>Negative Covenants</u>. So long as any principal of or interest on any DIP Loan or any other DIP Obligation (other than unasserted contingent indemnification Obligations) shall remain unpaid or any DIP Lender shall have any DIP Loan Commitment hereunder, each Loan Party shall not and shall not permit any of its Subsidiaries to:

(a)    <u>Liens, Etc.</u>  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof); sell any of its property or assets subject to an understanding or agreement,

---

[3] Post-Closing Covenant Schedule to be included.

-80-

contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable) with recourse to it or any of its Subsidiaries or assign or otherwise transfer, or permit any of its Subsidiaries to assign or otherwise transfer, any account or other right to receive income; other than, as to all of the above, Permitted Liens.

(b)    Indebtedness.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)    Fundamental Changes; Dispositions.  Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof) (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that

(i)    any Loan Party (other than Garden Fresh, Holdings or Parent) may be merged into, or consolidated with, another Loan Party (other than Garden Fresh and Parent), so long as (A) no other provision of this Agreement would be violated thereby, (B) such Loan Party gives the DIP Agents at least 15 days' prior written notice of such merger or consolidation, (C) no Default or Event of Default shall have occurred and be continuing either before or immediately after giving effect to such transaction and, (D) the Collateral Agent's rights in any DIP Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger or consolidation;

(ii)    any Loan Party and its Subsidiaries may make Permitted Dispositions and Permitted Investments; and

(iii)    in order to resolve disputes that occur in the ordinary course of business consistent with past practice, Parent and its Subsidiaries may discount or otherwise compromise for less than face value thereof, notes or accounts receivable.

(iv)    [Reserved.]

(d)    Change in Nature of Business; Change in Independent Certified Public Accountant.

(i)    Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 6.01(l), or acquire any material properties or assets that are not reasonably related to the conduct of such business activities.

-81-

(ii)     Permit the Parent or Holdings to have any material liabilities (other than liabilities arising or permitted under the DIP Loan Documents, the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents and the Sponsor Subordinated Debt Documents), own any material assets (other than the Equity Interests of its Subsidiaries, dividends and distributions permitted to be made on such Equity Interests and other de minimis assets) or engage in any operations or business (other than the ownership of its Subsidiaries and actions required for compliance with the DIP Loan Documents and except as expressly permitted by the DIP Loan Documents).

(e)     Loans, Advances, Investments, Etc.  Make or commit, or agree to make or permit any of its Subsidiaries to make or commit or agree to make, any Investment in any other Person, except for Permitted Investments.

(f)     Use of Proceeds, Cash Collateral.  Except as otherwise provided herein or approved by the Administrative Agent (at the direction of the Required DIP Lenders), use any cash (including Cash Collateral) or the proceeds of any DIP Loans in a manner or for a purpose inconsistent with this Agreement, the Orders and the Approved Budget (subject to the Permitted Variances); provided, that no cash (including Cash Collateral) or the proceeds of any DIP Loans may be used by the Loan Parties in connection with: (i) (x) with respect to cash (including Cash Collateral), the payment of any principal of the Prepetition Term Loan B Obligations, the Prepetition Term Loan C Obligations and Prepetition Term Loan D Obligations, and (y) with respect to proceeds of the DIP Loans (but not any other cash or Cash Collateral), the payment of any principal of the Prepetition Term Loan A Obligations and (ii) investigating (including by way of examination and/or discovery proceedings), initiating, asserting, joining, commencing, supporting or prosecuting any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders, the DIP Agents, the Prepetition Term Loan A Agent, the Prepetition Term Loan A Lenders, the Prepetition Term Loan B Agent, the Prepetition Term Loan B Lenders, the Prepetition Term Loan C Agent, the Prepetition Term Loan C Lenders, the Prepetition Term Loan D Agent, the Prepetition Term Loan D Lenders and each of their respective affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees; past, present and future, and their respective heirs, predecessors, successors and assigns, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (1) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (2) any so-called "lender liability" claims and causes of action; (3) any action with respect to the validity, enforceability, priority and extent of the Superpriority Claims, Adequate Protection Liens or other Adequate Protection Provisions, Prepetition Term Loan A Obligations, the Prepetition Term Loan B Obligations, the Prepetition Term Loan C Obligations and Prepetition Term Loan D Obligations or the DIP Loans; (4) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Superpriority Claims, the Adequate Protection Liens or other Adequate Protection Provisions, the Prepetition Term Loan A Obligations, the Prepetition Term Loan B Obligations, the Prepetition Term Loan C Obligations

-82-

and Prepetition Term Loan D Obligations, the DIP Obligations or the DIP Loans; or (5) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the Secured Parties hereunder or under the DIP Loan Documents, the Orders, the Prepetition Term Loan A Loan Documents or the Prepetition Term Loan B Loan Documents, or for any purpose that is prohibited under the Bankruptcy Code, in each case, other than an aggregate amount not to exceed $50,000 that may be used by, or to reimburse, the fees, costs or expenses of, the Committee solely in connection with the investigation of the prepetition claims of the holders of Prepetition Term Loan A Obligations and the Prepetition Term Loan B Obligations or their affiliates; provided, that, during the Remedies Notice Period, nothing herein or in the Orders, as applicable, shall limit the ability of the Loan Parties to seek to challenge an Event of Default.

(g)    Capital Expenditures.  Other than as expressly set forth in the Approved Budget, make or commit or agree to make, or permit any of its Subsidiaries to make or commit or agree to make, any Capital Expenditure (by purchase or Capitalized Lease).

(h)    Restricted Payments.  (i) Declare or pay any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding, (iv) return any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such or (v) pay any management fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting or other services agreement (including the Management Agreement) to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party, Ultimate Parent, Sun or another Permitted Holder; provided, however, that:

(A)    [Reserved.]

(B)    any Subsidiary of the Borrower may make dividends or distributions to the Borrower;

(C)    [Reserved.]

(D)    [Reserved.]

(E)    [Reserved.]

(F)    reasonable and customary indemnities to directors, officers and employees of Parent or any direct or indirect parent of Parent in the

-83-

ordinary course of business, to the extent reasonably attributable to the ownership or operations of Parent and its Subsidiaries; and

(G)    the Loan Parties may make dividends and distributions to Parent, to enable Parent to pay third parties in an aggregate amount not to exceed $25,000 for the period from the Closing Date through the Maturity Date.

(i)    <u>Federal Reserve Regulations</u>. Permit any DIP Loan or the proceeds of any DIP Loan under this Agreement to be used for any purpose that would cause such DIP Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)    <u>Transactions with Affiliates</u>. Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) in the ordinary course of business consistent with past practice, for fair consideration and on terms and conditions at least as favorable as would be obtained by such Loan Party at that time in a comparable arm's length transaction with a Person that is not an Affiliate thereof, (ii) transactions with another Loan Party, (iii) transactions permitted by Section 7.02(e) and Section 7.02(h), (iv) [reserved] and (v) the DIP Obligations and transactions pursuant to the DIP Loan Documents.

(k)    <u>Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries</u>. Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; <u>provided</u>, <u>however</u>, that nothing in any of clauses (i) through (iv) of this Section 7.02(k) shall prohibit or restrict compliance with:

(A)    this Agreement and the other DIP Loan Documents, the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents and the Sponsor Subordinated Debt Documents;

(B)    [Reserved.]

(C)    any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

-84-

(D)     in the case of clause (iv) any agreement setting forth customary restrictions on the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract of similar property or assets; or

(E)     in the case of clause (iv) any agreement, instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto.

(l)     <u>Limitation on Issuance of Equity Interests</u>.  Issue or sell or enter into any agreement or arrangement for the issuance and sale of, or permit any of its Subsidiaries to issue or sell or enter into any agreement or arrangement for the issuance and sale of, any shares of its Equity Interests, any securities convertible into or exchangeable for its Equity Interests or any warrants.

(m)     <u>Modifications of Indebtedness, Junior Obligations, Organizational Documents and Certain Other Agreements; Prepayments of Indebtedness; Etc</u>.

(i)     Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness in excess of $1,000,000, or of any instrument or agreement (including the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents, the Sponsor Subordinated Debt Documents, any purchase agreement, indenture, loan agreement or security agreement) relating to (A) any such Indebtedness (other than Indebtedness arising under the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents or the Sponsor Subordinated Debt Documents)  if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the DIP Lenders, the Prepetition Term Loan A Lenders or the issuer of such Indebtedness in any respect, <u>provided, however,</u> that any such Indebtedness may be refinanced if the replacement Indebtedness would otherwise constitute Permitted Indebtedness or (B) any Indebtedness arising under the terms of the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents or the Sponsor Subordinated Debt Documents.

(ii)     Do any of the following:

-85-

(A)  make any voluntary or optional payment, prepayment, redemption, defeasance, sinking fund payment or other acquisition for value (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due) of any of its or its Subsidiaries' Indebtedness (including the Prepetition Term Loan B, Prepetition Term Loan C, the Prepetition Term Loan D and the Sponsor Subordinated Debt), excluding the Prepetition Term Loan A Obligations as permitted under this Agreement and the Orders, or refund, refinance, replace or exchange any other Indebtedness for any such Indebtedness (other than the DIP Obligations and the Prepetition Term Loan A Obligations as permitted under this Agreement and the Orders),

(B)  make any payment (whether in respect of principal, interest, fees, expenses or otherwise), prepayment, redemption, defeasance, sinking fund payment or repurchase of any Junior Obligations or any Subordinated Indebtedness (including, but not limited to, the Sponsor Subordinated Debt),

(C)  make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event other than in respect of the Prepetition Term Loan A Obligations and the DIP Obligations, as expressly permitted under this Agreement and the Orders,

(D)  make any payment (whether in respect of principal, interest, fees, expenses or otherwise) in respect of the Prepetition Term Loan B Obligations (provided that interest paid in-kind may be so paid), Prepetition Term Loan C Obligations or the Prepetition Term Loan D Obligations,

(E)  pay any fees or expenses related to the transactions contemplated to be consummated on the Closing Date under this Agreement other than fees or expenses (x) expressly reserved in the Funds Flow Direction and paid on the Closing Date or (y) fees and expenses of the DIP Agents and DIP Lenders payable under the DIP Loan Documents or payment of fees and expenses of the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders that are paid after the Closing Date in accordance with the Approved Budget;

(iii)  amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN, except that a Loan Party may (A) change its name, jurisdiction of organization, organizational

-86-

identification number or FEIN in connection with a transaction permitted by Section 7.02(c) and (B) change its name upon at least 30 days' prior written notice by the Borrower to the DIP Agents of such change and so long as, at the time of such written notification, such Person provides any financing statements or fixture filings necessary to perfect and continue perfected the Collateral Agent's Liens;

    (iv)    amend, modify or otherwise change its Governing Documents, including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests;

    (v)    amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of the Management Agreement; or

    (vi)    [Reserved].

    (n)    <u>Investment Company Act of 1940</u>.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

    (o)    <u>ERISA</u>.  Except where any failure to comply could not reasonably be expected to result in a Material Adverse Effect, (i) engage, or, to the extent such Loan Party has the ability to control an ERISA Affiliate, permit any ERISA Affiliate to engage, in any transaction described in Section 4069 of ERISA; (ii) engage, or, to the extent such Loan Party has the ability to control an ERISA Affiliate, permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or, to the extent such Loan Party has the ability to control an ERISA Affiliate, permit any ERISA Affiliate to adopt any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or applicable law; (iv) fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

    (p)    <u>Limitations on Negative Pledges</u>.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition

-87-

upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (i) this Agreement, the other DIP Loan Documents, the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents and the Sponsor Subordinated Debt Documents, (ii) restrictions or conditions imposed by any agreement relating to Permitted Liens or secured Indebtedness permitted by Section 7.02(b) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and the proceeds thereof, (iii) [reserved], (iv) customary provisions in leases restricting the assignment or sublet thereof, (v) customary provisions restricting assignment of any licensing agreement or other contract entered into by the Loan Parties or any of their Subsidiaries in the ordinary course of business consistent with past practices, and (vi) encumbrances or restrictions on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business.

    (q)    <u>Anti-Terrorism Laws</u>.

    (i)    Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person,

    (ii)    deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the OFAC Sanctions Programs or

    (iii)    engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the OFAC Sanctions Programs, the USA PATRIOT Act or any other Anti-Terrorism Law.

    (iv)    The Borrower shall deliver to the DIP Lenders any certification or other evidence reasonably requested from time to time by any DIP Lender in its sole discretion, confirming the Borrower' compliance with this Section 7.02(q).

    (r)    Take any action, or permit Parent or any shareholder, member or owner of Borrower to take any action, that would have the effect of changing the classification of Borrower for federal, state, local and foreign tax purposes from its tax classification as of the Closing Date.

    (s)    <u>Chapter 11 Cases</u>.

    (i)    Other than any Adequate Protection Claims, any Adequate Protection Liens and any Superpriority Claims, in each case to the extent set forth in the Orders, as applicable, and except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is pari passu with, or senior to the claims and

-88-

Liens of, the DIP Agents, DIP Lenders, the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders.

(ii)    Make or permit to be made any change to the Orders, as applicable, without the consent of the Required DIP Lenders and the Prepetition Term Loan A Required Lenders.

(iii)    Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against DIP Agent, any DIP Lender, the Prepetition Term Loan A Agent, any Prepetition Term Loan A Lender, the Prepetition Term Loan B Agent or any Prepetition Term Loan B Lender with respect to this Agreement, the other DIP Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby; provided, that during the Remedies Notice Period, nothing herein or in the Orders, as applicable, shall limit the ability of the Loan Parties to seek to challenge an Event of Default.

(iv)    Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court after notice and a hearing and (b) are expressly permitted by the terms of the DIP Loan Documents and within the limits, including any allowed variance, of the Approved Budget or otherwise with the consent of the Required DIP Lenders.

(v)    File any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the DIP Lenders and the Prepetition Term Loan A Lenders and providing the DIP Lenders and the Prepetition Term Loan A Lenders prior (in any case, not less than two (2) Business Days' (or such lesser time as may be reasonably acceptable to Required DIP Lenders and the Prepetition Term Loan A Required Lenders)) notice and the opportunity to review and comment on each such motion.

(t)    <u>Total Expenditures; Total Receipts</u>.  With respect to the Test Period ending on each Test Date, the Loan Parties shall not, and shall cause each other Loan Party to not, without the consent of the Required DIP Lenders, (i) make disbursements that would be included in any disbursement line-item (a "<u>Disbursements Line</u>") in the Approved Budget during such Test Period in an aggregate amount which would exceed by more than fifteen percent (15.0%) the aggregate amount of disbursements budgeted in such Disbursements Line in the

-89-

Approved Budget for such Test Period (the "Operating Disbursement Variance") and (ii) permit receipts that would be included in the aggregate "Total Receipts" line-item in the Approved Budget (a "Receipts Line") during such Test Period to be in an aggregate amount less than eighty-five percent (85.0%) of receipts budgeted in such Receipts Line in the Approved Budget for such Test Period (the "Receipts Variance" and together with the Operating Disbursement Variance, the "Permitted Variances").

(u)      Minimum Liquidity.  On any Test Date, permit the Minimum Liquidity to be less than $100,000.

## ARTICLE VIII

## MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS RECEIVABLE AND OTHER COLLATERAL

Section 8.01    Collection of Accounts Receivable; Management of Collateral. Subject to the senior Liens and enforcement rights and the other rights and remedies of the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders set forth in the Orders and the Prepetition Term Loan A/B Intercreditor Agreement, as applicable:

(a)      Each Loan Party shall maintain the Existing Blocked Accounts with respect to such Loan Party's deposit accounts with the financial institutions set forth on Schedule 8.01 hereto.  No Loan Party shall be permitted to open any other deposit accounts after the Closing Date, other than with the prior consent of the Prepetition Term Loan A Required Lenders and the Required DIP Lenders.  All checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness received directly by any Loan Party from any Account Debtor, as proceeds from their Accounts Receivable, or as proceeds of any other DIP Collateral, shall be held by such Loan Party in trust for the DIP Agents, the Prepetition Term Loan A Agent, the DIP Lenders and the Prepetition Term Loan A Lenders, and, upon receipt be deposited by such Loan Party in original form and no later than the next Business Day after receipt thereof into an Existing Blocked Account.  Each Loan Party shall not commingle such collections with their own funds or with the proceeds of any assets not included in the DIP Collateral.  All funds received in the Existing Blocked Accounts (i) after the occurrence and during the continuance of an Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, upon request by the Collateral Agent (acting at the direction of the Required DIP Lenders), shall be sent by wire transfer or Automated Clearing House, Inc. payment to the Payment Office to be credited to the Administrative Agent's Account for application at the end of each Business Day when such funds are received in Administrative Agent's Account to reduce the then principal balance of the DIP Loan in accordance with the terms hereof, conditional upon final payment to the Administrative Agent, and (ii) at all other times, may be transferred to an operating account of such Loan Party subject to an Existing Control Agreement.  No checks, drafts or other instruments received by the Administrative Agent shall constitute final payment to the Administrative Agent unless and until such checks, drafts or instruments have actually been collected.

-90-

(b)    So long as no Event of Default has occurred and is continuing, the Loan Parties may enforce, collect and receive all amounts owing on the Accounts Receivable. After the occurrence and during the continuance of an Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, the Collateral Agent may send a notice of assignment and/or notice of the Collateral Agent's security interest to any and all Account Debtors or third parties holding or otherwise concerned with any of the DIP Collateral and, thereafter, the Collateral Agent shall have the sole right to collect the Accounts Receivable and payment intangibles of the Loan Parties and/or may take possession of the DIP Collateral and the books and records relating thereto. After the occurrence and during the continuation of an Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, the Loan Parties shall not, without prior written consent of the Collateral Agent, grant any extension of time of payment of any Account Receivable or payment intangible, compromise or settle any Account Receivable or payment intangible for less than the full amount thereof, release, in whole or in part, any Person or property liable for the payment thereof, or allow any credit or discount whatsoever thereon.

(c)    Each Loan Party hereby appoints each DIP Agent or its designee on behalf of such DIP Agent as such Loan Party's attorney-in-fact with power, exercisable during the continuance of an Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, to (i) endorse such Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Accounts Receivable or payment intangibles of such Loan Party, (ii) sign such Loan Party's name on any invoice or bill of lading relating to any of the Accounts Receivable or payment intangibles of such Loan Party, drafts against Account Debtors with respect to Accounts Receivable or payment intangibles of such Loan Party, assignments and verifications of Accounts Receivable or payment intangibles and notices to Account Debtors with respect to Accounts Receivable or payment intangibles of such Loan Party (provided however, that if no Event of Default is continuing, it shall only conduct verifications and send notices, as applicable, in the name of the applicable Loan Party), (iii) send verification of Accounts Receivable of such Loan Party, and (iv) notify the Postal Service authorities to change the address for delivery of mail addressed to such Loan Party to such address as such DIP Agent may designate and to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission (other than acts of omission or commission constituting gross negligence, bad faith, or willful misconduct as determined by a final judgment of a court of competent jurisdiction), or for any error of judgment or mistake of fact or law; this power being coupled with an interest is irrevocable until the DIP Loan and all other DIP Obligations under the DIP Loan Documents are paid in full and all of the DIP Loan Commitments are terminated.

(d)    Nothing herein contained shall be construed to constitute any DIP Agent as agent of any Loan Party for any purpose whatsoever, and the DIP Agents shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the DIP Collateral wherever the same may be located and regardless of the cause thereof (other than from acts of omission or commission constituting gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The DIP Agents shall not, under any circumstance or in any event whatsoever, have any liability for any

NY 76357801v7
NY 76357801v8

error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts Receivable of any Loan Party or any instrument received in payment thereof or for any damage resulting therefrom (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The DIP Agents, by anything herein or in any assignment or otherwise, do not assume any of the obligations under any contract or agreement assigned to any DIP Agent and shall not be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

(e)    Notwithstanding any other terms set forth in the DIP Loan Documents, the rights and remedies of the DIP Agents and the DIP Lenders herein provided, and the obligations of the Loan Parties set forth herein, are cumulative of, may be exercised singly or concurrently with, and are not exclusive of, any other rights, remedies or obligations set forth in any other DIP Loan Document or as provided by law.

Section 8.02    [Reserved.]

Section 8.03    <u>Collateral Custodian</u>.    Upon the occurrence and during the continuance of any Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, the Collateral Agent may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent who shall have full authority to do all acts necessary to protect the DIP Agents' and the DIP Lenders' interests. Upon the occurrence and during the continuance of any Event of Default and only after the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent may reasonably request to preserve the DIP Collateral. All costs and expenses incurred by the Collateral Agent by reason of the employment of the custodian shall be the responsibility of the Borrower and charged to the Loan Account.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01    <u>Events of Default</u>.    If any one or more of the following events (each, an "<u>Event of Default</u>") shall occur and be continuing:

(a)    Borrower shall fail to pay (i) any principal of any DIP Loan when due (whether by scheduled maturity, required repayment, acceleration or otherwise), (ii) any interest on any DIP Loan when due or (iii) within two (2) days after the due date, any Collateral Agent Advance or any fee, indemnity or other amount payable under this Agreement or any other DIP Loan Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise);

(b)    any representation, warranty or certification made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any DIP Loan Document or under or in connection with any report, certificate or other document

-92-

delivered to any DIP Agent or any DIP Lender pursuant to any DIP Loan Document shall have been incorrect in any material respect when made or deemed made;

(c)    any Loan Party shall fail to perform or comply with any covenant or agreement contained in (i) clauses (c), (d), (f), (n), (o), (p), (r) or (s) of Section 7.01, Section 7.02, or Article VIII, (ii) Section 7.01(a) and such failure, if capable of being remedied, shall remain unremedied for five (5) days or (iii) clauses (e), (g), (h), (i), (k) or (l) of Section 7.01 and (in circumstances described in this clause (iii)) such failure, if capable of being remedied, shall remain unremedied for five (5) Business Days, after the earlier of (x) the date a senior officer of any Loan Party shall have become aware of such failure and (y) the date written notice of such default shall have been given by any DIP Agent or DIP Lender to such Loan Party;

(d)    any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any DIP Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for fifteen (15) days after the earlier of (x) the date a senior officer of any Loan Party becomes aware of such failure and (y) the date written notice of such default shall have been given by any DIP Agent to such Loan Party;

(e)    any Loan Party shall fail to pay any principal of or interest or premium on any of its unstayed or post-Petition Date Indebtedness when due (excluding Indebtedness evidenced by this Agreement, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents and the Sponsor Subordinated Debt Documents) to the extent that the aggregate principal amount of all such Indebtedness exceeds $1,000,000, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)    [Reserved]

(g)    [Reserved]

(h)    any provision of any DIP Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any DIP Loan Document;

-93-

(i)      any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected Lien in favor of the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders on any DIP Collateral purported to be covered thereby;

(j)      the DIP Obligations shall cease to be Superpriority Claims;

(k)      one or more judgments, awards, or orders (or any settlement of any claim that, if breached, could result in a judgment, order, or award) for the payment of money exceeding $500,000 in the aggregate (the "Maximum Judgment Amount") shall be rendered against Parent or any of its Subsidiaries and remain unsatisfied, or the Parent or any of its Subsidiaries shall agree to the settlement of any one or more pending or threatened claims, actions, suits, or proceedings affecting any Loan Party before any court or other Governmental Authority or any arbitrator or mediator, providing for the payment of money exceeding $500,000 in the aggregate, and in the case of any such judgment or order either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement, or (ii) there shall be a period of 10 consecutive days after entry thereof during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such judgment, order, award or settlement shall not give rise to an Event of Default under this subsection if and for so long as (A) the amount of such judgment, order, award or settlement in excess of the Maximum Judgment Amount is covered by a valid and binding policy of insurance between the applicable Loan Party and the insurer covering full payment thereof (other than any deductible) or an amount sufficient to lower the exposure below the Maximum Judgment Amount, and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment, order, award or settlement;

(l)      any Loan Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of the business of the Loan Parties, taken as a whole, for more than 15 days;

(m)      any damage to, or loss, theft or destruction of, any portion of the DIP Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party;

(n)      any cessation of a substantial part of the business of a Loan Party;

(o)      the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party;

(p)      the indictment of Parent or any of its Subsidiaries under any criminal statute, or commencement of criminal or civil proceedings against any Loan Party, pursuant to which statute or proceedings the penalties or remedies sought include forfeiture to any Governmental Authority of any material portion of the property of such Person;

-94-

(q)     any Loan Party or any of its ERISA Affiliates shall have made a complete or partial withdrawal from a Multiemployer Plan, and, as a result of such complete or partial withdrawal, any Loan Party incurs a withdrawal liability in an annual amount exceeding $500,000 or a Multiemployer Plan enters reorganization status under Section 4241 of ERISA, and, as a result thereof any Loan Party's annual contribution requirements with respect to such Multiemployer Plan increases in an annual amount exceeding $500,000;

(r)     any Termination Event with respect to any Employee Plan shall have occurred, and, 30 days after notice thereof shall have been given to any Loan Party by any DIP Agent, (i) such Termination Event (if correctable) shall not have been corrected, (ii) the then current value of such Employee Plan's vested benefits exceeds the then current value of assets allocable to such benefits in such Employee Plan by more than $500,000 and (iii) such Termination Event could reasonably be expected to result in a liability to any Loan Party in excess of $500,000 (or, in the case of a Termination Event involving liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, could reasonably be expected to result in a liability to any Loan Party in excess of $500,000);

(s)     [Reserved];

(t)     any material provision (including any of the subordination provisions) of the Prepetition Term Loan A/B Intercreditor Agreement or the Prepetition Term Loan C/D Intercreditor Agreement or of any other intercreditor or subordination agreement shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any of the parties thereto, other than as provided in the Orders;

(u)     any material provision (including any of the subordination provisions) of any subordination agreement in favor of the Prepetition Term Loan A Agent, the Prepetition Term Loan A Lenders, the Prepetition Term Loan B Agent and the Prepetition Term Loan B Lenders, shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the Sponsor Subordinated Debt, the holder(s) of the obligations subject to such other subordination agreement or the agent(s) for such holder(s);

(v)     a Change of Control shall have occurred;

(w)     any Existing Credit Card Issuer or Existing Credit Card Processor withholds payment of amounts otherwise payable to any Loan Party to fund a reserve account or otherwise hold as collateral, or shall require any Loan Party to pay funds into a reserve account or for such Existing Credit Card Issuer or Existing Credit Card Processor to otherwise hold as collateral, or any Loan Party shall provide a letter of credit, guarantee, indemnity or similar instrument to or in favor of such Existing Credit Card Issuer or Existing Credit Card Processor such that in the aggregate all of such funds in the reserve account, other amounts held as collateral and the amount of such letters of credit, guarantees, indemnities or similar instruments shall exceed $500,000; or

(x)     There shall have occurred any of the following in the Chapter 11 Cases:

-95-

(i)　　the bringing of a motion by any Loan Party in the Chapter 11 Cases or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or that does not provide for the repayment of all DIP Obligations under this Agreement in full in cash; (ii) to grant any Lien other than Liens expressly permitted under this Agreement and the Orders upon or affecting any DIP Collateral; (iii) except as provided in this Agreement or the Orders, as the case may be, to use Cash Collateral of the DIP Agents, the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders under section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Agents, the Required DIP Lenders, the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders; or (iv) that (in the case of any Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Loan Party) approves or provides authority to take any other action or actions adverse to the rights and remedies of the DIP Agents, the Prepetition Term Loan A Agent, the DIP Lenders and the Prepetition Term Loan A Lenders under this Agreement, the Orders or the Prepetition Term Loan A Loan Documents, or their interest in the DIP Collateral;

(ii)　　the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party which does not provide for either (x) the repayment of all DIP Obligations under this Agreement in full in cash and the repayment of all of the Prepetition Term Loan A Obligations in full in cash on the effective date of such plan or (y) such other treatment of the DIP Obligations and the Prepetition Term Loan A Obligations in a manner acceptable to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders, respectively, or the termination of any Loan Party's exclusive right to file and solicit acceptances of a plan of reorganization;

(iii)　　the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not (i)(a) contain a provision for repayment in full in cash of all of the DIP Obligations under this Agreement and all of the Prepetition Term Loan A Obligations on or before the effective date of such plan or plans and (b) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the DIP Lenders and to the Prepetition Term Loan A Agent for the benefit of the Prepetition Term Loan A Lenders and the priority thereof as set forth in the Orders until the DIP Obligations and the Prepetition Term Loan A Obligations have been paid in full or (ii) provide for such other treatment of the DIP Obligations and the Prepetition Term Loan A Obligations in a manner acceptable to the Required DIP Lenders and the Prepetition Term Loan A Required Lenders, respectively;

-96-

NY 76357801v7
NY 76357801v8

(iv) the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any DIP Loan Document or any Order, in any case, without the prior written consent of the Required DIP Lenders and the Prepetition Term Loan A Required Lenders;

(v) the Final Order is not entered within twenty-eight (28) days (or such other period as the Required DIP Lenders and the Prepetition Term Loan A Required Lenders may agree to in writing) following the date of the Interim Hearing;

(vi) the payment of, or application by any Loan Party for authority to pay, any prepetition claim without the Required DIP Lenders' prior written consent other than (i) as provided in any "first day order" in form and substance reasonably acceptable to the Required DIP Lenders, (ii) as set forth in the Approved Budget (subject to the Permitted Variances) or (iii) unless otherwise expressly permitted under this Agreement;

(vii) the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Loan Party, for an order seeking the appointment of, in either case without the consent of the Required DIP Lenders and the Prepetition Term Loan A Required Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) the DIP Agents or the DIP Lenders under the DIP Loan Documents, or against the Prepetition Term Loan A Agent or the Prepetition Term Loan A Lenders under the Prepetition Term Loan A Loan Documents, or against the Prepetition Term Loan B Agent or the Prepetition Term Loan B Lenders under the Prepetition Term Loan B Loan Documents; or the sale (other than as contemplated by the Restructuring Support Agreement), without the consent of the DIP Agents, the Required DIP Lenders, the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders, of all or substantially all of the Borrower's or any other Loan Party's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or the CCAA Recognition Proceedings, or otherwise that does not provide for payment in full in cash of the DIP Obligations and the Prepetition Term Loan A Obligations;

(viii) the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent monetary DIP Obligations of the Borrower hereunder, or if any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases which does

-97-

not contain a provision for payment in full in cash of all noncontingent monetary DIP Obligations of the Borrower hereunder;

(ix)    the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or a bankruptcy under Debtor Relief Laws, as applicable, or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(x)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any DIP Collateral, or (y) with respect to any Lien of or the granting of any Lien on any DIP Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the DIP Agents and the Prepetition Term Loan A Agent;

(xi)    the entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under this Agreement or the other DIP Loan Documents and any portion of the payments made on account of the Prepetition Term Loan A Obligations;

(xii)   the failure of any Loan Party to perform any of its obligations under the Orders or any violation of any of the terms of any Order, subject to any applicable grace or cure periods;

(xiii)  the challenge by any Loan Party to the validity, extent, perfection or priority of any Liens (including Adequate Protection Liens) and Superpriority Claims granted under the Orders, the DIP Loan Documents, the Prepetition Term Loan A Loan Documents or the Prepetition Term Loan B Loan Documents, as applicable;

(xiv)   the remittance, use or application of Cash Collateral of the Loan Parties other than in accordance with any cash management procedures and agreements approved by the Bankruptcy Court and the Orders;

(xv)    the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the Prepetition Term Loan A Agent on behalf of the Prepetition Term Loan A Lenders and the applicable DIP Agent, on behalf of itself and the DIP Lenders without, in each case, the consent in writing of the Prepetition Term Loan A Required Lenders and the Required DIP Lenders or as otherwise expressly permitted in this Agreement;

(xvi)   the filing of a motion by any Loan Party requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with

-98-

(A) the claims of the DIP Agents and/or the DIP Lenders under the DIP Loan Documents, (B) the claims of the Prepetition Term Loan A Agent and/or the Prepetition Term Loan A Lenders under the Prepetition Term Loan A Loan Documents, or (C) the claims of the Prepetition Term Loan B Agent and/or the Prepetition Term Loan B Lenders under the Prepetition Term Loan B Loan Documents, in each case, except to the extent provided in the Orders (i) in connection with Prepetition Permitted Priority Liens, (ii) in respect of the Carve-Out, (iii) under the Adequate Protection Provisions or (iv) to the extent the claim relates to new financing that provides for the repayment of all DIP Obligations under this Agreement irrevocably in full in cash on the closing of such new financing.

(xvii)   the entry of an order precluding the Collateral Agent or the Prepetition Term Loan A Agent from having the right to or being permitted to "credit bid" with respect to the assets of the Loan Parties;

(xviii)   any attempt by any Loan Party to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the DIP Obligations or the Liens securing such DIP Obligations to any other debt;

(xix)   the reversal, vacation or stay of the effectiveness of any Order or any provision thereof without the consent of the Required DIP Lenders and the Prepetition Term Loan A Required Lenders;

(xx)   the payment of, or granting adequate protection (except pursuant to the Adequate Protection Provisions) with respect to, any Prepetition Term Loan A Obligations (provided, that, the Prepetition Term Loan A Lenders may request additional adequate protection in the form of replacement liens), any Prepetition Term Loan B Obligations, any Prepetition Term Loan C Obligations or any Prepetition Term Loan D Obligations (other than with respect to payment permitted under any "first day order" in form and substance satisfactory to the DIP Lenders or as set forth in any Order);

(xxi)   an application for any of the orders described in this Section 9 shall be made by a Person other than the Collateral Agent, the DIP Lenders and the Prepetition Term Loan A Lenders (either acting in concert or with the consent of each other party) and such application is not, to the extent requested by Collateral Agent, the DIP Lenders and the Prepetition Term Loan A Lenders, contested by Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(xxii)   the cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or

-99-

(xxiii) the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the DIP Loan Documents, the Orders, the DIP Liens, the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan A Liens, the Prepetition Term Loan B Liens, the Prepetition Term Loan B Loan Documents and the DIP Collateral,

then, and in any such event, the Collateral Agent may, at the request of the Required DIP Lenders, by notice to the Borrower, (i) declare all or any portion of the DIP Loan then outstanding to be due and payable, whereupon all or such portion of the principal of the DIP Loan, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other DIP Loan Documents shall become due and payable immediately with respect to the DIP Loan Commitments so terminated and the DIP Loan so repaid, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party, (ii) subject to the Orders, exercise any and all of its other rights and remedies under applicable law, hereunder and under the other DIP Loan Documents, in each case, as directed by the Required DIP Lenders; and (iii) subject to the Orders, deliver written notice to the Bankruptcy Court that, pursuant to the Orders, the automatic stay provisions of section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit the Collateral Agent and the DIP Lenders to exercise all rights and remedies provided for in the DIP Loan Documents upon the expiration of the Remedies Notice Period; provided, that, with respect to subclauses (ii) and (iii), any exercise of rights and remedies in respect of the DIP Collateral shall be subject to the senior Liens and enforcement rights and other rights and remedies of the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders set forth in the Orders and the Prepetition Term Loan A/B Intercreditor Agreement.

Section 9.02    Remedies Cumulative.    The rights and remedies of the DIP Lenders and DIP Agents under this Agreement, the other DIP Loan Documents, and all other agreements shall be cumulative.  Subject to the senior Liens and enforcement rights and other rights and remedies of the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders set forth in the Orders and the Prepetition Term Loan A/B Intercreditor Agreement, as applicable, the DIP Lenders and DIP Agents shall have all other rights and remedies not inconsistent herewith as provided under the Uniform Commercial Code, by law, or in equity.  No exercise by any DIP Lender or any DIP Agent of one right or remedy shall be deemed an election, and no waiver by any DIP Lender or any DIP Agent of any Event of Default shall be deemed a continuing waiver.  No delay by any DIP Lender or any DIP Agent shall constitute a waiver, election, or acquiescence by it.

Section 9.03    [Reserved].

Section 9.04    [Reserved].

Section 9.05    [Reserved].

Section 9.06    [Reserved].

-100-

Section 9.07  Deficiency.  Each Loan Party shall remain liable for any deficiency if the proceeds of any sale or other disposition of any DIP Collateral are insufficient to pay the DIP Obligations and the fees and disbursements of any attorney employed by the DIP Agents or any other Secured Party to collect such deficiency.

## ARTICLE X

## DIP AGENTS

Section 10.01  Appointment.  Each DIP Lender (and each subsequent maker of any DIP Loan by its making thereof) hereby irrevocably appoints and authorizes the Administrative Agent and the Collateral Agent to perform the duties of each such DIP Agent as set forth in this Agreement including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the DIP Loan outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to such DIP Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by such DIP Agent and not required to be delivered to each DIP Lender pursuant to the terms of this Agreement, provided that the DIP Agents shall not have any liability to the DIP Lenders for any DIP Agent's inadvertent failure to distribute any such notices or agreements to the DIP Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the DIP Obligations, the DIP Loan, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the DIP Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other DIP Loan Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Loan Parties, the DIP Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such DIP Agent of the rights and remedies specifically authorized to be exercised by such DIP Agent by the terms of this Agreement or any other DIP Loan Document; (vi) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other DIP Loan Document; and (vii) subject to Section 10.03 of this Agreement, to take such action as such DIP Agent deems appropriate on its behalf to administer the DIP Loan and the DIP Loan Documents and to exercise such other powers delegated to such DIP Agent by the terms hereof or the other DIP Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.  As to any matters not expressly provided for by this Agreement and the other DIP Loan Documents (including, without limitation, enforcement or collection of the DIP Loan), the DIP Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required DIP Lenders, and such instructions

-101-

of the Required DIP Lenders shall be binding upon all Lenders and all makers of the DIP Loan; provided, however, that the DIP Agents shall not be required to take any action which, in the reasonable opinion of any DIP Agent, exposes such DIP Agent to liability or which is contrary to this Agreement or any other DIP Loan Document or applicable law.

Section 10.02 <u>Nature of Duties; Delegation</u>.  (a) The DIP Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other DIP Loan Documents.  The duties of the DIP Agents shall be mechanical and administrative in nature.  The DIP Agents shall not have by reason of this Agreement or any other DIP Loan Document a fiduciary relationship in respect of any DIP Lender.  Nothing in this Agreement or any other DIP Loan Document, express or implied, is intended to or shall be construed to impose upon the DIP Agents any obligations in respect of this Agreement or any other DIP Loan Document except as expressly set forth herein or therein.  Each DIP Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the DIP Loan hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the DIP Collateral, and the DIP Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any DIP Lender with any credit or other information with respect thereto, whether coming into their possession before the Initial DIP Loans hereunder or at any time or times thereafter, provided that, upon the reasonable request of a DIP Lender, each DIP Agent shall provide to such DIP Lender any documents or reports delivered to such DIP Agent by the Loan Parties pursuant to the terms of this Agreement or any other DIP Loan Document.  If any DIP Agent seeks the consent or approval of the Required DIP Lenders to the taking or refraining from taking any action hereunder, such DIP Agent shall send notice thereof to each DIP Lender and each DIP Lender shall promptly respond thereto.

(b)     Each DIP Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any DIP Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any DIP Lender).  Any such Person shall benefit from this ARTICLE X to the extent provided by the applicable DIP Agent.

Section 10.03 <u>Rights, Exculpation, Etc.</u>  The DIP Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other DIP Loan Documents, except for matters arising directly from their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction (but such exception for gross negligence or willful misconduct shall not apply to actions or omissions that were at the direction or instruction of the Required DIP Lenders).  Without limiting the generality of the foregoing, the DIP Agents (i) may treat the payee of any DIP Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, in accordance with Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any DIP Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or

-102-

representation to any DIP Lender and shall not be responsible to any DIP Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other DIP Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other DIP Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the DIP Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any DIP Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other DIP Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the DIP Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the DIP Agents be responsible or liable to the DIP Lenders for any failure to monitor or maintain any portion of the DIP Collateral. The provisions of this Section 10.03 are subject to, and shall not limit in any respect, the provisions of Section 12.07. The DIP Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any DIP Lender to whom payment was due but not made, shall be to recover from other DIP Lenders any payment in excess of the amount which they are determined to be entitled. The DIP Agents may at any time request instructions from the DIP Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other DIP Loan Documents the DIP Agents are permitted or required to take or to grant, and the DIP Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the DIP Loan Documents until they shall have received such instructions from the Required DIP Lenders. Without limiting the foregoing, no DIP Lender shall have any right of action whatsoever against any DIP Agent as a result of such DIP Agent acting or refraining from acting under this Agreement or any of the other DIP Loan Documents in accordance with the instructions of the Required DIP Lenders.

Section 10.04 <u>Reliance</u>. Each DIP Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other DIP Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05 <u>Indemnification</u>. To the extent that any DIP Agent is not reimbursed and indemnified by any Loan Party, and whether or not such DIP Agent has made demand on any Loan Party for the same, the DIP Lenders will, within five days of written demand by such DIP Agent, reimburse and indemnify such DIP Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such DIP Agent), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such DIP Agent in any way relating to or arising out of this Agreement or any of the other DIP Loan Documents or any action taken or omitted by

-103-

such DIP Agent under this Agreement or any of the other DIP Loan Documents, in proportion to each DIP Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no DIP Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination that such liability resulted from such DIP Agent's gross negligence or willful misconduct. The obligations of the DIP Lenders under this Section 10.05 shall survive the payment in full of the DIP Loan and the other DIP Obligations and the termination of this Agreement.

Section 10.06  <u>DIP Agents Individually</u>.  With respect to its Pro Rata Share of the Total DIP Loan Commitment hereunder and the DIP Loan made by it (if any), each DIP Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other DIP Lender or maker of a DIP Loan. The terms "DIP Lenders" or "Required DIP Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each DIP Agent in its individual capacity as a DIP Lender or one of the Required DIP Lenders. Each DIP Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrower as if it were not acting as a DIP Agent pursuant hereto without any duty to account to the other DIP Lenders.

Section 10.07  <u>Successor DIP Agent</u>.

(a)    Any DIP Agent may at any time give at least thirty (30) Business Days' prior written notice of its resignation to the DIP Lenders and the Borrower, provided that no such notice shall be required in connection with the exercise of the Purchase Option and each of the DIP Lenders and the Borrower shall be deemed to have waived any such notice; provided, further, that concurrently with the consummation of the Purchase Option, the DIP Agent shall resign, effective immediately. Upon receipt of any such notice of resignation, the Required DIP Lenders shall have the right (with the consent of the Borrower, which consent shall not be unreasonably withheld, delayed or conditioned and which consent shall not be required during the continuance of an Event of Default) to appoint a successor DIP Agent, provided, that, in the event of the exercise and consummation of the Purchase Option, the new DIP Lenders thereunder shall have the right to appoint the successor DIP Agent. If no such successor DIP Agent shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within 30 Business Days after the retiring DIP Agent gives notice of its resignation, other than with respect to the consummation of the Purchase Option (or such earlier day as shall be agreed by the Required DIP Lenders) (the "<u>Resignation Effective Date</u>"), then, other than with respect to the Purchase Option, the retiring DIP Agent may (but shall not be obligated to), on behalf of the DIP Lenders, appoint a successor DIP Agent. Whether or not a successor DIP Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    With effect from the Resignation Effective Date, (i) the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other DIP Loan Documents and (ii) all payments, communications and determinations provided to be made by,

-104-

to or through such retiring DIP Agent shall instead be made by or to each DIP Lender directly, until such time, if any, as the Required DIP Lenders appoint a successor DIP Agent as provided for above.  Upon the acceptance of a successor DIP Agent's appointment as DIP Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring DIP Agent, and the retiring DIP Agent shall be discharged from all of its duties and obligations hereunder or under the other DIP Loan Documents.  After the retiring DIP Agent's resignation hereunder and under the other DIP Loan Documents, the provisions of this Article, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring DIP Agent in respect of any actions taken or omitted to be taken by it while the retiring DIP Agent was acting as a DIP Agent.

(c)    On or before the Resignation Effective Date, the Loan Parties shall, or if the Loan Parties shall fail to do so, the DIP Lenders shall (severally, based upon their Pro Rata Shares) pay to the retiring DIP Agent, any fees, expenses or other amounts which have accrued to such retiring DIP Agent as of the Resignation Effective Date (including, without limitation, the reasonable costs and expenses of transferring such DIP Agent's responsibilities hereunder to the successor DIP Agent).

Section 10.08  Collateral Matters.

(a)    Collateral Agent may from time to time make such disbursements and advances ("Collateral Agent Advances"), which amount shall not exceed $500,000 in the aggregate together with any increase of the DIP Loan Commitment, as provided under Section 2.01(d)(i), which the Collateral Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the DIP Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the DIP Loan and other DIP Obligations or to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 12.04.  The Collateral Agent Advances shall be repayable on demand and be secured by the DIP Collateral in the same priorities as set forth in the Orders, and shall bear interest at a rate per annum equal to the rate then applicable pursuant to Section 2.04(a).  The Collateral Agent Advances shall constitute DIP Obligations hereunder which may be charged to the Loan Account in accordance with Section 4.01.  The Collateral Agent shall notify each DIP Lender and the Borrower in writing of each such Collateral Agent Advance, which notice shall include a description of the purpose of such Collateral Agent Advance (and Borrower shall send a copy of each such notice to the Prepetition Term Loan A Agent for distribution to the Prepetition Term Loan A Lenders).  Without limitation to its obligations pursuant to Section 10.05, each DIP Lender agrees that it shall make available to the Collateral Agent, upon the Collateral Agent's demand, in US Dollars in immediately available funds, the amount equal to such DIP Lender's Pro Rata Share of each such Collateral Agent Advance.  If such funds are not made available to the Collateral Agent by such DIP Lender, the Collateral Agent shall be entitled to recover such funds on demand from such DIP Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Collateral Agent, at the Federal Funds Rate for three Business Days and thereafter at the Federal Funds Rate plus 0.50%.

-105-

(b)     The DIP Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any DIP Collateral upon termination of the Total DIP Loan Commitment and payment and satisfaction of all of the DIP Loan and all other DIP Obligations (other than unasserted contingent indemnification obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other DIP Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the DIP Lenders.  Upon request by the Collateral Agent at any time, the DIP Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of DIP Collateral pursuant to this Section 10.08(b).

(c)     Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the DIP Lenders (as set forth in Section 10.08(b)), each DIP Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release DIP Collateral conferred upon the Collateral Agent under Section 10.08(b).  Either without such confirmation (if the Collateral Agent has not requested such confirmation) or upon receipt by the Collateral Agent of such confirmation  (if the Collateral Agent has requested such confirmation)from the DIP Lenders of its authority to release any particular item or types of DIP Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the DIP Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders upon such DIP Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the DIP Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the DIP Collateral retained by any Loan Party.

(d)     Anything contained in any of the DIP Loan Documents to the contrary notwithstanding, the Loan Parties, each DIP Agent and each DIP Lender hereby agree that (i) no DIP Lender shall have any right individually to realize upon any of the DIP Collateral under any DIP Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the DIP Loan Documents may be exercised solely by the Collateral Agent for the benefit of the DIP Lenders in accordance with the terms thereof, (ii) subject to the Orders, in the event of a foreclosure by the Collateral Agent on any of the DIP Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any DIP Lender may be the purchaser of any or all of such DIP Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the DIP Agents and the DIP Lenders (but not any other DIP Agent or any DIP Lender or DIP Lenders in its or their respective individual capacities unless the Required DIP Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the DIP Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under

-106-

the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the DIP Obligations as a credit on account of the purchase price for any DIP Collateral payable by the Collateral Agent at such sale.

(e)      The Collateral Agent shall have no obligation whatsoever to any DIP Lender to assure that the DIP Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other DIP Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other DIP Loan Document, it being understood and agreed that in respect of the DIP Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the DIP Collateral as one of the DIP Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

Section 10.09 <u>Agency for Perfection</u>.   Each DIP Agent and each DIP Lender hereby appoints each other DIP Agent and each other DIP Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the DIP Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each DIP Agent and each DIP Lender hereby acknowledges that it holds possession of or otherwise controls any such DIP Collateral for the benefit of the DIP Agents and the DIP Lenders as secured party.   Should the Administrative Agent or any DIP Lender obtain possession or control of any such DIP Collateral, the Administrative Agent or such DIP Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such DIP Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions.   In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the DIP Collateral and under the DIP Loan Documents.   Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10 <u>No Reliance on any DIP Agent's Customer Identification Program</u>. Each DIP Lender acknowledges and agrees that neither such DIP Lender, nor any of its Affiliates, participants or assignees, may rely on any DIP Agent to carry out such DIP Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121,   as hereafter amended or replaced ("<u>CIP Regulations</u>"), or any other Anti-Terrorism Laws, including any programs involving any of the

-107-

following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the DIP Loan Documents or the transactions hereunder or contemplated hereby:  (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act.  Each DIP Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11  <u>No Third Party Beneficiaries</u>.  The provisions of this Article are solely for the benefit of the DIP Agents and the DIP Lenders, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12  <u>No Fiduciary Relationship</u>.  It is understood and agreed that the use of the term "agent" herein or in any other DIP Loan Document (or any other similar term) with reference to any DIP Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.13  <u>Reports; Confidentiality; Disclaimers</u>.  By becoming a party to this Agreement, each DIP Lender:

(a)    is deemed to have requested that each DIP Agent furnish such DIP Lender, promptly after it becomes available, a copy of each field audit or examination report and each appraisal and valuations report, if any, with respect to the Parent or any of its Subsidiaries (each, a "<u>Report</u>") prepared by or at the request of such DIP Agent, and each DIP Agent shall so furnish each DIP Lender with each such Report,

(b)    expressly agrees and acknowledges that the DIP Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any DIP Agent or other party performing any audit or examination will inspect only specific information regarding the Parent and its Subsidiaries and will rely significantly upon the Parent's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding the Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.19, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold any DIP Agent and any other DIP Lender preparing a Report harmless from any action the indemnifying DIP Lender may take or fail to take or any conclusion the indemnifying DIP Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying DIP Lender has

-108-

made or may make to the Borrower, or the indemnifying DIP Lender's participation in, or the indemnifying DIP Lender's purchase of, a loan or loans of the Borrower, and (ii) to pay and protect, and indemnify, defend and hold any DIP Agent and any other DIP Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by any such DIP Agent and any such other DIP Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying DIP Lender.

Section 10.14 <u>Orders and Intercreditor Agreements</u>.  Each DIP Lender hereby grants to the Collateral Agent all requisite authority to enter into or otherwise become bound by any intercreditor and/or subordination agreements entered into in connection with the Orders and to bind the DIP Lenders thereto by the Collateral Agent's entering into or otherwise becoming bound thereby, and no further consent or approval on the part of any DIP Lender is or will be required in connection with the performance by the Collateral Agent of such intercreditor and/or subordination agreements.

Section 10.15 [Intentionally Omitted].

Section 10.16 <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the DIP Loan and all other DIP Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the DIP Agents and the DIP Lenders (including any claim for the compensation, expenses, disbursements and advances of the DIP Agents and the DIP Lenders and their respective agents and counsel and all other amounts due the DIP Agents and the DIP Lenders hereunder and under the other DIP Loan Documents) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each DIP Agent and each DIP Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the DIP Agents and the DIP Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent hereunder and under the other DIP Loan Documents.

-109-

**ARTICLE XI**

**GUARANTY**

Section 11.01 <u>Guaranty</u>.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all DIP Obligations of the Borrower now or hereafter existing under any DIP Loan Document, whether for principal, interest (including, without limitation, all interest accruing during the Chapter 11 Cases), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrower, being the "<u>Guaranteed DIP Obligations</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the DIP Agents and the DIP Lenders in enforcing any rights under the guaranty set forth in this ARTICLE XI.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed DIP Obligations and would be owed by the Borrower to the DIP Agents and the DIP Lenders under any DIP Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving the Borrower.

Section 11.02 <u>Guaranty Absolute</u>.    Each Guarantor jointly and severally guarantees that the Guaranteed DIP Obligations will be paid strictly in accordance with the terms of the DIP Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the DIP Agents or the DIP Lenders with respect thereto. Each Guarantor agrees that this ARTICLE XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any DIP Agent or any DIP Lender to any DIP Collateral.  The obligations of each Guarantor under this ARTICLE XI are independent of the Guaranteed DIP Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of each Guarantor under this ARTICLE XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any DIP Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed DIP Obligations, or any other amendment or waiver of or any consent to departure from any DIP Loan Document, including, without limitation, any increase in the Guaranteed DIP Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    any taking, exchange, release or non-perfection of any DIP Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed DIP Obligations;

-110-

(d)     the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any DIP Agent or any DIP Lender;

(e)     any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the DIP Agents or the DIP Lenders that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This ARTICLE XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed DIP Obligations is rescinded or must otherwise be returned by the DIP Agents, the DIP Lenders or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Section 11.03 <u>Waiver</u>.    Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed DIP Obligations and this ARTICLE XI and any requirement that the DIP Agents or the DIP Lenders exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any DIP Agent or any DIP Lender to seek payment or recovery of any amounts owed under this ARTICLE XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any DIP Collateral, (iv) any requirement that any DIP Agent or any DIP Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any DIP Collateral, and (v) any other defense available to any Guarantor.    Each Guarantor agrees that the DIP Agents and the DIP Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the DIP Obligations.    Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits.    Each Guarantor hereby waives any right to revoke this ARTICLE XI, and acknowledges that this ARTICLE XI is continuing in nature and applies to all Guaranteed DIP Obligations, whether existing now or in the future.

Section 11.04 <u>Continuing Guaranty; Assignments</u>.    This ARTICLE XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed DIP Obligations (other than indemnification obligations as to which no claim has been made) and all other amounts payable under this ARTICLE XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the DIP Agents and the DIP Lenders and their successors, pledgees, transferees and assigns.    Without limiting the generality of the foregoing clause (c), any DIP Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its DIP

-111-

Loan Commitments or its Loan owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such DIP Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05 <u>Subrogation</u>.    Unless and until all of the Guaranteed DIP Obligations and all other amounts payable under this Article shall have been paid in full in cash and all of the DIP Loan Commitments have been terminated (a) each Guarantor hereby subordinates any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this ARTICLE XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the DIP Agents or the DIP Lenders against any Loan Party or any other guarantor or any DIP Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, and (b) each Guarantor hereby agrees that it shall not exercise any right or remedy, direct or indirect, arising by reason of any performance such Guarantor has or may have as against any Loan Party with respect to the Guaranteed DIP Obligations.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of the DIP Agents and the DIP Lenders and shall forthwith be paid to the DIP Agents and the DIP Lenders to be credited and applied to the Guaranteed DIP Obligations and all other amounts payable under this ARTICLE XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as DIP Collateral for any Guaranteed DIP Obligations or other amounts payable under this ARTICLE XI thereafter arising.  If (i) any Guarantor shall make payment to the DIP Agents and the DIP Lenders of all or any part of the Guaranteed DIP Obligations, (ii) all of the Guaranteed DIP Obligations and all other amounts payable under this ARTICLE XI shall be paid in full in cash and (iii) all DIP Loan Commitments have been terminated, the DIP Agents and the DIP Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed DIP Obligations resulting from such payment by such Guarantor.  Notwithstanding anything to the contrary contained in this <u>Section 11.05</u>, no Guarantor shall exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and shall not proceed or seek recourse against or with respect to any property or asset of, any Loan Party (including after payment in full of the Guaranteed DIP Obligations and any other amounts payable under this Article or after termination of the DIP Loan Commitments) if all or any portion of the DIP Obligations shall have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of such Loan Party whether pursuant to the Security Agreement or otherwise.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01 <u>Notices, Etc</u>.

(a)    <u>Notices Generally.</u>  All notices and other communications provided for hereunder shall be in writing and shall be mailed (certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, if to any Loan Party, at the following address:

> Garden Fresh Restaurant Corp.
> 15822 Bernardo Center Drive, Suite A
> San Diego, California 92127
> Attention:  Chief Executive Officer
> Telephone:  (858) 675-1600 x1002
> email: <u>ceo@gardenfreshcorp.com</u>

> with a copy to:

> Morgan, Lewis & Bockius
> 101 Park Avenue
> New York, New York 10178
> Attention:  Patricia Brennan
> Telephone: (212) 309-6814
> Telecopier: (212) 309-6001
> Email: <u>patricia.brennan@morganlewis.com</u>

> if to the Collateral Agent or the Administrative Agent, to it at the following address:

> Cortland Capital Market Services LLC
> 225 West Washington Street, Suite 2100
> Chicago, IL 60606
> Attention:  Ryan Warren and Legal Department
> Telecopier:  (312) 564-5100
> Email: ryan.warren@cortlandglobal.com and
> legal@cortlandglobal.com

> with copies (which shall not constitute notice) to:

> Holland & Knight LLP
> 131 S. Dearborn Street, 30th Floor
> Chicago, Illinois 60603
> Attention: Joshua M. Spencer
> Telecopier: (312) 578-6666
> Email: <u>Joshua.spencer@hklaw.com</u>

> and;

> Holland & Knight LLP
> 31 West 52nd Street

-113-

NY 76357801v7
NY 76357801v8

New York, NY 10019
Attention: Barbra R. Parlin
Telecopier: (212) 385-9010
Email: barbra.parlin@hklaw.com

and;

Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038
Attention: Jayme Goldstein
Fax: (212) 806-6006
Email: jgoldstein@stroock.com

and:

BP Salad Holdings LLC
1620 26th Street, Suite 6000N
Santa Monica, CA 90404
Attention: Lawrence Goldman, Esq. and Gary Hobart
Telephone: (310) 996-9700
Telecopier: (310) 996-9669

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01. All such notices and other communications shall be effective, (i) if mailed (certified mail, postage prepaid and return receipt requested), when received or 3 days after deposited in the mails, whichever occurs first, (ii) if telecopied, when transmitted and confirmation received, or (iii) if delivered by hand, Federal Express or other reputable overnight courier, upon delivery, except that notices to any DIP Agent pursuant to ARTICLE II shall (x) not be effective until actually received by such DIP Agent, and (y) if not actually received before 12:00 noon (New York City time) on a Business Day, shall not be effective until the next-following Business Day.

    (b)    <u>Electronic Communications</u>.

    (i)    Each DIP Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications. Notices and other communications to the DIP Lenders hereunder may be delivered or furnished by electronic communication (including email and Internet or intranet websites) pursuant to procedures approved by the DIP Agents, <u>provided</u> that the foregoing shall not apply to notices to any DIP Lender pursuant to ARTICLE II if such DIP Lender has notified the DIP Agents that it is incapable of receiving notices under such Article by electronic communication.

-114-

(ii)     Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

Section 12.02 Amendments, Etc. Subject to the Orders, no amendment or waiver of any provision of this Agreement or any other DIP Loan Document, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the DIP Agents and the DIP Lenders or extending an existing Lien over additional property, by the DIP Agents and the Borrower, (y) in the case of any other waiver or consent, by the Administrative Agent and the Required DIP Lenders (or by the Administrative Agent with the consent of the Required DIP Lenders) and (z) in the case of any other amendment, by the Administrative Agent and the Required DIP Lenders (or by the Administrative Agent with the consent of the Required DIP Lenders) and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall:

(i)     increase the DIP Loan Commitment of any DIP Lender, reduce the principal of, or interest on, the DIP Loan payable to any DIP Lender, reduce the amount of any fee payable for the account of any DIP Lender, or postpone or extend any scheduled date fixed for any payment (but not any prepayment) of principal of, or interest or fees on, the DIP Loan payable to any DIP Lender, in each case, without the written consent of such DIP Lender (except (1) in connection with the waiver of default rate interest (which shall be effective with the consent of the Required DIP Lenders) and (2) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the stated rate of interest or a reduction of fees for purposes of this clause (i));

(ii)     change the percentage of the DIP Loan Commitments or of the aggregate unpaid principal amount of the DIP Loan that is required for the DIP Lenders or any of them to take any action hereunder without the written consent of each DIP Lender directly affected thereby;

-115-

NY 76357801v7
NY 76357801v8

(iii)    amend the definition of "Required DIP Lenders" or "Pro Rata Share" without the written consent of each DIP Lender;

(iv)    release all or a substantial portion of the DIP Collateral (except as otherwise provided in the Orders, this Agreement and the other DIP Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the DIP Agents and the DIP Lenders, or release the Borrower or all or substantially all of the Guarantors, in each case, without the written consent of each DIP Lender; or

(v)    amend, modify or waive Section 4.03 or this Section 12.02 of this Agreement without the written consent of each DIP Lender.

Notwithstanding the foregoing:

(A) no amendment, waiver or consent shall, unless in writing and signed by a DIP Agent, affect the rights or duties of such DIP Agent (but not in its capacity as a DIP Lender) under this Agreement or the other DIP Loan Documents;

(B) (i) no term (including any defined term) or provision under the DIP Loan Documents the breach of which would constitute a TLA Event of Default, may be amended or otherwise modified (including by waiver or consent), by any DIP Agent, any of the DIP Lenders and/or any of the Loan Parties, in each case under this clause (i) without the prior written consent of the Prepetition Term Loan A Agent, the Prepetition Term Loan A Required Lenders or the Prepetition Term Loan A Lenders, as applicable, and (ii) none of the DIP Agents or the DIP Lenders may forbear with respect to, or waive (including by consent), any TLA Event of Default or any term (including any defined term) or provision which if breached would constitute a TLA Event of Default, in each case, under this clause (ii), without the prior written consent of the Prepetition Term Loan A Agent, Prepetition Term Loan A Required Lenders or the Prepetition Term Loan A Lenders, as applicable; and

(C) upon the occurrence and during the continuance of an Event of Default, the consent of the Borrower shall not be required to change any order of priority set forth in Section 2.05(d) and Section 4.03.

(b)    If any action to be taken by the DIP Agents or DIP Lenders hereunder requires the consent, authorization, or agreement of the Required DIP Lenders, all of the DIP Lenders or any DIP Lender affected thereby, and a DIP Lender other than a BP Party (the "Holdout Lender") fails to give its consent, authorization, or agreement (and the Borrower and all other Required DIP Lenders, Lenders, or DIP Lenders affected thereby, as applicable, have given their consent, authorization, or agreement), then BP, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "Replacement DIP Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. A Replacement DIP Lender may be BP or any

-116-

Person selected by BP; provided, that if any Person proposed as Replacement DIP Lender by BP is not (i) a BP Party or (ii) an existing Lender, then the Borrower's consent shall be required (not to be unreasonably withheld, conditioned or delayed). Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date such notice is given. Prior to the effective date of such replacement, the Holdout Lender and each Replacement DIP Lender shall execute and deliver to Administrative Agent an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever; provided, if the consent, authorization or agreement it has failed to give would have directly resulted in a decrease in pricing in respect of the DIP Obligations, then such Holdout Lender shall be repaid its share of the outstanding Obligations calculated as if this Agreement was terminated and all DIP Obligations were paid in full as a result of a voluntary prepayment on the effective date of such replacement. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered to Administrative Agent such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 12.07(b).

(c)    If any amendment or modification to any of the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents or the Sponsor Subordinated Debt Documents amends or modifies any covenant (including any financial covenant) or event of default contained in any such document (or any related definitions), in each case, in a manner that is more restrictive than the applicable provisions permit as of the date thereof, or if any amendment or modification to the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents or the Sponsor Subordinated Debt Documents adds an additional covenant or event of default therein, the Borrower acknowledges and agrees that this Agreement or the other DIP Loan Documents, as the case may be, shall be automatically amended or modified to affect similar amendments or modifications reflecting existing cushions with respect to this Agreement or such other DIP Loan Documents, without the need for any further action or consent by the Borrower or any other party. In furtherance of the foregoing, the Borrower shall permit the DIP Agents and DIP Lenders to document each such similar amendment or modification to this Agreement or such other DIP Loan Document or insert a corresponding new covenant or event of default in this Agreement or such other DIP Loan Document without any need for any further action or consent by the Borrower. Nothing contained in this Section shall be deemed to permit the Loan Parties, the Prepetition Term Loan A Agent, the Prepetition Term Loan A Lenders, the Prepetition Term Loan B Agent, the Prepetition Term Loan B Lenders, the Prepetition Term Loan C Agent, the Prepetition Term Loan C Lenders, the Prepetition Term Loan D Agent, the Prepetition Term Loan D Lenders, the Sponsor Subordinated Debt Agent or the holders of the Sponsor Subordinated Debt to amend or otherwise modify any provision of, as applicable, the Prepetition Term Loan A Loan Documents, the Prepetition Term Loan B Loan Documents, the Prepetition Term Loan C Loan Documents, the Prepetition Term Loan D Loan Documents or the Subordinated Debt Loan Documents, as applicable, except as otherwise expressly permitted by the Orders, the intercreditor agreements applicable thereto (as in effect on the Closing Date and on the date thereof) or the Subordination Agreement, as applicable.

-117-

Section 12.03 <u>No Waiver; Remedies, Etc.</u>  No failure on the part of any DIP Agent or any DIP Lender to exercise, and no delay in exercising, any right hereunder or under any other DIP Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any DIP Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the DIP Agents and the DIP Lenders provided herein and in the other DIP Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the DIP Agents and the DIP Lenders under any DIP Loan Document against any party thereto are not conditional or contingent on any attempt by the DIP Agents and the DIP Lenders to exercise any of their rights under any other DIP Loan Document against such party or against any other Person.

Section 12.04 <u>Expenses; Taxes; Attorneys' Fees.</u>  The Borrower will pay on demand, all costs and expenses incurred by or on behalf of each DIP Agent (and, in the case of clauses (c) through (n) below, each DIP Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable fees, costs, client charges and expenses of counsel for each DIP Agent (and, in the case of clauses (c) through (n) below, each DIP Lender), accounting, due diligence, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of DIP Collateral, the rating of the DIP Loan, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other DIP Loan Documents (including, without limitation, the preparation of any additional DIP Loan Documents pursuant to Section 7.01(b) or the review of any of the agreements, instruments and documents referred to in Section 7.01(f)), (b) any syndication of the DIP Loan or DIP Loan Commitments, (c) any requested amendments, waivers or consents to this Agreement or the other DIP Loan Documents whether or not such documents become effective or are given, (d) the preservation and protection of the DIP Agents' or any of the DIP Lenders' rights under this Agreement or the other DIP Loan Documents, (e) the defense of any claim or action asserted or brought against any DIP Agent or any DIP Lender by any Person that arises from or relates to this Agreement, any other DIP Loan Document, the DIP Agents' or the DIP Lenders' claims against any Loan Party, or any and all matters in connection therewith, (f) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other DIP Loan Document, (g) the filing of any petition, complaint, answer, motion or other pleading by any DIP Agent or any DIP Lender, or the taking of any action in respect of the DIP Collateral or other security, in connection with this Agreement or any other DIP Loan Document, (h) the protection, collection, lease, sale, taking possession of or liquidation of, any DIP Collateral or other security in connection with this Agreement or any other DIP Loan Document, (i) any attempt to enforce any Lien or security interest in any DIP Collateral or other security in connection with this Agreement or any other DIP Loan Document, (j) any attempt to collect from any Loan Party, (k) all liabilities and costs of any DIP Agent or DIP Lender arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources alleged to have resulted from any Release of Hazardous Materials or any harm or injury alleged to have resulted from any Release of Hazardous Materials on, at, upon, under, from or into such property, (l) any Environmental Action or Environmental Liabilities and Costs, (m) any Remedial Actions

-118-

incurred by DIP Agent or DIP Lender in connection with any Loan Party or assets or properties at any time owned, leased or operated by any Loan Party, or (n) any Environmental Liabilities and Costs incurred by DIP Agent or DIP Lender in connection with any Environmental Lien upon any property owned, leased or operated by any Loan Party; provided, however, that the Borrower shall not be obligated to any DIP Agent or DIP Lender for any of clauses (e) through (n) above to the extent the amount claimed thereunder was caused by the gross negligence, bad faith or willful misconduct of the Person requesting payment of such costs and expenses, or (o) the receipt by any DIP Agent or any DIP Lender of any advice from professionals with respect to any of the foregoing for which indemnification or reimbursement is otherwise available.    Without limitation of the foregoing or any other provision of any DIP Loan Document: (x) the Borrower agrees to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other DIP Loan Documents, and (y) if the Borrower fails to perform any covenant or agreement contained herein or in any other DIP Loan Document, any DIP Agent may itself perform or cause performance of such covenant or agreement, and the expenses of such DIP Agent incurred in connection therewith shall be reimbursed on demand by the Borrower.

Section 12.05  Right of Set-off.  Upon the occurrence and during the continuance of any Event of Default and provided that the Prepetition Term Loan A Obligations have been indefeasibly repaid in full in cash, any DIP Agent or any DIP Lender may, and is hereby authorized to, at any time and from time to time, to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding (a) accounts specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's employees and (b) trust or tax withholding accounts) at any time held and other Indebtedness at any time owing by such DIP Agent or such DIP Lender to or for the credit or the account of any Loan Party against any and all DIP Obligations of the Loan Parties then due and payable under any DIP Loan Document, irrespective of whether or not such DIP Agent or such DIP Lender shall have made any demand hereunder.  The rights of the DIP Agents and the DIP Lenders under this Section 12.05 are in addition to the other rights and remedies (including other rights of set-off) which the DIP Agents and the DIP Lenders may have under this Agreement or any other DIP Loan Documents of law or otherwise.

Section 12.06  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07  Assignments and Participations.

(a)    This Agreement and the other DIP Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each DIP Agent and each DIP Lender and their respective successors and assigns; provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other DIP Loan Documents without the prior written consent of each DIP Lender and, for so long as the Prepetition Term Loan A Obligations have not been indefeasibly repaid in full in cash, the Prepetition Term Loan A Lenders, and any

-119-

such assignment without the DIP Lenders' and the Prepetition Term Loan A Lenders' prior written consent shall be null and void.

(b)    Each DIP Lender may assign to one or more other DIP Lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of the DIP Loan made by it; provided, however, that (i) such assignment is in an amount which is at least $500,000 or a multiple of $500,000 in excess thereof (or the remainder of such DIP Lender's DIP Loan) (except such minimum amount shall not apply to an assignment by a DIP Lender to (x) a DIP Lender, an Affiliate of such DIP Lender or a Related Fund of such DIP Lender or (y) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $500,000 or a multiple of $500,000 in excess thereof), (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Administrative Agent, for the benefit of the Administrative Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a DIP Lender to a DIP Lender, an Affiliate of such DIP Lender or a Related Fund of such DIP Lender), and (iii) no such assignment shall be made to any Loan Party, the Permitted Holders, the Sponsor Subordinated Debt Agent, the holders of the Sponsor Subordinated Debt or any of their respective Affiliates.  Notwithstanding the foregoing conditions in connection with the Purchase Option the only condition required with respect to such assignment is the execution and delivery to the Collateral Agent (and the Administrative Agent, if applicable) of an Assignment and Acceptance, together with any promissory note subject to such assignment.  The Purchase Option shall be binding on each DIP Lender from time to time party to this Agreement. Upon such execution and delivery and satisfaction of the requirements of Section 12.07(e), from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, (A) the assignee thereunder shall become a "DIP Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning DIP Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning DIP Lender's rights and obligations under this Agreement, such DIP Lender shall cease to be a party hereto).  Notwithstanding anything to the contrary contained in this Section 12.07(b), a DIP Lender may assign any or all of its rights under the DIP Loan Documents to an Affiliate of such DIP Lender or a Related Fund of such DIP Lender without delivering an Assignment and Acceptance to the DIP Agents or to any other Person; provided, however, that (I) the Borrower and the Administrative Agent may continue to deal solely and directly with such assigning DIP Lender until an Assignment and Acceptance has been delivered to the Administrative Agent for recordation on the Register, (II) the Collateral Agent may continue to deal solely and directly with such assigning DIP Lender until receipt by the Administrative Agent of a copy of the fully executed Assignment and Acceptance pursuant to Section 12.07(e), (III) the failure of such assigning DIP Lender to deliver an Assignment and Acceptance to the DIP Agents shall not affect the legality, validity, or binding effect of such assignment, and (IV) an Assignment and Acceptance between the assigning DIP Lender and an Affiliate of such DIP Lender or a Related

-120-

Fund of such DIP Lender shall be effective as of the date specified in such Assignment and Acceptance and recordation on the Related Party Register referred to in the last sentence of Section 12.07(d) below.

(c)     By executing and delivering an Assignment and Acceptance, the assigning DIP Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning DIP Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other DIP Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other DIP Loan Document furnished pursuant hereto; (ii) except as provided in the last sentence of this Section 12.07(c), the assigning DIP Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other DIP Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other DIP Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning DIP Lender, any DIP Agent or any DIP Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other DIP Loan Documents; (v) such assignee appoints and authorizes the DIP Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other DIP Loan Documents as are delegated to the DIP Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other DIP Loan Documents are required to be performed by it as a DIP Lender.

(d)     The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the DIP Lenders and the DIP Loan Commitments of, and the principal amount of each DIP Lender's Pro Rata Share of the DIP Loan (and stated interest thereon) (the "Registered Loans") owing to each DIP Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the DIP Agents and the DIP Lenders may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Agreement and the other DIP Loan Documents. The Register shall be available for inspection by the Borrower and any DIP Lender at any reasonable time and from time to time upon reasonable prior notice. This Section 12.07(d) shall be construed so that the DIP Loan and DIP Loan Commitments are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Internal Revenue Code. In the case of an assignment pursuant to the last sentence of Section 12.07(b) as to which an Assignment and Acceptance is not delivered to the Administrative Agent, the assigning DIP Lender shall, acting solely for this

-121-

purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained, a register (the "<u>Related Party Register</u>") comparable to the Register on behalf of the Borrower. The Related Party Register shall be available for inspection by the Borrower and any DIP Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon receipt by the Administrative Agent of (i) a completed Assignment and Acceptance, (ii) the applicable "know your customer" documentation of the assignee and (iii) the processing and recordation fee referenced in Section 12.07(b) (if applicable), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the DIP Loan subsequent to the effective date of the applicable corresponding assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment to the Administrative Agent), provide to the Administrative Agent a copy of the fully executed Assignment and Acceptance, and immediately provide to the Borrower a copy of the fully executed Assignment and Acceptance.

(f)     A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register or the Related Party Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register or the Related Party Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the DIP Agents shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(g)     In the event that any DIP Lender sells participations in a Registered Loan, such DIP Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "<u>Participant Register</u>"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and any DIP Lender at any reasonable time and from time to time upon reasonable prior notice.

(h)     Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.09(d).

-122-

(i)        Each DIP Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other DIP Loan Documents (including, without limitation, all or a portion of the DIP Loan made by it); provided, that (i) such DIP Lender's obligations under this Agreement and the other DIP Loan Documents shall remain unchanged; (ii) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the DIP Agents and the other DIP Lenders shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations under this Agreement and the other DIP Loan Documents; and (iii) a participant shall not be entitled to require such DIP Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the DIP Loan, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the DIP Loan or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the DIP Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other DIP Loan Document).  The Loan Parties agree that each participant shall be entitled to the benefits of Section 2.09 of this Agreement with respect to its participation in any portion of the DIP Loan as if it was a DIP Lender.

(j)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such DIP Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to such DIP Lender pursuant to securitization or similar credit facility (a "Securitization"); provided that no such pledge or assignment shall release such DIP Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such DIP Lender as a party hereto.  The Loan Parties shall cooperate with such DIP Lender and its Affiliates to effect the Securitization including, without limitation, by providing such information as may be reasonably requested by such DIP Lender in connection with the rating of its DIP Loan or the Securitization.

Section 12.08 Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other DIP Loan Document *mutatis mutandis*.

Section 12.09 GOVERNING LAW.    THE VALIDITY, CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER DIP LOAN DOCUMENT IN RESPECT OF SUCH OTHER DIP LOAN DOCUMENT) AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND

-123-

CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND, AS MAY BE APPLICABLE, THE BANKRUPTCY CODE.

Section 12.10 <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE</u>. EACH OF THE PARTIES HERETO AGREES THAT ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURTS OF THE STATE OF DELAWARE, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE COLLATERAL AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE COLLATERAL AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION 12.10, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER DIP LOAN DOCUMENTS; PROVIDED, THAT NOTHING IN THIS SECTION 12.10 SHALL AFFECT THE RIGHT OF THE DIP AGENTS OR ANY DIP LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW OR COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY OR ANY COLLATERAL IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES, AND DOCUMENTS IN ANY SUIT, ACTION, OR PROCEEDING BROUGHT IN THE UNITED STATES OF AMERICA ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DIP LOAN DOCUMENTS BY THE MAILING (BY REGISTERED MAIL OR CERTIFIED MAIL, POSTAGE PREPAID) OR DELIVERING OF A COPY OF SUCH PROCESS TO SUCH LOAN PARTY C/O THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE DIP AGENTS AND THE DIP LENDERS TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF

-124-

ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS.

Section 12.11 <u>WAIVER OF JURY TRIAL, ETC.</u> EACH LOAN PARTY, EACH DIP AGENT AND EACH DIP LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER DIP LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR THE OTHER DIP LOAN DOCUMENTS, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY DIP AGENT OR ANY DIP LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY DIP AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE DIP AGENTS AND THE DIP LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12 <u>Consent by the DIP Agents, the DIP Lenders, the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders.</u> Except as otherwise expressly set forth herein to the contrary or in any other DIP Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "<u>Action</u>") of any DIP Agent, any DIP Lender, the Prepetition Term Loan A Agent or any Prepetition Term Loan A Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party, to which any DIP Agent or any DIP Lender has succeeded thereto and under which the Prepetition Term Loan A Agent or any Prepetition Term Loan A Lender has been provided any such rights, such Action shall be required to be in writing and may be withheld or denied by such DIP Agent, such DIP Lender, the Prepetition Term Loan A Agent or such Prepetition Term Loan A Lender, in their respective discretion.

Section 12.13 <u>No Party Deemed Drafter.</u> Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14 <u>Reinstatement; Certain Payments.</u> If any claim is ever made upon any DIP Agent or any DIP Lender for repayment or recovery of any amount or amounts received by such DIP Agent or such DIP Lender in payment or on account of any of the DIP Obligations, such DIP Agent or such DIP Lender shall give prompt notice of such claim to each other DIP Agent and DIP Lender and the Borrower, and if such DIP Agent or such DIP Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such DIP Agent or such DIP Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such DIP Agent or such DIP Lender with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding

-125-

upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other DIP Loan Documents or the termination of this Agreement or the other DIP Loan Documents, and (B) it shall be and remain liable to such DIP Agent or such DIP Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such DIP Agent or such DIP Lender. The provisions of this Section shall survive the repayment of the DIP Obligations and release of the Liens granted under the DIP Loan Documents.

Section 12.15  Indemnification; Limitation of Liability for Certain Damages.

(a)    In addition to each Loan Party's other DIP Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each DIP Agent and each DIP Lender and all of their respective Affiliates, officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Closing Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other DIP Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any DIP Agent's or any DIP Lender's furnishing of funds to the Borrower under this Agreement or the other DIP Loan Documents, including, without limitation, the management of any DIP Loan, (iii) the DIP Agents and the DIP Lenders relying on any instructions of the Borrower or the handling of the Loan Account and DIP Collateral of the Borrower as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other DIP Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other DIP Loan Documents, or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence, bad faith or willful misconduct of any Indemnitee or any of its Related Parties, as determined by a final judgment of a court of competent jurisdiction. "Related Parties" shall mean, with respect to any Indemnified Party, such Indemnified Party and each of its officers, directors and employees.

(b)    Without limiting Section 12.15(a) hereof, each Loan Party agrees to, jointly and severally, defend, indemnify, and hold harmless the Indemnitees against any and all (a) Environmental Liabilities and Costs and (b) all other claims, demands, penalties, fines, liability (including strict liability), losses, damages, costs and expenses (including without limitation, reasonable legal fees and expenses, consultant fees and laboratory fees), arising out of (i) any Releases or threatened Releases (x) at any property presently or formerly owned or operated by any Loan Party or any Subsidiary of any Loan Party, or any of their respective predecessors in interest, or (y) of any Hazardous Materials generated and disposed of by any Loan Party or any Subsidiary of any Loan Party, or any of their respective predecessors in interest; (ii) any violations of Environmental Laws by any Loan Party or any Subsidiary; (iii) any

-126-

Environmental Action asserted against any Loan Party or any Subsidiary of any Loan Party; (iv) any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure to Hazardous Materials used, handled, generated, transported or disposed by any Loan Party or any Subsidiary of any Loan Party, or any predecessor in interest; and (v) any breach of any warranty or representation regarding environmental matters made by the Loan Parties in Section 6.01(r) or the breach of any covenant made by the Loan Parties in Section 7.01(j). Notwithstanding the foregoing, the Loan Parties shall not have any obligation to any Indemnitee under this subsection (b) regarding any potential environmental matter covered hereunder which is caused by the bad faith, gross negligence or willful misconduct of any Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(c)     The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 12.15 are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(d)     No party hereto shall assert, and each party hereto hereby waives, any claim based on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any DIP Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each party hereto hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(e)     The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the DIP Obligations and discharge of any Liens granted under the DIP Loan Documents.

Section 12.16  Records.  The unpaid principal of and interest on the DIP Loan, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the DIP Loan Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, including, without limitation, the fees set forth in the Fee Letter, shall at all times be ascertained from the records of the DIP Agents, which shall be conclusive and binding absent manifest error.

Section 12.17  Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, each DIP Agent and each DIP Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the DIP Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each DIP Agent and each DIP Lender, and their respective successors and assigns, except

-127-

that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each DIP Agent and each DIP Lender, and any assignment by any DIP Lender shall be governed by Section 12.07 hereof.

Section 12.18 <u>Interest</u>. It is the intention of the parties hereto that each DIP Agent and each DIP Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other DIP Loan Document would be usurious as to any DIP Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such DIP Agent or such DIP Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other DIP Loan Document or any agreement entered into in connection with or as security for the DIP Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any DIP Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by such DIP Agent or such DIP Lender under this Agreement or any other DIP Loan Document or agreements or otherwise in connection with the DIP Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such DIP Agent or such DIP Lender on the principal amount of the DIP Obligations (or, to the extent that the principal amount of the DIP Obligations shall have been or would thereby be paid in full, refunded by such DIP Agent or such DIP Lender, as applicable, to the Borrower); and (ii) in the event that the maturity of the DIP Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any DIP Agent or any DIP Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such DIP Agent or such DIP Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such DIP Agent or such DIP Lender, as applicable, on the principal amount of the DIP Obligations (or, to the extent that the principal amount of the DIP Obligations shall have been or would thereby be paid in full, refunded by such DIP Agent or such DIP Lender to the Borrower).  All sums paid or agreed to be paid to any DIP Agent or any DIP Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such DIP Agent or such DIP Lender, be amortized, prorated, allocated and spread throughout the full term of the DIP Loan until payment in full so that the rate or amount of interest on account of the DIP Loan hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (x) the amount of interest payable to any DIP Agent or any DIP Lender on any date shall be computed at the Highest Lawful Rate applicable to such DIP Agent or such DIP Lender pursuant to this Section 12.18 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such DIP Agent or such DIP Lender would be less than the amount of interest payable to such DIP Agent or such DIP Lender computed at the Highest Lawful Rate applicable to such DIP Agent or such DIP Lender, then the amount of interest payable to such DIP Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such DIP Agent or such DIP Lender until the total amount of interest payable to such DIP Agent or such DIP Lender shall equal the total amount of

-128-

interest which would have been payable to such DIP Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 12.18.

For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrower, on the one hand, and the DIP Agents and the DIP Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the DIP Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19 <u>Confidentiality</u>. Each DIP Agent and each DIP Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other DIP Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), <u>provided</u> that nothing herein shall limit the disclosure by any DIP Agent or any DIP Lender of any such information (i) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, counsel, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization so long as such assignee or participant (or prospective assignee or participant) first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 12.19; (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority; (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor, accountant or any nationally recognized rating agency or otherwise to the extent consisting of general portfolio information that does not identify Loan Parties; (vi) in connection with any litigation to which any DIP Agent or any DIP Lender is a party; (vii) in connection with the exercise of any remedies hereunder or under any other DIP Loan Document or any action or proceeding relating to this Agreement or any other DIP Loan Document or the enforcement of rights hereunder or thereunder; or (viii) with the consent of the Borrower. Each DIP Agent and each DIP Lender agrees that, upon receipt of a request or identification of the requirement for disclosure pursuant to clause (vi) hereof, it will make reasonable efforts to keep the Loan Parties informed of such request or identification.

Section 12.20 <u>Public Disclosure</u>. Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using

-129-

the name of a DIP Agent, any DIP Lender or any of their respective Affiliates or referring to this Agreement or any other DIP Loan Document without the prior written consent of such DIP Agent or such DIP Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such DIP Agent or such DIP Lender before issuing such press release or other public disclosure). Each Loan Party hereby authorizes each DIP Agent and each DIP Lender, after consultation with the Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such DIP Agent or such DIP Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such DIP Agent or such DIP Lender shall deem appropriate.

Section 12.21 <u>Integration</u>. This Agreement, the Orders, the Prepetition Term Loan A/B Intercreditor Agreement, the Prepetition Term Loan C/D Intercreditor Agreement and the other DIP Loan Documents together reflect the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.22 <u>USA Patriot Act</u>. Each DIP Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrower, which information includes the name and address of each such entity and other information that will allow such DIP Lender to identify the entities composing the Borrower in accordance with the USA PATRIOT Act. Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any DIP Lender may reasonably require from time to time in order to enable such DIP Lender to comply with the USA PATRIOT Act.

Section 12.23 <u>Orders and Other Agreements</u>. Notwithstanding anything to the contrary herein or in any of the DIP Loan Documents, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of the Orders and the Prepetition Term Loan A/B Intercreditor Agreement, which, among other things, set out the priority, with respect to the DIP Collateral, as between, on the one hand, the Prepetition Term Loan A Agent and the Prepetition Term Loan A Lenders, and, on the other hand, the DIP Agents and the DIP Lenders. In the event of a conflict between (a) the terms of the Orders and this Agreement, the terms of the Orders shall govern and control and (b) the Prepetition Term Loan A/B Intercreditor Agreement and the Orders, the Orders shall govern and control.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

NY 76357801v7
NY 76357801v8

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

<u>BORROWER</u>:

GARDEN FRESH RESTAURANT CORP.

By: _____
     Name:
     Title:

<u>GUARANTORS</u>:

GARDEN FRESH HOLDINGS, INC.

By: _____
     Name:
     Title:

GF HOLDINGS, INC.

By: _____
     Name:
     Title:

GARDEN FRESH PROMOTIONS, LLC

By: _____
     Name:
     Title:

GARDEN FRESH INTERMEDIATE HOLDING, LLC

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

<u>COLLATERAL AGENT</u>:

CORTLAND CAPITAL MARKET SERVICES LLC

By: _____

       Name:
       Title:

<u>ADMINISTRATIVE AGENT</u>:

CORTLAND CAPITAL MARKET SERVICES LLC

By: _____

       Name:
       Title

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

DIP LENDERS:

BP SALAD HOLDINGS LP,
as DIP Lender

By:_____
Name:
Title:

<u>SCHEDULE 1.01(A)</u>

**DIP LENDERS AND DIP LOAN COMMITMENTS**

| DIP Lender | DIP Loan Commitment |
|---|---|
| BP SALAD HOLDINGS LP | $3,500,000.00 |
| TOTAL: | **$3,500,000.00** |

## EXHIBIT B

**BUDGET**

01:19353964.1

162770.1 NY 76364344
NY 76364437

**Garden Fresh | DIP Budget**

| ($ in thousands) Week Ending Sunday | Week 1 9-Oct | Week 2 16-Oct | Week 3 23-Oct | Week 4 30-Oct | Week 5 6-Nov | Week 6 13-Nov | Week 7 20-Nov | Week 8 27-Nov | Week 9 4-Dec | Post Close Thereafter |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | $5,122 | $5,047 | $4,856 | $4,577 | $5,256 | $4,864 | $6,095 | $5,538 | $5,125 | - |
| Disbursements: | | | | | | | | | | |
| Food and Operating | 1,281 | 1,746 | 1,445 | 1,346 | 1,491 | 1,741 | 1,791 | 1,519 | 1,732 | - |
| Payroll, Rent, Utilities and Other | 2,505 | 2,987 | 2,103 | 4,147 | 4,025 | 2,961 | 2,077 | 3,756 | 4,154 | - |
| Insurance Related | 734 | 30 | 30 | 30 | 600 | 30 | 30 | 30 | 600 | - |
| Capital Expenditures | 110 | 110 | 110 | 135 | 135 | 135 | 135 | 135 | 135 | - |
| Interest | 931 | - | - | - | 724 | - | - | - | 724 | - |
| Debtors Professionals | - | - | - | - | - | 420 | - | - | - | 890 |
| UCC Professionals | - | - | - | - | - | 50 | - | - | - | 75 |
| Other Professionals and Bankruptcy Expenses | 309 | - | 600 | - | 65 | 250 | - | - | 65 | 365 |
| **Total Disbursements** | 5,869 | 4,873 | 4,289 | 5,658 | 7,040 | 5,587 | 4,033 | 5,440 | 7,411 | 1,330 |
| **Net Change in Cash** | (747) | 174 | 567 | (1,081) | (1,784) | (723) | 2,062 | 98 | (2,286) | (1,330) |
| Cash Balance - Beginning | 1,736 | 1,989 | 2,163 | 2,729 | 1,648 | 1,864 | 1,141 | 3,203 | 3,301 | 1,016 |
| Net Cash Flow | (747) | 174 | 567 | (1,081) | (1,784) | (723) | 2,062 | 98 | (2,286) | (1,330) |
| DIP Draw | 1,000 | - | - | - | 2,000 | - | - | - | - | 500 |
| **Cash Balance - Ending** | $1,989 | $2,163 | $2,729 | $1,648 | $1,864 | $1,141 | $3,203 | $3,301 | $1,016 | $186 |

1 of 1