# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN FRESH RESTAURANT<br>INTERMEDIATE HOLDING, LLC, *et al.*,[1] | Case No. 16-12174 (CSS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF TERI STRATTON IN SUPPORT OF ENTRY OF ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS AND ENCUMBRANCES; (II) APPROVING THE STALKING HORSE APA; AND (III) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

I, Teri Stratton, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.  I am a managing director of Piper Jaffray & Co. ("PJC")[2]. Pursuant to an Order entered by the Court on November 15, 2016 [Docket No. 352], PJC has been retained as the Debtors' Financial Advisor and Exclusive Agent with respect to the Sale Transaction (defined below).

2.  I hold a Bachelor of Arts degree in Economics from the University of California, Los Angeles and a Masters of Business Administration in Finance, with Honors, from the Anderson School at UCLA. I am a Certified Insolvency and Restructuring Advisor ("CIRA") and am currently a CIRA course instructor. I am a board member of the Association of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Garden Fresh Restaurant Intermediate Holding, LLC (7513); Garden Fresh Holdings, Inc. (8804); GF Holdings, Inc. (8783); Garden Fresh Restaurant Corp. (8786); and Garden Fresh Promotions, LLC (1376). The location of the Debtors' corporate headquarters is 15822 Bernardo Center Drive Suite A, San Diego, California 92127.

[2] All capitalized terms not defined herein shall have the meaning ascribed in the Motion or in the Bid Procedures Order (each of which is defined below).

Insolvency and Restructuring Advisors and head of the Committee on Investment Banking, a member of the Board of Trustees of the Turnaround Management Association, and a member of the American Bankruptcy Institute. I regularly speak on a variety of investment banking and bankruptcy topics at industry conferences.

3. I have been an investment banker specializing in serving distressed and stressed clients for 17 years. Prior to my investment banking career, I served in the special assets group of California Bank & Trust. In that capacity, I played an integral role in the assessment, valuation, and management of various distressed loans. In the course of my employment, I have served a number of reorganization, workout, and bankruptcy clients in several industries across the United States, and I have extensive experience in structuring transactions and conducting merger and acquisition processes in the distressed environment. Some in- and out-of-court restructurings and M&A assignments in which I have been involved include Rotary Drilling Tools, Malibu Lighting Corporation, Golden County Foods, Inc., Mi Pueblo Holdings, LLC, Chef Solutions, Inc., Claim Jumper Restaurants, LLC, Brown & Cole Stores LLC, Larry's Markets, Select Snacks, Sun World International, Inc., CFP Holdings, Inc., Hoop Retail, Inc., Mercury Plastics, Edwards Theaters, and JELD-WEN, Inc.

4. The facts set forth in this declaration ("Declaration") are based upon my personal knowledge, information and belief, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors, and upon information supplied to me by the Debtors' management and advisors. If called as a witness, I could and would testify competently to the facts set forth herein.

5. I submit this Declaration in connection with the *Debtors' Motion for Orders (A)(I) Authorizing and Approving Bid Procedures; (II) Authorizing and Approving the Debtors'*

*Entry into the Stalking Horse APA; (III) Approving Notice Procedures; (IV) Scheduling a Sale Hearing; and (V) Approving Procedures for Assumption and Assignment and Determining Cure Amounts and (B)(I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances; (II) Approving the Stalking Horse APA; and (III) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 103] (the "Motion").

6. The Debtors seek approval of a proposed sale (the "Sale Transaction") of substantially all of the assets of the Debtors (the "Purchased Assets") to GFRC Holdings LLC (f/k/a GFRC Acquisition LLC) (together with its direct and indirect subsidiaries, Garden Fresh Restaurants LLC and GFRC Promotions LLC, "GFRC") pursuant to the terms of that certain Asset Purchase Agreement dated November 14, 2016 (as amended, supplemented, or otherwise modified from time to time, including all Exhibits, Schedules, and Appendices thereto) [Docket No. 347] (the "GFRC APA"), by and among the Debtors and GFRC. GFRC is an affiliate of the TLA Lenders, who, since the execution of the GFRC APA, are also the Debtors' DIP Lenders.

7. I support the Debtors' request for approval of the Sale Transaction and entry of the Sale Order because I believe that: (i) the Purchased Assets were fairly and thoroughly marketed both before and after the Petition Date, in accordance with this Court's *Order (A)(I) Authorizing and Approving Bid Procedures; (II) Authorizing and Approving the Debtors' Entry into the Stalking Horse APA; (III) Approving Notice Procedures; (IV) Scheduling a Sale Hearing; and (V) Approving Procedures for Assumption and Assignment and Determining Cure Amounts* [Docket No. 354] (the "Bid Procedures Order"); and (ii) the proposed Sale Transaction represents the highest and best offer reasonably available for the Purchased Assets and maximizes value for the Debtors' estates. Among other things, the proposed Sale Transaction, in

conjunction with the Court's previous approval of the Debtors' post-petition financing, will permit all reasonably anticipated administrative expenses to be paid in full, or otherwise assumed or satisfied by GFRC.

8. Beginning in February 2016, as directed by the Debtors' Board of Directors, PJC contacted parties to determine their interest in an acquisition of the Purchased Assets. Specifically, PJC contacted 215 potential bidders, representing both financial and strategic potential buyers. Of these contacted bidders, 173 either reviewed a teaser document or participated in high-level discussions about the transaction, and 76 of these entities ultimately negotiated confidentiality agreements and were provided a Confidential Information Memorandum about the Debtors' business. Interested parties were asked to participate in an initial discussion with PJC to learn more about the purchase opportunity and the Debtors' business. Parties who demonstrated sufficient interest in the transaction were then given access to further due diligence information via a package of detailed financial information.

9. In April 2016, four parties provided oral or written indications of interest and were invited to more detailed diligence discussions and presentations with the Debtors' management. Two parties elected at this stage to move forward and participate in follow up discussions, attend management presentations and review a virtual data room. These parties were then asked to provide written letters of intent for the Board of Directors to consider by early June. By early June 2016, however, PJC had received no letters of intent, and all the parties who remained in the process ultimately declined to submit any bid.

10. Beginning in March 2016, PJC, working together with the Debtors' counsel and advisors to certain of the Prepetition Secured Parties, began searching for alternative capital for an out-of-court restructuring that would provide liquidity while enabling the TLC and TLD

Lenders to remain in the capital structure. Unfortunately, the Debtors received no offers for such an alternative. Certain of the Prepetition Secured Parties did identify a potential equity investor, and the Debtors executed a letter of intent at the direction of their Board of Directors, in July 2016. The potential equity investor conducted detailed due diligence and held meetings with management, but in August 2016, decided <u>not</u> to pursue any transaction.

11. After the potential equity investor declined to move forward with an offer, and with no pending offers (and a looming liquidity crisis), the Debtors began negotiations with certain of their TLB Lenders (the "<u>TLB Purchaser</u>"), who expressed interest in submitting a bid for the sale of the Purchased Assets. After extensive negotiations, the Debtors and the TLB Purchaser entered into a Restructuring Support Agreement, under which the TLB Purchaser would serve as a stalking horse for the Purchased Assets and, if ultimately the successful purchaser under the terms of the proposed Bid Procedures, would acquire the Purchased Assets and certain of the Debtors' liabilities subject to certain conditions precedent.

12. The TLB Purchaser ultimately determined not to proceed with the purchase of the Purchased Assets. Accordingly, on November 14, 2016, following discussions between the Debtors, the TLB Purchaser, the TLA Lenders and the TLA Agent, the parties agreed to the termination of the Stalking Horse Purchase Agreement, in accordance with section 3.4(a) thereof. Because of the concern that the TLB Purchaser would terminate the Stalking Horse Purchase Agreement, the Debtors had been conducting negotiations with the TLA Lenders regarding their interest in purchasing the Purchased Assets for several weeks. After extensive negotiations, conducted in good faith with all parties represented by counsel, the Debtors and GFRC, an affiliate of the TLA Lenders, reached agreement on the terms of GFRC APA.

13. On November 15, 2015, the Court entered the Bid Procedures Order approving, among other things, the Bid Procedures.

14. Subsequent to the entry of the Bid Procedures Order, PJC reached out to the potential purchasers that PJC had contacted and/or worked with prior to the Petition Date, providing each a copy of the Bid Procedures Order and the approved Bid Procedures, and inviting such parties to reach out to PJC to continue to discuss the acquisition of the Purchased Assets. As a result of these continued efforts, 27 parties conducted post-petition due diligence on the Purchased Assets, and nine of these parties participated in visits to the Debtors' facilities and discussions with the Debtors' management and advisors. One potentially interested party, an affiliate of Real Mex Restaurants (the "Potential Overbidder"), remained engaged throughout the entirety of the post-petition marketing process. Indeed, the Potential Overbidder performed extensive diligence, consulted with the Debtors' management, visited the Debtors' facilities, participated in teleconferences with the Debtors' professionals and Committee counsel, and prepared and served an adequate assurance package.

15. In an effort to conduct the marketing process in the most comprehensive manner practicable, the Debtors, in accordance with the Bid Procedures, and with the consent of the TLA Agent, the TLA Lenders and GFRC, extended the Bid Deadline on several occasions, from an initial deadline of December 6, 2016 to December 29, 2016. *See* Docket Nos. 418, 420, 446 and 464. Ultimately, however, neither the Potential Overbidder nor any other potentially interested party submitted any bid for the Purchased Assets. On December 29, 2016, following the deadline for potential bidders to submit Qualified Bids, the Debtors filed a notice with the Court certifying that no Qualified Bids other than that of GFRC had been received before the Bid

Deadline, that the Auction was cancelled, and that GFRC was the Successful Bidder and the GFRC APA was the Successful Bid.  *See* Docket No. 486.

16. During the marketing and sale process, PJC remained in constant communication with the Debtors and their counsel regarding, among other things, the marketing and sale process, and PJC assisted the Debtors regarding the decisions that were made with respect thereto.  PJC also conducted in-person and telephonic meetings with the professionals and members of the Committee, including Province, Inc., regarding, among other things, the sale process, and provided the Committee's professionals with regular updates.

17. The Debtors conducted the sale process in accordance with, and have otherwise complied in all respects with, the Bid Procedures Order and the Bid Procedures.  I believe that the sale process established by the Bid Procedures Order and Bid Procedures afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.  Neither GFRC nor any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an insider of the Debtors. I am familiar with Sections 363(m) and (n) of the Bankruptcy Code, and as the primary point person responsible for dealing with all potential bidders, I am not aware of any basis to allege any wrongdoing or collusion or bad faith by any party.  I believe that the sale process has had the intended effect of maximizing the value of the Purchased Assets for the benefit of all of the Debtors' stakeholders, and I do not believe that any further sale or marketing process would generate additional interest in the Purchased Assets.  Therefore, I believe that the sale terms proposed in the GFRC APA represent the highest and best possible return to the estates on account of the Purchased Assets.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my information, knowledge and belief.

Dated: January 5, 2017
Los Angeles, California

*/s/ Teri Stratton*
Teri Stratton
Managing Director
Piper Jaffray & Co
2321 Rosecrans Avenue, Suite 3200
El Segundo, CA 90245